UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(West Palm Beach Division)

Case Number: _____

KEVIN HARRELL,

     Plaintiff,

vs.

CITY OF WEST PALM BEACH, a
Florida municipal corporation;
BRIAN GELLIN, individually; SCOTT
LALLY, individually, and MICHAEL
OSWALD, individually,

     Defendants.

_____/

## Complaint for Damages and Injunctive Relief

### COUNT I:
### Title VII Claim for Hostile-Environment and Tangible-Job-Detriment Race Discrimination

Plaintiff, Kevin Harrell, sues defendants, City of West Palm Beach;

Brian Gellin, individually; Scott Lally, individually, and Michael Oswald,

individually, and alleges:

### Introduction and Summary

1.    This is an action by Kevin Harrell, a Black master police officer

("MPO") for the City of West Palm Beach Police Department—derogatorily

**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL  33301 ● 954.462.1983

nicknamed "Midnight" by white supervisors because of his dark complexion—who was:

      a.     ridiculed repeatedly because of his race, including during roll calls and over the police radio;

      b.     routinely denied backup on police calls by younger, white officers;

      c.     ignored by sergeants to whom he constantly complained about such basic officer-safety behavior as back-up non-responses by younger, white patrol officers;

      d.     physically attacked by a uniformed, armed white sergeant while both were on duty—witnessed by a Black detective who testified truthfully to Internal Affairs and three white patrol officers, who were standing within feet of MPO Harrell and the sergeant but who testified they saw nothing; Internal Affairs issued the sergeant a written reprimand for conduct—battery on a law enforcement officer—that constitutes a felony under Florida law;

      e.     made into a pariah amongst white police officers by, <u>inter alia</u>, a sergeant who spread false rumors that MPO Harrell was taking photographs of police officers sleeping in their cars and turning them over to management—and the lieutenant who allowed the sergeant to do so;

       f.     deprived of his badge, gun and police powers for some six months in 2020 after a white sergeant and a white lieutenant herded him into an irregular fitness-for-duty examination based largely on damning, but untrue, letters the sergeant solicited from the younger, white squad members about whose officer-safety behaviors MPO Harrell had repeatedly complained and the lieutenant forwarded to higher-ups within the police department and to the human-resources department, which then forwarded them to a fitness-for-duty psychologist;

       g.     upon his return to duty, given lower prestige assignments, i.e., the lobbies of City Hall and the Police Department, as opposed to the Criminal Investigation Division or Road Patrol, and

       h.     falsely accused of sexually harassing behavior by a female Code Enforcement Officer in a scheme orchestrated by the white sergeant who had solicited the fitness-for-duty letters—in a case so flimsy that even the West Palm Beach Police Department's Internal Affairs Unit deemed it to be "unfounded."

     2.     MPO Harrell sues the City for pursuant to the race-discrimination and retaliation provisions of both Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and the Florida Civil Rights Act of 1992 for both facilitating tangible-job-detriment discrimination by supervisors and permitting a racially hostile environment.  He seeks

compensatory damages, injunctive relief and his costs, including reasonable attorneys' fees.

3.      He sues Sgt. Brian Gellin, Sgt. Scott Lally and Lt. Michael Oswald pursuant to 42 U.S.C. § 1983 for violating his clearly established rights against race discrimination by both maintaining a racially hostile environment and:

a.      in the cases of Sgt. Gellin and Lt. Oswald, orchestrating a trumped-up relief from duty, which was a tangible job detriment, and

b.      in the case of Sgt. Lally, engaging in a racially motivated battery that under Florida law is a third degree felony.

*   *   *

MPO Harrell seeks compensatory and punitive damages, as well as attorney's fees and litigation expenses, against each individual defendant, as well as injunctive relief to prevent any further harassment.

## Jurisdiction and Venue

4.      These claims arise under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 and discrimination and retaliation prohibitions of both Title VII of the Civil Rights Act of 1964, as amended, by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Florida Civil Rights Act of 1992, Ch. 760, FLA. STAT. ("FCRA").  This Court has jurisdiction over the federal claims under

28 U.S.C. § 1331.  This Court has supplemental jurisdiction over MPO Harrell's claim under the FCRA, as well as his battery claim against Sgt. Lally, pursuant to 28 U.S.C. § 1367 because those claims are so related to claims over which the Court has federal-question jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.     The claims being sued upon arose in Palm Beach County, Florida, where the defendants at all material times did business.

## Parties

6.     Kevin Harrell was at all material times a Black master police officer employed by the City of West Palm Beach.

7.     Defendant City of West Palm Beach is, and at all times material was, a Florida municipal corporation that operated towards MPO Harrell under color of state law and was an "employer" as defined by 42 U.S.C. § 2000e(b) and § 760.02(7), FLA. STAT.

8.     Brian Gellin was at all times material a police sergeant employed by the City of West Palm Beach who, in supervising MPO Harrell, was acting towards MPO Harrell under color of state law.

9.     Scott Lally was at all times material a police sergeant employed by the City of West Palm Beach who, in supervising MPO Harrell, was acting towards MPO Harrell under color of state law.

10.    Michael Oswald was at all times material a police lieutenant employed by the City of West Palm Beach who, in supervising MPO Harrell, was acting towards MPO Harrell under color of state law.

## General Allegations

*The evidence of racism against which MPO Harrell's fitness-for-duty exam and relief from duty played out*

11.    MPO Harrell has been a West Palm police officer since in or about 2003 and has held the rank of Master Police Officer since October 2019; for the first 17 years of his employment, all of his evaluations were above average.

12.    Within two years of his becoming a police officer, however:

a.    Supervisors, including (more receently) Sgts. Gellin and Lally, began referring to him—including at roll calls and over the police radio—by such racially derogatory names as "Midnight" (the most common one), "Charcoal," "Darkness," "Black Jesus" and the "Malcolm X of the Police Department"; non-Black officers were not similarly denigrated with racially-charged nicknames.

b.    When the dispatcher would announce over the police radio that it was now "midnight," Sgt. Gellin, Sgt. Lally and Officer Anthony Imbessi, among others, would respond:  "Are you trying to raise Officer Harrell?";

c.      Sgt. Gellin—whose racist nature is betrayed by his Instagram rants about former President Barrack Obama, Vice President Camilla Harris and the removal of confederate statutes—would make such remarks as, when he was viewing a video taken that included MPO Harrell: "Open your eyes—I can't see you";

d.      Management's do-nothing awareness of this behavior is illustrated by the way in which Assistant Chief Tamika West, a Black woman who is the commander, dealt with MPO Harrell's July 27, 2020 complaint about Sgt. Gellin's referring to him as "Midnight" during, inter alia, night-shift roll calls: Assistant Chief West took no action other than to tell Sgt. Gellin to stop, but Sgt. Gellin did **_not_** stop referring to MPO Harrell in racial terms.

13.    White supervisors' behavior towards MPO Harrell began to worsen in 2019 and— beginning with Sgt. Lally's battering MPO Harrell while both were on duty and armed (a felony for which the police department neither arrested nor seriously sanctioned Sgt. Lally) and culminating in Sgt. Gellin and Lt. Oswald's orchestrating an irregular fitness-for-duty evaluation in July 2020 done by a psychologist who based his recommendation that MPO Harrell be relieved from duty on, among other things:

a.      a review of eight letters, four of them anonymous, that Sergeant Gellin had solicited from seven younger white and Hispanic

members of MPO Harrell's squad (and the boyfriend of one of the seven who was on another squad) about whose officer-safety behavior MPO Harrell had repeatedly complained to Sgt. Gellin— which letters MPO Harrell had never seen and about the false accusations of which he did not learn until the psychologist, Michael Brannon, Psy.D., confronted him with the accusations, which he denied;

b.      a telephone interview with Sgt. Gellin—about whose racist name-calling MPO Harrell had complained to Assistant Chief West July 27 and about whose rumor-mongering (false allegations that MPO Harrell was taking photographs of police officers asleep in their cars and that he constantly wore a Black Lives Matter ("BLM") COVID mask) he had complained to Deputy Chief Richard Morris July 20;

c.      a telephone interview with Lt. Mike Oswald, who had assisted Sgt. Gellin in gathering the eight letters and forwarding them, whom Dr. Brannon quoted as saying that MPO Harrell "has recently had 'use-of-force' citizen complaints filed against him"—without identifying any such complaints or mentioning that no use-of-force complaint had ever been sustained against MPO Harrell, and

d.      a 38-minute internet-video interview with MPO Harrell.

*Events leading up to MPO Harrell's being relieved of duty*

14.     The initial incident with Sgt. Lally was on December 22, 2019, when he and MPO Harrell were working separate, off-duty details on Clematis Street, the West Palm Beach's night-club district:

      a.     Sgt. Lally walked to the edge of a downtown sidewalk around midnight near the Banko Cantina, where MPO Harrell was working, began staring at MPO Harrell, gripping both hands into fists and biting his lower lip—which MPO Harrell took as an indication that Sgt. Lally wanted to fight;

      b.     Sgt. Gellin, who was on duty as the sergeant for the Entertainment District Unit ("EDU"), was present, but made no attempt to intervene;

      c.     Sgt. Gellin told MPO Harrell that he did not want to make a report about the incident, but did so after MPO Harrell persisted in demanding that he do so;

      d.     Assistant Chief  West asked MPO Harrell how he wanted the complaint handled, to which MPO Harrell responded that he wanted Sgt. Lally to "stay away from me and leave me the fuck alone."

      e.     As will be demonstrated below, Sgt. Lally did neither.

15.     Later that same night, Sgt. Gellin refused, as the EDU sergeant, to respond to request for assistance concerning a nightclub fight in which an

on-duty officer, Charles Rideau, had to put an off-duty officer, Pierre Etienne, into a choke hold to get him and fellow off-duty officer, Darrian Thomas, to cease brawling with fellow patrons.

16.    Sgt. Gellin was transferred from the EDU to night-shift patrol January 20, 2020, following written complaints to the EDU lieutenant by subordinates concerning Sgt. Gellin's attitude and a lack of confidence in his leadership abilities.

17.    Sgt. Lally's armed battery of MPO Harrell occurred on or about April 13, 2020, after MPO Harrell had parked his police cruiser near a pizza restaurant on Dixie Highway and approached a group of police officers that included Sgt. Lally:

a.    Sgt. Lally began criticizing MPO Harrell for his police-radio back-and-forth with a rookie, Officer Pierre Etienne, whom MPO Harrell had perceived as getting overly alarmed during the vehicle pursuit of a suspected drug dealer in which both were involved, to which MPO Harrell responded by telling Sgt. Lally that he had watched Sgt. Lally plant guns and drugs on people for years, that Sgt. Lally was a "dirty cop," and that MPO Harrell was recording the conversation on his body camera;

b.    Sgt. Lally at that point reached for MPO Harrell, grabbed his body camera, pulled it off and threw it on the ground;

c.    MPO Harrell complained to:

          i.      Sgt. Gellin ("Sgt. Lally just put his hands on me. . . . Brian, this guy just battered me"), who did nothing—other than to refuse to report the incident;

          ii.     Lt. Emily Wiggs in Internal Affairs, and

          iii.    Theresa Gordon, West Palm Beach's then Human Resources Officer, who is Black, and who told Internal Affairs that "this guy, [referring to Sgt. Lally], has been doing stuff like this for years."

      d.     During the Internal Affairs investigation, three non-Black police officers—Anthony Imbassi, Martin Warsaw and Ismael Flores—testified that they saw nothing (not withstanding that they were standing in close proximity to both men); Brian McDaniel, a Black detective, confirmed MPO Harrell's account;

      e.     Sgt. Lally was given a written reprimand July 11, 2020, for "conduct towards a subordinate officer," and

      f.     MPO Harrell was given a written reprimand for having parked in a no-parking zone.

### *The final incidents pre-dating MPO Harrell's being relieved of duty*

18.    The final incidents before MPO Harrell was relieved of duty and sent for a fitness-for-duty examination began July 7, 2020,  when MPO Harrell requested Sgt. Gellin's presence at the site of a head-on collision for which a highly-intoxicated woman had been arrested and a supervisor was

needed to document the minimal use of force involved in making the arrest as being appropriate:

a.      Sgt. Gellin told MPO Harrell that, even through he was on duty, he was shopping with his girlfriend and would not come to the scene, ending the conversation by saying "Goodbye, Midnight";

b.      Officer Banko Abreu, a rookie who had responded to the accident with MPO Harrell, handcuffed the intoxicated woman to the gurney of the ambulance, but neither accompanied the ambulance to the hospital so that he could un-handcuff her, nor informed MPO Harrell that he had handcuffed her to the gurney—concerning which Sgt. Gellin wrote up MPO Harrell for failure to communicate with a co-worker;

c.      Officer Nikol Lopez, the night-shift police officer with the most training about making DUI arrests, did not arrive at scene until after an ambulance had taken the driver to the hospital and then, after both she and MPO Harrell had arrived at the hospital, refused to draw blood from the driver to be used as evidence—saying that she had never been trained to do that, although MPO Harrell learned that all DUI training involves learning to draw blood.

19.     MPO Harrell on July 18, 2020 confronted Sgt. Gellin concerning Sgt. Gellin's spreading rumors that:

      a.    MPO Harrell had been taking photographs of police officers asleep in their police cars (which photos existed, but had actually taken by Deputy Chief Richard Morris), and

      b.    MPO Harrell's allegedly wearing a Black Lives Matter COVID mask all the time (he did so once—at a debriefing following a BLM demonstration) was the reason that the police department banned anything other than plain masks.

20.    When Sgt. Gellin denied that he had been spreading rumors, MPO Harrell went to Lts. Kevin Ferrell and Oswald July 19  to set up a meeting with Deputy Chief Morris.

21.    Here is what happened July 20:

      a.    Lt. Oswald informed MPO Harrell at 1:34 p.m. that the meeting with Deputy Chief Morris had been arranged for later that day;

      b.    Sgt. Gelin texted MPO Harrell at 3:30 p.m. that his beat would be changed for 4 p.m. shift from his regular assignment to an area known as a "punishment beat" because of the heavier workload it involves;

      c.    At 4:25 p.m., as the night-shift briefing ended, Officer Dayhanna Rubio, about whose poor performance and officer-safety deficiencies MPO Harrell had complained, shouted as she walked alongside Sgt. Gellin, referring to MPO Harrell: "Where's he going?  To admit he took the pictures?"

d.      Although Sgt. Gellin, when asked to instruct Officer Rubio to stop saying such things about MPO Harrell, said he had not heard it, Lt. Oswald acknowledged as he walked MPO Harrell to the deputy chief's office having heard Officer Rubio's comment.

e.      Although Deputy Chief Morris initially said he thought that MPO Harrell was being a little paranoid, when MPO Harrell explained that he had gotten threats from Sgt. Gellin and other officers and that he was fearful of the what would happen if Deputy Chief Morris did not intervene, Deputy Chief Morris ordered Sgt. Gellin, Sgt. Robert Heisser and Officer Rubio into his conference room, informed them that MPO Harrell was not the officer taking photographs, that MPO Harrell's having one time worn a BLM mask was not why the ban on anything other than plain masks had been put into place and that the deputy chief wanted all such rumors to stop immediately;

f.      Sgt. Gellin began that evening soliciting letters—almost exclusively from police officers concerning whose job performance and officer-safety behavior MPO Harrell had complained about—to support a fitness-for-duty complaint.

22.    When MPO Harrell complained to Lts. Oswald and Ferrell July 30 that Sgt. Gellin was still speaking ill of him and the picture-taking rumors continued and the two lieutenants characterized his complaints as over-emotional and erratic, MPO Harrell asked whether they were attempting to

set him up for a fitness–for–duty examination; both lieutenants denied it—but ordered MPO Harrell to take two weeks off.

23.     The following day, MPO Darrell's first day off, Officer Mike Thomas warned him Sgt. Gelling and various patrol officers were writing letters accusing him of creating a hostile environment; when MPO Darrell advised Lt. Farrell of what he had learned, Lt. Farrell advised him not to answer his phone or text for a couple of days.

24.     During that two weeks, Sgt. Gelling, with assistance from Lt. Oswald, collected and packaged letters that they presented to Assistant Chief West and Human Resources, who forwarded them to Dr. Brannon without permitting MPO Darrell to see (or challenge) them.  The letters were from:

a.     Officer Abreu, the rookie who had handcuffed the drunken arrested to the gurney, who complained, inter alia, that he "faced . . . disciplinary action," which he blamed on "Of. Darrell's attitude towards other officers";

b.      Officer Danielle Goldberg, about whom MPO Darrell had complained to a day-shift sergeant, George (Terry) Golden, who is Black, that she did not respond to calls and created officer-safety issues;

c.     Officer Douglas Bales, who worked on a different squad but was dating Officer Goldberg, whose letter stated in part, "I had noted some

type of animosity by Of. Darrell towards Of. Goldberg and night shift Of. Nicole Lopez. . . .";

d. Officer Lopez, who was among the officers who would fail to back up MPO Darrell on calls, and who wrote, inter alia, that "Officer Darrell has a reputation of going out of his way to get new officers in trouble, which I experienced first-hand";

e. Officer Robert McGivney, a white officer with whom MPO Darrell had historically had differences concerning Officer McGivney's exaggerations in probable-cause affidavits and police reports—particularly ones involving minorities, and with whom MPO Darrell had recently gotten into a confrontation because Officer McGivney and Officer Gregory McDonald, another white police officer, had been spreading the rumor that MPO Darrell was taking photographs of officers asleep in their police cruiser, and had threatened to report them to Lt. Oswald, made a false report of that incident (as summarized below by Dr. Brannon):

> [Field Training Officer ("TO")] R. McGivney reported about an incident that occurred on 07-12-20. It was reported that several officers were together writing reports in the community when Officer Darrell approached them at a high rate of speed in his department vehicle, squealing his tires as he came to stop behind them. He was further reported to have quickly exited his vehicle and he began to take photographs of the other officers on his cellular telephone. He was reported to have stated to TO McGivney, "You want to be part of this IA?" He was reported to have stated to another officer on the scene, "I am formally requesting you to be in Lt. Oswald's office in five minutes." He was reported to have left the area at a high rate of speed while again squealing his tires[,']

TO McGivney's report does not appear to have been subjected to any scrutiny or verification by either police-department management, Human Resources or Dr. Brannon, and

       f.    Sgt. Gelling, who in a cover letter to Lt. Oswald enclosing the other letters (along with three anonymous ones) wrote that "I have **NEVER** seen and heard so many people complain (sworn and civilian) about a single officer. Besides hearing it from other officers, I have witnessed first-hand watching Of. Darrell's use of force videos, civilian complaints, and issues with other supervisors," (emphasis in original) for none of which allegations was any documentation presented.

     25.    On August 12, the day he was before he was to return to work, MPO Darrell checked his schedule—and found that he was not listed; Its. Farrell and Oswald, however, tented him that he was scheduled, and Oswald told him to bring a union representative so that he could go over a month-old citizen's complaint.

     26.    Lt. Oswald advised MPO Darrell August 12 that Assistant Chief West wanted see him and a human-resources employee e-mailed MPO Darrell that he had a fitness-for-duty examination scheduled in two days, which examination Assistant Chief West advised MPO Darrell was triggered by the letters Sgt. Gelling had collected and Lt. Oswald had packaged—which

letters she would not permit him to read, lest (she worried aloud) he confront the writers.

27.    MPO Darrell characterized Dr. Brannon as having "[come] across as very biased], condescending, uninformed and [as someone who] would not provide sufficient time for me to explain exactly what took place and show the information he was not provided by Human Resources or my supervisors"; he quotes Dr. Brannon as remarking "Interesting" when MPO Harrell told the psychologist that he had not be allowed to read the letters that Sgt. Gellin had collected.

28.    Based on such "evidence," Dr. Brannon on August 23, 2020, declared MPO Harrell "not fit for duty," which resulted in Human Resources four days later putting him on light duty and ordering him to undergo counseling assistance at his own expense.

*The aftermath of the fitness for duty report*

29.    MPO Harrell was assigned 90 days of at-home clerical work, i.e., taking reports over the phone and transcribing them on his laptop; neither overtime nor off-duty detail-work was available to him.

30.    Laurence Miller, Ph.D., who had been seeing Officer Harrell intermittently since 2012, disagreed with Dr. Brannon's core conclusion, and on October 15, 2020, reported that

> [MPO Harrell] successfully completed a course of EAP counseling and
> medication management with Marjorie Gillespie, PhD, APRN-C,

PMHNC-BC, MCAP.  Medication management has since been taken over by Uma Choday, MD.  I have consulted with Dr. Gillespie and she opines that Officer Harrell has successfully completed his course of EAP treatment and is currently fit for duty.

31.    Rick King, Esquire, a Police Benevolent Association lawyer, e-mailed City officials November 2, 2020, asking for information related to MPO Harrell's being on light-duty status, and forwarded the findings of Drs. Miller and Gillespie that MPO Harrell was fit for duty and should be returned to full duty.

32.    Two days later, on November 4,  IA personnel showed up at MPO Harrell's door November to collect his badge, guns and identification, and to inform him (without explanation) that he had been changed from light duty to administrative leave with pay.

33.    When Mr. King met with Frank Adderly, West Palm Beach's police chief, and Deputy Chief Morris November 16 to discuss MPO Harrell's return and to ask why his initial complaint was not taken seriously, Deputy Chief Morris stated he did not think that the situation would have gotten as aggressive as it had.

34.    MPO Harrell telephoned Chief Adderly, who is Black, November 18 to ask if they could meet in person; the chief agreed and they met for breakfast the following day.

35.    During the November 19 breakfast, Chief Adderly allowed MPO Harrell to explain what had happened from the start, told MPO Harrell he had

never been advised of either MPO Harrell's complaints or his meeting with Deputy Chief Morris and Assistant Chief Brown, said he would reach out to Dr. Brannon and suggested how MPO Harrell should speak to Dr. Brannon to get a favorable evaluation.

36.    Four days later, Human Resources notified MPO Harrell that he should call Dr. Brannon's office for an appointment, which took place November 27 and resulted in fit-for-duty evaluation—with a caveat that MPO Harrell should not be assigned to work with other police officers.

37.    In a report dated December 3, 2020, Dr. Brannon wrote:

> During the current assessment, the examinee continues to verbalize feelings of resentment towards some of his superiors and co-workers who were involved in his most recent work conflicts. He also perceives his job as a hostile work environment and his superiors as non-responsive to his concerns. For the above-stated reasons, it is the opinion of this examiner that the examinee is Not Fit for Duty for a return to a road patrol setting that requires collaboration with other police officers. If there is an option for the examinee to return to work for his final two years in a role in which he would not be required to regularly interact with other police officers (as suggested by Assistant Chief Tamika West), it is the opinion of this examiner that the examinee would be Fit for Duty for that alternative job assignment.

38.    MPO Harrell was restored to "administrative duty" in the Criminal Investigation Division for 90 days, starting December 10, and following a January 28, 2021 letter requested from Dr. Miller (as opposed to Dr. Brannon) was restored to full duty February 17, 2021:  "It is my opinion that Officer Kevin Harrell is presently psychologically fit to return to duty as a WPBPD police officer."

39.     However, instead of continuing to work as a detective in the Criminal Investigation Division ("CID")—an assignment to which he had been scheduled to move into prior to being put on light duty, and to which he had been told that he would return—MPO Harrell was informed February 12 that he was being removed from CID because, he was told by Assistant Chief Anthony Spatara, of a "patrol shortage."

40.     Instead of patrol, however, Chief Adderly met with MPO Harrell February 17, told him that he was being assigned to City Hall—and dismissively—that MPO Harrell should not "bring any drama over there."

    a.     MPO Harrell responded to the chief that there had been no "drama," but simply actual complaints of a racially hostile environment and race discrimination that neither the police department nor human resources had properly addressed.

    b.     Chief Adderly replied that the human-resources department had been "fucked up" and that the director was guilty of mismanagement.

41.     Although MPO Harrell did not bring any "drama" to the City Hall assignment, Sgt. Gellin did:

    a.     Sgt. Gellin had been taken out of the patrol section and transferred to supervise the civilian Code Enforcement Officers (CEOs), who

are headquartered at City Hall—which assignment he used to resume his harassment of MPO Harrell:

      b.    Sgt. Gellin was observed and overheard by Raymond G. Leung, a then-code enforcement officer, soliciting negative (albeit false) complaints from the code-enforcement squad about MPO Harrell so Sgt. Gellin could "get him the fuck out of City Hall."

      c.    That scheme produced an July 19, 2021 allegation from Cassandre Saint Hailar, a female CEO, that Officer Harrell was acting inappropriately towards her;

      d.    Rather than forward the complaint through the chain of command, i.e., giving it to Lt. Gregory Rideau, a Black officer who at the time was suing West Palm Beach for racial discrimination, Sgt. Gellin forwarded it directly to Human Resources.

      e.    The chief of police determined, following an IA investigation concluded in October 2021, that the allegations were "unsubstantiated."

      f.    Sgt. Gellin, however, was successful in getting MPO Harrell out of City Hall:  he was reassigned to the Police Department lobby.

      g.    Sgt. Gellin's role in concocting and executing the "unfounded" complaint has neither been investigated nor punished.

*Legal issues and claims*

42.    Title VII of the Civil Rights Act of 1964, as amended, provides
that "[I]n shall be an unlawful employment practice for an employer. . . to
fail or refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation, terms,
conditions or privileges of employment, because of such individual's race. . .
." 42 U.S.C. § 2000e-2(a)(1).

43.    The failure of the City of West Palm Beach to have "exercised
reasonable care to avoid harassment and to eliminate it when it might
occur," as required by <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 805
(1998), notwithstanding MPO Farrell's having "act[ed] with reasonable care
to take advantage of the employer's safeguards and otherwise to prevent
harm that could have been avoided," <u>id</u>., is shown by:

a.    The City's failure to have addressed Sgt. Lally's armed
battery of MPO Harrell by anything more than a written reprimand (for not
having dealt properly with a subordinate officer)—the same penalty (a
written reprimand) as was imposed on MPO Harrell (for having parked in a
no-parking zone during the incident);

b.    The ineffectiveness of Assistant Chief West's having done
nothing more about Sgt. Gellin's repetitive racial mockery, e.g., referring to

MPO Harrell during unit roll calls as "Midnight" during roll calls and over the police radio, than to tell Sgt. Gellin to stop (which he never did), and

   c. The failure of Deputy Chief Morris to have done anything more about Sgt. Gellin's spreading a rumor through the predominantly white department that MPO Harrell, a Black law enforcement officer, had been taking photographs of police officers sleeping in their cruisers than to have told Sgt. Gellin (ineffectively) to stop doing so, and

   d. the ask-no-questions complicity of Assistant Chief West and Human Resources (the performance of which Chief Adderly accurately and critically assessed in retrospect) in unquestionably sending MPO Harrell to a fitness-for-duty assessment based in large part on complaint letters by discontented junior officers (three of which were anonymous) that had been gathered by a sergeant whom Assistant Chief West had ordered to stop referring to MPO Harrell in racially mocking terms and Deputy Chief Morris had ordered only recently to stop spreading rumors about MPO Harrell's photographing sleeping police officers and wearing a BLM COVID mask, and

   e. The failure of the police department to investigate the genesis of an "unsubstantiated" inappropriate-behavior complaint against MPO Harrell that was forwarded by Sgt. Gellin, MPO Harrell's racially-biased nemesis, directly to the human-resources department outside of MPO

Harrell's chain of command, which would have been through Lt. Rideau, who is Black.

44.    Against such a no-consequences background, the race-based harassment of MPO Harrell has continued—and is continuing:

a.    A three-page letter—entitled "The Rat Squad," quoting the false allegations solicited by Sgt. Gellin on which Dr. Brannon's not-fit-for-duty report was based, and accusing MPO Harrell as being the "anonymous source" of a You-Tube gadfly who has been filming what she perceives as police misbehavior—was mailed by "Supporters of the Thin Blue Line" from Sgt. Gellin's residential zip code[1] to MPO Harrell, the police chief, Internal Affairs, Human Resources, the mayor, the Fraternal Order of Police, "Officers of the West Palm Beach Police Department," three television stations and the Palm Beach Post, and

b.    Internal Affairs opened an investigation into MPO Harrell for "criticism" because of his on-the-scene complaint to Lt. Matthew Bassette that Officer Jacqueline Medina had cancelled a request for assistance that MPO Harrell made because of a fight that broke out at a night club where he and Officer Medina were working an off-duty detail, although Officer Medina was nowhere near the fight.

---

[1]Sgt. Gellin has listed his residential address on documents that are public record.

45.     Even if the City were to have exercised reasonable care to avoid harassment, and MPO Harrell were to have failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided, the racially motivated harassment by Sgt. Gellin and Lt. Oswald has culminated in tangible employment actions, such as an undesirable reassignment:  As a direct, natural and proximate result of Sgt. Gellin and Lt. Oswald, and the City's toleration of it, MPO Harrell has suffered tangible job detriments, e.g.:

a.     lost earnings (e.g., overtime opportunities and off-duty details);

b.     unexplained reassignment upon reinstatement to lower-prestige assignments of being stationed in either City Hall or the Police Department Lobby, as opposed to being a detective or a patrol officer; and

c.     reputational damage, and

d.     emotional distress and mental anguish.

46.     The race discrimination that MPO Harrell suffered, as more particularly alleged above, in violation of his statutory right to be free from race discrimination, constitutes irreparable harm for which there is no adequate remedy at law.

47.   If not enjoined by this Court to cease their deprivation of MPO Harrell's statutory right to be free from race discrimination, the City of West Palm Beach would continue to discriminate against him because of his race.

48.   Plaintiff is entitled, pursuant to 42 U.S.C. § 2000e-5(k), to recover his costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant judgment for him, and against the defendant, City of West Palm Beach:

**One**, determining that the City and its agents, including but not limited to Sgt. Gellin, Sgt. Lally and Lt. Oswald, violated MPO Harrell's statutory right to be free from race discrimination;

**Two**, enjoining the City and its agents, including but not limited to Sgt. Gellin, Sgt. Lally and Lt. Oswald, both preliminarily and permanently, to cease discriminating against MPO Harrell because of his race;

**Three**, awarding MPO Harrell back wages and compensatory damages against the City of West Palm Beach;

**Four**, awarding MPO Harrell his costs, including attorney's fees and litigation expenses, against the City of West Palm Beach, and

**Five**, granting such other and further relief as is just.

## COUNT II:
## Kevin Harrell's FCRA Claim for Hostile-Environment and Tangible-Job-Detriment Race Discrimination

Plaintiff, Kevin Harrell, realleges and adopts, as if fully set forth in Count II, which is the state-law mirror image of the Title VII claims contained in Count I, the allegations of ¶¶ 1-41 and 43-47.

49.   The Florida Civil Rights Act of 1992 provides that "[i]t shall be an unlawful employment practice for an employer. . . to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race. . . ."  § 760.10(1)(a), FLA. STAT.

50.   Plaintiff is entitled, pursuant to § 760.11(5), FLA. STAT., to recover his costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant judgment for him, and against the defendant, City of West Palm Beach:

**One**, determining that the City and its agents, including but not limited to Sgt. Gellin, Sgt. Lally and Lt. Oswald, violated MPO Harrell's statutory right to be free from race discrimination;

**Two**, enjoining the City and its agents, both preliminarily and permanently, to cease discriminating against MPO Harrell because of his race;

***Three***, awarding MPO Harrell back wages and compensatory damages against the City of West Palm Beach;

***Four***, awarding MPO Harrell costs, including attorney's fees and litigation expenses, against the City of West Palm Beach, and

***Five***, granting such other and further relief as is just.

## COUNT III:
### Kevin Harrell's Hostile Environment Claim Against Sgt. Gellin Under 42 U.S.C. § 1983 for Violation of his Clearly Established 14th Amendment Right Against Race Discrimination

51.    Plaintiff, Kevin Harrell, realleges and adopts, as if fully set forth in Count III, the allegations of ¶¶ 1-6; 8-9; 11; 12(a)-(c); 13; 14(a)-(c), 15; 16; 17(a)-(c)(I) and 18-41.

52.    The discriminatory intimidation, ridicule and insult described more specifically in Count I of this complaint:

a.    Were offensive, dangerous or designed to isolate MPO Harrell from non-Black police officers and even civilian workers, <u>see, e.g.</u>:

i.    ¶¶ 12(a) and (b) (referring to MPO Harrell at roll calls and over the police radio as "Midnight," "Charcoal," "Darkness," "Black Jesus" and "the Malcolm X of the Police Department";

ii.    ¶ 12(c) (telling him "Open your eyes—I can't see you" when watching a video of MPO Harrell;

        iii.     ¶¶ 14(a), (b) and (c) (Sgt. Gellin's refusing to intervene when Sgt. Scott Lally appeared to be ready to fight with MPO Harrell, and then refusing to report the incident);

        iv.     ¶ 15 (Sgt. Gellin's refusing that same night to respond to a radio call for assistance when a bar fight was going on);

        v.     ¶ 17(c)(I) (Sgt. Gelling's refusal to make a police report on Sgt. Lally's having battered MPO Harrell);

        vi.     ¶ 18(a) (Sgt. Gellin's refusal to respond to a DUI arrest scene to make a use-of-force report because he was shopping with his girlfriend, and dismissing MPO Harrell's request by telling him "Goodnight, Midnight);

        vii.     ¶ 19(a) (Sgt. Gellin's spreading a false rumor, including during roll calls, that MPO Harrell was taking photographs of police officers' asleep in their cruisers), and

        viii.     ¶ 19(b) (Sgt. Gellin's spreading a false rumor, including at roll calls, that MPO Harrell's repeatedly wearing a Black Lives Matter Covid mask—which MPO Harrell actually wore only once) was why the police chief had ordered that no one wear anything other than a plain mask.

        b.     MPO Harrell did not directly or indirectly invite or solicit the statements through his own acts or statements, see, e.g.:

         i.     ¶ 12(d) (MPO Harrell's complaint to Assistant Chief West about Gellin's calling him "Midnight";

         ii.     ¶¶ 19(a) and (b) (MPO Harrell's asking Sgt. Gellin to stop spreading the rumors about the photographs of sleeping police officers of MPO Harrell's wearing a BLM mask);

         iii.     ¶ 20 (MPO Harrell's complaining about Sgt. Gellin's rumor spreading to Lts. Michael Oswald and Kenneth Ferrell, and asking them to arrange a meeting with Deputy Chief Morris);

         iv.     ¶¶ 21(a), (c) and (d) (MPO Harrell's meeting with Deputy Chief Morris, who ordered Sgt. Gellin and two others to his office to order them to cease spreading rumors, and

         v.     ¶¶ 22 and 23 (MPO Harrell's renewing his complaints to Lts. Oswald and Ferrell that Sgt. Gellin was continuing to spread rumors about him).

53.    The offensive acts and statements more particularly alleged in Count I were so severe or pervasive that they materially altered the terms and conditions of MPO Harrell's employment as a West Palm Beach police officer, e.g.:

         a.     the derogatory racial references alleged in ¶¶ 12-(a)-(c) constituted racial insults, the frequency of which rendered the West Palm

Beach police department (and particularly the Patrol night shift under the command of Sgt. Gellin) an objectively hostile environment;

> b.     Sgt. Gellin's failure to intervene, alleged in ¶¶ 14(a)-(c) and 15, physically endangered MPO Harrell, and the failure to report the armed battery of a law enforcement officer that is alleged in ¶ 17(c)(I), sought to deprive MPO Harrell of protection by Internal Affairs against future physical attacks by Sgt. Lally;

> c.     Sgt. Gellin's spreading of untrue rumors about MPO Harrell cited in ¶¶ 19(a) (accusing MPO Harrell of taking photographs of police officers sleeping) and 19(b) (accusing MPO Harrell of repeatedly wearing a BLM COVID mask) alienated MPO Harrell from fellow officers:

>> i.     upon whom he had to depend for, among other things, their backing him on calls for service when dispatched to do so;

>> ii.     to the extent that they were primed to write the false letters that they did, quotations from the accusations contained in which letters played a significant role in Dr. Brannon's not-fit-for-duty report.

> d.     Sgt. Gellin's "Goodnight, Midnight" dismissal of MPO Harrell's request, alleged in ¶ 18(a), that Sgt. Gellin respond to an accident scene at which there had been an arrest (where a rookie was handcuffing a severely intoxicated arrestee to a gurney without accompanying her to the hospital to unlock the handcuff) impeded MPO Harrell's ability to do his job.

54.     As a direct, natural and proximate result of the Sgt. Gellin's subjecting MPO Harrell to a hostile work environment because of his race, MPO Harrell has suffered damages, including but not limited to:

      a.     lost earnings;

      b.     diminishment of earning capacity; and

      c.     emotional distress and mental anguish.

55.     Sgt. Gellin exhibited wilful disregard of MPO Harrell's clearly established fourteenth-amendment right to be free from race discrimination in public employment, entitling him to recover punitive damages against him.

56.     If not enjoined by this Court to cease their deprivation of MPO Harrell's constitutional right to equal protection, Sgt. Gellin would continue to discriminate against MPO Harrell because of his race, Black.

57.     Plaintiff is entitled, pursuant to 42 U.S.C. § 1988 to recover his costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant judgment for him, and against the defendant, Brian Gellin:

***One***, determining that Sgt. Gellin violated MPO Harrell's clearly established fourteenth-amendment right to be free from race discrimination in public employment;

*Two*, enjoining Sgt. Gellin, both preliminarily and permanently, to cease discriminating against MPO Harrell because of his race;

*Three*, awarding MPO Harrell compensatory damages against Sgt. Gellin;

*Four*, awarding MPO Harrell punitive damages against Sgt. Gellin;

*Five*, awarding MPO Gellin costs, including attorney's fees and litigation expenses, against Sgt. Gellin, and

*Six*, granting such other and further relief as is just.

<u>**COUNT IV:**</u>
**Kevin Harrell's Tangible Job Detriment Claim Against Sgt. Gellin and Lt. Oswald Under 42 U.S.C. § 1983 for Violation of his Clearly Established 14th Amendment Right Against Race Discrimination**

58.     Plaintiff, Kevin Harrell, realleges and adopts, as if fully set forth in Count IV, the allegations of ¶¶ 1-6; 8; 10; 12(a)-(c); 13(a)-(c); 14(a)-(c); 15; 16(a); 17(a)-(c)(I); 18(a); 19(a)-(b); 20(a)-(f), and 22-41.

59.     Sgt. Gellin was motivated in his actions towards MPO Harrell because of race, as can be inferred from the allegations of ¶¶ 12(a)-(c).

60.     Lt. Oswald's racial motivation can be inferred from:

        a.      his joining with Sgt. Gellin to forward the solicited letters from disgruntled white co-workers of MPO Harrell to Human Resources and police-department management for the purpose of obtaining a fitness-for-duty examination, as alleged in ¶¶ 13(a) and (c), and

b.      his untruthfully (or half-truthfully) telling the fitness-for-duty psychologist in a telephone interview that MPO Harrell "has recently had 'use-of-force' citizen complaints filed against him" without also disclosing that no citizen complaint about improper or excessive use-of-force had ever been sustained against MPO Harrell, as alleged in ¶ 13(c), which were behaviors that he had never engaged concerning any white police officer.

61.    Lt. Oswald's complicity in Sgt. Gellin's plan to ambush MPO Harrell with a sure-thing supervisory request for a fitness-for-duty examination can be inferred from his:

a.      responding of MPO Harrell's complaint July 30 that Sgt. Gellin was still spreading rumors about MPO Harrell's taking photographs of sleeping police officers, notwithstanding Deputy Chief Morris's order, by ordering MPO Harrell to take two weeks off—and denying to MPO Harrell that he was being set up for a fitness-for-duty complaint, even though Sgt. Gellin was using that time to solicit, collect and have Lt. Oswald deliver the damning letters to Assistant Chief West and the human-resources department, as alleged in ¶ 22, and

b.      feigning ignorance of his and Sgt. Gellin's fait accompli when MPO Harrell called the night before his scheduled return to ask why he was not on the squad's duty roster, as alleged in ¶ 25, even though the fitness-for-duty paperwork was already being processed, as alleged in ¶ 26.

62.     Based at least in part on the untruthful letters that Sgt. Gellin and Lt. Oswald had supplied, Dr. Brannon found MPO Harrell not fit-for-duty August 23, as alleged in ¶ 28, triggering an immediate 90-day assignment to working-remotely light duty, as alleged in ¶ 29, which was changed to no-badge, no-gun administrative leave immediately after a lawyer from the Police Benevolent Association began challenging City officials about Dr. Brannon's conclusions, as alleged in ¶¶ 31 and 32.

63.     During a November 15 meeting with the PBA lawyer, Rick King, Esq., Deputy Chief Morris said that he had never thought the pursuit of MPO Harrell would be as aggressive as it had become, as ¶ 32.

64.     Following a telephone call from MPO Harrell November 18, as alleged in ¶ 33, Police Chief Adderly met with MPO Harrell November 19, allowed MPO Harrell to tell him from the beginning what had happened, told MPO Harrell that he had never been advised of MPO Harrell's complaints or his meeting with Deputy Chief Morris and Assistant Chief West, told MPO Powell that he would request a re-examination by Dr. Brannon and coached him on what answers he needed to give to pave his way to reinstatement, all as alleged in ¶ 35.

65.     Following a November 27, 2020 re-examination, Dr. Brannon found MPO Harrell fit-for-duty, but only if he was put into an assignment in

which he did not have to interact to other police officers, as alleged at ¶¶ 37, 35.

66.    Following, **_First_**, an assignment to "administrative duty" in the CID December 10, and, **_Second_**, a report requested from MPO Harrell's personal psychologist, MPO Harrell was restored to full duty February 17, 2021, as alleged in ¶ 38.

67.    However, rather than being assigned as a detective, a position to which he was scheduled to be moved when Sgt. Gellin and Lt. Oswald orchestrated his fitness-for-duty sidelining, MPO Harrell was assigned to the City Hall lobby—and told by the chief not to "bring any drama over there," as alleged in ¶¶ 39 and 40.

68.    When MPO Harrell reminded the chief that he had not brought any drama to his old job, but rather had simply made complaints about a racially discriminatory hostile-environment, Chief Adderly acknowledged that the human-resources department had "fucked up," as alleged in  ¶¶ 40(a) and (b).

69.    Sgt. Gellin, who had been removed from road patrol and assigned to supervise the civilian Code Enforcement Supervisors who were headquartered at  City Hall, orchestrated a complaint by a female code-enforcement officer, Cassandre Sainte Hillaire, that MPO Harrell was

behaving inappropriately towards her—for which his motivation was to "get [MPO Harrell] the fuck out of City Hall," as alleged in ¶¶ 40(a)-(c).

a.      Sgt. Gellin's tactics in pursuing this goal included skipping the chain of command, which would have required him to run the complaint through MPO Harrell's supervisor, Lt. Gregory Rideau, a Black man who at the time had a race-discrimination suit pending in federal court, as alleged in ¶ 40(d).

b.      The chief of police determined, based on an internal-affairs investigation, that the allegations were "unsubstantiated," as alleged in ¶ 40(e).

70.      MPO Harrell, notwithstanding that the allegations were "unsubstantiated," has been moved from City Hall to the police department's least prestigious assignment:  sitting at the desk in the police department lobby, as alleged in ¶ 40(f).

71.      As a direct, natural and proximate result of the Sgt. Gellin and Lt. Oswald's subjecting MPO Harrell to tangible job detriments because of his race, MPO Harrell has suffered damages, including but not limited to:

a.      lost earnings;

b.      diminishment of earning capacity; and

c.      emotional distress and mental anguish.

72.    Sgt. Gellin and Lt. Oswald each exhibited wilful disregard of MPO Harrell's clearly established fourteenth-amendment right to be free from race discrimination in public employment, entitling him to recover punitive damages against each of them.

73.    If not enjoined by this Court to cease their deprivation of MPO Harrell's constitutional right to equal protection, Sgt. Gellin and Lt. Oswald would continue to discriminate against MPO Harrell because of his race, Black.

74.    Plaintiff is entitled, pursuant to 42 U.S.C. § 1988 to recover his costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant judgment for him, and against the defendants, Brian Gellin and Michael Oswald:

***One***, determining that Sgt. Gellin and Lt. Oswald violated Master Officer Harrell's fourteenth-amendment right to be free from race discrimination in public employment;

***Two***, enjoining Sgt. Gellins and Lt. Oswald, both preliminarily and permanently, to cease discriminating against MPO Harrell because of his race;

***Three***, awarding MPO Harrell compensatory damages against Sgt. Gellin and Lt. Oswald, jointly and severally;

***Four***, awarding MPO Harrell punitive damages against Sgt. Gellin and Lt. Oswald, individually;

***Five***, awarding MPO Gellin costs, including attorney's fees and litigation expenses, against Sgt. Gellin and Lt. Oswald, jointly and severally, and

***Six***, granting such other and further relief as is just.

### COUNT V:
### Kevin Harrell's Hostile Environment Claim Against Sgt. Lally Under 42 U.S.C. § 1983 for Violation of his Clearly Established 14th Amendment Right Against Race Discrimination

75.    Plaintiff, Kevin Harrell, realleges and adopts, as if fully set forth in Count V, the allegations of ¶¶ 1-3; 3(b); 4-6; 9; 11; 12(a)-(b); 14(a)-(e); 17(a)-(c)(I), (d) and(e);

76.    The discriminatory intimidation, ridicule and insult by Sgt. Lally described more specifically in Count I of this complaint:

a.    Were offensive, dangerous or designed to isolate MPO Harrell from white police officers, <u>see, e.g.</u>:

i.    ¶¶ 12(a) and (b) (referring to MPO Harrell at roll calls and over the police radio as "Midnight," "Charcoal," "Darkness," "Black Jesus" and "the Malcolm X of the Police Department";

ii.     ¶¶ 14(a) and (b)(Sgt. Lally's menacing MPO Harrell December 22, 2019 while they were working neighboring off-duty details at night clubs in the Clematis Street entertainment district);

iii.    ¶¶ 17(a) and (b) (Sgt. Lally's April 13, 2020 assault and battery on MPO Harrell, which included ripping MPO Harrell's body-camera off his chest and throwing it to the ground—which constituted a third-degree felony under Florida statutes, see §§ 784.03(a)(1) ("The offense of battery occurs when a person . . . [a]ctually and intentionally touches or strikes another person against the will of the other") and 784.07(2)(b) ("Whenever any person is charged with knowingly committing an assault or battery upon a law enforcement officer. . . the offense for which the person is changed shall be reclassified . . . [i]n the case of battery, . . . to a felony of the third degree. . . "), and

iv.     ¶ 17(d), Sgt. Lally's obtaining the false testimony of three white police officers who claimed to have seen nothing during Sgt. Lally's battery of MPO Harrell—which was contradicted by a Black detective who corroborated MPO Harrell's account.

77.    The offensive acts and statements more particularly alleged in ¶ 76 were so severe or pervasive that they materially altered the terms and conditions of MPO Harrell's employment as a West Palm Beach police officer:

a.     the derogatory racial references alleged in ¶¶ 12(a) and (b) constituted racial insults, the frequency of which rendered it the West Palm Beach police department (and particularly the Patrol night shift) an objectively hostile environment;

b.     The  December 22, 2019, menacing of MPO Harrell, alleged at ¶ 14(a), and the felonious attack April 13, 2020, alleged ¶¶ 17(a) and (b), topped off by the solicitation of false testimony from white police officers concerning the event, see ¶ 17(d), were racially motivated adverse actions by a supervisor who did not act similarly towards white police officers—and therefore was a violation by Sgt. Lally of MPO Harrell's Fourteenth Amendment right to equal protection.

78.     As a direct, natural and proximate result of the Sgt. Lally's subjecting MPO Harrell to a hostile work environment because of his race, MPO Harrell has suffered damages, including but not limited to:

a.     an isolation of MPO Harrell from white police officers on the West Palm Beach Police Department, and a resulting reduction in his ability to function optimally as a police officer;

b.     diminishment of earning capacity; and

c.     emotional distress and mental anguish.

79.     Sgt. Lally exhibited wilful disregard of MPO Harrell's clearly established fourteenth-amendment right to be free from race discrimination

in public employment, entitling him to recover punitive damages against him.

80.    If not enjoined by this Court to cease his deprivation of MPO Harrell's constitutional right to equal protection, Sgt. Lally would continue to discriminate against MPO Harrell because of his race, Black.

81.    Plaintiff is entitled, pursuant to 42 U.S.C. § 1988 to recover his costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant judgment for him, and against the defendant, Scott Lally:

*One*, determining that Sgt. Lally violated MPO Harrell's fourteenth-amendment right to be free from race discrimination in public employment;

*Two*, enjoining the Sgt. Lally, both preliminarily and permanently, to cease discriminating against MPO Harrell because of his race;

*Three*, awarding MPO Harrell compensatory damages against Sgt. Lally;

*Four*, awarding MPO Harrell punitive damages against Sgt. Lally;

*Five*, awarding MPO Harrell costs, including attorney's fees and litigation expenses, against Sgt. Lally, and

*Six*, granting such other and further relief as is just.

## COUNT VI:
## Kevin Harrell's Battery Claim Against Sgt. Lally

82.     Plaintiff, Kevin Harrell, realleges and adopts, as if fully set forth in Count VI, the allegations of ¶¶ 1-3; 3(b); 4; 6, and 9.

83.     Defendant, Scott Lally, on or about April 13, 2020, actually and intentionally touched or struck MPO Harrell against the will of MPO Harrell.

84.     As a direct, natural and foreseeable result of Sgt. Lally's touching or striking MPO Harrell, MPO Harrell suffered damages.

85.     The actions of Sgt. Lally were so willful and wanton as to justify an award of punitive damages to teach him, and others like him, not to engage in battery in the future.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant judgment for him, and against the defendant, Scott Lally:

**One**, determining that Sgt. Lally actually and intentionally touched or struck MPO Harrell against the will of MPO Harrell;

**Two**, awarding Master Officer Harrell compensatory damages against Sgt. Lally;

**Three**, awarding Master Officer Harrell punitive damages against Sgt. Lally;

**Four**, awarding MPO Harrell costs against Sgt. Lally, and

**Five**, granting such other and further relief as is just.

Dated:  August 15, 2021.

Respectfully Submitted,

*/s/ William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No. 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No. 275565
KAmlong@TheAmlongFirm.com
JENNIFER DALEY
Florida Bar No. 856436
JDaley@TheAmlongFirm.com

THE AMLONG FIRM
500 Northeast Fourth Street
Suite 101
Fort Lauderdale, Florida 33301-1154
(954) 462-1983

**Attorneys for the Plaintiff,
Kevin Harrell**

\\amlong3\cpshare\CPWin\HISTORY\210325_0001\17F7.8C