UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(West Palm Beach Division)

Case N0. 22-81275-CIV-SINGHAL/McCabe

KEVIN HARRELL,

     Plaintiff,

vs.

CITY OF WEST PALM BEACH, a
Florida municipal corporation,

     Defendants.

_____/

## Plaintiff's Second Amended, Supplemental Complaint for Damages And Both Preliminary and Permanent Injunctive Relief

### COUNT I:

### Title VII Claim for Hostile-Environment and Tangible-Job-Detriment Race Discrimination

Plaintiff, Kevin Harrell, sues defendant, City of West Palm Beach, and alleges:

### Introduction and Summary

1.    This is an action by Kevin Harrell, a Black master police officer ("MPO") for the City of West Palm Beach Police Department—derogatorily nicknamed "Midnight" by white supervisors because of his dark complexion — whom the City:



**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL 33301 ● 954.462.1983

a. refused to protect from racially discriminatory behavior by supervisors, notwithstanding his repeated complaints;

b. subjected to tangible job detriments, e.g., a relief from duty based on a not-fit-for-duty diagnosis orchestrated by racially motivated supervisors and, eventually, termination;

c. following, **One**, MPO Harrell's filing charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and, **Two**, within two months of his obtaining a notice of right to sue from the Department of Justice, suspended from duty in connection with a no-probable-cause seizure of his cell phone by narcotics detectives who:

i. found no evidence of criminal behavior by the execution of that search warrant, but

ii. nonetheless, turned the cell-phone over to internal-affairs investigators to review the cell phone for administrative violations.

2. The City's termination of MPO Harrell is the most recent in a string of racially discriminatory events occurring over the past several years.

3. MPO Harrell sues the City pursuant to:

a. Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, for tangible-job-detriment discrimination by management, race-based harassment sergeants and fellow police officers and retaliation for engaging in behaviors protected by Title VII, and

b.      Violating his rights under the Fourth Amendment to the United States Constitution by firing him based information found during a no-warrant search of his cell phones by internal-affairs investigators.

4.      In summary, MPO Harrell seeks compensatory damages, injunctive relief and his costs, including reasonable attorneys' fees concerning the violation of his rights against both discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, as well as for violation of his Fourth Amendment Rights of the United States Constitution; he seeks injunctive relief pursuant to his privacy and search-and-seizure rights under the Florida Constitution.

## Jurisdiction and Venue

5.      Counts I and II arise under the discrimination and retaliation prohibitions of Title VII of the Civil Rights Act of 1964, as amended, by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq. ("Title VII"), concerning which the Department of Justice issued notices of right to sue May 17, 2021, and May 15, 2023, within 90 days of each of those notices MPO Harrell has filed his respective initial and amended, supplemental complaints. Count III arises under the Search-and-Seizure Clause of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.  This Court has  federal-question jurisdiction under 28 U.S.C. § 1331.

6.      The claims being sued upon arose in Palm Beach County, Florida, where the defendant at all material times did business.

## Parties

7.      Kevin Harrell was at all material times a Black Master Police Officer ("MPO") employed by the City of West Palm Beach.

8.      Defendant City of West Palm Beach is, and at all times material was, a Florida municipal corporation that was an "employer" as defined by 42 U.S.C. § 2000e(b) and operated towards MPO Harrell under color of state law for purposes of 42 U.S.C. § 1983.

## General Allegations

9.      MPO Harrell has been a West Palm police officer since in or about 2003 and has held the rank of Master Police Officer since October 2019; for the first 17 years of employment, all his evaluations were above average.

10.      Within two years of his becoming a police officer, however:

a.      Supervisors, including (more recently) Sgts. Brian Gellin and Scott Lally, began referring to him—including at roll calls and over the police radio—by such racially derogatory names as "Midnight" (the most common one), "Charcoal," "Darkness," "Black Jesus" and the "Malcolm X of the Police Department"; non-Black officers were not similarly denigrated with racially-charged nicknames:

          i.     When a dispatcher would announce over the police radio that it was now "midnight," Sgt. Gellin, Sgt. Lally and Officer Anthony Imbessi, among others, would respond:  "Are you trying to raise Officer Harrell?";

          (1)    Sgt. Gellin—whose racist nature is betrayed by his Instagram rants about former President Barrack Obama, Vice President Kamela Harris and the removal of confederate statutes—would make such remarks as, when he was viewing a night-time video including MPO Harrell: "Open your eyes—I can't see you."

          (2)    MPO Harrell's problems on the job substantially increased upon the transfer to his shift of Sgt. Gellin — who had been removed from the Entertainment District Unit ("EDU") to night-shift patrol January 20, 2020, following written complaints to the EDU lieutenant by subordinates concerning Sgt. Gellin's attitude and subordinates' lack of confidence in his leadership abilities.

11.    White supervisors' behavior towards MPO Harrell began to worsen after Sgt. Gellin's being made his sergeant, <u>e.g.</u>:

          a.     Sgt. Lally ripped MPO Harrell's body-camera off of MPO Harrell's police vest April 13, 2020 as the two of them argued while both were on duty and armed — which behavior by Sgt. Lally constituted battery of a law enforcement officer, a felony under Florida law, <u>see</u> § 784.07(2)(b),

FLA. STAT., for which Sgt. Lally was neither arrested nor even seriously sanctioned internally:

> i.      When MPO Harrell complained to Sgt. Gellin, "Sgt. Lally just put his hands on me. . . .  Brian, this guy just battered me," Sgt. Gellin did nothing—other than to refuse to report the incident;

> ii.      During the Internal Affairs investigation, three non-Black police officers—Anthony Imbassi, Martin Warsaw and Ismael Flores—testified that they saw nothing (not withstanding that they were standing in close proximity to both men); Brian McDaniel, a Black detective, confirmed MPO Harrell's account;

> iii.      Although Theresa Gordon, West Palm Beach's then-Human Resources Officer, who is Black, who told Internal Affairs that "this guy, [referring to Sgt. Lally], has been doing stuff like this for years," Sgt. Lally was given nothing stronger that a written reprimand July 11, 2020, for "conduct towards a subordinate officer."

12.      The final series of incidents before MPO Harrell was relieved of duty and sent for a fitness-for-duty examination began July 7, 2020, when MPO Harrell requested Sgt. Gellin's presence at the everything-went-wrong site of a head-on collision:

> a.      Although a supervisor was needed to document the appropriateness of the minimal use of force involved in the arrest of a

highly-intoxicated woman, Sgt. Gellin told MPO Harrell by telephone that, even though he was on duty, he was shopping with his girlfriend and would not come to the scene, ending the conversation by saying "Goodbye, Midnight";

  b.   Officer Banko Abreu, a rookie who had responded to the accident with MPO Harrell, handcuffed the intoxicated woman to the gurney of the ambulance, but neither accompanied the ambulance to the hospital so that he could un-handcuff her, nor informed MPO Harrell that he had handcuffed her to the gurney—concerning which Sgt. Gellin wrote up MPO Harrell for failure to communicate with a co-worker when MPO Harrell complained about Sgt. Gellin's refusal to respond to the scene;

  c.   Concerning that same drunk-driving incident, Officer Nikol Lopez, the night-shift officer with the most training concerning driving-under-the-influence arrests, did not arrive at scene until after an ambulance had taken the driver to the hospital, and

  d.   After both Officer Lopez and MPO Harrell arrived at the hospital, Officer Lopez refused to draw blood from the driver to be used as evidence—saying that she had never been trained to do so, although MPO Harrell learned that all DUI training involves learning to draw blood.

  13.   The next incident was when MPO Harrell on July 18, 2020 confronted Sgt. Gellin concerning Sgt. Gellin's spreading rumors that:

    a.      MPO Harrell had been taking photographs of police officers asleep in their police cars (which photos existed, but had been taken by Deputy Chief Richard Morris), and

    b.      MPO Harrell's wearing a Black Lives Matter ("BLM") COVID mask all the time was the reason the police department banned anything other than plain masks, notwithstanding MPO Harrell's only having done so once—at a debriefing following a BLM demonstration.

14.    When Sgt. Gellin denied that he had been spreading rumors, MPO Harrell went to Lts. Kevin Ferrell and Michael Oswald July 19 to set up a meeting with Deputy Chief Morris.

15.    Here is what happened July 20:

    a.      Lt. Oswald informed MPO Harrell at 1:34 p.m. that the meeting with Deputy Chief Morris had been arranged for later that day;

    b.      Sgt. Gelin texted MPO Harrell at 3:30 p.m. that his beat would be changed for 4 p.m. shift from his regular assignment to an area known as a "punishment beat" because of the heavier workload it involves;

    c.      At 4:25 p.m., as the night-shift briefing ended, Officer Dayhanna Rubio, about whose poor performance and officer-safety deficiencies MPO Harrell had complained, shouted as she walked alongside Sgt. Gellin, referring to MPO Harrell: "Where's he going?  To admit he took the pictures?";

d.      Sgt. Gellin, when asked to instruct Officer Rubio to stop saying such things about MPO Harrell, said he had not heard it; Lt. Oswald, however, acknowledged having heard Officer Rubio's comment as he walked MPO Harrell to the deputy chief's office, and

e.      Deputy Chief Morris initially said he thought that MPO Harrell was being a little paranoid, but when MPO Harrell explained that he had gotten threats from Sgt. Gellin and other officers and that he was fearful of what would happen if Deputy Chief Morris did not intervene, Deputy Chief Morris ordered Sgt. Gellin, Sgt. Robert Heisser and Officer Rubio into his conference room and informed them:

i.      MPO Harrell was not the officer taking photographs;

ii.     MPO Harrell's having one time worn a BLM mask was not why the ban on anything other than plain masks had been put into place, and

iii.    All such rumors were to stop immediately.

16.     Sgt. Gellin began that evening soliciting letters—almost exclusively from police officers concerning whose job performance and officer-safety behaviors MPO Harrell had complained—to support a fitness-for-duty complaint.

17.     When MPO Harrell complained to Lts. Oswald and July 30 that Sgt. Gellin was still speaking ill of him and the picture-taking rumors were

continuing, the two lieutenants characterized his complaints as over-emotional and erratic:

      a.    MPO Harrell asked whether they were attempting to set him up for a fitness–for-duty examination, but

      b.    While the lieutenants denied it, they ordered MPO Harrel to take two weeks off.

18.    The following day, MPO Harrell's first day off, Officer Mika Thomas warned him Sgt. Gellin and various patrol officers were writing letters accusing him of creating a hostile environment; when MPO Harrell advised Lt. Ferrell of what he had learned, Lt. Ferrell advised him not to answer his phone or text for a couple of days.

19.    During those two weeks, Sgt. Gellin, with assistance from Lt. Oswald, collected and packaged letters that they presented to Assistant Chief Tamika West and Human Resources, which forwarded them to Michael Brannon, Psy.D., without permitting MPO Harrell to see (or challenge) them. The letters were from:

      a.    Officer Abreu, the rookie who had handcuffed the drunken arrestee to the gurney, who complained, <u>inter alia</u>, that he "faced . . . disciplinary action," which he blamed on "Ofc. Harrell's attitude towards other officers";

b.    Officer Danielle Goldberger, about whom MPO Harrell had complained to a day-shift sergeant, George (Terry) Golden, who is Black, that she did not respond to calls and created officer-safety issues;

c.    Officer Douglas Bales, who worked on a different squad but was dating Officer Goldberger, whose letter stated in part, "I had noted some type of animosity by Ofc. Harrell towards Ofc. Goldberger and night shift Ofc. Nicole Lopez. . . .";

d.    Officer Lopez, who was among the officers who would fail to back up MPO Harrell on calls, and who wrote, <u>inter alia</u>, that "Officer Harrell has a reputation of going out of his way to get new officers in trouble, which I experienced first-hand";

e.    Officer Robert McGlinney, a white officer:

i.    with whom MPO Harrell had historically had differences concerning Officer McGlinney's exaggerations in probable-cause affidavits and police reports—particularly ones involving minorities, and

ii.    with whom MPO Harrell had recently gotten into a confrontation because Officer McGlinney and Officer Gregory McDonald, another white police officer, had been spreading the rumor that MPO Harrell was taking photographs of officers asleep in their police cruiser, and MPO Harrell had threatened to report them to Lt. Oswald, and

iii.    who made a false report of that incident (as

summarized below by Dr. Brannon):

> [Field Training Officer ("FTO")] R. McGlinney reported about an
> incident that occurred on 07-12-20. It was reported that several
> officers were together writing reports in the community when Officer
> Harrell approached them at a high rate of speed in his department
> vehicle, squealing his tires as he came to stop behind them. He was
> further reported to have quickly exited his vehicle and he began to
> take photographs of the other officers on his cellular telephone. He
> was reported to have stated to FTO McGlinney, "You want to be part of
> this IA?" He was reported to have stated to another officer on the
> scene, "I am formally requesting you to be in Lt. Oswald's office in five
> minutes." He was reported to have left the area at a high rate of speed
> while again squealing his tires[,]

which report does not appear to have been subjected to any scrutiny or

verification by either police-department management, Human Resources or

Dr. Brannon, and

        f.    Sgt. Gellin, who in a cover letter to Lt. Oswald enclosing

the other letters (along with three anonymous ones) wrote that "I have

**NEVER** seen and heard so many people complain (sworn and civilian) about

a single officer.  Besides hearing it from other officers, I have witnessed

first-hand watching Ofc. Harrell's use of force videos, civilian complaints, and

issues with other supervisors," (emphasis in original) for none of which

allegations was any documentation presented.

        20.    On August 12, the day before he was to return to work, MPO

Harrell checked his schedule—and found that he was not listed; Lts. Ferrell

and Oswald, however, texted him that he was scheduled, and Lt. Oswald

told him to bring a union representative so that he could go over a month-old citizen's complaint.

21.     Lt. Oswald advised MPO Harrell August 12 that Assistant Chief West wanted see him and a human-resources employee e-mailed MPO Harrell that he had a fitness-for-duty examination scheduled in two days, which examination Assistant Chief West advised MPO Harrell was triggered by the letters Sgt. Gellin had collected and Lt. Oswald had packaged—which letters she would not permit him to read, lest (she worried aloud) he confront the writers.

22.     MPO Harrell characterized Dr. Brannon as having "[come] across as very bias[ed], condescending, uninformed and [as someone who] would not provide sufficient time for me to explain exactly what took place and show the information he was not provided by Human Resources or my supervisors"; he quotes Dr. Brannon as remarking "Interesting" when MPO Harrell told the psychologist that he had not been allowed to read the letters that Sgt. Gellin had collected.

23.     Based on such "evidence," Dr. Brannon on August 23, 2020, declared MPO Harrell "not fit for duty," which resulted in Human Resources's putting him on light duty four days later and ordering him to undergo counseling assistance at his own expense.

24.     In summary, the first round of hostility towards, and discriminatory treatment of, MPO Harrell culminated with MPO Harrell's being suspended as unfit for duty following this series of events:

a.     Sgt. Gellin and Lt. Oswald's orchestrating a referral to an irregular fitness-for-duty evaluation in July 2020:

i.     The irregularities included that the examination was performed by a psychologist who based his recommendation that MPO Harrell be relieved from duty on, among other things:

(1)     Eight letters, four of them anonymous, that Sergeant Gellin had solicited primarily from younger white and Hispanic members of MPO Harrell's squad (and the boyfriend of one of the seven who was on another squad) about whose officer-safety behavior MPO Harrell had repeatedly complained to Sgt. Gellin and others;

(2)     Letters MPO Harrell had never seen until Dr. Brannon confronted him with the accusations, which MPO Harrell denied;

ii.     a telephone interview with Sgt. Gellin—about whose racist name-calling MPO Harrell had complained to Assistant Chief West July 27 and about whose rumor-mongering (false allegations that MPO Harrell was taking photographs of police officers asleep in their cars and that he constantly wore a BLM COVID mask) he had complained to Deputy Chief Richard Morris July 20;

b.     a telephone interview with Lt. Oswald, who had assisted Sgt. Gellin in gathering the eight letters and forwarding them, whom Dr. Brannon quoted as saying that MPO Harrell "has recently had 'use-of-force' citizen complaints filed against him" — without identifying any such complaints or mentioning that no use-of-force complaint had ever been sustained against MPO Harrell, and

c.     a 38-minute internet-video interview with MPO Harrell.

25.     MPO Harrell was assigned 90 days of at-home clerical work, <u>i.e.</u>, taking reports over the phone and transcribing them on his laptop; neither overtime nor off-duty detail-work was available to him.

26.     Laurence Miller, Ph.D. (as opposed to Dr. Brannon, Psy.D.), who had been seeing Officer Harrell intermittently since 2012, disagreed with Dr. Brannon's core conclusion, and on October 15, 2020, reported that

> [MPO Harrell] successfully completed a course of EAP counseling and medication management with Marjorie Gillespie, PhD, APRN-C, PMHNC-BC, MCAP.  Medication management has since been taken over by Uma Choday, MD.  I have consulted with Dr. Gillespie and she opines that Officer Harrell has successfully completed his course of EAP treatment and is currently fit for duty.

27.     Ralph E. (Rick) King III, Esquire, a retired West Palm Beach police captain and Police Benevolent Association lawyer, e-mailed City officials November 2, 2020, asking for information related to MPO Harrell's light-duty status, and forwarded the findings of Drs. Miller and Gillespie that MPO Harrell was fit for duty and should be returned to full duty.

28.     Two days later, on November 4, IA personnel showed up at MPO Harrell's door November to collect his badge, guns and identification, and to inform him (without explanation) that he had been changed from light duty to administrative leave with pay.

29.     When Mr. King met with Frank Adderly, West Palm Beach's police chief, and Deputy Chief Morris November 16 to discuss MPO Harrell's return and to ask why his initial complaint had not been taken seriously, Deputy Chief Morris stated he had not thought the situation would have gotten as aggressive as it had.

30.     MPO Harrell telephoned Chief Adderly, who is Black, November 18 to ask if they could meet in person; the chief agreed and they met for breakfast the following day.

31.     During the November 19 breakfast, Chief Adderly allowed MPO Harrell to explain what had happened from the start, told MPO Harrell he had never been advised of either MPO Harrell's complaints or his meeting with Deputy Chief Morris and Assistant Chief Brown, said he would reach out to Dr. Brannon and suggested how MPO Harrell should speak to Dr. Brannon to get a favorable evaluation.

32.     Four days later, Human Resources notified MPO Harrell that he should call Dr. Brannon's office for an appointment:  It took place November

27 and resulted in a fit-for-duty evaluation—with a caveat that MPO Harrell should not be assigned to work with other police officers.

33.    In a report dated December 3, 2020, Dr. Brannon wrote:

> During the current assessment, the examinee continues to verbalize feelings of resentment towards some of his superiors and co-workers who were involved in his most recent work conflicts. He also perceives his job as a hostile work environment and his superiors as non-responsive to his concerns. For the above-stated reasons, it is the opinion of this examiner that the examinee is Not Fit for Duty for a return to a road patrol setting that requires collaboration with other police officers. If there is an option for the examinee to return to work for his final two years in a role in which he would not be required to regularly interact with other police officers (as suggested by Assistant Chief Tamika West), it is the opinion of this examiner that the examinee would be Fit for Duty for that alternative job assignment.

34.    MPO Harrell was restored to "administrative duty" in the Criminal Investigation Division for 90 days, starting December 10, and—following a January 28, 2021 letter requested from Dr. Miller (as opposed to Dr. Brannon), in which Dr. Miller stated "[i]t is my opinion that Officer Kevin Harrell is presently psychologically fit to return to duty as a WPBPD police officer," and was restored to full duty February 17, 2021.

35.    However, instead of continuing to work as a detective in the Criminal Investigation Division ("CID")—an assignment to which he had been scheduled to move into prior to being put on light duty, and to which he had been told that he would return—MPO Harrell was informed February 12 that he was being removed from CID because, he was told by Assistant Chief Anthony Spatara, who is white, of a "patrol shortage."

36.     However, instead of assigning MPO Harrell to patrol, Chief Adderly met with MPO Harrell February 17, told him that he was being assigned to City Hall—adding dismissively that MPO Harrell should not "bring any drama over there":

a.      MPO Harrell responded to the chief there had been no "drama," but simply actual complaints of a racially hostile environment and race discrimination that neither the police department nor human resources had properly addressed;

b.      Chief Adderly acknowledged in reply that the human-resources department had been "fucked up" and that the director was guilty of mismanagement.

37.     Although MPO Harrell did not bring any "drama" to the City Hall assignment, Sgt. Gellin did:

a.      Sgt. Gellin had been taken out of the patrol section and transferred to supervise the civilian Code Enforcement Officers (CEOs), who are headquartered at City Hall—which assignment gave him a proximity to MPO Harrell, which proximity he used to resume his harassment of MPO Harrell:

b.      Sgt. Gellin was observed and overheard by Raymond G. Leung, a then-code enforcement officer, soliciting negative (albeit false)

complaints from the code-enforcement squad about MPO Harrell so Sgt. Gellin could "get him the fuck out of City Hall."

      c.     That scheme produced a July 19, 2021 allegation from Cassandre Saint Hailar, a female CEO, that Officer Harrell was acting inappropriately towards her;

      d.     Rather than forward the complaint through the chain of command, i.e., giving it to Lt. Gregory Rideau, a Black officer, **One**, of superior rank to Sgt. Gellin, and, **Two**, who at the time was suing West Palm Beach for racial discrimination, Sgt. Gellin forwarded it directly to Human Resources;

      e.     The chief of police determined, following an IA investigation concluded in October 2021, that the allegations were "unsubstantiated," which within the West Palm Beach Police Department means that "[t]he allegation is either demonstrably false or there is no credible evidence to support it," according to the department's Standard Operating Procedure IV-22's definition of the synonymous "unfounded";

      f.     Sgt. Gellin, however, was successful in getting MPO Harrell out of City Hall:  he was reassigned to the Police Department lobby, and

      g.     Sgt. Gellin's role in concocting and executing the "unfounded" complaint was neither investigated nor punished.

38.     Title VII provides that "[i]t shall be an unlawful employment practice for an employer. . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race. . . ."  42 U.S.C. § 2000e-2(a)(1).

39.     The failure of the City of West Palm Beach to have "exercised reasonable care to avoid harassment and to eliminate it when it might occur," as required by Faragher v. City of Boca Raton, 524 U.S. 775, 805 (1998), notwithstanding MPO Harrell's having "act[ed] with reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided," id., is shown by:

        a.      The City's failure to have addressed Sgt. Lally's armed battery of MPO Harrell by anything more than a written reprimand (for not having dealt properly with a subordinate officer)—the same penalty (a written reprimand) as was imposed on MPO Harrell (for having parked in a no-parking zone during the incident);

        b.      The ineffectiveness of Assistant Chief West's having done nothing more about Sgt. Gellin's repetitive racial mockery, e.g., referring to MPO Harrell during unit roll calls as "Midnight" during roll calls and over the police radio, than to tell Sgt. Gellin to stop (which he never did), and

        c.     The failure of Deputy Chief Morris to have done anything more about Sgt. Gellin's spreading a rumor through the predominantly white department that MPO Harrell, a Black law enforcement officer, had been taking photographs of police officers sleeping in their cruisers than to have told Sgt. Gellin (ineffectively) to stop doing so, and

        d.     The ask-no-questions complicity of Assistant Chief West and Human Resources (the performance of which Chief Adderly accurately and critically assessed in retrospect, <u>see</u> ¶ 36(b)) unquestionably contributed to  sending  MPO Harrell to a fitness-for-duty assessment based in large part on:

           i.     complaint letters from discontented white and Latino junior officers (three of which were anonymous),

           ii.     Which had been gathered by a sergeant whom Assistant Chief West had ordered to stop referring to MPO Harrell in racially mocking terms and

           iii.     Whom Deputy Chief Morris had ordered only recently to stop spreading rumors about MPO Harrell's photographing sleeping police officers and wearing a BLM COVID mask, and

        e.     The failure of the police department to investigate the genesis of an "unsubstantiated" inappropriate-behavior complaint against MPO Harrell that was forwarded by Sgt. Gellin, MPO Harrell's racially-biased

nemesis, directly to the human-resources department outside of MPO Harrell's chain of command, which would have been through Lt. Rideau, who is Black.

40.     Against such a no-consequences background, the race-based harassment of MPO Harrell has continued up through (and beyond) his termination:

a.      A three-page letter—entitled "The Rat Squad," quoting the false allegations solicited by Sgt. Gellin on which Dr. Brannon's not-fit-for-duty report was based, and accusing MPO Harrell as being the "anonymous source" of a You-Tube gadfly (Ms. Vielma, a/k/a "Acura Amanda")—was mailed by "Supporters of the Thin Blue Line" from Sgt. Gellin's residential zip code[1] to MPO Harrell, the police chief, Internal Affairs, Human Resources, the mayor, the Fraternal Order of Police, "Officers of the West Palm Beach Police Department," three television stations and the Palm Beach Post, and

b.      Internal Affairs sustained a complaint against MPO Harrell for "criticism" based on his on-the-scene complaint to Lt. Matthew Bassette that Officer Jacqueline Medina, who is not Black, had cancelled a request for assistance that MPO Harrell made because of a fight that broke out at a night club where he and Officer Medina were working an off-duty detail,

_____

[1]Sgt. Gellin has listed his residential address on documents that are public record.

although Officer Medina was nowhere near the fight at the time she cancelled the call.

41.     Even if the City were to have exercised reasonable care to avoid harassment, or MPO Harrell were to have failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided (neither of which occurred), the racially hostile atmosphere created and aggravated by Sgt. Gellin and Lt. Oswald culminated in tangible employment actions, e.g., the fitness-for-duty suspension and reassignment from patrol or criminal investigations to such lower-prestige jobs as being assigned to the lobbies of City Hall and the police department.

42.     As a direct, natural and proximate result of Sgt. Gellin and Lt. Oswald's harassment of MPO Harrell, and the City's toleration of it, MPO Harrell has suffered both tangible and intangible job detriments, e.g.:

a.      lost earnings during his time relieved from duty in connection with Dr. Brannon's having declared him "not fit for duty" (e.g., overtime opportunities and off-duty details);

b.      unexplained reassignment upon reinstatement to such lower-prestige assignments of being stationed in either City Hall or the Police Department Lobby, as opposed to being a detective or a patrol officer;

c.      reputational damage, and

       d.    clinically significant emotional distress and mental anguish.

43.    The race discrimination that MPO Harrell suffered, as more particularly alleged above, in violation of his statutory right to be free from race discrimination, constitutes irreparable harm for which there is no adequate remedy at law.

44.    If not enjoined by this Court to cease its deprivation of MPO Harrell's statutory right to be free from race discrimination, the City of West Palm Beach would continue to discriminate against him because of his race.

45.    Plaintiff is entitled, pursuant to 42 U.S.C. § 2000e-5(k), to recover his costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant judgment for him, and against the defendant, City of West Palm Beach:

***One***, determining that the City and its agents, including but not limited to Sgt. Gellin, Sgt. Lally and Lt. Oswald, violated MPO Harrell's statutory right to be free from race discrimination;

***Two***, enjoining the City and its agents, both preliminarily and permanently, to cease discriminating against MPO Harrell because of his race;

***Three***, awarding MPO Harrell back wages and compensatory damages against the City of West Palm Beach;

*Four*, awarding MPO Harrell his costs, including attorney's fees and litigation expenses, against the City of West Palm Beach, and

*Five*, granting such other and further relief as is just.

## COUNT II:

### Kevin Harrell's Title VII Claim for Discrimination and Retaliation

46.     Plaintiff, Kevin Harrell, realleges and adopts, as if fully set forth in Count II, the allegations of ¶¶ 1(a), (b) and (c)(I) and (ii); 2; 3(a), and 4-9.

47.     During the time that the EEOC and DOJ were processing MPO Harrell's initial and supplemental charges of discrimination for the City's having violated his federal and Florida statutory rights to be free from racial discrimination in the workplace, WPB police-department management was setting in motion a series of actions that culminated in MPO Harrell's termination.

48.     MPO Harrell on or about April 3, 2023 filed an Amended, Supplemental Charge of Discrimination with the EEOC, which alleged, in pertinent part:

> I am a Black Master Police Officer who was the charging party in EEOC Charge No. 510-2021-04506, which alleged discrimination based upon race, color, retaliation and perceived disability, concerning which the Equal Employment Opportunity Commission and the Department of Justice issued a notice of right to sue dated May 17, 2022.  Before I could even file suit on that claim August 15, 2022, the City began retaliating against me based on my having protected(sic) unlawful employment practices, *i.e.,* not only retaliating against me, but also

continuing to treat me differently that it does persons who are not Black.

49.     The Department of Justice issued MPO Harrell a notice of right to sue concerning the second EEOC via electronic mail May 15, 2022, cc'ing "City of West Palm Beach, et al."

50.     The police department's criminal investigation division within two months of the City's receipt of the Notice of Right to Sue, i.e., on July 15, 2022, obtained a search warrant to seize MPO Harrell's cell phone, based on an affidavit by Agent Thomas Viale stating, in connection with a drug investigation, he had probable cause to believe that MPO Harrell was violating § 838.21, FLA. STAT., "Disclosure or use of confidential criminal justice information," which provides, in pertinent part:

> It is unlawful for a public servant, with intent to obstruct, impede, or prevent a criminal investigation or a criminal prosecution, to disclose active criminal investigative or intelligence information as defined in chapter 119 or to disclose or use information regarding either the efforts to secure or the issuance of a warrant, subpoena, or other court process or court order relating to a criminal investigation or criminal prosecution when such information is not available to the general public and is gained by reason of the public servant's official position. . . .

51.     Although internal-affairs investigators cannot use search warrants to conduct their investigations—since obtaining a search warrant requires that the law enforcement officer who wishes to get it to convince a judge that he or she has a reasonable belief that the warrant would lead to the discovery of evidence of criminal behavior—the West Palm Beach Police

Department made it quite clear in the first paragraph of its report recommending that MPO Harrell be fired that it had used a search warrant issued to investigate criminal behavior to investigate administrative rule violations:

> On July 19th, 2022, Internal Affairs was notified by Lieutenant Joseph Herb that Officer Kevin Harrell was the subject of a criminal investigation by the West Palm Beach Police Department. Lieutenant Herb and Sergeant Rich Smith advised they had a search warrant for Officer Harrell's cellular phone. Officer Harrell was immediately placed on administrative leave pending a criminal investigation. On October 5th, 2022, Lieutenant Herb advised his criminal investigation was complete and provided all evidence of potential policy violations to Internal Affairs.

52. The "all evidence of potential violations" included materials that were only acquirable through use of the search warrant—which only authorized the search of the cell phone to uncover evidence of criminal violations.

53. Specifically, the warrant authorized narcotics agents to search MPO Harrell's phone for "[d]ata related to communications between Officer Harrell, Richard Althouse, Amanda Vielma and any known associates created between the time period between (sic) May 15th 2021 and the date of the execution of the warrant":

   a. Mr. Althouse is a civil-rights activist, and a former law-firm investigator, whom MPO Harrell has engaged as a "street lawyer" to obtain public records from the police department concerning incidents and

individuals he perceived as being involved in antagonizing him—just as suspected criminal also engage Mr. Althouse to do public-records research for them:

       i.    Mr. Althouse was convicted in 2001 of two Class-D federal felonies in connection with his purchase of a handgun—knowingly making a false statement or representation to a federally licensed firearms dealer about his residential address and knowingly and wilfully making a false statement in a matter within the jurisdiction of the executive branch of the federal government—and sentenced to one year and one day of imprisonment and three years of supervised release;

       ii.    The United States Attorney's Office in West Palm Beach unsuccessfully opposed Mr. Althouse's motion for a termination of his supervised release six months before its scheduled expiration in August 2004 based on what it characterized as his "contumacious conduct with police officers," and

       iii.    Mr. Althouse's civil rights were restored, upon information and belief, in 2008.

       b.    Although Agent Viale stated in his search-warrant affidavit that Mr. Althouse had been videotaped cutting down a surveillance camera that police had placed in a tree:

        i.      Mr. Althouse has not been arrested in connection with the drug-trafficking investigation;

        ii.      One could reasonably infer that Mr. Althouse has been working with the West Palm Beach Police Department as an informant in lieu of being arrested for cutting down the surveillance camera, but

        iii.      Neither the search-warrant affidavit nor the internal-affairs report quotes Mr. Althouse as stating that MPO Harrell divulged to Mr. Althouse any information about the drug investigation—or engaged in any other criminal behavior.

        c.      Ms. Vielma is a civil-rights activist and self-styled "investigative reporter" who videotapes and airs on her web site, "Acura Amanda," incidents of what she perceives of as police misbehavior:

        i.      Although Ms. Vielma was named in both the search warrant affidavit and the search warrant, there was no allegation that she and MPO Harrell were jointly engaged in any criminal activity, but

        ii.      In his announcement of the department's terminating MPO Harrell, Chief Adderly nonetheless issued a press release stating that MPO Harrell had provided information to Ms. Vielma about fellow police officers with whom he had issues and "that were intended to destroy confidence in the operation of th police department and it adversely effected the moral and efficiency of the department."

      iii.    Although the communications were not criminal, the chief stated that they "caused a disruption in our agency and put a lot of people at our department that actually worked with him on a daily basis [and] felt uncomfortable based on some of the things that he did."

54.    Agent Viale stated in his July 15, 2022 affidavit to obtain the search warrant, <u>inter alia</u>, that:

      a.    From "May through September in 2021," the Organized Crime section was involved in wiretap assisted investigation to a drug trafficking operation in West Palm Beach's Black community;

      b.    "On July 21st, 2021," in a phone call from one member of the drug-trafficking organization to another, that he thinks the police are about to launch an investigation and he "will talk to Richard Althouse to see if he could help the organization. . . ."

      c.    Two agents on spotted MPO Harrell in his marked police car meeting with Mr. Althouse in the parking lot of the Post Office on Clematis Street, speaking for about 15 minutes as each remained in their cars and then, as Mr. Althouse appeared to be chuckling, drive away; the agents noted that Mr. Althouse was a "street lawyer," one of whose functions was to make public records requests;

      d.    MPO Harrell had more than 200 "telecommunication contacts" with Mr. Althouse between August 2021, when MPO Harrell was

suspected of giving information about the drug investigation to Mr. Althouse, and February 2022, when a confidential informant stated that MPO Harrell "was meeting with" one the gang members whom Mr. Althouse had brought to City Hall;

      e.    Agent Viale's affidavit concluded what he had just described was "a pattern of Officer Harrell disseminating information . . . to obstruct and or impede Your Affiant's investigation. . ."

55.    What the affidavit did not say, however, was how MPO Harrell, who at the time was assigned to guard the lobby of City Hall, was supposed to have gotten any of the information that Agent Viale was accusing him of leaking.

56.    Agent Viale swore that the Drug Enforcement Administration had identified MPO Harrell's phone number as being the number for a specifid Samsung Galaxy, and concluded that he was

> confident that . . . the data within Officer Harrell's cell phone will reveal communication that exist between Althouse and Officer Harrell, regarding the sensitive information of Your Affiants (sic) investigation, that included the identities of not only confidential informants, but undercover narcotics agents. Information within Officer Harrell's cell phone would assist the Organized Crime Section in determining the mode, substance, and extent of those communications that have obstructed the Organized Crime Section's investigations in violation of Florida State Statute 838.21(21).

57.    Notwithstanding that the internal-affairs report prepared by Lt. Bevell states that

> On August 27th, 2021, Althouse submitted a public records request for WPB PD case number 2020-0014433. This case number is the main case number for the drug trafficking case and was not made available to the public. There is no way Althouse should have even known that case number existed to submit a public records request. On August 27th, 2021, Althouse was observed walking and talking with Vernon Tanksley in the NE corner of the alley[,]

MPO Harrell was neither made the subject of a search warrant nor suspended until after the City was notified that he had been issued a notice of right to sue by the DOJ.

58.   Unable to find any evidence of criminal behavior on MPO Harrell's cell phone, the Police Department's Organized Crime Section turned the phone, along with all of the material that it had downloaded pursuant to the search warrant, over to Internal Affairs.

59.   Lt. Roy Bevell, the commander of the internal-affairs unit, stated in the opening paragraph of his narrative in the internal-affairs report:

> On July 19th, 2022, Lieutenant J. Herb advised me that his unit, Special Investigations Division, Organized Crime Section, was investigating Officer K. Harrell for his potential involvement with a drug trafficking organization, possibly providing information to known associate, Richard Althouse. Lieutenant Herb also believed Office Harrell was divulging information to Amanda Vielma, a social Media Blogger. Officer Harrell was immediately placed on Administrative Leave pending the outcome of the criminal investigation.

   a.   The internal-affairs report failed to mention that the Organized Crime section had found no evidence of any criminal activity by MPO Harrell;

b.    While the internal-affairs report suggests that there could have been disclosure of confidential information by MPO Harrell to Mr. Althouse, it cites to no evidence than any such behavior occurred.

c.    Neither the internal-affairs report, nor the search-warrant affidavit, cited to any reasonably suspected criminal activity involving MPO Harrell and Ms. Vielma.

60.    While the report does state that one of the drug-traffickers did accompany Ms. Althouse to City Hall when MPO Harrell was working there, it does not mention that MPO Harrell's only conversation with the drug trafficker was to ask him why he was there and to tell Mr. Althouse never to bring him around again.

61.    Agent Viale's affidavit obtained the search warrant for MPO Harrell's cell phone by assuring a circuit judge, under oath, that the incidents catalogued above showed "a pattern of Officer Harrell disseminating information with intent. . . to obstruct and or impede" the drug-trafficking investigation, and concluding that the Organized Crime section had a reasonable belief that a search of his cell phone

> will reveal communication that exist between Althouse and Officer Harrell, regarding the sensitive information of Your Affiants (sic) investigation, that included the identities of not only confidential informants, but undercover narcotics agents. Information within Officer Harrell's cell phone would assist the Organized Crime Section in determining the mode, substance, and extent of those communications that have obstructed the Organized Crime Section's investigations in violation of Florida State Statute 838.21(21).

62.     That just was not true, as the West Palm Beach Police Department likely knew when it learned May 17, 2021 that the Department of Justice had just authorized MPO Harrell to sue the City pursuant to Title VII for having tolerated racial harassment by such persons as Sgts. Gellin and Lally, relieved him of duty through a highly irregular process, kept him on either light duty or administrative leave and relegated him to low-status jobs such as staffing either the City Hall lobby or the Police Department Lobby.

63.     As stated in the preface of the internal-affairs report:

On July 19th, 2022, Internal Affairs was notified by Lieutenant Joseph Herb that Officer Kevin Harrell was the subject of a criminal investigation by the West Palm Beach Police Department. Lieutenant Herb and Sergeant Rich Smith advised they had a search warrant for Officer Harrell's cellular phone. Officer Harrell was immediately placed on administrative leave pending a criminal investigation. ***On October 5th, 2022, Lieutenant Herb advised his criminal investigation was complete and provided all evidence of potential policy violations to Internal Affairs.***

(Emphasis supplied.)

64.     The City of West Palm Beach terminated MPO Harrell March 30, 2023 based solely on non-criminal information it obtained from MPO Harrell's cell phone, which phone had been given to them by criminal investigators who had obtained it through a search warrant authorizing them to search for only criminal information occurring (which they did not find) or information it learned by following up on such non-criminal information.

65.     The police department's ordering the search-and-seizure of MPO Harrell's cell phone only two months after it received from the Department of Justice a Notice of Right to Sue based on MPO Harrell's initial charge of discrimination would permit a reasonable jury to infer that the search-and-seizure occurred because the City perceived he was preparing to sue the City for race discrimination.

66.     On information and belief, no white law enforcement officer employed by the City of West Palm Beach has ever been subject to termination based on a internal-affairs investigation into non-criminal behavior discovered by Organized Crime detective using a search warrant that had been issued to find evidence that a police officer had leaked confidential information to criminals to disrupt a drug-trafficking investigation.

67.     As a direct, natural and proximate result of the West Palm Beach Police Department's reaction to learning that MPO Harrell hat gotten a notice of right to sue from the Department of Justice, and enlisting both the Internal Affairs and Organized Crime sections to pursue unfounded investigations against him, MPO Harrell has suffered both tangible and intangible job detriments, e.g.:

    a.     lost earning because of his termination;

b.      the expense of engaging a defenses lawyer to resist the

allegations;

c.      reputational damage, and

d.      clinically significant emotional distress and mental anguish.

68.     The race discrimination and retaliation that MPO Harrell suffered,

as more particularly alleged above, in violation of his statutory right to be

free from race discrimination and retaliation, constitute irreparable harm for

which there is no adequate remedy at law.

69.     If not enjoined by this Court to cease its deprivation of MPO

Harrell's statutory right to be free from race discrimination and retaliation,

the City of West Palm Beach would continue to discriminate and retaliated

against him because of his race and because of his opposition to racial

discrimination.

70.     Plaintiff is entitled, pursuant to 42 U.S.C. § 2000e-5(k), to

recover his costs and litigation expenses, including a reasonable attorney's

fee, for bringing this action.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant

judgment for him, and against the defendant, City of West Palm Beach:

*One*, determining that the City and its agents, including but not

limited to Chief Frank Adderly and Lt. Roy Bevell, violated MPO Harrell's

statutory rights to be free from race discrimination and retaliation for opposing race discrimination;

*Two*, enjoining the City and its agents, both preliminarily and permanently, to cease discriminating and retaliating against MPO Harrell because of his race or because of his engaging in behavior protected by the anti-retaliation provisions of Title VII;

*Three*, awarding MPO Harrell back wages and compensatory damages against the City of West Palm Beach;

*Four*, awarding MPO Harrell his costs, including attorney's fees and litigation expenses, against the City of West Palm Beach, and

*Five*, granting such other and further relief as is just.

### COUNT III:

### Kevin Harrell's § 1983 Fourth Amendment Claim for the Search and Seizure Of his Cell Phone and its Being Turned Over to Internal Affairs For an Administrative Investigation

71.    Plaintiff, Kevin Harrell, realleges and adopts, as if fully set forth in Count III the allegations of ¶¶ 1(c)(I)-(ii); 3(b); 4; 5; 6; 7; 8; 9; 47; 50; 51; 52; 53(a)(I)-(iii), (b)(I)-(iii) and (c)(I)-(iii); 54(a)-(e); 55; 56; 57; 58; 59(a)-(c); 60; 61; 62; 63; 64; and 65.

72.    This claim arises under the Fourth Amendment to the United States Constitution, as extended to the states by the Fourteenth Amendment, and 42 U.S.C. § 1983.

73.     The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and **no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.**

(Emphasis supplied.)

74.     Because today's cell phones have been determined by the United States Supreme Court to be in fact minicomputers that also have the capacity to be used as a telephone, and could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps or newspapers, police officers must generally secure a warrant before conducting a search of a cell phone because a cell phone search would typically expose to the government far more than the most exhaustive search of a house.

75.     Such a warrant would require:

a.      A showing of probable cause that evidence of criminal activity would be found in the place to be search;

b.      A description of the subject and scope of the search that the magistrate has authorized, and

c.      A limitation on the search's temporal scope.

76.     The City of West Palm Beach neither:

      a.     Presented such evidence to the Circuit Judge from whom it obtained the search warrant, nor

      b.     Obtained from that judge a warrant authorizing its internal affairs investigators to conduct a search of MPO Harrell's seized cell phone.

77.    The City of West Palm Beach's Organized Crime investigators and its internal-affairs investigators, however, did — under cover of their seeking a search warrant:

      a.     Misrepresent to the Circuit Judge that there was a reasonable basis to believe there was any criminal overtones to the relationships amongst MPO Harrell, Mr. Althouse and Ms. Vielma, the You-Tube investigative reporter;

      b.     Exceed the scope of the search warrant, which was solely to obtain evidence that MPO Harrell had leaked information to a ring of drug traffickers, and

      c.     Provide the internal-affairs detectives with information concerning possible violations of administrative rules that those investigators had no justification under the Fourth Amendment to obtain.

78.    The unconstitutional behavior in which the West Palm Beach Police Department engaged was overseen, approved and engaged in by its chief of police, Frank Adderly:

      a.     Who was the City's final policy maker as to that behavior;

b.      Who was the City's decision maker as to that behavior, and

c.      Whose decision to violate MPO Harrell's Fourth Amendment rights against unreasonable search and seizures was not subject to any review or appeal within the City of West Palm Beach.

79.     If the City of West Palm Beach were enabled to terminate the law-enforcement career of MPO Harrell, or otherwise inflict discipline on him, through such an unconstitutional violation of MPO Harrell's Fourth Amendment rights, MPO Harrell would suffer a violation of his rights for which there would be no adequate remedy at law.

80.     As a direct, natural and proximate result of the West Palm Beach Police Departments get rid of a Black, anti-discrimination police officer by violating his fourth-amendment rights, MPO Harrell has suffered both tangible and intangible job detriments, e.g.:

a.      lost earnings during his time after being terminated based on the City of West Palm Beach's unconstitutional investigation of the contents of his cell phone;

b.      the expense of hiring an attorney to defend him against those allegations;

c.      reputational damage, and

d.      clinically significant emotional distress and mental anguish.

81.    The fourth-amendment violation MPO Harrell suffered, as more particularly alleged above, constitutes irreparable harm for which there is no adequate remedy at law.

82.    If not enjoined by this Court to cease its deprivation of MPO Harrell's statutory right to be free from race discrimination, the City of West Palm Beach would continue to discriminate against in violation of his fourth-amendment rights.

83.    MPO Harrell is entitled, pursuant to 42 U.S.C. 1988, to recover his costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Kevin Harrell, prays that this Court will grant judgment for him, and against the defendant, City of West Palm Beach:

**One**, determining that the City and its agents, including but not limited to Chief Frank Adderly and Lt. Roy Bevell, violated MPO Harrell's constitutional rights to be free from unreasonable searches and seizures;

**Two**, enjoining the City and its agents, both preliminarily and permanently, to cease violating MPO Harrell's rights under the Fourth Amendment, including by reinstating MPO Harrel as a Master Police Officer on the West Palm Beach Police Department;

**Three**, awarding MPO Harrell back wages and compensatory damages against the City of West Palm Beach;

**Four**, awarding MPO Harrell his costs, including attorney's fees and

litigation expenses, against the City of West Palm Beach, and

**Five**, granting such other and further relief as is just.

Dated:  August 14, 2023.

Respectfully Submitted,

*/s/ William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No. 270288
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No. 275565
KAmlong@TheAmlongFirm.com
JENNIFER DALEY
Florida Bar No. 856436
JDaley@TheAmlongFirm.com

THE AMLONG FIRM
500 Northeast Fourth Street
Suite 101
Fort Lauderdale, Florida 33301-1154
(954) 462-1983

***Attorneys for the Plaintiff,***
***Kevin Harrell***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has

been filed and served electronically via CM/ECF this day  all counsel of record

on the service list.

Respectfully submitted,
THE AMLONG FIRM
500 N.E. Fourth St., Suite 101
Fort Lauderdale, Florida   33301
(954) 462-1983 / FAX:  (954) 523-3192
Eservice@TheAmlongFirm.com

*/s/William R. Amlong*
WILLIAM R. AMLONG
Florida Bar Number  470228
WRAmlong@TheAmlongFirm.com
JENNIFER DALEY
Florida Bar Number 856436
JDaley@TheAmlongFirm.com
***Attorneys for the Plaintiff,***
***Kevin Harrell***

\\amlong3\cpshare\CPWin\HISTORY\210325_0001\17F7.8C