UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:22-cv-81275-AHS

KEVIN HARRELL,

       Plaintiff,

v.

CITY OF WEST PALM BEACH,

       Defendant.

_____/

## DEFENDANT, CITY OF WEST PALM BEACH'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT

Respectfully submitted this 30th day of April, 2024.

**GRAYROBINSON, P.A.**

*/s/ Fabian A. Ruiz*
Fabian A. Ruiz
Florida Bar No. 117928
fabian.ruiz@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
Counsel for Defendant
*City of West Palm Beach, FL*

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant, CITY OF WEST PALM BEACH (the "City") respectfully moves for the entry of final summary judgment with regard to Plaintiff, Kevin Harrell's ("Plaintiff") claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1983 ("§1983"), and states as follows in support thereof:

## I.     SUMMARY OF THE ARGUMENT

In his 43-page Second Amended Complaint, Plaintiff, who is a former Police Officer for the City of West Palm Beach and identifies as Black, alleges he was: (1) harassed by non-supervisors on the basis of his race dating back to 2005; (2) intentionally discriminated against because of his race when he was placed on leave, criminally investigated, and terminated; and (3) retaliated against after the City's Police Department "learn[ed] that [Plaintiff] hat [sic] gotten a notice of right to sue from the Department of Justice[.]" (DE 66, "Sec. Am. Compl.," ¶¶3(a), 67). Quite simply, Plaintiff's claims are meritless.

Preliminarily, in order to accept Plaintiff's implausible version of the story, the Court would have to disregard that the City's undisputed decision-maker in this case, Chief of Police Frank Adderley ("Chief Adderley"), is also Black.  Because Chief Adderley is within the same protected class as Plaintiff, it is "'extremely difficult' for [ ] [P]laintiff to establish discrimination[.]" *Welch v. Delta Air Lines*, 978 F. Supp. 1133, 1153 (N.D. Ga. 1997) (citing *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991)).  In fact, the City's Mayor, the City Administrator (a/k/a City Manager), and Assistant Chief of Police, Tameca West ("Asst. Chief West") are also Black.  Even if the Court were to disregard this obvious hurdle, Plaintiff would still be unable to establish a *prima facie* case of race discrimination or retaliation.

Plaintiff has an extensive and well-documented history of being unable to appropriately interact with other City employees, members of the public and, as he testified, his family members and co-workers from his most recent post-termination employer (Nordstrom). (SOF ¶¶ 7-15).  In fact, Plaintiff has been arrested twice, for allegedly assaulting his father, and allegedly battering a co-worker at Nordstrom after being terminated from the City. (SOF ¶ 16).

The City outlined the events leadings up to Plaintiff's termination in DE 76, but they bear repeating.  First, an undercover agent for the Police Department captured Plaintiff on camera surreptitiously meeting with a convicted felon, Richard Althouse ("Mr. Althouse"). (SOF ¶ 40). At the time, Mr. Althouse had been under surveillance for nearly a year, as part of a larger criminal investigation into the "Tanksley Drug Trafficking Organization." (*Id.*).  An IA investigation into

Plaintiff's involvement was opened and, upon its conclusion, it was determined (among other things) that: (i) Plaintiff had sent Sgt. Brian Gellin's home address to Amanda Vielma (a/k/a "Acura Amanda"), a self-proclaimed "first amendment auditor" who Plaintiff admits "harassed" certain members of the City's Police Department; (ii) Plaintiff frequently communicated with Mr. Althouse, and used Mr. Althouse to submit public records requests on Plaintiff's behalf; and (iii) Plaintiff provided Mr. Althouse with confidential information that Plaintiff could only have known because of his position as a City Police Officer. (SOF ¶ 41). Importantly, when he was interviewed under oath about these actions and interactions during the IA investigation, Plaintiff admitted to certain acts he did not believe were problematic (such as having Mr. Althouse submit public records requests on his behalf), but lied to the investigator several times, including about knowing that Mr. Althouse was a convicted felon, despite text messages from Plaintiff to the contrary. (*Id.*). Ultimately, Plaintiff was found to have engaged in six (6) different acts of official misconduct, including lying during the IA investigation. (*Id.*). Chief Adderley then independently reviewed and considered the IA investigation, had a pre-disciplinary meeting with Plaintiff and his attorney, and decided to terminate his employment. (SOF ¶ 42). Notably, Plaintiff's conduct was so egregious, his own union declined to contest Plaintiff's termination on his behalf. (*Id.*).

Despite his objectively outrageous conduct having been very well-documented, and despite filing his Combined Rule 41(g) Motion ("Rule 41(g) Motion") (DE 74), wherein he asked the Court to prevent the City from using the information in the IA investigation in its defense, Plaintiff nevertheless continues to deny having done anything wrong. In fact, after Chief Adderley terminated Plaintiff, Plaintiff not only disputed having done anything wrong, he amended his complaint to claim that the events leading up to his termination – and his termination itself – supported his race discrimination and retaliation claims, and that the City violated his Fourth Amendment rights when it considered the information from his cell phone during its administrative investigation. When he was given another opportunity to provide a logical explanation for his actions during his deposition in this case, Plaintiff once again ignored the evidence before him, and said he had not done anything improper. (SOF ¶ 43).

Even more importantly than the evidence supporting the City's actions, Plaintiff has failed to present sufficient evidence to support his discrimination and retaliation claims. With respect to his race harassment claim, Plaintiff cannot establish that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment, nor does he have any evidence to

establish that the City should be liable for such alleged co-worker harassment. (SOF ¶ 72). With respect to his tangible employment action discrimination claim, Plaintiff cannot produce a comparator that was treated more favorably than he was for having engaged in the same misconduct, because no one has ever engaged in the same misconduct as Plaintiff.  With respect to his retaliation claim, Plaintiff cannot establish that the City's decision-maker, Chief Adderley, was aware of the "notice of right to sue" prior to terminating him, because he was not. (SOF ¶ 45). Plaintiff also cannot rebut the City's legitimate, non-discriminatory, and non-retaliatory reasons for its employment decisions by proving that it was pretext.  Seemingly conceding how meritless his discrimination and retaliation claims are, Plaintiff attempts to tack on a §1983 claim, in support of which he alleges the City violated the search and seizure provisions of the Fourth Amendment. Yet, as this Court recognized in its Order denying Plaintiff's Rule 41(g) Motion, the §1983 claim is not only meritless, it is "unprecedented."  The search of Plaintiff's phone was not only legal, it was conducted pursuant to a valid search warrant that Plaintiff waited 18 months to contest (in the wrong forum).  Plaintiff's claim that the City should have ignored such material is meritless, and Plaintiff cannot point to a single case supporting his claim the City's actions were unconstitutional.

As such, and as set forth herein and in the City's Statement of Facts filed concurrently herewith,[1] there are no genuine issues of material fact relating to Plaintiff's claims.

## II.        SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, discovery, and exhibits show there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party is not required to produce evidence showing the absence of a genuine issue of material fact; rather, the moving party's burden is satisfied by showing that there is insufficient evidence to support the non-moving party's case. *Id.* at 325. To oppose summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable trier of fact to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* at 252. Moreover, a plaintiff's speculative testimony about the motive for an employer's actions is insufficient to create a triable issue of material fact. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

---

[1] The City's Statement of Undisputed Material Facts ("SOF") is being filed contemporaneously with this Motion for Summary Judgment. References to the SOF will be cited as (SOF ¶__).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.   ARGUMENT AND SUPPORTING MEMORANDUM OF LAW

### A.   Plaintiff Cannot Establish A *Prima Facie* Case Of Race Harassment (Hostile Work Environment) Under Title VII.

Title VII prohibits employers from discriminating against their employees, in pertinent part, on the basis of an employee's race and color. Such discrimination claims "can be brought about in either of two ways." *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004). "One is through a tangible employment action, such as a pay decrease, demotion or termination." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Cir. 2007). "The other way is through creation of a hostile work environment caused by [ ] harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." *Id.*

In order to establish a *prima facie* case of hostile work environment race harassment under Title VII, Plaintiff must establish that: (1) he belongs to a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based on his race (or color); (4) the "harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," and (5) "a basis for holding the employer liable." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*).  Based on the undisputed facts, Plaintiff cannot establish a racially hostile work environment claim because, at a minimum, his claim is untimely, and he fails to satisfy the fourth and fifth elements of the *prima facie* test.

#### i.   Plaintiff's race harassment claim is untimely.

Before commencing a lawsuit under Title VII, plaintiffs are required to exhaust their administrative remedies by timely filing a charge of discrimination. *H&R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1295 (11th Cir. 2010). Timely filing a charge of discrimination is a prerequisite to bringing suit under Title VII. *Maynard v. Pneumatic Prod. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001).  In a deferral state such as Florida, a "plaintiff must file a charge of discrimination with the [EEOC] within 300 days of the discriminatory act, at the latest." *Id.*

"The timeliness rules differ for discrete acts of discrimination and hostile work environment claims." *Moore v. San Carlos Park Fire Prot. & Rescue*, 808 F. App'x 789, 795 (11th Cir. 2020) (unpublished).  "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" must fall within the limitations period to be actionable. *Nat'l R.R. Passenger*

4

*Corp. v. Morgan*, 536 U.S. 101, 122 (2002). With respect to claims of harassment, a series of untimely harassing conduct only "comprises the same hostile work environment where the 'pre- and post-limitations period incidents involve [1] the same type of employment actions, [2] occurred relatively frequently, and [3] were perpetrated by the same managers.'" *Jones v. Allstate Ins. Co.*, 707 F. App'x. 641, 647 (11th Cir. 2017). A plaintiff cannot rely on an alleged unlawful employment action that "had no relation to the acts [within the 300-day limitation period], or [that] for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim[.]" *Morgan*, 536 U.S. at 115. Untimely allegations may only be considered if the Court determines that the untimely hostile work environment allegations "about which [Plaintiff] complains are part of the same actionable hostile work environment practice, and, if so, whether any act falls within the statutory time period." *Jimerson v. Int'l Longshoremen Ass'n, Local 1423*, 2005 U.S. Dist. LEXIS 38043 *15-16 (S.D. Ga. 2005).

Here, Plaintiff filed two charges of discrimination. (SOF ¶ 17). Because the earlier charge of discrimination was filed on May 27, 2021, Title VII requires that Plaintiff allege discriminatory acts that occurred on or after July 31, 2020 (i.e., 300 days prior to the date his first charge was filed). When taken together, Plaintiff's Second Amended Complaint and his EEOC charges indicate that only four (4) timely adverse employment actions occurred on or after July 31, 2020, none of which relate to his race harassment claim in any way: (1) the August 15, 2020 fitness-for-duty examination; (2) being placed on light duty after a psychologist found him "not fit for duty"; (3) being placed on administrative leave with pay for the same reason; and (4) his termination (after the IA investigation). (Sec. Am. Compl. ¶¶20, 22, 63). Plaintiff's additional claims that he was anonymously ridiculed for his friendship with Acura Amanda, investigated for sexual harassment, and criminally and internally investigated after his involvement with a convicted felon was discovered, are not adverse actions because they are not harms to "an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Missouri*, 144 S. Ct. 967, 974 (2024).

While Plaintiff suffered certain adverse employment actions within the actionable time period, "these adverse employment actions alone do not demonstrate a hostile work environment." *Moore*, 808 F. App'x at 797. Instead, Plaintiff must tie the timely "discrete acts" to his alleged race harassment, which he fails to do. *Id*. Instead, Plaintiff claims that his August 15, 2020 fitness-for-duty examination occurred after Sgt. Gellin allegedly denied spreading rumors about Plaintiff taking photographs of other officers sleeping in their cars, and subsequently "solicit[ed] letters –

almost exclusively from police officers concerning whose job performance and officer safety behaviors MPO Harrell had complained[.]" (Sec. Am. Compl. ¶¶15-16). Plaintiff's own allegations make clear that these events, and the subsequent fitness-for-duty examination, had nothing to do with race harassment, but with "the picture-taking rumors." (Sec. Am. Compl. ¶17). Plaintiff being placed on light duty and, subsequently administrative leave, is not related to any alleged race harassment because Chief Adderley took those employment actions after Dr. Michael Brannon ("Dr. Brannon") declared Plaintiff unfit for duty. (SOF ¶¶ 36-38; Sec. Am. Compl. ¶23). The second time Plaintiff was placed on administrative leave was after an IA investigation was opened regarding his involvement with Mr. Althouse. (SOF ¶¶ 40-41; Sec. Am. Compl. ¶51). Plaintiff's termination came as a result of the findings of that IA investigation, but such events have nothing to do with Sgt. Gellin, Sgt. Lally, or any alleged race harassment. (SOF ¶¶ 40-45). Even viewing the record in the light most favorable to Plaintiff, his allegations and testimony are "so vague that it is practically impossible for a court to determine whether" his alleged adverse employment actions are "sufficiently related" to any alleged race harassment. *Moore*, 808 F. App'x at 797. Therefore, Plaintiff's race harassment claim must fail for untimeliness.

### ii. Plaintiff's alleged harassment is not sufficiently "severe or pervasive."

Title VII is not "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). In fact, Title VII "does not prohibit all verbal or physical harassment in the workplace[.]" *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (internal quotations omitted). "[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing[,]" do not run afoul Title VII. *Faragher*, 524 U.S. at 788 (holding that such "conduct must be extreme").

Instead, "Title VII prohibits only the type of severe or pervasive [ ] harassment that 'alters the conditions of the victim's employment.'" *Id.* In order to meet this high threshold, Plaintiff must establish that the work environment is "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). While the employee must "subjectively perceive the harassment as sufficiently severe or pervasive," the "subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1246. In assessing whether conduct is sufficiently severe or pervasive, courts must examine the "totality of the circumstances" based upon four factors: (1) frequency, (2) severity, (3) whether the conduct is physically threatening, and (4) whether the conduct unreasonably interferes with the employee's job

performance. *Id.* "The environment must be one that 'a reasonable person would find hostile or abusive' and that 'the victim . . . subjectively perceive[s] . . . to be abusive." *Id.* (citing *Harris*, 510 U.S. at 21–22). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Id.*

Importantly, because the Eleventh Circuit's has such a high bar for what is considered sufficiently "severe or pervasive," indisputably egregious conduct still fails to support a claim. *See*, *e.g.*, *Barrow v. Ga. Pac. Corp.*, 144 F. App'x. 54, 57- 58 (11th Cir. 2005) (affirming summary judgment for employer where plaintiff, who was African American, witnessed displays of the rebel flag, the letters "KKK," and a noose, and was subjected to racial slurs, including: (i) the superintendent calling him "nigger" three times in one year, repeatedly called him "boy," and telling him two or three times that he was going to kick the plaintiff's "black ass"; (ii) his supervisor "call[ing] him a 'nigger' and t[elling] him that if he looked at 'that white girl' he would 'cut' him"; (iii) another superintendent "call[ing] [plaintiff] 'black boy' on one occasion"; and (iv) another supervisor "once call[ing] him a 'dumb ass'"); *Alexander v. Opelika City Sch.*, 352 F. App'x 390, 393 (11th Cir. 2009) (affirming summary judgment for employer where plaintiff claimed to have been "constantly" called "boy," his supervisor made a comment "about how to tie a noose around a person's neck" because none of the alleged racial comments contained threats of physical violence and the plaintiff "did not demonstrate that the comments interfered with his job performance"); *McCann v. Tillman*, 526 F.3d 1370 (11th Cir. 2008), *cert. denied*, 555 U.S. 944 (2008) (affirming summary judgment for employer where a white employee called plaintiff "girl" and two male black employees "boys," and another coworker referred to a former black employee as a "nigger bitch" and declared that "he had never received the 'nigger vote' and that he didn't want it[,]" was found not to be severe or pervasive race harassment because "[a]lthough offensive, such instances of racially derogatory language alone, extending over a period of more than two years, [were] too sporadic and isolated to establish that her employers' conduct was so objectively severe and pervasive as to alter the terms and conditions of her employment"); *Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 2d 1314 (M.D. Fla. 2002) (granting motion for summary judgment where two of supervisor's comments to black employee, that he should "remember how we did blacks in the thirties when they got out of hand . . . we would take them out back and lynch them," and that he used guns like the one missing from the store "to shoot blacks," although offensive "were not frequent enough to alter the terms or conditions of employment" under Title VII).

Here, when Plaintiff's testimony is analyzed against the Eleventh Circuit's *Mendoza* factors, it is clear that the conduct alleged, even if true, is not actionable because it is not objectively frequent enough, severe, physically threatening, and it did not unreasonably interfere with Plaintiff's job performance. *Mendoza*, 195 F.3d at 1238. While Plaintiff attempts to describe everything that happened in his employment as "racial harassment" (*see, e.g.*, Sec. Am. Compl. ¶¶ 37(a)-(g), 40(a)-(b), 42(a)-(d)), the only actual allegation that can reasonably be interpreted as supporting a claim of race harassment is the allegation that non-supervisory employees called Plaintiff "Midnight," "Charcoal," "Darkness," "Black Jesus," and the "Malcolm X of the Police Department." (Sec. Am. Compl. ¶10). Even prior to the relevant time period, Plaintiff admits that he perceived being called these names as jokes, such as when Sgt. McIntosh (who identifies as Black) would tell Plaintiff that he "can make charcoal jealous," and when Sgt. McIntosh and Sgt. Cooper (who likewise identifies as Black) put a black square on a piece of paper and said it was Plaintiff's graduation picture. (SOF ¶¶ 22-23). Despite alleging that being called "darkness" supports his race harassment claim, Plaintiff testified that only two people called him "darkness"; Officer Rebholz (who identifies as White) and Sgt. Allison (who identifies as Black)). (SOF ¶ 23). Despite Officer Rebholz being White, Plaintiff considered it to be a joke from both men. (*Id.*) ("I didn't think he had any racial intent."). Plaintiff also perceived being called "Midnight" by Officer Rebholz, and "Charcoal" by Lt. McIntosh and Lt. Bullard, as a joke. (SOF ¶ 23). Plaintiff also admits he called himself "Midnight" and responded to it during his employment. (SOF ¶ 24).

Within the relevant time period, Plaintiff testified that Sgt. Lally only called him "Midnight" one time in the last three years of his employment, when he greeted Plaintiff by saying "What's up, Midnight?" (SOF ¶¶ 29-31). Plaintiff testified that Sgt. Gellin either called him "Midnight" or "2280," which was Plaintiff's police ID number, when addressing Plaintiff, though Plaintiff stopped working in the same unit Sgt. Gellin around July 30, 2020, when other officers complained about Plaintiff's attitude. (SOF ¶¶ 25-28). In his text message exchange with Sgt. Gellin, Sgt. Gellin does not refer to Plaintiff as "Midnight" at any point. (SOF ¶ 26). Therefore, even if one were to disregard that Plaintiff subjectively perceived many of the comments upon which his claim is based (*see*, Sec. Am. Compl. ¶10) to be "jokes," his claim still fails because the alleged conduct is not sufficiently severe or pervasive to be actionable under applicable precedent.

### iii. Plaintiff cannot establish the alleged race harassment sufficiently interfered with the terms and conditions of his employment.

Even if the Court were to find the forgoing conduct to be sufficiently frequent and severe,

Plaintiff has not presented any evidence that any conduct interfered with his work performance or that it affected his compensation or other terms and conditions of employment in any way. *Mendoza*, 195 F.3d at 1248 (noting the existence of frequent conduct "does not compensate for the absence of other factors"). To the contrary, Plaintiff did not suffer any adverse employment actions *because of* any alleged harassment, regardless of his repeated attempts to link the two. (SOF ¶¶ 34-45). Likewise, Plaintiff has not presented any evidence that any alleged harassment was physically threatening or humiliating. Instead, when asked why he requested that his deposition be moved from West Palm Beach to Fort Lauderdale, Plaintiff testified about more than 30 instances that he subjectively believed were physically threatening. (SOF ¶¶ 20-21). However, not a single one of those events had anything to do with Plaintiff's race. (*Id*.). When he was interviewed under oath during IA investigations, and by HR, relating to some of these events, Plaintiff never once mentioned believing that his race was related in any way. (*See e.g.*, SOF ¶¶ 58, 63). Importantly, Plaintiff ignores his involvement in all of these events. For example, text messages show Plaintiff invited Sgt. Allison to "[b]ring [his] bitch ass now[,]" and texted Sgt. Allison to "56" (i.e., to "meet" Plaintiff) nearly 20 consecutive times. (SOF ¶ 69). Despite admitting they would have "probably" fought as a result, Plaintiff did not perceive his own conduct to be physically threatening. (*Id*.) ("I made no comment of making physical threats to him[.]"). Because Plaintiff has failed to present any evidence that he was physically threatened due to his race, or that such conduct interfered with his work performance, his race harassment claim fails.

      **iv.   Plaintiff has failed to establish that the City is liable for any alleged race harassment because Sgt. Gellin and Sgt. Lally were not supervisors under applicable U.S. Supreme Court precedent.**

Even if Plaintiff could meet his burden of establishing that Sgt. Gellin and Sgt. Lally's conduct was sufficiently severe or pervasive, and altered the terms and conditions of his employment (which he cannot), the City is nevertheless entitled to summary judgment because Plaintiff is unable to establish a basis for the City's liability. As courts have recognized, "[a]n employer's liability in a hostile work environment claim depends on the status of the harasser." *Albakri v. Sheriff of Orange Cty.*, No. 615CV1969ORL31GJK, 2017 WL 1196664, at *6 (M.D. Fla. Mar. 31, 2017). If, as is the case here, "the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.*; *see also*, *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997).

      ***a.   Sgt. Gellin and Sgt. Lally are not "supervisors."***

In *Vance v. Ball State University*, the Supreme Court provided a bright-line rule as to who could be a supervisor under Title VII: employees can be considered a supervisor "**only when the employer has empowered the employee to take tangible employment actions against the victim**, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" 570 U.S. 421, 431 (2013) (emphasis added). The Court stressed the advantages of such a bright-line test as being "one that can be readily applied," holding that "supervisor status will generally be capable of resolution at summary judgment." *Id.* at 441. Contrary to Plaintiff's allegation that "white supervisors" harassed him (Sec. Am. Compl. ¶1), the undisputed facts establish that Sgt. Gellin and Sgt. Lally were "coworkers" and not "supervisors" under Title VII because neither had the power to hire, fire, discipline, promote, reassign, or take other actions with respect to the terms and conditions of Plaintiff's employment. (SOF ¶ 33).

### b. *Plaintiff cannot show the City was negligent.*

Where, as here, "the alleged harasser is a coworker, an employer is liable only if it was negligent—that is, if it 'knew or should have known of the harassing conduct but failed to take prompt remedial action.'" *Harrison v. City of Tampa*, No. 8:17-CV-01369T02CPT, 2019 WL 2358791, at *8 (M.D. Fla. June 4, 2019). Plaintiff has the burden of establishing that he put the City on notice by "proving that []he complained to higher management of the problem or by demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises." *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir. 1988). However, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *See Miller v. Chi. Transit. Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021). Here, Plaintiff cannot establish that he put the City on notice of any alleged acts of race harassment.

The City maintained a reporting procedure for employees to file complaints of harassment based on a protected category. (SOF ¶¶ 46-47). Plaintiff was aware of that policy, and was regularly trained on the policy. (SOF ¶¶ 48-50). While Plaintiff testified having utilized the City's reporting procedure by writing down all of his complaints and providing those complaints to HR and IA, none of Plaintiff's communications to HR or IA contain any allegations regarding his purported belief that he was harassed because of his race. (SOF ¶¶ 51-71). Instead, Plaintiff's numerous letters demonstrate nothing more than generalized grievances, which do not support him

having complained about race harassment, as required.  Plaintiff's written grievances are generalized, despite the fact that Plaintiff agreed that writing "detailed reports that can be investigated, followed up on and ultimately lead to criminal charges is an important aspect of [his] job" of police officer. (SOF ¶ 53).  Plaintiff also agreed that, when preparing written reports, it is important to describe events exactly as they happened, which he testified having done to the best of [his] ability[.]" (*Id.*).  Additionally, despite knowing everyone's email at the City, Plaintiff never wrote Chief Adderley, Assistant Chief West, the City Administrator, nor the City's Mayor to complain about any alleged race harassment directly. (SOF ¶ 51).  Therefore, even if the alleged conduct towards Plaintiff was "sufficiently severe or pervasive, there would be no basis for holding the [City] liable." *Harrison*, No. 8:17-CV-01369T02CPT, 2019 WL 2358791, at *8.

> **v.  If Sgt. Gellin and Sgt. Lally were considered "supervisors," the City would nevertheless be entitled to summary judgment on their Seventh Defense because it exercised reasonable care (*Faragher* Defense).**

Even assuming that Sgt. Gellin and Sgt. Lally were Plaintiff's supervisors, which they were not, an employer may raise an affirmative defense to liability based upon supervisor harassment by proving: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior," and (b) that the plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. 775, 807 (holding that the question of notice of alleged harassment to the employer is distinct from the question of the whether an environment is sufficiently severe or pervasive to constitute harassment).  Here, because the City effectively promulgated an anti-discrimination and harassment policy, and Plaintiff failed to take advantage of that policy by never complaining about any of the alleged acts of race harassment (SOF ¶¶ 46-71) or, at best, having delayed over 15 years from when he claims the alleged race harassment began to complain for the first time (Sec. Am. Compl. ¶10), his claim for race harassment must fail.

> #### a.  The City has taken reasonable care to prevent harassment.

The effective promulgation of an anti-harassment policy satisfies the first prong of the *Faragher* affirmative defense. *Id.* at 807-808; *see also*, *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298-99 (11th Cir. 2000) (holding the employer exercised reasonable care to prevent harassment based upon an effective anti-harassment policy).  Here, it is undisputed that the City has always had an EEO Policy, which contains prohibitions against race harassment and discrimination, and contains a complaint procedure that allows employees to file complaints of

"actual or suspected EEO policy violations" with the City's EEO Compliance Officer, or "directly with the Chief Human Resources Officer, the City Administrator, or the Mayor." (SOF ¶¶ 46-50). Since the City promulgated a comprehensive anti-harassment policy that was effectively communicated to Plaintiff, it has satisfied the first part of the *Faragher* defense.

### b. Plaintiff unreasonably failed to take advantage of corrective opportunities.

Under the second element of the *Faragher* defense, an employee unreasonably fails to take advantage of preventative or corrective measures by "not using the procedures in place to promptly report any harassment." *Baldwin*, 480 F.3d at 1306. Here, Plaintiff claimed that he wrote and submitted each of his alleged "complaints" about race discrimination, but the writings themselves show that Plaintiff never complained about race discrimination whatsoever. (SOF ¶¶ 54-71). Instead, Plaintiff only complained about generalized grievances, which is insufficient to establish that he engaged in a protected activity under Title VII. *See, e.g.*, *Wooden v. Dolgencorp, LLC*, No. 5:21-CV-46-TKW/MJF, 2022 WL 1750048, at \*5 (N.D. Fla. May 11, 2022), *R&R adopted*, No. 5:21-CV-46-TKW-MJF, 2022 WL 1747341 (N.D. Fla. May 31, 2022) ("communications with management must be **acts of opposition to prohibited discrimination**") (emphasis added). As a result, there is no record evidence that would lead a reasonable person to conclude that Plaintiff complained about behavior made unlawful under Title VII under the circumstances.

Additionally, even if Plaintiff's written grievances can be ignored, and his alleged oral complaints of discrimination can be accepted, Plaintiff unreasonably delayed by waiting over 15 years to complain about race discrimination for the first time. As the Eleventh Circuit has held, such a delay in complaining to an employer with an adequate race harassment policy is still a failure by the employee to take advantage of such policy. *Baldwin*, 480 F.3d at 1307 (holding that plaintiff "waited too long" where her complaint "came three months and two weeks after the first proposition incident and three months and one week after the second one") (citing *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1289-91 (11th Cir. 2003) (an employee's reporting delay of two and a half months after the first incidents of harassment was too long for purposes of *Faragher*). "The genius of the *Faragher-Ellerth* plan is that the corresponding duties it places on employers and employees are **designed to stop [ ] harassment before it reaches the severe or pervasive stage** amounting to discrimination in violation of Title VII. . . . But that design works only if employees report harassment promptly, earlier instead of later, and the sooner the better." *Baldwin*, 480 F.3d at 1307 (emphasis added). Accordingly, Plaintiff's race harassment claim fails.

**B.** <u>**Plaintiff Cannot Establish A Claim Of Tangible Employment Action Discrimination.**</u>

To establish a *prima facie* case of tangible employment action discrimination under Title VII, Plaintiff must prove that: (1) he was a member of a protected category; (2) he was qualified for, or adequately performed, his position; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably than he was. *See Knight v. Baptist Hosp. of Miami, Inc*., 330 F.3d 1313, 1316 (11th Cir. 2003). Plaintiff bears the ultimate burden of proving that the City intentionally discriminated against him. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

In cases such as this one, where there is no direct evidence of discrimination, the Supreme Court has created a framework on the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The burden is on the Plaintiff to "produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion." *Williams v. Vitro Servs. Corp.,* 144 F.3d 1438, 1441 (11th Cir. 1998). If Plaintiff is able to produce sufficient evidence to create an inference of discrimination and establish a *prima facie* case, the burden then shifts to the City to articulate a legitimate, non-discriminatory reason for the employment action. *Castillo v. Roche Labs, Inc.*, 467 F. App'x 859, 862-63 (11th Cir. 2012). To satisfy this burden, the City need only *produce* evidence that would allow the trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus. *See Burdine,* 450 U.S. at 253; *see also*, *Clarke v. Winn-Dixie Stores, Inc*., No. 06-61886-CIV, 2007 WL 3011018, at *4 (S.D. Fla. 2007) (Moreno, J.) (explaining *McDonnell Douglas* framework).

Once the City does so, the burden shifts back to Plaintiff to *prove* that (i) the reason proffered by the City is pretext; and (ii) that the actual reason for the adverse employment action was discrimination. *Brown v. City of Opelika,* 211 F. App'x., 862, 863-64 (11th Cir. 2006). Based on the undisputed facts, Plaintiff has failed to prove intentional unlawful discrimination and the City is entitled to judgment as a matter of law.

**i.  Plaintiff's Discrimination Claim Must Fail Because He Cannot Identify Any Similarly Situated Employees Outside Of His Class.**

In order to establish a *prima facie* case of tangible employment action discrimination, Plaintiff must prove that the City treated similarly situated employees outside his protected category (i.e., non-black police officers) more favorably than him. *Coutu v. Martin Cty. Bd. of Cty.*

*Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995).  In a comparator analysis, it is Plaintiff's burden to show that he and his comparators were "similarly situated in all material respects." *Lewis v. City of Union Cnty., Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019).  In the "usual case, a comparator who is 'similarly situated in all material respects': [1] will have engaged in the same basic conduct (or misconduct) as the plaintiff; [2] will have been subject to the same employment policy, guideline, or rule; [3] will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and [4] will share the plaintiff's employment or disciplinary history. *Hartwell v. Spencer*, 792 F. App'x 687, 693 (11th Cir. 2019).

In his Second Amended Complaint, Plaintiff misconstrues his burden and alleges that "no white law enforcement officer employed by the City of West Palm Beach has ever been subject to termination based on a [sic] internal-affairs investigation into non-criminal behavior discovered by Organized Crime detective using a search warrant that had been issued to find evidence that a police officer had leaked confidential information to criminals to disrupt a drug-trafficking investigation." (Sec. Am. Compl. ¶ 66).  This attempt to flip the burden is simply a red herring. By describing the acts that only he has ever engaged in, and then claiming that no such person "has ever been subject to termination," Plaintiff is not establishing the existence of a comparator, he is actually demonstrating that no comparator exists.  For sake of clarity, apart from Plaintiff, the City has _never_ obtained a search warrant for another police officer – regardless of race – because the City has never had probable cause to believe that another police officer has been associating with a convicted felon that actively antagonizes the City and serves as a "street lawyer" for a drug trafficking organization. (SOF ¶ 72).  Plaintiff's claim fails for this reason alone. *See Lewis*, 918 F.3d at 1220–21; *see also*, *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1324 (11th Cir. 1998) (plaintiff failed to establish a *prima facie* case of discrimination where "no similarly situated, nonminority employee was identified who was treated better than [p]laintiff"); *Jackson v. Geo Group, Inc*., 2008 WL 11333141, at *6 (S.D. Fla. Apr. 1, 2008) (Ryskamp, J.) (granting summary judgment in favor of employer where plaintiff failed to "identify any similarly-situated employees outside his protected class who received more favorable treatment than he"); *Dawson v. Miami-Dade Cnty.*, 07-20126 CIV, 2008 WL 1924266, at *8 (S.D. Fla. Mar. 11, 2008) ("To satisfy the third element of a *prima facie* case [of discrimination], Plaintiff must identify at least one similarly-situated employee who was treated differently than Plaintiff."); *Solorano v. University of Miami*, 2014 WL 12498004, at *2 (S.D. Fla. 2014) (dismissing plaintiff's discrimination claim for failure

to identify a similarly situated employee who was treatment more favorably).

### ii. The City has articulated a legitimate, non-discriminatory reasons for its actions, for which there is no evidence of pretext.

Even if Plaintiff can establish a *prima facie* case of discrimination (and he cannot), the City can rebut the initial inference of discrimination by articulating a legitimate, non-discriminatory reason for its employment decisions, including Plaintiff's termination. *McDonnell Douglas*, 411 U.S. at 802. Because the City need only produce, rather than prove, a non-discriminatory reason, its burden is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (noting that the employer's burden is one of production, and "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff").

The undisputed record evidence establishes that Chief Adderley ordered Plaintiff to undergo a fitness-for-duty examination after nearly all of Plaintiff's platoon complained about him. (SOF ¶ 36). After Dr. Brannon declared Plaintiff unfit for duty, Chief Adderley ordered Plaintiff to mandatory EAP (which Plaintiff had also attended in 2013), light duty for 90 days, and then administrative leave pending his fitness for duty re-evaluation. (SOF ¶ 37). After Plaintiff's fitness for duty re-evaluation, he was found to be fit for duty limited to a non-patrol assignment that did not require collaboration with other police officers, which is why Chief Adderley assigned Plaintiff to City Hall. (SOF ¶ 38). Plaintiff was then re-assigned from City Hall to the Police Department lobby after code enforcement officer Cassandra St. Hillaire (who identifies as Black) filed a sexual harassment complaint against Plaintiff, and the City Administrator (who also identifies as Black) required Chief Adderley to re-assign Plaintiff because he "was causing a disruption." (SOF ¶ 39). The second time Chief Adderley placed Plaintiff on administrative leave resulted from an IA investigation being opened into Plaintiff's numerous communications with Mr. Althouse. (SOF ¶¶ 40-41). Finally, Chief Adderley terminated Plaintiff after IA conducted an independent investigation, and determined that Plaintiff engaged in misconduct that required discipline. (SOF ¶¶ 41-42). The IA investigation, yielded credible evidence of Plaintiff's malfeasance, including Plaintiff's text messages and admissions, including Plaintiff's admitted association with Mr. Althouse. (SOF ¶ 41). The undisputed evidence also reflects that the sole decision-maker with respect to Plaintiff's termination, Chief Adderley, independently reviewed the AI investigation and, after meeting with Plaintiff and his counsel, determined that Plaintiff failed to provide a justifiable reason for his actions, warranting his immediate termination. (SOF

¶42). All of these events - including Plaintiff's termination, which was based on his violation of numerous City polices and which he cannot dispute - are legitimate, non-discriminatory reasons that are sufficient to meet the City's "exceedingly light" burden of production under *McDonnell Douglas. Perryman*, 698 F.2d at 1142; *see also Edwards v. Niles Sales & Serv., Inc.*, 439 F. Supp. 2d 1202, 1230 (S.D. Fla. 2006) (Moore, J.) (holding that "without question, these are legitimate reasons to fire an employee," where the employee had not complied with a company policy).

### iii. Plaintiff fails to establish the City's actions are pretextual.

As the Eleventh Circuit has explained, "if the [employer's] proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). Plaintiff cannot establish pretext based only on the fact that he does not agree with the City's stated legitimate, non-discriminatory, non-retaliatory reasons, and his disagreement with those decisions does not render unworthy of credence or otherwise raise a genuine issue of fact. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head."). Moreover, it is well-settled that it is neither Plaintiff's nor the Court's role to second-guess the City's personnel decisions. *See, e.g., Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) ("Sears' business judgment—its decision to restructure its management program—does not concern us."). Since Courts "are not in the business of adjudging whether employment decisions are prudent or fair[,] . . . [the Court's] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Kok v. Kadant Black Clawson, Inc.*, 274 F. App'x 856, 858 (11th Cir. 2008). Therefore, "[t]o show that the employer's reasons were pretextual, the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Valenzuela v. GlobeGround North America, LLC*, 18 So. 3d 17, 25 (Fla. 3d DCA 2009), citing *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004). Plaintiff must come forward with evidence "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons[.]" *Lawson v. Plantation Gen. Hosp., L.P.*, 2010 U.S. Dist. LEXIS 30953 at *21 (S.D. Fla. Mar. 30, 2010) (citations omitted).

Here, Plaintiff admitted that he never worked in a management level position and never

worked as a member of human resources at the City. (SOF ¶ 32).  Plaintiff also admitted that he never participated in any employment decisions for any other City employee, and does not know what information or evidence the City's decision-makers rely upon when rendering employment decisions. (*Id.*).  Plaintiff also does not allege that the City's decision-maker, Chief Adderley, ever made any discriminatory comments about Plaintiff's race.  Most importantly, Plaintiff has offered zero credible evidence that a similarly situated employee was treated more favorably than he was. Therefore, he cannot challenge the legitimate, non-discriminatory reasons the City provided for its actions, and cannot show the City's proffered reasons are pretext for race discrimination.

### C.  Plaintiff's Retaliation Claims Fail As A Matter of Law

Under Title VII's anti-retaliation provision, an employer cannot retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e3(a).  To establish a *prima facie* case of retaliation, a plaintiff must show: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse action. *Howard v. Walgreen* Co., 605 F.3d 1239, 1244 (11th Cir. 2010). In order to show causation, Plaintiff must show that: (1) the decision-maker was aware of his protected conduct; and (2) the protected conduct and the adverse employment action were not wholly unrelated. *Gupta v. Fla. Bd. Of Regents*, 212 F.3d 571, 590 (11th Cir. 2000).  Plaintiff may do so by demonstrating that the decision-maker became aware of the protected activity and that there was close temporal proximity between when the decision-maker learned of the protected activity and the subsequent adverse employment action. *Id.*  Importantly, the Court "must focus on the actual knowledge and actions of the decision-maker[,]" who in this case was solely Chief Adderley. (SOF ¶ 33).  *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002); *Brown*, 211 F. App'x., at 863-64.

#### i.  Plaintiff cannot establish a causal connection between his alleged protected activity and termination.

In his Second Amended Complaint, Plaintiff alleges that he was terminated against after the "Department of Justice issued [Plaintiff] a notice of right to sue concerning the second EEOC [sic] via electronic mail May 15, 2022, cc'ing 'City of West Palm Beach, et al." (Sec. Am. Compl. ¶ 49).  Plaintiff contends that, "within two months of the City's receive of the Notice of Right to Sue, <u>i.e.</u>, on July 15, 2022, the City obtained a search warrant to seize MPO Harrell's cell phone[.]"

17

(Sec. Am. Compl. ¶ 50).   At the very least, Plaintiff fails to satisfy the third prong of his *prima facie* case of retaliation because he has failed to establish that: (1) Chief Adderley (the decision-maker) was aware that Plaintiff engaged in any protected activity prior to terminating his employment; and (2) Chief Adderley actually based his decision to terminate on any such protected activity, or that it was a "significant factor." *Bigge*, 894 F.2d at 1501.   As a matter of common sense and settled law, a "decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. Bellsouth Tel. Inc*., 231 F.3d 791, 799  (11th Cir. 2000).   In the Eleventh Circuit, plaintiffs are required "to show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories." *Raney v. Vinson Guard Svc., Inc*., 120 F.3d 1192, 1997 (11th Cir. 1997) (affirming summary judgment where plaintiff failed to present evidence showing that the decision-maker knew of plaintiff's protected activity).

Here, it is undisputed that Chief Adderley was unaware of the City's receipt of the notice of right to sue, let alone at the time he made the decision to terminate Plaintiff's employment. (SOF ¶¶ 44-45).   Additionally, Chief Adderley was not aware, nor did he have reason to suspect, that Plaintiff ever complained about discrimination, harassment, or retaliation on any basis, including on the basis of his race, when he terminated his employment. (*Id*.).   Based on those uncontroverted facts, and given that Plaintiff has already admitted that he cannot show that "the ultimate decision-maker knew of [his] protected activity when he made the decision" to terminate his employment, there can be no causal connection and his claim must fail.  *See McShane v. U.S. Attorney General*, 144 F. App'x. 779, 791 (11th Cir. 2005) (citing *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 155-56 (11th Cir. 2002)) (finding no causation where there was no evidence that the decision maker had knowledge of the alleged protected activity prior to transferring employee).

### a.  *Plaintiff's Intervening Act of Misconduct Destroys Any Causal Connection.*

Even if Plaintiff could establish, beyond speculative timing, that Chief Adderley was aware of the existence of the notice of right to sue *before* deciding to terminate Plaintiff's employment (which he cannot), Plaintiff's retaliation claim still fails because of his intervening act of misconduct.  This separates any possible causal connection between the City's receipt of the notice of right to sue, and Chief Adderley's decision to terminate Plaintiff's employment. *See*, *e.g.*, *Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997) (finding no causal connection between a protected act and an adverse action, where the adverse action was caused by intervening act of misconduct); *Brisk v. Shoreline Foundation, Inc.*, 654 F. App'x. 415 (11th Cir. 2016) (affirming

summary judgment in favor of the employer where there was an intervening cause of poor work performance between the employee's protected conduct and termination).

### ii. The City proffered a legitimate, non-retaliatory reason for Plaintiff's termination for which there is no evidence of pretext.

As with Plaintiff's tangible employment action discrimination claim (*see*, IV(B)(ii)-(iii)), even if Plaintiff could establish a *prima facie* case of retaliation (and he cannot), the City can meet its "exceeding light" burden of producing, rather than proving, non-retaliatory reasons for its employment actions. *Perryman*, 698 F.2d at 1142. Plaintiff's retaliation claim must therefore fail.

### D. Plaintiff's §1983 Claim Fails As A Matter Of Law.

Pursuant to *Monell v. Dep't of Soc. Serv.*, and its progeny, municipalities like the City can only be sued directly under §1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978). However, "a municipality can be found liable under §1983 only where the municipality itself causes the constitutional violation at issue." *Baxter v. Roberts*, 54 F.4th 1241, 1269 (11th Cir. 2022). To state a claim for *Monell* liability, Plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). The Eleventh Circuit has identified at least three routes by which a plaintiff can seek to establish a "custom or policy": "(1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022).

### i. Plaintiff has failed to establish a violation of the U.S. Constitution.

The Fourth Amendment ensures the right of citizens to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. Art. IV. "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

Plaintiff's §1983 claim is simple: he alleges the City violated his Fourth Amendment-protected expectation of privacy when the Police Department's "Organized Crime Investigators . . . [p]rovide[d] the internal-affairs detectives with information concerning possible violations of

administrative rules[.]" (Sec. Am. Compl. ¶ 77(a)-(c)).  Plaintiff's claim is factually misleading, and legally incorrect.  Factually, Circuit Court Judge Caroline Cahill Shepherd issued search warrants for the <u>City</u> to search Plaintiff's cell phone, and did not limit the search to OCS. (SOF ¶ 73).  Legally, while the Fourth Amendment "protects the citizen against invasion of privacy . . . [o]nce that interest is invaded legally by an official of the State, the citizen has lost his reasonable expectation of privacy to the extent of the invasion." *United States v. Brand*, 556 F.2d 1312, 1317 (5th Cir. 1977).[2]  "Later arrivals may join their colleagues even though the exigent circumstances justifying the initial entry no longer exist." *Id.*  While the undersigned has not found any Eleventh Circuit or Supreme Court cases in which those courts analyze a subsequent viewing or use of seized information for personnel related purposes, the existing applicable precedent establishes that Plaintiff lost any reasonable expectation of privacy in the information from his cell phone when the City first searched his phone.  Because Plaintiff cannot establish the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," his claim must fail.

### ii. Plaintiff has failed to prove a "custom or policy."

Even if the subsequent viewing of information legally seized as a result of a search warrant did violate the Fourth Amendment (which it does not), no reasonable juror could find that the City had a policy, practice, or custom of sharing information obtained via a search warrant with its IA unit, as Plaintiff argues.  In fact, while information that has been obtained <u>without</u> a search warrant has been provided to IA in connection with other personnel investigations, the City has *never* previously obtained a search warrant in connection with any of its police officers (SOF ¶ 73), and Plaintiff can present no evidence to support an inference that this is a widespread policy within the City.  Plaintiff presents no evidence to suggest that a City employee was acting pursuant to an actual policy, as opposed to Plaintiff's own belief that, under the circumstances applicable to Plaintiff's particular situation, it was permissible for OCS to share information from his cell phone with IA without the need for an additional warrant. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (noting that "policy" within the context of *Monell* liability "generally implies a course of action consciously chosen from among various alternatives").  Plaintiff has therefore failed to establish that the City had a policy, practice, and custom, and his §1983 claim must fail.

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 30th day of April 2024, I served a true and correct copy of

the foregoing document via e-mail to the following:

### <u>Service List</u>

William R. Amlong, Esquire
Jennifer Daley, Esquire
The Amlong Firm
500 N.E. Fourth Street
Suite 101
Ft. Lauderdale, FL 33301
wramlong@theamlongfirm.com
jdaley@theamlongfirm.com
*Attorneys for Plaintiff*

 /s/*Fabian A. Ruiz*
*Counsel for Defendant*
*City of West Palm Beach, FL*

#60242156 v1

21