# EXHIBIT D TO CITY'S STATEMENT OF MATERIALS FACTS

# DEPOSITION TRANSCRIPT OF FRANK ADDERLEY WITH EXHIBITS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:22-cv-81275-AHS

KEVIN HARRELL,

Plaintiff,

vs.

CITY OF WEST PALM BEACH, a Florida municipal corporation; BRIAN GELLIN, individually; SCOTT LALLY, individually, and MICHAEL OSWALD, individually,

Defendants.
_______________________________/

Zoom Deposition Teleconference

Tuesday, February 27, 2024
10:52 a.m. to 3:18 p.m.

DEPOSITION OF

FRANK ADDERLEY

Taken before Nicholas Bruens, Court Reporter, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition Duces Tecum filed in the above-styled cause.

APPEARANCES:

On Behalf of the Plaintiff:

AMLONG & AMLONG, P.A.
500 Northeast 4th Street, Suite 101
Fort Lauderdale, Florida 33301
(954) 462-1983
wramlong@theamlongfirm.com
BY: WILLIAM R. AMLONG, ESQUIRE

On Behalf of the Defendants:

GRAYROBINSON, P.A.
333 Southeast 2nd Avenue, Suite 3200
Miami, Florida 33131
(305) 416-6880
julie.zolty@gray-robinson.com
fabian.ruiz@gray-robinson.com
BY: JULIE ZOLTY, ESQUIRE
BY: FABIAN RUIZ, ESQUIRE

CITY OF WEST PALM BEACH
Post Office Box 3366
West Palm Beach, Florida 33402
(305) 822-1350
dyeargin@wpb.org
BY: DOUGLAS YEARGIN, ESQUIRE

Also Present:

KEVIN HARRELL, PLAINTIFF

INDEX

| TESTIMONY OF FRANK ADDERLEY | PAGE |
|---|---|
| Direct Examination by Mr. Amlong | 5 |
| Cross-Examination by Mr. Ruiz | 102 |
| Redirect Examination by Mr. Amlong | 104 |
| Recross-Examination by Mr. Ruiz | 109 |
| Certificate of Oath | 111 |
| Certificate of Reporter | 112 |

INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 30 | Search Warrant Affidavit | 21 |

THEREUPON:

FRANK ADDERLEY,

having been first duly sworn and responding, "Yes," was examined and testified as follows:

DIRECT EXAMINATION

BY MR. AMLONG:

Q. Good morning, Chief Adderley. My name is Bill Amlong, I represent Kevin Harrell. Please give us your full name, tell us what city you live in and what you do for a living.

A. Full name is Franklin Charles Adderley. I am the -- I currently reside in the City of Fort Lauderdale, Florida. And I have a rental apartment in the City of West Palm Beach, where I am currently employed.

Q. And your job is Chief of Police?

A. Yes. I'm the Police Chief in the City of West Palm Beach.

Q. How did you get that job?

MR. RUIZ: Objection to the form. You can --

THE WITNESS: I was nominated by the Mayor and confirmed by the City Commission back in June of 2019.

BY MR. AMLONG:

Q. And take me briefly through your educational

and professional background.

A. Education, I graduated from Stranahan High School. I have an associate degree at the Broward Community College in Criminal Justice, a bachelor's degree in criminal justice from Florida Gulf Coast University, and I have a master's degree in public administration from Florida International University. That is my educational background. What else?

Q. Well, what -- when did you get your bachelor's degree?

A. I believe it was like 1992. Wait. No, no. Let me back up. Bachelor's degree probably was 2002, somewhere in that ballpark.

Q. Okay. And your master's is from FIU?

A. Yes, sir.

Q. And what is that in?

A. That year was 2014.

Q. And what is your master's in?

A. Oh. What is it in, public administration.

Q. And take me through your professional background, please.

A. I got hired at Fort Lauderdale Police Department in October of 1980. I spent thirty-six years in Fort Lauderdale Police Department, where I obtained the rank of Sergeant, Captain, Major.

I was the Assistant Chief, and then I became the Police Chief my last eight years in the City of Fort Lauderdale. After that, I had a rank of Colonel at the Broward Sheriff's Office for two years, in charge of the Community Service Division, Service Bureau. And for the last two-and-a-half years I have served as the Police Chief here in the City of West Palm Beach.

Q. Okay. How long were you a sergeant?

A. How long?

Q. Yes.

A. Let's see. I got promoted to sergeant, I don't know, ten years maybe.

Q. And captain?

A. I was a captain for about, maybe, five years or so. I was a major for about a year. I was the Assistant Chief for less than a year before they made me the Police Chief.

Q. Police Chief for how long? Eight years you said?

A. I was the Police Chief for Fort Lauderdale for eight years.

Q. And when you were a sergeant, what were your assignments? When you were a police officer, what were your assignments?

A. As a police officer, I worked road patrol. I

was on a proactive street patrol unit assigned to the Fort Lauderdale Beach. And then I became a narcotics detective serving in the Major Narcotics Unit.

And before, I spent about three years in the DEA Task Force before I got promoted to the rank of sergeant. As a sergeant, I served in the Patrol Division.

I was then in charge of the sergeant assigned to the Street Suppression Team in Fort Lauderdale, known as the Raiders was our name. And then I went from there to the Office of Internal Affairs as a sergeant.

After that, I was promoted to the rank of captain, where I served in the Patrol Division. I then went to the Community Service Division. I then took over the --

Q. After you were captain you went to what division?

A. As -- when I got promoted to the rank of captain, I was in the Patrol Division with my first assignment as a captain. From there, I went to the Community Policing Division as a captain.

And from there, I went to the Special Investigations Division as a captain. And from there, I got promoted to the rank of major, where I served in the Patrol Division in charge of a district in our city at the time, the City of Fort Lauderdale.

And from there, I got promoted to the rank of Assistant Chief in Charge of Investigations. And from Assistant Chief, I then took over the agency as the Chief, Police Chief.

Q. And you were the Assistant Chief for less than a year?

A. Yes.

Q. You said that you were a narcotics detective and you spent three years with the DEA Task Force. Was that at the same time?

A. As I served in the narcotics. Yeah. I was assigned to the Organized Crime Bureau as a detective, into the Major Narcotics Unit. And I think the last, either, two or three years before I got promoted to the rank of sergeant, I was in the DEA Task Force.

Q. So, how long were you in Narcotics, including both for the City and DEA?

A. I'd say roughly, like, nine years, nine to ten years if I remember correctly. It has been so long.

Q. Okay. And as a sergeant, were you in any investigative units?

A. Yeah. As a sergeant, I was in charge of the Street Suppression Team, one of the sergeants in charge of the Street Suppression Team. And it is, basically, street level drug, prostitution, and other street crime

enforcement assignments. And then from there, I was a sergeant investigator assigned to the Office of Internal Affairs.

Q. And as a captain, were you in charge of any investigative units?

A. Excuse me? Yes. Special Investigations Division I was in charge of. It is all of the groups like the Major Narcotics, the Street Suppression Teams, the Street Prostitution Unit that worked -- the Street Vice Unit, I would say.

The Vice Unit that worked prostitution, gambling cases, extortion cases. And then I had a RICO Squad that reported to me that did racketeering cases.

Q. Okay. So, as both a police officer and as a sergeant, you've had experience in dealing with search warrants?

A. Yes.

Q. How many search warrants would you estimate that you have gotten during your career?

MR. RUIZ: Hold on. Bill, did you say gotten?

MR. AMLONG: Yes.

MR. RUIZ: Object to the form.

THE WITNESS: Well, I mean, hundreds. I mean --

BY MR. AMLONG:

Q. Okay. That's good enough.

A. Yeah. I mean --

Q. Okay.

A. -- it has been a long time since I've done a search warrant.

Q. All right. But you're familiar with what you have to do with getting a search warrant?

A. Yes, sir.

Q. And just for the record, what do you need to get a search warrant?

MR. RUIZ: Objection to the form.

THE WITNESS: You need probable cause.

BY MR. AMLONG:

Q. Probable cause for what?

A. To prove that there is a, you know, evidence that the crime was committed or about to be committed. And you have to take, like, those facts to a judge who then authorizes you to conduct the search.

Q. All right. When the judge authorizes a search, does the Judge just say go in and search the house, or does the Judge tell you to search the house for particular items?

A. It is spelled out in the warrant.

Q. So, when you go to the judge to get the warrant, you need to tell the judge not just why you

want to get material but what material you wish to get, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: Yes.

BY MR. AMLONG:

Q. And how specific do you need to be about what material it is that you are searching for?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, I mean, specifics are based on the evidence that you have gathered. And you know, if the judge feels that you have sufficient information and those facts have been articulated properly for the judge, then he'd authorize it. And if he doesn't feel that way, then the judge won't give you the search warrant.

BY MR. AMLONG:

Q. But you have to tell the judge what it is that you are searching for and why you are searching for it, correct?

A. Yes. I mean, you know, normally, you've got a State Attorney that is involved that, actually, is the lead prosecutor in the case. And they understand what the evidence in the case is. And that person kind of guides the affiant on the direction on what they are articulating to the judge.

Q. Does -- in your experience, do search warrants allow you to seize material that is not evidence of a crime?

MR. RUIZ: Objection to the form.

THE WITNESS: No. I mean, it tells you what you can search and what you can't search. And you have to comply to that order.

BY MR. AMLONG:

Q. When you were in Internal Affairs at Fort Lauderdale, how long was that?

A. How long ago that was?

Q. How long were you in the Internal Affairs?

A. I think I was about, you know, two or three years.

Q. And you were there as a sergeant?

A. Yes.

Q. In Fort Lauderdale is Internal Affairs a Criminal Investigation Unit or an Administrative Unit?

A. Administrative.

Q. How about West Palm Beach?

A. Same.

Q. When you were in Narcotics in West Palm Beach, did you ever turn over to administrative -- when you were in Narcotics in Fort Lauderdale, did you ever turn over to Internal Affairs any materials that you had

obtained from a search warrant issued for drugs?

MR. RUIZ: Objection to the form.

THE WITNESS: Yeah. That's a common practice.

BY MR. AMLONG:

Q. What would you turn over to Internal Affairs?

A. The investigation. The completed criminal investigation.

Q. Would you turn over materials that were not criminal in character?

A. That's not criminal?

Q. Yes.

A. We'd give them --

Q. Well, first of all, would you seize anything that is not evidence of a crime?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, no. I mean, when you seize stuff, you know, you have an order that you take back before the prosecutor signs off and the judge. I mean, they -- you've got to just give them a list of what you seize.

BY MR. AMLONG:

Q. And did you seize anything that is not evidence of a crime?

A. Well, I'm pretty sure that would be addressed when you give it to the prosecutor and the judge. I

mean, if they feel that it was outside the scope then that would be addressed with them.

So, you can't go back to the judge and say yeah, you told me to search this house, but I went to a second house. I mean, no. I mean, that's improper.

Q. Let me rephrase that. When you were executing a search warrant, have you ever seized anything that you did not, at the time you seized it, believe was evidence of criminal behavior?

MR. RUIZ: Objection to the form.

THE WITNESS: What do you mean when you say objection to the form when I --

MR. RUIZ: I'm just objecting to the manner in which he was asking the question. But if you understand, you can answer.

MR. AMLONG: Just to remind, for the Court's benefit, so when he's saying objecting to the form, ignore that. If he tells you not to answer, that's when you don't answer.

THE WITNESS: Okay. So, let's get back to the question. Because --

MR. AMLONG: Sure. Read that question back to me, please.

(Thereupon, a readback was performed.)

THE WITNESS: No.

BY MR. AMLONG:

Q. And so, any materials that you may have turned over to Internal Affairs would have been materials that you felt were -- was evidence of criminal behavior?

MR. RUIZ: Objection to the form.

THE WITNESS: Yeah. I mean, Internal Affairs did the investigation.

BY MR. AMLONG:

Q. But you would not turn over to Internal Affairs evidence of administrative violations, would you?

A. I don't think criminal has anything to do with administrative. They are two separate deals. So, if it is a criminal investigation and once that's completed, you then give over the criminal investigation.

Q. But you don't seize stuff that is probative only of administrative violations, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: Again, the criminal investigator is focused on a criminal investigation. When it comes to the administrative case, that is two separate deals.

So, if you've got a completed criminal investigation and you give it to the Internal Affairs Division, and they're the ones that look

into the administrative violations.

And I mean, that's the only way I can clearly explain it to you. I mean, I don't think the criminal investigator is concerned about what is happening on the administrative -- or what is happening in the administrative investigation. Because that is not really their focus.

BY MR. AMLONG:

Q. Is the West Palm Beach Police Department Internal Affairs -- I'm sorry. Is the West Palm Beach Police Department Organized Crime Section authorized to seize materials that would be probative of administrative violations by a police officer if those items are not also evidence of criminal behavior?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, I mean, if you are a what is it, supervisor or officer and you see during your criminal investigation that someone commits an administrative violation, I mean, they're compelled to give it to -- that violation to Internal Affairs.

I mean, that's their job as supervisors and officers in the department. You can't say just because I'm working a criminal investigation, and someone is seen doing some administrative violation

that you ignore because it is a criminal investigation. They are compelled to give that information to Internal Affairs.

BY MR. AMLONG:

Q. So, you are saying that you are allowed to search for, if you turn it over to Internal Affairs, material that is not covered by the search warrant?

MR. RUIZ: Objection to the form.

THE WITNESS: No. I did not say that at all. I said that if the criminal investigator sees a violation that could be an administrative violation, their role as police officers, detectives, supervisors, managers, have to give that information to Internal Affairs.

They can't ignore it. They can't say, you know, I see that a violation was done here, and I can ignore it because this is a criminal investigation, and the person didn't commit a crime.

If they commit an administrative violation, they -- it is their job to report that to Internal Affairs or their immediate supervisor.

BY MR. AMLONG:

Q. Are investigators allowed to use a search warrant to search for evidence of administrative

violations?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, again, and I think -- I think I'm explaining it to you right, but you're taking it in another context. You have a criminal investigation.

And in the criminal investigation, during the course of that investigation, someone sees an administrative violation. If it is a detective, the detective has to report that to his sergeant.

The sergeant needs to bring that to the attention of their lieutenant. The lieutenant has to determine -- has to give that to the captain. And then there's a discussion as to where it goes to, and it eventually goes to Internal Affairs.

We're not going to look at an administrative violation if it comes up in a criminal case and not do anything about it. I mean, it is there, and we've got to deal with it.

But you know, it doesn't say you've got the right to go and do a search warrant. Because the Court doesn't give search warrants for an administrative case.

BY MR. AMLONG:

Q. As Chief of Police, are you advised prior to

the issuance of any search warrant concerning one of your sworn officers?

MR. RUIZ: Objection to the form.

THE WITNESS: If they go to execute a search warrant on one of our officers?

MR. AMLONG: Yeah.

THE WITNESS: In a criminal case, yes. If it is within the -- our department. Yeah. Of course I would know about it.

BY MR. AMLONG:

Q. All right. Let me ask you to look at what has been marked as Plaintiff's Exhibit 30. And Chief, just help me for a moment. Is page 1753 part of a search warrant affidavit?

A. No. It is not.

Q. All right.

A. That is the last page of the search warrant signed by the judge, I think it was Shephard.

Q. And the search warrant goes from 1754 through 1764, correct?

A. Yeah. It seems to me that that's one document. I believe you received testimony that there was another search warrant. But this seems to be one search warrant, here.

Q. So, Chief, please look at -- and we'll make

this Exhibit 30, Bate stamped pages city1754 through city1764.

(Thereupon, Plaintiff's Exhibit 30 was marked for identification.)

BY MR. AMLONG:

Q. Were you shown this search warrant affidavit before it was submitted to the State Attorney's Office?

A. No.

Q. Were you shown this search warrant affidavit before it was sent to Judge Shephard?

A. No.

Q. Were you shown this search warrant prior to it being served on the police officer?

A. No.

Q. Were you advised of the search warrant before it was obtained?

A. Yes.

Q. Who advised you?

A. I had a conversation with the State Attorney's Office.

Q. And with whom did you speak at the State Attorney's Office?

A. I believe it was the lead prosecutor, Diva. I don't recall her last name at the moment, but she was the lead prosecutor. And they -- briefing, they briefed

us on this case. They said that they were going to execute a search warrant on Officer Harrell's cell phone.

Q. Did the prosecutor -- was that Justin Chapman or was it someone else?

A. I think it would have been Chapman's boss because I think she is the one that was in charge of this investigation.

Q. And did she tell you what they were going to be looking for?

A. Well, she gave us an overview of what the case entailed and how, you know, Officer Harrell's involvement and what they were seeking. But, you know, the State Attorney comes in and explains that -- you know, I think that they, basically, then articulate all of those things on their own when it comes to legal reasons and why they felt that they probable cause to do it.

Q. Did she explain to you what probable cause they had concerning communications between Officer Harrell and Amanda Vielma?

A. I don't recall that specifically.

Q. Did anybody ever tell you that the West Palm Beach Police Department had any reason to believe that Officer Harrell and Ms. Vielma were involved in a

criminal activity?

MR. RUIZ: Objection to the form.

THE WITNESS: And I don't recall any of that. No. I would have to refer back to the State Attorney's Office. Because they, basically, were the lead in directing our detectives and putting his update together and getting the -- having probable cause for the search warrant.

BY MR. AMLONG:

Q. Well, who instituted the search warrant, the State Attorney's Office or the Narcotics Section?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, I mean it is initiated by us under the direction of the State Attorney's Office. I mean, before you just go and get the individual case, you've got a racketeering case that the head of the Racketeering Unit that is in charge.

And she, actually, was the lead when it comes down to what steps were being made in this investigation. You've got an investigator that was the lead investigator that took direction from her.

So, you know, I'm very comfortable with the State Attorney's Office. And when they presented it to me that they had probable cause to execute

this warrant, it sounds very -- I was pretty comfortable in my comfort zone.

BY MR. AMLONG:

Q. Have you read the search warrant?

A. No.

Q. Ever?

A. No.

Q. Did you review any of the materials that were seized pursuant to the search warrant?

A. I don't know specifically about the search warrant. All I know is the internal investigation that came to me. The -- as far as the criminal case, you know, again, you've got the head person in charge of the Racketeering Office with the Palm Beach County State Attorney's Office who reports directly to the State Attorney.

And she comes in and says that this is their case, and this is what they're going to do. And they have probable cause to believe that certain things have happened, so that they can obtain a search warrant and that they are going to execute the search warrant.

I mean, that is a little bit above my grade when it comes to that. And I'm going to take her word for it. And at the conclusion, this became part of an investigation that was done, an administrative

investigation.

Q. Do you know how communications between Ms. Vielma and Officer Harrell were considered to be part of a criminal investigation?

A. Do I personally know? No.

Q. Are you aware of any evidence that Officer Harrell gave Richard Althouse concerning an ongoing narcotics investigation?

A. I was informed that he gave some information. Can I tell you the exact date without reading the investigation at this point? No. But yeah, I know that was being discussed.

Q. In your experience, did that make all of the communications between Officer Harrell and Mr. Althouse -- and Mr. Reporter, that is A-L-T-H-O-U-S-E. Does that make all of the communications between Officer Harrell and Mr. Althouse subject to the search warrant?

MR. RUIZ: Objection to the form.

THE WITNESS: Again, you know, if the State Attorney felt that it was, then you know, they were basically riding the bus on that one. So, I would say that was their call.

BY MR. AMLONG:

Q. Well, your detectives asked the State Attorney's Office to give them permission to search all

communications between Mr. Althouse and Officer Harrell, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: Yeah. And if the State Attorneys felt that it was inappropriate, they wouldn't have done it.

BY MR. AMLONG:

Q. And do you feel that all conversations between Mr. Althouse and Officer Harrell, even if they did not involve criminal information, were fair game for being seized and turned over to Internal Affairs?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, if it had been part of the criminal investigation and they gave it to Internal Affairs, then yeah. Internal Affairs gets to see it.

BY MR. AMLONG:

Q. Even if it is not a crime?

A. Well, again, Internal Affairs isn't part of the crime. Internal Affairs isn't there to tell the State Attorney's Office that they're wrong in the steps that they did and what evidence that was seized.

They are here at the conclusion of the case to review the criminal case and see if there is any administrative violations that were done. As far as the

legalities of the search warrant and the -- that's a question for the State Attorney's Office.

Q. Have you ever had a search warrant used to pursue a non-criminal Internal Affairs investigation?

A. A non-criminal Internal Affairs investigation search warrant does not exist. So, the answer to that question is no. It never happened.

Q. Did you meet with Lieutenant Herb about the search warrant?

A. Prior to the execution of it?

Q. Yes.

A. Yeah. He was at the meeting with the State Attorney's Office when they briefed him in the State Attorney's Office, saying that they were going to get this thing authorized after they meet with the judge. And they felt that they had probable cause to do what they did.

Q. What did Lieutenant Herb -- I'm sorry?

A. Would Lieutenant Herb do what?

Q. I thought I heard Mr. Ruiz saying something.

MR. RUIZ: No, no. I think it was you.

MR. AMLONG: All right. Mr. Reporter, read the question back, please.

THE COURT REPORTER: Okay. Give me a second.

(Thereupon, a readback was performed.)

MR. AMLONG: Yes.

THE WITNESS: Well, again, it wasn't really Lieutenant Herb speaking. It would be the prosecutor that is giving the briefing and telling us, you know, where they were in the investigation and what actions were going to be taken.

BY MR. AMLONG:

Q. Other than Lieutenant Herb's presence when the Assistant State Attorney called you, did you have any communication with Lieutenant Herb about the search warrants?

A. You know, I probably had a conversation with him, but don't recall exactly what that conversation entailed. But the conversation that really stood out is from the State Attorney's Office.

Because, you know, in order to get to the judge, you've got to go through the State Attorney's Office. And she was the person, again, in charge of the RICO Unit in the State Attorney's Office.

So, she has a lot of weight and her opinion definitely outstands whatever Lieutenant Herb would have had to say.

Q. Did you ever meet with Lieutenant Herb at the police station about the search warrant?

MR. RUIZ: Objection to the form.

THE WITNESS: I don't recall meeting with Lieutenant Herb. No.

BY MR. AMLONG:

Q. Did you ever meet with Captain Roble about --

MR. RUIZ: Objection to the form.

THE WITNESS: I mean, yeah. I think they were in the same meeting with the State Attorney.

BY MR. AMLONG:

Q. Did you ever meet with Captain Roble at the police station separate from the State Attorney's call?

A. I don't recall that.

Q. Huh?

A. I don't recall. Possibly, but I don't really recall that.

Q. Did you ever meet with Deputy Chief Morris before this search warrant affidavit went to the State Attorney's Office?

MR. RUIZ: Objection to the form.

THE WITNESS: Possibly. I had meetings with them. Obviously, I see them every day. But again, I mean, whatever those meetings were really relied basically on what the direction the State Attorney was going to take in this investigation.

We can meet all we want when it comes to that. But we can talk when we need to talk or whatever.

But it doesn't happen until you get the green light from the State Attorney to move forward with it, and that is what happened.

BY MR. AMLONG:

Q. Did the State Attorney's Office make any effort to file criminal charges against Officer Harrell?

MR. RUIZ: Objection to the form.

THE WITNESS: I'm not really -- yeah. I think they did consider them. Did they file charges? I don't think so. I don't recall.

BY MR. AMLONG:

Q. And Chief Morris had been fired, correct?

A. Well, I was told that he already resigned.

Q. If he had not resigned, would he have been fired?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, that is not a question for me because I'm not the person that terminated him.

BY MR. AMLONG:

Q. Who did?

A. The Mayor. I mean, the Mayor would have made that decision. Because that's the one we -- well, it would be the City Administrator because that's who he gave his resignation to.

Q. What presentation did he give?

MR. RUIZ: Objection to the form.

THE WITNESS: What?

BY MR. AMLONG:

Q. You say -- you were saying that Deputy Chief Morris was fired after giving a presentation?

A. No, no, no. Resignation.

MR. RUIZ: Resignation.

THE WITNESS: He gave a resignation. I got a -- I'd seen a resignation with Rick Morris resigned from his place of employment here in the City.

BY MR. AMLONG:

Q. Was he asked to resign?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, that was -- I don't know how that, actually --

BY MR. AMLONG:

Q. Did the --

A. Not part of the conversation.

Q. Did the City Attorney tell you that he was going to give him a choice between resigning or getting fired?

MR. RUIZ: I'm going to object on the basis of privilege. Did you mean City Administrator? You said City Attorney.

BY MR. AMLONG:

Q. I'm sorry. Did the City Administrator tell you that he was going to give Chief Morris a choice between resigning and being fired?

A. No.

MR. RUIZ: Same objection.

BY MR. AMLONG:

Q. Did they ever tell you why Chief Morris was asked to resign?

A. No.

Q. Did anyone tell you why Chief Morris was being asked to resign?

A. The only conversation I had was when the Mayor said that he was going to terminate his employment. And then the next thing I know, he resigned. So, I was not included in that conversation.

Q. Why did the Mayor tell you he was going to terminate his employment?

MR. RUIZ: Objection to the form.

THE WITNESS: He said that that was the decision that he was making. And he informed me that that's what he was going to do and that he was going to follow up with the City Administrator and that was it.

He called Morris on the phone, told him that he was being terminated, and to follow up with the

City Administrator.

And then the next thing I know, there was the letter of Rick Morris resigning. So, to tell you how it goes from termination to resigning, I was not part of that conversation.

BY MR. AMLONG:

Q. What was the reason that Chief Morris was being asked to resign?

MR. RUIZ: Objection to the form.

THE WITNESS: Again, the Mayor said that he was going to terminate employment. And he called him on the phone, told him that.

And he was then directed to follow up with the City Administrator in which I was not a part of that conversation. And the next thing I knew there was a letter saying that Rick Morris submitted his resignation, so --

BY MR. AMLONG:

Q. Did anyone ever tell you why he was being told to either resign or be fired?

MR. RUIZ: Objection to the form.

THE WITNESS: No.

MR. RUIZ: I think he's answered this a few different ways now, Bill, so --

BY MR. AMLONG:

Q. So, tell me how the structure works there. Is the Mayor in charge of the police department?

A. The Mayor is in charge of the City. And then you've got the City Administrator that is also in charge of the City that is my direct boss.

Q. Well, is the Mayor a strong mayor?

A. Yes.

Q. So, he can fire any employee he wishes?

MR. RUIZ: Objection to the form. And I know we've gone through this in other depos, but Chief Adderley is here in his personal --

MR. AMLONG: I know.

MR. RUIZ: -- capacity. And he is not here as a representative. So, you know, to the extent that you're asking questions about the structure, this is all, I mean, if we can agree, this is all based on his personal knowledge and understanding.

BY MR. AMLONG:

Q. Okay. Okay. Do you know if the Mayor can fire anyone he wishes to?

A. Well, I mean, you've got people that are -- have contract employees and protected in the you know, bargaining units that are allowed you know, due process when it comes to those types of separations from employment. And then you have people like me, that are,

you know, at-will, that can be fired without cause.

Q. Was Chief Morris an at-will employee?

A. Yes.

Q. Have you ever seized a cell phone pursuant to a search warrant?

A. Me, personally?

Q. Yes.

A. Let me think about that for a minute. No.

Q. All right. Do you know of any instance other than in the case of -- well, you do understand that Internal Affairs simply gave the -- gave Officer Harrell's search warrant to Internal Affairs, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: Internal Affairs received the search warrant.

MR. AMLONG: Internal Affairs got the search warrant, got the telephone, and then gave it to Internal Affairs.

MR. RUIZ: Objection to the form.

THE WITNESS: I don't understand. You sound as if they did a search warrant for Internal Affairs. Is that what you're asking me?

BY MR. AMLONG:

Q. No. I'm asking you whether or not they seized the search warrant. And then when they found no

criminal activity, they gave the search warrant to Lieutenant Herb?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, let me say this. I think at the conclusion of the criminal investigation, everything went to Internal Affairs. That's the best way I can explain it.

BY MR. AMLONG:

Q. Even though there was no criminal information that was obtained in the search?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, I mean, I'm not saying that there was no criminal information. I mean, the people that can articulate that better would be the State Attorney.

You know, they have a decision if they are going to criminally charge someone with the crimes that they commit or not. It just so happens, here in Palm Beach County, a lot of people commit crimes, and the State Attorney feels that they're not going to prosecute them. But you know, that's their job.

BY MR. AMLONG:

Q. Do you know whether or not there is any evidence of any crime that was committed by Officer

Harrell that was found in his search -- on his telephone?

A. Again, that is up to the State Attorney to decide.

Q. Are you aware of any -- evidence of any criminal behavior on the part of Officer Harrell that was discovered during the search of his telephone?

A. Well, I mean, I think there are some communications with him, you know, giving information to Althouse that could be a crime. I would think it's a crime.

I mean, you know, if you are obstructing justice and giving criminal information about the operations of the police department to me, I think that's a crime. But you know, the State Attorney doesn't think that that's -- they can successfully prosecute the case, that's really their call.

Q. What information did the telephone include about Officer Harrell giving -- Mr. Althouse information about any drug investigation?

MR. RUIZ: Objection to the form.

THE WITNESS: I think it is in the investigation. Do you want me to read -- I guess if I can find it, right? If that's what you're asking for.

MR. AMLONG: I want to know not what they were looking for. I want to know what information was found on his telephone concerning his giving confidential police information to Mr. Althouse.

MR. RUIZ: Same objection as before. The deponent is sitting here in his individual capacity. So, you know, to the extent that you're asking him about information that is beyond his personal knowledge, I'm going to object to the question.

THE WITNESS: Yeah. I mean, I think that would be in the investigation. Again, I mean, you know, if you look at the case, if the State Attorney feels that it is a criminal violation that they don't feel that they can successfully prosecute, it doesn't mean that the person didn't commit a crime.

BY MR. AMLONG:

Q. Had anybody told you -- has anybody from the State Attorney's Office told you that they found evidence that Officer Harrell had committed a crime on his telephone?

A. It was explained to me that they just didn't feel that they could successfully prosecute. Yeah. So, they decided not to charge him. That is my

understanding.

Q. What -- from whom did that understanding come?

MR. RUIZ: Objection to the form.

THE WITNESS: Who said that? You mean in the State Attorney's Office?

BY MR. AMLONG:

Q. Did the State Attorney's Office tell you that they found evidence of a crime, but they didn't think they could prosecute it?

A. Yeah. That was my -- as I recall, that came from the chief in charge of the Racketeering Squad.

Q. In the police department or the State Attorney's Office?

A. State Attorney's Office.

Q. So, the Chief of Racketeering in the State Attorney's Office told you that they had found information of a crime on Sergeant Harrell's phone, on Officer Harrell's phone?

A. Yeah. I mean, you know, they felt that they didn't have enough to successfully prosecute him.

Q. What information of a crime did the State Attorney's Office tell you? Did they tell you personally or did they tell somebody else from the police department?

A. That was what I recall. I recall that that

came from -- that was from the chief there, female, Diva. I don't recall her last name, but she is in charge of the Racketeering Unit there at the State Attorney's Office.

Q. So, you had -- was this a telephone call?

A. That could have been a briefing, afterwards, before everything went over to Internal Affairs.

Q. Well, the phone went to Internal Affairs before it went to the State Attorney's Office, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: The phone went to Internal Affairs. Why would the phone go to Internal Affairs before the State Attorney's Office, the group that, actually, pushed to get the search warrant? I mean, no. It is --

MR. AMLONG: You're saying the State Attorney's Office --

THE WITNESS: Hold on a second. Just one second. The phone did not go to Internal Affairs. It goes -- it is part of a criminal investigation. It went to the State Attorney's Office.

They reviewed it. It was my understanding through our follow up meetings with them that they didn't feel that they had enough to criminally prosecute the guy. They made the decision.

Not to say that the guy didn't commit a crime. That's not what they're saying. They just didn't think that they could successfully prosecute. So, there is a big difference between the two.

You know, it is do you have enough to charge him, yeah. can we successfully prosecute him, no. That's why we're not going to charge him. So, you know, that's the decision that they made.

And you know, they do that quite frequently here in Palm Beach County. So, that's something that they would have to answer to. At the conclusion of that, yeah, the case goes to Internal Affairs.

BY MR. AMLONG:

Q. What crime did they find? What crime did they suspect that they found evidence of that wasn't strong enough to prosecute?

A. I cannot speak for them.

Q. Did you speak to anybody at the State Attorney's Office about this?

A. Yeah. I mean, I had a conversation with Diva. But, you know, she felt that they didn't have enough to successfully prosecute him.

Q. Was that before or after the search warrant was issued?

A. I would say after. I mean, they need to wait until they collect all of the evidence until they make a decision.

Q. Did the -- what did the department give the State to permit the State to make that determination?

MR. RUIZ: Objection to the form. Again, the deponent is here in his individual capacity, not as a corporate representative. But if you know.

THE WITNESS: Well, it was part of the criminal investigation. I'm pretty sure you've got a copy of it.

MR. RUIZ: Bill, we've been going for about an hour and fifteen, hour twenty.

MR. AMLONG: Okay.

MR. RUIZ: How long do you plan on going? Just so to know if we should take a lunch or just a five-minute break.

MR. AMLONG: Probably a lunch.

MR. RUIZ: Do you want to do half an hour?

MR. AMLONG: Sure.

MR. RUIZ: Okay. We'll be back here at --

(Off the record.)

(Back on the record.)

BY MR. AMLONG:

Q. Chief Adderley, what role, if any, did you

have in suspending Officer Harrell in 2020 and referring him to Dr. Michael Brannon?

A. That was the discussion that we had with HR, and that was the determination that we decided, that that was the best form of action.

Q. Okay. Who recommended Dr. Brannon?

A. I did.

Q. Had you worked with Dr. Brannon before?

A. Not necessarily. I mean no. We, in Fort Lauderdale, had several cases with him.

Q. Well, that's what I mean. In -- have you worked with him before?

A. Yes.

Q. How many people did you send to Dr. Brannon for evaluation?

A. In West Palm?

Q. In Fort Lauderdale.

A. Oh. Man, I don't remember.

Q. In what role were you sending people to him? What was your role when you were doing this?

A. Oh. We want to make sure people are fit for duty. You know, when you have claims that people can't -- don't work well in group settings, constantly having disruptions in the agency, what caused these things. You know, we relied on psychologists to evaluate them.

Q. All right. Was this when you're Chief or Assistant Chief or what?

A. In Fort Lauderdale?

Q. Yes.

A. Yeah. I can't really say the number of times we did it in Lauderdale. I mean, I've done it, I think, it was three times now in West Palm Beach. Two or three times in West Palm Beach.

Q. Have you ever sent anybody to Dr. Brannon for an evaluation in which the evaluation did not come back that he was unfit for duty?

A. Saying that they were fit for duty?

Q. Unfit for duty.

A. Can you just ask that again? I think the --

Q. Okay. Of the people that you sent to Dr. Brannon, how many if any did he find fit for duty, as opposed to being unfit?

A. I can't recall. I'm sure he's found some people fit for duty in Lauderdale. But you know, when you have -- I think when you look at the people we sent to him in West Palm Beach, it was -- they were all unfit based on the evaluation.

Q. And who were the people in West Palm Beach that you sent to Dr. Brannon?

A. Harrell was one. We had another officer,

Padgett, that was sent. I think there is a third one I can't remember right now. Well, I think those two; it could be the two.

Q. Do you think there were just -- what is Officer Padgett's first name?

A. Corbell.

Q. P-A-G?

A. Yeah. I don't have the spelling with me.

Q. Was officer -- is he a police officer?

A. Yeah, he was.

Q. And when was he sent for an examination?

A. During his last shooting, which led to his termination.

Q. When did the shooting take place?

A. In July of '22.

Q. And Officer Padgett was in the middle of an arbitration when you sent him, correct?

A. No.

Q. When did you send him?

A. Well, I mean during the course of his investigation. I mean, he made some indications of using the deadly force and not even knowing that he was using deadly force.

He had a number of people that felt that the guy wasn't himself after he was involved in a shooting years

ago. We had a -- we got a person in the City who, basically, kept saying yeah, the guy has PTSD, but, you know, let's put him back on the road, which clearly was not a good recommendation because he continued to have problems with it. So, we decided to get a second opinion and we used Brannon.

Q. And Brannon found him unfit for duty?

A. Brannon found him unfit for duty, felt that he was suffering from PTSD, and he had a structured plan to help him with his PTSD. Unlike the other person that evaluated him.

Q. Who was the other person?

A. I think his name was Miller.

Q. Do you remember, was he a PhD or PsyD?

A. Well, he got a doctor. So, I'm pretty sure somebody gave him a PhD or an MD or something to go with it.

Q. Was that the same -- you said --

A. It was -- I think so.

Q. You sent Padgett to Dr. Miller?

MR. RUIZ: Objection to the form.

THE WITNESS: Padgett was sent to Miller. Everybody in West Palm Beach goes to Miller. And then you have these cases which, you know, you have people with continuing problems, and Miller seems

to think put them back on the street.

And I think that we need a second opinion. And clearly, we have individuals you know, that I think need a second opinion. We selected Branon. Brannon is totally, you know, objective. He is no contact. You know, he is a guy that give an objective opinion.

BY MR. AMLONG:

Q. Have you ever had -- has Dr. Brannon ever found anybody to be fit for duty when you sent them?

A. Yeah. I mean, when you, actually, think about -- I think he is saying Padgett could have been fit for duty. He just had a plan as to how you treat him for PTSD.

You know, rather than putting him back on the street, he felt that the guy needed treatment in order to be able to go back to the street. Unlike Miller, who said just put him back on the street.

Q. How about Officer Jason Barquin, B-A-R-Q-U-I-N?

A. Is that a question?

Q. Yeah. Did you send Officer Barquin to Dr. Brannon?

A. No. Barquin got fired because he stole fentanyl from the fire shop.

Q. And you --

A. So, he --

Q. You never sent him to Dr. Brannon?

A. I don't recall him going to Brannon. But, you know, he committed basically a crime of theft of drugs. So, I mean, you know, we're terminating his employment.

Q. What about Sergeant Craig Davis?

A. Craig Davis?

Q. Yes. Did you send Sergeant Davis to Dr. Brannon?

A. No. Like I said before, just two people that went to Brannon; Harrell and Padgett.

Q. And he found both of them to be unfit?

A. Again, he didn't say Padgett was unfit. He felt that Padgett suffered from PTSD. He had a plan scheduled that could help Padgett get back to a point where he could come back to duty. He didn't say it was -- he was just completely unfit and couldn't do it.

Q. When was Padgett's shooting incident?

A. Which one? He had two.

Q. All right. Tell me when each of them was.

A. He had the first one before I was even here. And that's the one that everyone was led to believe he was suffering from PTSD. Miller felt the same way. So did Brannon. Brannon agreed. But again, there was a

difference in their responses.

Q. When was the second shooting?

A. The second shooting was, again, in '22, I believe, where he shot an unarmed suspect running away with -- running away from him.

Q. And he claimed it to be an accidental shooting, right?

A. Who claimed that?

Q. Did not Officer Padgett claim that the second shooting was an accidental shooting?

A. Is that what Padgett says? Yeah. I'm pretty sure he said that. He said he completely -- in his sworn statement, he said he completely blacked out. He remembered everything up to the point where he pulled the trigger.

He blacked out, and then all the sudden after he pulled the trigger, he remembered everything after that. So, you know, if he said that it was accidental, I don't know how it could be accidental if he was unconsciously, at the time, he didn't know he was, actually, doing it.

Q. In the -- was Officer Padgett in the midst of an arbitration when you sent him to Dr. Brannon?

MR. RUIZ: Objection to the form.

THE WITNESS: For the second time, no.

BY MR. AMLONG:

Q. So, he -- how many times did you send him to Dr. Brannon?

A. Once.

Q. Was that -- the first time was before you got here, right?

MR. RUIZ: Objection to the form.

THE WITNESS: I can't send him yet if I wasn't here.

BY MR. AMLONG:

Q. Yeah. I'm saying the first time, the first shooting was before you arrived in West Palm Beach?

A. Yeah. That happened before I became the Police Chief. Yes.

Q. Okay. And when did the second shooting occur?

A. For the third time, it occurred in 2022.

Q. Did you relieve Officer Padgett from duty as soon as the shooting took place?

A. Yeah.

Q. When did you relieve him of duty?

A. It was immediately after the shooting. That is the common practice. Every time someone is involved in a shooting they are relieved of duty. They are released immediately.

Q. How long was he out when you relieved him of duty?

A. How long was he out?

Q. Yes.

A. How long was he out before I relieved him of duty?

Q. No. How -- he was involved in the second shooting, and you relieved from duty because that is automatic. How long was that relief from duty?

A. He was out until the conclusion of the investigation that determined that he was unjustified in the use of force. And we terminated him, so he never came back.

Q. When did you send him to Dr. Brannon?

A. During the course of the investigation.

Q. Had Officer Padgett taken his case to arbitration?

MR. RUIZ: Objection to the form.

THE WITNESS: Yeah. We did his arbitration a few months ago.

BY MR. AMLONG:

Q. And was the arbitration completed?

A. Was it what?

Q. Was it completed?

A. No, no, no. We're waiting on the arbitrator's findings.

Q. Is the evidentiary portion of the arbitration

completed?

MR. RUIZ: Objection to the form.

THE WITNESS: I don't know if I -- I don't know how to answer that.

BY MR. AMLONG:

Q. Well, is the arbitration still going on?

A. No. We are waiting for a judgement.

Q. Have all of the witnesses who are going to testify before the arbitrator testified?

A. I believe so.

Q. And when did that conclude?

A. A couple of months ago.

Q. Was Officer Padgett sent to Dr. Brannon before or after the arbitration began?

MR. RUIZ: Objection to the form. Again, I just want to add the same objection I had before we went on break. Chief Adderley is here in his individual capacity, not as a corporate representative. So, he can respond to the extent that his personal knowledge, he has that information. He is not speaking on behalf of the City.

THE WITNESS: Yeah. I mean, he shoots at an unarmed suspect. He is placed on administrative leave with pay. We are conducting an

investigation.

I was -- well, first of all, the Riviera Beach Police Department conducted a criminal investigation, determined that he should have been arrested for aggravated assault, and the State Attorney's Office decided that they were not going to criminally charge him.

We then conducted an admin investigation which showed that he violated the use of force policy. And during the course of our investigation, he made some indication that led us to send him for evaluation.

We got a choice. We had Miller, who says that he has PTSD. And he feels that we can put this guy back on the street in a uniformed patrol in the public, and clearly his recommendation wasn't a good one.

We asked for a second opinion. It went to Brannon. Brannon then says he suffers from PTSD, shouldn't be back on the street, but here is a structured plan as to how he can be treated before he goes back to the road.

So, Brannon came in, you know, and that's how he was evaluated. That was his evaluation. So, he didn't say he can't go back. He just said that

before he goes back he needs to be treated for PTSD.

BY MR. AMLONG:

Q. And when was Brannon's recommendation?

A. When was it?

Q. Yes.

A. Well, it would have been prior to before we terminated him at his employment.

Q. And is this a union arbitration?

A. Yeah. He was represented by the union.

Q. Which one?

A. FOP.

Q. Do you know who his lawyer is?

A. I don't recall his name.

Q. Did you ever send anybody to Dr. Brannon while you were with the Sheriff's Office?

A. No.

Q. How many people -- did you ever send anybody to Dr. Brannon other than when you were Chief of Police at the City of Fort Lauderdale?

A. Did I ever send someone to Brannon when I was in Fort Lauderdale?

Q. No. Other than when you were Chief of Police?

A. Oh. No.

Q. Do you recall how many people you sent?

A. No.

Q. Do you recall the ones you sent? Do you recall how many, if any, Dr. Brannon said should not be relieved of duty?

A. Should not be relieved of duty?

Q. Yes.

A. Well, that wouldn't be his finding. I mean, his finding would be if they're fit for duty or not fit for duty.

Q. Okay. How many of the people whom you sent to Dr. Brannon did he find fit for duty?

A. I would say there were a number of people that were found fit for duty. I mean, I don't think any of it really stood out either way.

Q. When you were in Fort Lauderdale, was the FOP the union?

A. Yes.

Q. In Fort Lauderdale, do you know if there would be any file other than the individual officer's files that would show whether or not you had sent somebody to Dr. Brannon?

A. I don't think Fort Lauderdale has a report of who went to Brannon and who didn't go to Brannon. I think that's something that would -- at the police department. No. I think that one, it is a confidential

document through the HR Department in Fort Lauderdale.

Q. You're saying the City Hall HR Department, as opposed to the police department?

A. They would know. They were the ones that would have coordinated that.

Q. Look at Exhibit 10, please.

A. Okay.

Q. Have you ever seen that document before?

A. Yeah. This is Brannon's report, right? Yeah.

Q. It is. Have you seen that document before?

A. Indictment? No.

Q. No. Have you seen that document before?

A. Oh, the document. Yes.

Q. When did you see it.

A. I would say sometime in 2020.

Q. How did you come to see it?

A. That would have come from HR.

Q. Had you ever had, in all of your years as a police officer, are you aware of any situation in which a sergeant has gathered letters from police officers asking that a fellow police officer be relieved of duty?

MR. RUIZ: Objection to the form.

THE WITNESS: No. I've never heard of that.

BY MR. AMLONG:

Q. I'm sorry?

A. No.

Q. So, this is the first time?

A. The first time for what?

Q. Well, you are aware that Sergeant Gellin collected letters from police officers complaining about sergeant -- complaining about Officer Harrell, correct?

A. I saw a number of anonymous letters that came up, saying that this guy was unfit, saying that they didn't want to put the name on it. And there were a bunch of anonymous letters.

I didn't know -- if you're telling me that Gellin said that he's the one that coordinated that, that's news to me, because I'm not aware of that.

We did receive a number of letters from people who wanted to remain anonymous, saying that they saw certain things with Officer Harrell, and they felt that, you know, he was not working well with them in a number of different ways. But, you know, if you're saying Gellin told you that, then that's a new one. I mean, that's news to me.

MR. AMLONG: Mr. Ruiz, do you have Exhibit Number 6 handy?

MR. RUIZ: Yeah. Give me a second.

THE WITNESS: Wow. That makes it even worse.

BY MR. AMLONG:

Q. Did you say it makes it even worse?

A. Yeah. I mean, I -- to have all of these people, and I remember, I thought it was a number of anonymous people. But now you have officers -- now that I'm taking a look at this they, actually, signed their names.

Q. Have you seen these letters before?

A. Yeah. But, you know, I mean, the ones that kind of stood out were the ones that were, like, anonymous letters and --

Q. Well, the anonymous letters, there were only two. Is that correct?

A. But now that it is refreshing my memory, you've got a number of people that are in his squad that are articulating some facts about him being unprofessional and -- I mean, this is more of a disruption than I, actually, thought and this is huge.

Q. Are you aware of whether or not these officers had engaged in behavior that Officer Harrell had criticized as being unprofessional or as detracting from his officer safety?

A. Detracting from his officer safety?

Q. Yes.

A. Well, let me see, here. I think this is a lot of people saying that he is causing the problem with

officer safety.

Q. When you say we have a lot of people, we have Officer Goldberger then we have an anonymous letter. That is two. We have a concerning officer, which is anonymous. That's three. We then have Officer Abreau. That's four. We have Officer McGinley. That's five. We have Officer Bales. That is six. Officer Lopez. That's seven. And Sergeant Gellin. That's eight. Do you consider that to be a lot of people?

A. You said eight people, right?

Q. Yes.

A. Yeah. That's a platoon. So, that's a -- you know, you've got eight people with a sergeant. And I think you've got a total of maybe ten per platoon, if I'm not mistaken, that work in the north end of the city that says we've got a problem with this one person.

So, you've got ten people that work together, and eight of them are saying that we've got a problem with one person. Yeah. I think that is a lot.

Q. Do you know how these letters were gathered?

A. No. I don't.

Q. How many years overall have you been in law enforcement?

A. Forty-four, plus two.

Q. So, forty-six. During the forty-six years

that you have been in law enforcement, have you ever been aware of a sergeant soliciting letters from police officers concerning another police officer?

MR. RUIZ: Objection to the form.

THE WITNESS: I've never seen it done before. But I think as a supervisor, he's got an obligation to bring it to his supervisor's attention. And that's what he did here. He put the letters together and he wrote a memo to his lieutenant, which eventually ended up in my office.

BY MR. AMLONG:

Q. And how did it get in your office?

A. Well, I'm sure his lieutenant took it to his captain, and his captain brought it to the Assistant Chief. Who, at the time, would have been Tamica West and she brought it to me.

Q. Did you have any discussion with Chief West about this?

A. I'm sure I did. But you know, when you look at again, this group of people that are saying that we have a problem then how do we address this?

I mean, can you say, you know, the person had been evaluated by someone who continues to let him -- who feels that they should continue to work in the same environment without a plan as to how to make this person

more fit for duty.

That's why we sent him to the person that had the plan. And Brannon is, I think, is the one that we decided to send him to.

Q. Did you review Officer -- before you removed him from duty, did you review Officer Harrell's work record for approximately twenty years?

A. Yeah. I think that was being -- that was discussed.

Q. You think it was discussed or it was discussed?

A. I'm pretty sure it was. When we have a discussion about discipline, we look at all of those things. Yeah.

Q. Did anything in Officer Harrell's previous reviews indicate the sort of behavior that the other officers are articulating now?

A. Well, I mean, if you look at his discipline history -- I mean, he's got some discipline where he has issues dealing with people. Members of the public, you know, co-workers.

Q. And how many incidents of discipline did Officer Harrell have?

MR. RUIZ: Objection to the form.

THE WITNESS: I don't have it right in front

of me here, but there are some which, you know, I think he used poor judgement in.

BY MR. AMLONG:

Q. How many?

A. I don't know the number. I don't have it right in front of me.

Q. Do you remember when the last one was?

A. I -- prior to this one that he was terminated, right?

Q. Pardon? Yes.

A. Yeah. Well, I mean, we had incidents of -- I don't have it here. Do we have it here, his Internal Affairs discipline cases, or no? No. I don't have it in front of me. I mean, I think his -- that record can speak for itself.

Q. What if anything did you do to prepare for this deposition?

A. I looked at some of these exhibits that you have here. But I remember the case. I remember the case.

Q. What are you reading on your telephone?

A. Huh?

Q. What are you reading on your cell phone?

A. I have to send a text message to the Mayor because I can't make it to his 1:30 meeting.

Q. Before suspending Officer Harrell, did you ask him about these letters?

A. Hold on. Let me just send this text.

MR. RUIZ: Yeah. Chief Adderley is asking for a break so he can finish sending this text.

MR. AMLONG: All right. That's fine.

(Off the record.)

(Back on the record.)

MR. AMLONG: What was my last question, Mr. Reporter?

THE COURT REPORTER: Your last question was before suspending Officer Harrell, did you ask him about these letters.

THE WITNESS: Okay. It was -- do you mean suspending him for this case that led to his termination?

MR. AMLONG: No. I mean before you sent him to Dr. Brannon.

THE WITNESS: I don't recall that conversation. You know, we gave everything to Brannon and turned it all over to them.

BY MR. AMLONG:

Q. Why would you do that instead of asking Officer Harrell for his version of what happened?

A. Well, I mean, I think that's -- you get the

evaluation and then you have a discussion about it. That's how it was normally done.

Q. You had breakfast with Officer Harrell following Dr. Brannon's initial evaluation, correct?

A. Yes.

Q. Was it just the two of you?

A. Yes.

Q. What do you recall Officer Harrell telling you during that breakfast?

A. Well, he disagreed with Brannon. And, you know, he had some issues I think with someone in the HR Department. Clearly, he's had some history with them that he disagreed with them on.

And, you know, I wanted to assure him that, you know, we want to have a fair process. And, you know, I don't realize -- I mean, at that day, at that particular time, Brannon was saying not only was he not fit for duty, but he also didn't think he could be rehabilitated.

Which I had been, you know, in the many years of law enforcement, I had never heard anybody say that about anyone.

Q. What, if anything, did you do in response?

A. Did do when?

Q. What, if anything, did you you do in response

to your -- to what Officer Harrell was telling you during that breakfast?

A. Well, I mean, you know, we looked back at it again. I think he had another -- a visit with Brannon, if I remember correctly. And then, you know, Brannon says that he is fit for duty, was his second opinion of it.

But he still -- but, still again, I think it is kind of interesting you go from not fit for duty, can't be rehabilitated, to well, yeah, he is fit. But, you know, maybe his assignment needs to be away from this type of work environment.

Q. Were any of the officers who complained about Officer Harrell black?

MR. RUIZ: Objection to the form.

THE WITNESS: Oh. In the letters?

MR. AMLONG: Yes.

THE WITNESS: I'm not really sure. I'm not sure about the -- if they were black or white because I'm not really familiar with all of the names that are on the letters.

BY MR. AMLONG:

Q. Did you instruct Officer Brannon -- I mean, I'm sorry. Did you instruct Dr. Brannon what you wanted him to find?

A. Never had a conversation with him.

Q. Did you communicate with him in any other way?

A. No.

Q. Did you have anyone else communicate with him?

MR. RUIZ: Objection to the form.

THE WITNESS: That would have been done through HR. I had no communication with Brannon.

BY MR. AMLONG:

Q. Did you tell HR why and how you wanted Officer Harrell re-evaluated?

MR. RUIZ: Objection to the form.

THE WITNESS: No. It is just -- for the first time or the second time?

MR. AMLONG: Either.

THE WITNESS: No. I just said to them. I said I've never heard of anything like this before. I think we need to get a second evaluation from him.

BY MR. AMLONG:

Q. Were you -- you already had an evaluation from Dr. Miller, did you not?

A. Say that again?

Q. You already had an evaluation from Dr. Miller saying that he was not unfit for duty, did you not?

MR. RUIZ: Objection to the form.

THE WITNESS: Yeah. And again, Miller, when

you look at his work product compared to Brannon, I think Brannon does a much better job.

BY MR. AMLONG:

Q. Dr. Miller is a PhD, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: They're both doctors, Brannon and Miller.

BY MR. AMLONG:

Q. But do you know what kind of doctor Dr. Brannon is?

A. Well, I mean, I would assume that they are psychologists.

Q. Do you know the difference between a PhD and a PsyD?

A. And a PsyD?

Q. Yes. P-S-Y, period, D.

A. No.

Q. Did you have any conversations with Dr. Brannon?

MR. RUIZ: Objection to the form.

THE WITNESS: For the fourth time, no.

BY MR. AMLONG:

Q. Were you aware that police officers and sergeants would refer to Officer Harrell as midnight?

A. I've heard stories about that. I was told

that that was a name that he referred to himself as.

Q. Who told you that?

A. Chief West.

Q. Chief West told you that he nicknamed himself midnight?

A. That's what she told me.

Q. Did you discuss that during your breakfast meeting with Officer Harrell? Did he discuss being referred to by other officers as midnight?

A. No. I don't know anything about midnight. I've never heard anyone refer to the guy as midnight. The only persons that brought that up were people like Chief West and a couple of other black officers that were stating I don't even understand why he would say that about himself.

Q. Which black officers?

A. West, she is a black female. She is the Chief. And, you know, she says that a number of black officers were offended that he would, actually, say that about himself.

Q. Did -- when you got these letters, did you and Chief West have a discussion about the letters and what should be done?

A. I'm pretty sure she was a part of that discussion.

Q. Who -- you say she was a part, who else was a part of that discussion?

A. I remember Rick Morris being a part of that discussion and Chief West. I think the -- I think it was just the three of us.

Q. Do you remember what Chief West said?

A. Chief West, basically, gave us, like, the history of Harrell. Saying that you know, he has -- he doesn't work well with his fellow officers.

Q. Did she say that was his story?

A. Yeah. It's been for a while, according to her. A lot before. Much more before I came here, before I even met him.

Q. Do you know why these letters were never shown to Officer Harrell?

MR. RUIZ: Objection to the form.

THE WITNESS: I have no idea.

BY MR. AMLONG:

Q. Typically, when there is a written complaint about an officer, prior to relieving the officer from duty, do you show the officer the -- do you make the officer aware of the complaint?

MR. RUIZ: Objection to the form.

THE WITNESS: Of course.

BY MR. AMLONG:

Q. But you didn't --

A. Wait. Hold on a second. He was relieved of duty when you have someone like a Brannon saying that he can't -- he is not fit for duty, and he can't be rehabilitated. I think we have no other choice but to do that.

Q. Did you --

A. Just because you've got a bunch of letters, don't say you've got to relieve the guy of duty.

Q. But you did relieve him from duty pending Brannon's evaluation, right?

A. Well, yeah. I mean, when Brannon said that the guy is unfit and he can't be rehabilitated, I think that is a very serious evaluation. I mean, you can't ignore that.

Q. But you relieved him from duty before that, correct?

A. I don't recall that if it happened that way.

Q. Did you take away his badge and gun as soon as you got these letters?

A. I don't remember the chain of events here of when it, actually, happened. One second. I don't recall that.

MR. RUIZ: I think he just gave an answer, Bill.

THE WITNESS: Yeah. I don't recall that.

MR. AMLONG: Well, the --

THE WITNESS: I mean, there's a written notice. I mean, if you've got that written notice, that would refresh my memory.

MR. RUIZ: Bill, we can't hear you.

MR. AMLONG: I know.

MR. RUIZ: Okay. Do you want to take a five-minute break or something?

MR. AMLONG: Sure.

(Off the record.)

(Back on the record.)

BY MR. AMLONG:

Q. Did you give Officer Harrell written notice that he was being relieved of duty prior to the first evaluation?

MR. RUIZ: Objection to the form.

THE WITNESS: Prior to the first evaluation?

MR. AMLONG: Yes.

THE WITNESS: No.

BY MR. AMLONG:

Q. Did you take away his badge and gun prior to the first evaluation?

A. I don't recall that. That would have been something that -- to my understanding, you know, he

wanted a vacation. And then he was assigned to the Assistant Chief, so I don't think she took his gun away until the evaluation came in.

Q. In Exhibit 6, it appears as if Sergeant Gellin has begun forwarding these materials up the chain of command on July 30, 2020.

A. Yep.

Q. Sergeant Harrell's -- Officer Harrell's recollection is that he was not sent home until August 13, 2020. And Dr. Brannon's records show that the dates of examination, the first one was August 15, 2020. Does that jibe with your memory?

MR. RUIZ: Objection to the form. I don't -- I believe he just testified to what his memory was. I don't know if he needs it refreshed. I'm not sure how this refreshes his memory anyways, but --

THE WITNESS: Well, the first evaluation was done by Brannon on when?

MR. AMLONG: On August 15, 2020.

THE WITNESS: Okay. August 15th. And he was relieved when?

MR. AMLONG: He recalled being sent home August 13th.

THE WITNESS: I don't know how that could happen. I mean, he was assigned to Chief West.

And then when we got the Brannon evaluation, of what I recall, the -- you know, when he says he can't be rehabilitated and not fit for duty, I mean, that's very serious. I mean, I don't think we have much of a choice at that time.

BY MR. AMLONG:

Q. But how long was it between when you got the letters and when you, actually, sent him to Dr. Brannon?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, based on what you just pointed out, it was, I don't know, fifteen, sixteen days. He goes on vacation, and then he comes back and he is assigned to the Chief. He goes in for his evaluation. We get a response from Brannon, and then the decision is to put him on administrative leave.

BY MR. AMLONG:

Q. Do you know whether or not a lieutenant ordered Officer Harrell to take a vacation after these letters were gathered?

A. Performance evaluation?

Q. No. Was ordered by a lieutenant to take a vacation prior to being sent to Dr. Brannon?

MR. RUIZ: Objection to the form.

THE WITNESS: Why would -- no -- ordered to

take a -- no. I'm not aware of anything like that.

BY MR. AMLONG:

Q. Did Assistant Chief West report to you that Officer Harrell had been complaining about race discrimination?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, I mean, she is in a position to take that to Internal Affairs if she felt that he got discriminated in any of those things that would have came up as far as racial discrimination. Not just to him, to anyone, would be directed to Internal Affairs.

BY MR. AMLONG:

Q. No. My question to you is when Chief West brought these letters to you, did she mention to you that he had been -- that he was suffering from -- that he claimed to have been suffering from race discrimination?

A. I don't recall that. I recall Chief West saying that she had a disruption in this platoon which he was assigned to. And this was a very serious problem on the evening shift.

Q. Referring to the letters?

A. The letters, the people that signed the letters. You know, you've got a sergeant and a

lieutenant that are now part of that discussion.

Q. When you had been named Chief but had not taken office yet, do you recall bumping into Officer Harrell at Publix?

A. Before I was the Police Chief?

Q. Before you, actually, took office. After you had been named, but before you took office.

A. Specifically, no. I don't remember that. But could it have happened? Probably.

Q. Do you recall Officer Harrell telling you before you took office that racism was a problem in the department?

A. Well, yeah. I'd heard a lot of people say that there was racism in the department. I mean, I had a number of conversations with retired black police officers. We dealt with the Greg Rideau case. Yeah. I mean, that's not something unusual. I mean, I think everybody has got those stories.

Q. Do you feel that since you have taken office, that racism has continued to exist within the department?

MR. RUIZ: Objection to the form.

THE WITNESS: My job is to prevent racism. And I did everything I possibly can to address every situation that came to my attention.

MR. AMLONG: That's not the question. Read the question back, please.

THE COURT REPORTER: Give me a second.

(Thereupon, a readback was performed.)

MR. RUIZ: Same objection.

THE WITNESS: Not incidents that have been brought to my attention. I think we have addressed them. Could there be other incidents that I'm not aware of? Possibly.

BY MR. AMLONG:

Q. During the breakfast you had with Officer Harrell, did Officer Harrell complain that he was the victim of racism?

MR. RUIZ: Objection to the form.

THE WITNESS: I don't recall that. I think that, you know, he was concerned about this evaluation with Brannon. He didn't think that it was a fair evaluation.

One of the things that I do remember, he said that he never met with Brannon. And I didn't know how Brannon could, actually, evaluate him if he didn't meet with him.

BY MR. AMLONG:

Q. Well, did Brannon ever tell you that he had a video conference with him?

A. Again, for the fifth time, I never had a conversation with Brannon.

Q. Okay. You don't know whether or not Brannon had a video conference with him?

A. I don't know what Brannon did. I mean, I never talked to the guy.

Q. Do you think a video conference would be sufficient to base a -- would be sufficient on which to base a recommendation to relieve him from duty?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, I don't know what that was. I don't know what he did. I never had a conversation with him. I can tell you about the conversation that stood out with me and Harrell, and that was Harrell felt that he never met with the guy, never talked to the guy.

So, if you say that my conversation with Harrell was that he didn't think that it was a fair evaluation because he never met with him, and now you're telling me he had a video conference with him, then I'm hearing just two different stories on your end.

BY MR. AMLONG:

Q. Why did you say that you wanted a second evaluation?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, I mean, after I met with Harrell, he felt that he deserved a second evaluation. Okay. We called up HR and said can you look into this.

He felt that he never met with Brannon and that he feels that he deserves a second shot. I'm not objecting to it. I mean, you know, when someone says not fit for duty and can't be rehabilitated, I mean, that is a very serious evaluation.

So, I mean, if that's the route we're going to take, I mean, having confirmation would definitely help us rather than hurt us.

MR. AMLONG: Look at this document that has been marked as Exhibit 16.

THE WITNESS: Okay. What is -- I'm a very black man. I'm a very black -- all right. Okay.

BY MR. AMLONG:

Q. Have you ever seen that document before?

A. I don't recall seeing this. This is pretty new to me. Whose document is this? What -- Florida Commission on Human Relations and the EEOC?

Q. That is the charge of discrimination that Officer Harrell filed with the EEOC. Officer --

A. First of all, my name is misspelled here. So, I definitely would have objected to that because I don't want to get my -- I don't want to be confused with the person that spelled their name that way.

Q. And what is the policy when a complaint comes in to the Equal Employment Opportunity Commission, does it go to Human Relations at City Hall?

MR. RUIZ: Again, I'm going to object to the form. Chief Adderley is sitting here in his personal individual capacity, not as a representative of the City. So, he can speak with respect to his personal knowledge or belief, but not on behalf of the City.

THE WITNESS: Yeah. This would go to --

BY MR. AMLONG:

Q. Do you know whether it goes to City Hall?

A. It is my understanding.

Q. Do you know whether, typically, charges of discrimination are forwarded to you?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, if someone makes a formal complaint that is in our agency, that would be handled by the Office of Internal Affairs.

BY MR. AMLONG:

Q. How, if at all, did you become aware that

Officer Harrell had made a charge of discrimination?

MR. RUIZ: Objection to the form.

BY MR. AMLONG:

Q. And this was on May 27, 2021.

A. '21?

Q. 2021. Yes.

A. Okay. Maybe from the City Attorney's Office, indicating that we have a pending lawsuit.

Q. Okay. Prior to a lawsuit being filed, were you ever informed there was a charge of discrimination that had been filed by Officer Harrell?

A. If that is included in his lawsuit.

Q. I said prior to his filing a lawsuit, were you ever made aware that he was complaining about race discrimination to the EEOC?

A. Well, I mean, yeah. The EEOC, that would go to the State Attorney's Office via HR and the EEOC does their investigation.

Q. I'm asking you, Chief, prior to there being a lawsuit filed --

A. No. I don't --

Q. -- were you ever personally made aware that Officer Harrell had complained to the EEOC about race discrimination?

A. I don't recall that. I don't recall that.

Q. You say that under your routine practice, the Internal Affairs Office would have investigated this?

A. Yeah. It would have made --

MR. RUIZ: Objection to the form.

THE WITNESS: No, no. It says if someone would have made a complaint of discrimination to the police department, it goes to the Office of Internal Affairs. This didn't go to the Office of Internal Affairs. It goes to the Florida Commission of Human Relations and the EEOC.

BY MR. AMLONG:

Q. Do you know after the City of West Palm Beach got this, whether there was any investigation into this -- into these allegations?

MR. RUIZ: Same objection.

THE WITNESS: No. This is -- no. The EEOC conducts their own independent investigations.

BY MR. AMLONG:

Q. Do you know if the City responded to the EEOC?

A. Well, there were courses that they had for it. Yeah. I'm sure we did, but that wouldn't be something that would be handled by me.

Q. Did anybody from Human Resources ever show you this charge of discrimination?

A. I don't recall.

Q. Let me ask you to look at Exhibit 21.
A. Yeah, yeah, yeah.
Q. I'm sorry?
MR. RUIZ: I think he is ready.
BY MR. AMLONG:
Q. Okay. Have you ever seen the document, the August 3, 2021 letter from West Palm Beach Human Resources to the Equal Employment Opportunity Commission prior to today?
A. This is the response by then City -- Assistant City Attorney Lloyd Panamefs (phonetic) and Sylvia Granberry (phonetic).
Q. Have you ever seen this document before?
A. Yes. This sort of looks familiar to me.
Q. When did you see it?
A. This would have been back when they -- back in 2021.
Q. But you aren't -- you are not cc'd on it?
A. Did what?
Q. You were not -- the document did not show that you were cc'd, correct?
A. I'm not cc'd on it. No. Again, I mean, this is handled by HR and the City Attorney's Office.
Q. Did you have any input into this response?
MR. RUIZ: Objection to the form.

THE WITNESS: I might have had a conversation with the two authors of it.

BY MR. AMLONG:

Q. You might have had or you did?

A. I don't really recall. Possibly.

Q. On page three --

A. Let's see. A conference call. Attendees, Adderley, Morris, West. Yeah. A number of -- I guess, men, talked about it.

Q. I'm sorry. Where are you reading from?

A. Go ahead. I'll wait for you.

Q. No. Where were you reading from?

A. It is here on the -- they're talking about a conference call on page four, so --

Q. Well, this is talking about an August 4, 2020 conference call involving you, Chief Morris, Chief West, and Chief Human Resources Officer, Jose Luis Rodriguez. That was prior to the filing of the charge of discrimination. Were you ever informed that a charge of discrimination had been filed?

MR. RUIZ: Do you want to give a timeline, Bill?

BY MR. AMLONG:

Q. Well, ever, up until this lawsuit was filed?

A. I don't recall specifically this charge of

discrimination and it going to -- no. I don't recall.

Q. On page three under allegation one it states, quote, I am a very black African American police officer, colon, racist supervisors and co-workers calling me midnight or sometimes on the radio, 2397, paren, military time for 11:57 p.m., close paren.

I've served the City eighteen years. Even though the City now has an African American as Chief of Police, paren, Frank Adderley, close paren, Assistant Chief of Police, paren, Tamica West, close paren, racist lieutenants and sergeants have a Jim Crow culture in the ranks.

Other black members of the police department are being similarly discriminated against. The response says, the City admits that the charging party identifies, self-identifies as a, quote, very black African American police officer, close quote, and that he has served the City for eighteen years.

The City specifically denies the existence of a, quote, Jim Crow culture, close paren. Parentheses, the City, in fact, imposed one suspension on a CP himself, for using a racial or ethnic slur on a mobile communication system by stating, quote, go brown hornet, period, close quote.

This is evidence Exhibit 3, the letter. The City

is without sufficient information to form a belief, and therefore, denies the remaining examination of this set forth above. Were you ever asked to contribute to this response to the EEOC?

A. No. I don't really -- I don't even know anything about go brown hornet. What does that mean? And I don't even -- I'm not even familiar with the 2397. I don't even know what that is.

Q. That is three minutes before midnight.

A. Okay. What is the significance of that? Midnight would be 0:00.

Q. Right. Did you ever --

A. Why would it be, if it is midnight in question, why would it be three minutes before it?

Q. Yeah. I'm not the one who said this.

A. Yeah. I've been -- I mean, I don't even understand the significance. So, for me to respond to that, I don't even know what they're talking about. And this is the first time I'm reading something about go brown hornet. I mean, no. I don't recall any of that.

Q. Let me ask you to look at Exhibit 19. Do you recognize that as being the investigative file on the complaint?

A. Yes.

Q. And --

MR. RUIZ: Can you repeat your question, Bill?

BY MR. AMLONG:

Q. I haven't finished it yet. Do you recall the outcome of this investigation?

A. It was not sustained, if I remember correctly.

Q. What does not sustained mean?

MR. RUIZ: Hold on one second. Objection to the form.

THE WITNESS: That means you can't prove or disprove the allegation.

BY MR. AMLONG:

Q. Do you know if there was any investigation into how the allegation came to be made?

A. Say that again.

Q. Do you know if there was any investigation into how the investigation came to be made?

A. I don't even understand the question.

Q. Do you understand how and why Ms. Saint Hilaire made the investigation?

A. Well, based on this document, she filled out a citizen's complaint and gave it to her sergeant.

Q. And should the -- and the sergeant should have taken it to the lieutenant, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: The sergeant at that time would

have taken it to his captain. He didn't have a lieutenant.

BY MR. AMLONG:

Q. Well, the lieutenant in City Hall was Lieutenant Rideau, correct?

A. Gellin didn't work for the lieutenant at City Hall. He worked for the captain in charge of -- that was in charge of code at the time. That captain would have been Cameron (phonetic).

Q. Do you know if Sergeant Gellin took it to the captain?

A. I know that there was a discussion about it. I know that the City Administrator was aware of it and that the -- it went to the -- it eventually became a complaint that went to the Office of Internal Affairs who conducted an investigation.

Q. Do you know why Officer Harrell was taken out of City Hall and reassigned to the Police Department lobby?

A. That was a request that came from the City Administrator.

Q. Did he say why or she say why?

A. He said that he was causing a disruption at City Hall, and everybody was complaining about him, and that she wanted him out of the lobby of City Hall.

Q. Did everybody -- was that, simply, the code enforcement people?

A. I have no idea. You know, my boss told me to do it and I did it.

Q. Your who told you to do it?

A. My immediate boss, Faye Johnson, told me to do it and I did it.

Q. Who is Faye Johnson?

A. Faye Johnson is the City Administrator.

Q. Do you know if anybody ever investigated the allegations that were made in letters that Sergeant Gellin forwarded to your office?

A. That was handled by Chief West.

Q. So, Chief West said that she just gave them to you. Do you know whether anyone ever investigated the allegations?

MR. RUIZ: Objection to the form. You're testifying on behalf of the witness.

THE WITNESS: You know, I think that was all handled by Chief West, the way I recall. That wouldn't be something that I would have handled.

BY MR. AMLONG:

Q. You would have or would not have?

A. Well, I would have. I mean, she is in charge of operations and patrol. I mean, I am the Chief of

Police. I mean, that would seem like the issue was we had one officer in a platoon that was causing a disruption.

And it was being addressed. So, you know, would -- he was on administrative leave. And then we had a second evaluation by Brannon, he comes back.

We put him in the Detective Bureau, which he was assigned to a black male sergeant who was very confident that he could properly supervise him. He later came back and says it can't be done.

This guy is causing a disruption in the Detective Bureau. Then they put him to City Hall, where he worked for a black lieutenant, Greg Rideau, who felt very confident, said he had a good relationship with him.

He caused a number of issues that were a disruption. That led to the black female City Administrator saying that he could not be in City Hall and that we had to bring him to -- that we had mentioned we brought him to the lobby of the police station.

Q. Did she say who was complaining about him?

A. No. I didn't get it specifically. I mean, I'm aware this was right around the same time this incident happened with code. So, who were the additional complainants to her? I don't know.

All I know is that we were familiar with this

incident. The City Administrator wanted him removed from the lobby of the City Hall; was causing a disruption in City Hall.

We did that. We gave it to the Internal Affairs to investigate. And the conclusion was that the charges were not sustained.

Q. You said he was assigned to the Detective Bureau under a black sergeant. What black sergeant was that?

A. Jerry Banks.

Q. Wasn't he under the command of Assistant Chief Spatara?

A. No. His immediate supervisor would have been Lieutenant DeVito, who reports to Captain Joe Ahern. And Captain J. Ahern reported to Chief Spatara. So, that's three levels beneath Chief Spatara, who doesn't supervise him on a daily basis.

Q. Do you know whether or not Officer Harrell had any problems with Chief Spatara?

A. Yeah. He told me a story once that he thought that Spatara was a racist. And I asked him why and he says that they -- were at the Publix out near Ibis one Saturday.

And Spatara walked up to him and said hey, I see you shop at the same Publix that I shop at. And he felt

that he was being intimidated by that comment.

I mean, I'm a black man. I mean, I hear people, you know, racially discriminate against me. But they didn't say we're shopping at the same supermarket.

Q. Do you recall meeting with Rick King and Deputy Chief Morris concerning Officer Harrell's being relieved of duty pursuant to the Brannon report?

A. Yeah. I mean, Rick King, basically, reiterated the same things that Harrell said to me when I met him for breakfast, saying that there -- they wanted to request that -- his second evaluation.

Q. Do you recall Chief Morris saying that he did not believe the situation with Officer Harrell would have become as aggressive against him as it had?

MR. RUIZ: Objection to the form.

THE WITNESS: Wait a minute. He said -- what did Rick Morris say?

BY MR. AMLONG:

Q. Did you -- did Chief Morris say that he had not thought the situation of the antagonism towards Officer Harrell would have gotten as aggressive as it had gotten?

A. No. I don't recall what Rick Morris says. It was more --

Q. Not -- Morris, you don't recall what he said?

A. I'm not -- I don't recall Morris saying any of that.

Q. During the meeting that you had with Officer Harrell, did you tell Officer Harrell that you had never been advised of any of his complaints that he had brought to Deputy Chief Morris or Assistant Chief Brown?

MR. RUIZ: Objection to the form.

THE WITNESS: Assistant Chief?

MR. AMLONG: Excuse me. Chief West.

MR. RUIZ: Objection to the form.

THE WITNESS: Yeah. I don't remember any of that.

BY MR. AMLONG:

Q. Let me rephrase. Do you remember any -- do you remember Chief Morris sharing with you any of the complaints that Officer Harrell had shared with him?

MR. RUIZ: Objection to the form.

THE WITNESS: The only thing I recall is Morris feeling that there was no validity to his claims. But with specifics about why he came to that conclusion, I really don't recall how.

BY MR. AMLONG:

Q. Do you remember any complaints that Chief West relayed to you that Officer Harrell had made to her?

A. Well, I mean -- again, I mean, that goes back

to saying the midnight comments. She's the one that said that he gave himself that name and he was offended by that.

Q. Who was offended by that?

A. That, I guess, he gave himself that nickname himself, midnight, and she didn't understand why he would be offended if he is giving himself that name.

Q. Did you ever ask him if he had given himself that name?

A. No. I don't even have a discussion with him about it. No one ever referred to the guy as midnight in my presence.

Q. Do you not recall Chief West saying that Sergeant Gellin had referred to Officer Harrell as midnight?

MR. RUIZ: Objection to the form.

THE WITNESS: Getman?

MR. AMLONG: Gellin.

THE WITNESS: Oh. Gellin. Yeah. I -- based on her account and what she relayed to me, it was that, you know, it was, like, a joking thing that you know, Harrell referred to himself as midnight and that they would joke on the rounds about his nickname being midnight. You know --

BY MR. AMLONG:

Q. Who was joking around?

A. Harrell and Gellin. That that was, like, a joke between the two of them. And then it -- I guess she got -- she heard them saying it one day and was offended and told them not to say that again. So, she, basically, admonished the both of them by not -- telling them not to say that in her presence or that it was inappropriate.

Q. Do you recall why Officer Harrell was moved out of the Criminal Investigation Division?

A. Yeah. We had a -- again, we had a black sergeant who says that the guy was causing a disruption in the Criminal Investigation Division. His name is Jerry Banks, sergeant in charge of violent crime.

Q. And was Officer Harrell assigned to violent crimes?

A. He starts as -- he was assigned to Jerry Banks. That was his sergeant.

Q. Do you know whether or not Officer Harrell was told that he was being moved out because there was a patrol shortage?

A. A patrol shortage?

Q. I'm saying do you know whether he was told that he was being moved out by -- because there was a patrol shortage?

A. Well, if there was a patrol shortage, then that means he would have went to patrol. He didn't go to patrol. He went to City Hall at a desk.

Q. The question is do you know whether or not Officer Harrell was told that the reason he was -- by Assistant Chief Spatara, that he was being moved out of CIB because of a patrol shortage?

A. No. I don't know anything about that.

Q. When Officer Harrell was assigned to City Hall, did you tell him that he should not, quote, to bring any drama over there, close quote?

A. Yeah. I just told him to just do his job and he shouldn't have any problems. He worked in --

Q. Well --

A. He only works with a guy. I don't recall the drama. But basically, you know, just go and do your job and listen to your lieutenant. He's got a guy, he -- they have a great relationship. Everything should work out. And that was my advice to him.

Q. Did you tell him to not bring any drama over?

A. I don't recall, actually, using the term drama. But basically, just go and do your job, follow the policy, listen to your lieutenant. You've got a good lieutenant. He's going to look out for you, and just do your job.

Q. When you were re-assigning him to City Hall, do you -- did you tell him that concerning his prior relief from duty, that the Human Resources Department had, quote, fucked up, close quote?

MR. RUIZ: Objection to the form.

THE WITNESS: No. I don't know anything about that.

BY MR. AMLONG:

Q. In your standard operating procedure, section Roman Numeral 4-22, is the definition of unfounded concerning Internal Affairs investigations as being -- or unsubstantiated as being the allegation is either demonstrably false or there is no credible evidence to support it?

MR. RUIZ: Objection to the form.

THE WITNESS: You're talking two different deals. Unfounded means that there was -- that they couldn't prove the allegation. Not substantiated or not sustained means you couldn't prove or disprove the allegation.

BY MR. AMLONG:

Q. Well, you concluded it was unsubstantiated, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: It says not sustained.

MR. RUIZ: Are you asking him in his individual capacity or are you asking what the results of the investigation?

MR. AMLONG: I'm asking him what he -- what his conclusion was in the investigation.

MR. RUIZ: I mean, if you look at the investigation, itself, he is not the person who made the conclusions. So, I don't know where that question is coming from.

THE WITNESS: That came from Internal Affairs. Not sustained, number one allegation, signed by then Captain, now Major Dees, on October 7, 2021. I signed on October 12, 2021. No action taken.

MR. RUIZ: Can we go on a break or are we moving forward?

MR. AMLONG: No. We're ending, almost.

BY MR. AMLONG:

Q. Are you familiar with the phrase Seal Team Six within the West Palm Beach Police Department?

A. Yeah. I heard that term.

Q. Okay. Can you tell me what it means?

A. I have no idea what it means, but I was told when I first came here four-and-a-half years ago that Seal Team Six was going to go after me.

And they went after all the Chiefs and they

controlled the Chiefs, and you know, a lot of people said this, the Seal Team Six.

And then, you know, I surround them. Just, basically, they just had some incidents where you had a captain of the department years ago that was having an affair with another officer.

And, you know, these people got together and documented it and gave it to Internal Affairs to, basically, prove that this guy was not only just having an affair with one of his subordinates, but doing it on duty.

And he eventually got demoted. And they named them Seal Team Six because I guess by the tactics of surveilling this guy, you know, going out and -- to this subordinate's house and having sex with her on duty.

Q. What contact, if any, did you have -- what relationship, if any, did you have with the FOP representatives?

A. FOP representatives?

Q. Yes.

A. You know, we have a working relationship. You know, they see things one way, I see it differently, and we end up having arbitrations.

Q. Do you know why the FOP has declined to arbitrate on behalf of Officer Harrell?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, I mean, I can't speak for them. I mean, that's the decision for the FOP and a question for them to answer. And I don't want to be the person to answer for the union.

BY MR. AMLONG:

Q. Has anyone ever told you -- has anyone from the FOP ever told you why they were not representing Officer Harrell?

A. Well, I'm not going to engage any conversation with the FOP as to how they conducted business. Because the last thing I want is people to think that I have a special relationship with them. We have a working relationship. They run the FOP and I run the police department.

Q. Thank you. Have a great day.

A. Okay.

MR. RUIZ: Can I have a couple of minutes, just to figure out if I have any questions, and then we can go back on and finish up?

(Off the record.)

(Back on the record.)

BY MR. AMLONG:

Q. Chief, when you received the letters from Sergeant Gellin and the other personnel concerning

Officer Harrell, why did you not refer that to Internal Affairs to investigate whether the allegations were true?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, first of all, I didn't get them from Gellin and the other officers. I got it from Chief West.

And at the time, was there an allegation, you know, we looked at is as is Harrell, actually, a -- I don't know. Is this a disruption of a policy or this is an issue of his being fit for duty.

I think that was more or less the weight of the conversation that led to him being fit for duty, not one of discipline.

And I think when you look at these types of incidents, were we looking to discipline him or are we trying to correct a problem. And when you get into this, of, you know, officers that probably need some help to kind of get them back on track, that was the route we went.

So, I felt that Miller wasn't really helping him if he had been working with him all these years. And now we get a new person that would probably take another look at it, give us some insight.

Let's help Kevin Harrell get back to being a good police officer. And that was the approach we took. We took him to Brannon, and now all of the sudden it goes up to not only that the guy is not fit, but he also can't even be rehabilitated. Which, you know, to me, I mean, that's a very hard statement. And that's why we ended up in that situation.

BY MR. AMLONG:

Q. Well, would it not have made a difference as to whether or not the allegations that were made in the letters were true or not?

MR. RUIZ: Objection to the form.

THE WITNESS: True?

BY MR. AMLONG:

Q. Would Internal Affairs not have been able to determine whether or not the allegations that were being made against Officer Harrell had, actually, occurred?

A. Well, again, I mean if it is, you know, making some allegations against this officer, which are, basically, a lot of personalities, conflicts and those kinds of things.

And again, I mean, you know, are we looking to discipline for Harrell or help him. And I think we took the other approach. We tried the avenue of helping him,

not trying to discipline.

Q. Well, taking his gun and badge away and relieving him of duty isn't helping him, is it?

MR. RUIZ: Objection to the form.

THE WITNESS: If he is being -- if we are being told he is unfit and can't be rehabilitated, damn right it does. We can't put people on the street having a person, a professional person, say something like that as far as an officer on the street. That would be the front page of the Post. High liability.

MR. AMLONG: All right. Thank you. Cross?

CROSS-EXAMINATION

BY MR. RUIZ:

Q. Chief Adderley, just some follow up on some of those questions to try to get some clarity on some things.

Okay. You were asked a lot of questions about the criminal investigation as it relates to the administrative investigation that led to Harrell's termination. Do you remember that?

A. Yes.

Q. And then I believe you testified as to what was -- what OCS handed over to Internal Affairs in the course of, you know, those events taking place. Do you

remember that?

A. Yes.

Q. I believe you said everything went to IA. Do you remember that testimony?

A. Yes.

Q. Do you, actually, know what OCS handed over to IA?

A. No.

Q. Okay. Would you agree with me that the best evidence of what was, actually, handed over would probably be contained in these documents here?

A. Yes.

Q. You were asked questions relating to the fitness for duty examination and the actions that the -- the things that you did with respect to relieving Officer Harrell of duty. Do you remember that?

And just generally, the steps that you took after you received the letters complaining about Harrell's interpersonal issues you just testified about. Do you remember that?

A. Yes.

Q. I think you were asked a lot of questions about what you would typically do in those situations and whether you would typically do this as opposed to that and that sort of thing. Do you remember that

testimony?

A. Yes.

Q. Okay. Do you believe that you did anything with respect to really anything relating to Harrell's employment that was not what you would have typically done in that situation?

A. Based on the system, what we normally do.

Q. I have no further questions.

REDIRECT EXAMINATION

BY MR. AMLONG:

Q. Chief, is there anything as the -- anything in the search warrant that instructs the Organized Crime Section to hand the telephone over to Internal Affairs?

MR. RUIZ: Objection to the form.

THE WITNESS: I have no idea.

BY MR. AMLONG:

Q. Well, if there was nothing in there, then it should not have been handed over to Internal Affairs, should it have been?

MR. RUIZ: Objection to the form.

THE WITNESS: Not privy to that. All I know is you have a criminal investigation. I don't know. We went over this. This is about the sixth time, now. And at the conclusion of that criminal investigation, that information went to Internal

Affairs.

BY MR. AMLONG:

Q. And all of the information on which you base determination of Officer Harrell came from the material that was given to Internal Affairs by the Organized Crime Section, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: No. I think there are other things. Like, you know, his compelled statement played a big role in that as well.

BY MR. AMLONG:

Q. Sorry?

A. I'm sure his compelled statement had a lot of weight into it.

Q. Whose statement?

A. Officer Harrell's compelled statement.

MR. RUIZ: Compelled.

BY MR. AMLONG:

Q. Oh. Okay. You mean his being accused of lying during that statement?

A. Yeah. I mean, his statement definitely had a lot of weight in it.

Q. Well, what did he admit in his statement?

MR. RUIZ: Objection to the form.

THE WITNESS: I think that there are some

things that show some inconsistency of what he said. And there is factual information that clearly refutes it.

BY MR. AMLONG:

Q. But all the factual information was contained in his telephone that was seized by Organized Crime, correct?

A. No. No.

Q. Then why wasn't he fired prior to Internal Affairs getting its hands on the phone?

A. Well, before you terminate someone, they are entitled to due process, and you have to investigate them.

Q. What information did Internal Affairs have on which to base determination that did not come from his telephone?

MR. RUIZ: Objection to the form.

THE WITNESS: Well, you know, I think that the -- you know, you look into the internal investigation, there is a list of things that -- I think one of the things that stood out is that, you know, he says that you know, that he was trying to obtain information through the drug dealers about the one-year-old kid that was murdered.

And if you look at the timeline, I mean, his

communications with them were, you know, before the actual homicide. So, I think when you look at the evidence of other incidents in that case, it has absolutely nothing to do with the criminal investigation.

BY MR. AMLONG:

Q. Well, all of the information based upon which you terminated him came from the telephone, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: I don't think so. I think that his statements had a lot to do with it, you know.

BY MR. AMLONG:

Q. Those are his statements that were made when he was being questioned about what was on the telephone, correct?

MR. RUIZ: Objection to the form.

THE WITNESS: That and other incidents, you know, that we learned by the Office of Internal Affairs.

BY MR. AMLONG:

Q. I'm sorry. That was what?

A. Other information. I mean, I don't have the report in front of me right now, but I think if you read that Internal Affairs investigation, it is not going to say everything was done based on, you know, a criminal

case.

It was based on that, that which was the conclusion of the criminal case, and other things that were involved in that. I don't think it was solely that case if I remember correctly.

Q. Well, there was no criminal case against him, correct?

A. You say there was or there was not?

Q. There was not a criminal case against Officer Harrell, was there?

A. There were no criminal charges filed against him. And that was the decision made by the chief in charge of the Racketeering Unit of the Palm Beach County's State Attorney's Office.

Q. Is that in writing?

MR. RUIZ: Objection to the form.

THE WITNESS: I haven't seen it, and it is not one of your exhibits here. So, it could be.

MR. AMLONG: All right. Thank you.

MR. RUIZ: I just have one follow-up question. Chief Adderley, you were just asked a lot of questions again about the IA investigation.

THE WITNESS: Yes.

RECROSS-EXAMINATION

BY MR. RUIZ:

Q. Would you agree with me that the best evidence about the conclusions that were reached as a result of the IA investigation, including what was considered, is going to be the IA investigation, itself?

A. Yes.

Q. Following the IA investigation, did you have a previous lawyer and hearing with Officer Harrell?

A. Yes.

Q. As far as you remember, was his counsel present during that meeting?

A. Yes.

Q. Okay. No further questions. We will read, please.

THE COURT REPORTER: Okay.

MR. RUIZ: Hey, Nick, what court reporter's office are you with?

THE COURT REPORTER: Brickell Gomberg.

MR. RUIZ: I'm sorry. Say that again.

THE COURT REPORTER: Brickell Gomberg.

MR. RUIZ: Brickell Gomberg. Can you spell that for me?

THE COURT REPORTER: Brickell, B-R-I-C-K-E-L-L, Gomberg, G-O-M-B-E-R-G.

MR. RUIZ: Okay. And what's the -- do you have the phone number?

THE COURT REPORTER: Yeah. Let me give it to you.

MR. AMLONG: So, Fabian, are you ordering this?

MR. RUIZ: Yes, I am.

MR. AMLONG: All right. We'll take a copy.

MR. RUIZ: Okay. Thank you.

THE COURT REPORTER: Okay. So --

MR. AMLONG: All right. Nick, we'll take a copy.

THE COURT REPORTER: Yes. Original to Mr. Ruiz, a copy to Mr. Amlong, regular.

MR. RUIZ: Yep.

THE COURT REPORTER: All right.

MR. AMLONG: Thank you.

THE COURT REPORTER: Thanks a lot, guys.

MR. AMLONG: Bye now.

(Thereupon, the deposition was concluded at 3:18 p.m.)

(Reading and signing of the deposition transcript was reserved.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, Nicholas Bruens, Court Reporter, Notary Public, State of Florida, certify that Frank Adderley, personally appeared before me on the 27th day of February 2024, and was duly sworn.

Signed this 13th day of March, 2024.

Nicholas Bruens

______________________________________

Nicholas Bruens, Court Reporter
Notary Public, State of Florida
Commission No.: HH 332386
Commission Expires: 03/11/27

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, Nicholas Bruens, Court Reporter, certify that I was authorized to and did report the deposition of Frank Adderley; that a review of the transcript was reserved; and that the transcript is a true and correct record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 13th day of March 2024.

Nicholas Bruens

___________________________________

Nicholas Bruens, Court Reporter

WITNESS NOTIFICATION LETTER

March 9, 2024

FRANK ADDERLEY
c/o: FABIAN RUIZ, ESQUIRE
GRAYROBINSON, P.A.
333 Southeast 2nd Avenue, Suite 3200
Miami, Florida 33131
fabian.ruiz@gray-robinson.com

RE: KEVIN HARRELL vs. CITY OF WEST PALM BEACH
CASE NO.: 9:22-cv-81275-AHS
Deposition taken on February 27, 2024.

The transcript of the above proceeding is now available for your review.

Please call to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday.

Please complete your review within 30 days.

Sincerely,

Brickell, Gomberg & Associates, Inc.

I do hereby waive my signature:

__________________________
FRANK ADDERLEY

cc: via email:
wramlong@theamlongfirm.com

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS PAGE

KEVIN HARRELL vs. CITY OF WEST PALM BEACH
CASE NO.: 9:22-cv-81275-AHS

DEPOSITION OF FRANK ADDERLEY
TAKEN FEBRUARY 27, 2024

Page No. Line No. Change Reason

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

__________________________________________

FRANK ADDERLEY Date

0

**0:00** 85:11
**03/11/27** 111:15

1

**1:30** 62:25
**10** 56:6
**10:52** 1:15
**101** 2:4
**102** 4:4
**104** 4:5
**109** 4:6
**11:57** 84:6
**111** 4:7
**112** 4:8
**12** 97:13
**13** 72:10
**13th** 72:23 111:9 112:16
**15** 72:11,19
**15th** 72:20
**16** 78:16
**1753** 20:13
**1754** 20:19
**1764** 20:20
**19** 85:21
**1980** 6:23
**1992** 6:11

2

**2002** 6:12
**2014** 6:17
**2019** 5:23
**2020** 43:1 56:15 72:6,10,11,19 83:15
**2021** 80:4,6 82:7,17 97:12,13
**2022** 50:15
**2024** 1:15 111:8,9 112:16 113:2,7 114:6
**21** 4:14 80:5 82:1
**22** 45:15 49:3
**2397** 84:5 85:7
**27** 1:15 80:4 113:7 114:6
**27th** 111:7
**2nd** 2:12 113:4

3

**3** 82:7 84:25
**3:18** 1:15 110:19
**30** 4:14 20:12 21:1,3 72:6 113:12
**305** 2:14,23
**3200** 2:12 113:4
**33131** 2:13 113:5
**332386** 111:14
**333** 2:12 113:4
**33301** 2:5
**33402** 2:22
**3366** 2:21

4

**4** 83:15
**4:00** 113:11
**416-6880** 2:14
**4-22** 96:10
**462-1983** 2:6
**4th** 2:4

5

**5** 4:3
**500** 2:4

6

**6** 57:22 72:4

7

**7** 97:12

8

**822-1350** 2:23

9

**9** 113:2
**9:00** 113:11
**9:22-cv-81275-AHS** 1:3 113:7 114:4
**954** 2:6

A

**a.m** 1:15 113:11
**able** 47:17 101:16
**above-styled** 1:23
**Abreau** 59:5
**absolutely** 107:4
**accidental** 49:6,10,18,19
**according** 69:11
**account** 93:20
**accused** 105:19
**action** 43:5 97:13 112:14,15
**actions** 28:6 103:14
**activity** 23:1 36:1
**actual** 107:2
**actually** 12:21 23:19 31:15 40:14 47:11 49:20 58:5,17 68:19 70:22 73:8 75:6 76:21 95:21 100:9 101:18 103:6,10
**add** 52:16
**Adderley** 1:18 4:2 5:2,7,11 34:11 42:25 52:17 63:4 79:9 83:8 84:9 102:15 108:21 111:7 112:7 113:3,20 114:6,23
**additional** 89:24
**address** 60:21 75:24
**addressed** 14:24 15:2 76:7 89:4
**admin** 53:8
**administration** 6:7,19
**administrative** 13:18,19,23 16:10,13,17,

21 17:1,5,6,13, 19,25 18:11,20,25 19:9,16,23 24:25 26:25 52:24 73:16 89:5 102:20

**Administrator** 30:23 31:23 32:1,22 33:1,14 34:4 87:13,21 88:9 89:17 90:1

**admit** 105:23

**admits** 84:15

**admonished** 94:6

**advice** 95:19

**advised** 19:25 21:15,18 92:5

**affair** 98:6,10

**Affairs** 8:11 10:3 13:9,12,17,25 14:5 16:3,6,10,25 17:10,21 18:3,6,14,22 19:15 26:11,15,19,20 27:4,5 35:11,12,14,16,18,22 36:6 40:7,8,12,13,19 41:13 62:13 74:8,12 79:23 81:2,8,9 87:15 90:4 96:11 97:10 98:8 100:2 101:16 102:24 104:13,18 105:1,5 106:10,14 107:19,24

**affiant** 12:24

**affidavit** 4:14 20:14 21:6,9 29:16

**African** 84:3,8,17

**afterwards** 40:6

**against** 30:6 84:14 91:3,14 101:18,20 108:6,9,11

**agency** 9:3 43:24 79:22

**aggravated** 53:5

**aggressive** 91:14,21

**ago** 13:11 46:1 51:18 52:12 97:23 98:5

**agreed** 48:25

**ahead** 83:11

**Ahern** 90:14,15

**allegation** 84:2 86:10,13 96:12,18,20 97:11 100:8

**allegations** 81:14 88:11,16 100:2 101:11,17,20

**allow** 13:2

**allowed** 18:5,24 34:23

**already** 30:13 66:19,22

**Althouse** 25:7,14,17 26:1,9 37:10,19 38:4

**A-L-T-H-O-U-S-E** 25:15

**am** 5:11,14 84:3 88:25 110:5 112:10,12,14

**Amanda** 22:21

**American** 84:3,8,17

**Amlong** 2:3,8 4:3,5 5:6,8,24 10:21,25 11:13 12:5,16 13:8 14:4,21 15:16,22 16:1,8 17:8 18:4,23 19:24 20:6,10 21:5 23:9 24:3 25:23 26:7,17 27:22 28:1,7 29:3,8 30:4,11,19 31:3,11,16,25 32:6 33:6,18,25 34:12,18 35:16,23 36:8,23 38:1,18 39:6 40:16 41:14 42:14,18,20,24 47:8 49:25 50:9 51:19 52:5 54:3 56:24 57:21,25 60:11 62:3 63:6,9,17,22 65:17,22 66:8,14,18 67:3,8,22 69:18,25 71:2,7,10,13,19,21 72:19,22 73:6,17 74:2,13 76:1,10,23 77:23 78:15,19 79:15,24 80:3 81:11,18 82:5 83:3,23 86:2,11 87:3 88:22 91:18 92:9,13,22 93:18,25 96:8,21 97:4,16,17 99:6,23 101:9,15 102:12 104:10,16 105:2,11,18 106:4 107:6,12,20 108:19 110:3,6,9,12,15,17

**anonymous** 57:7,10,15 58:4,10,11 59:3,5

**answer** 15:15,18,19 27:6 41:11

52:4 70:24 99:4,5
**answered** 33:23
**antagonism** 91:20
**anybody** 22:23 38:19 41:19 44:9 47:10 54:15,18 64:21 81:23 88:10
**anyone** 32:10 33:19 34:20 64:22 66:4 68:11 74:11 88:15 99:7
**anything** 14:13,22 15:7 16:12 19:18 61:15 62:16 64:23,25 66:16 68:10 74:1 85:6 95:8 96:6 104:3,4,11
**anyways** 72:16
**apartment** 5:13
**APPEARANCES** 2:1
**appeared** 111:7
**appears** 72:4
**appointment** 113:10
**approach** 101:2,25
**approximately** 61:7
**arbitrate** 98:25
**arbitration** 45:17 49:22 51:15,17,20,25 52:6,14 54:9
**arbitrations** 98:23
**arbitrator** 52:9
**arbitrator's** 51:23
**aren't** 82:18
**arrested** 53:5
**arrived** 50:11
**articulate** 22:15 36:14
**articulated** 12:13
**articulating** 12:25 58:15 61:17
**assault** 53:5
**assigned** 8:1,8 9:12 10:2 72:1,25 73:13 74:21 89:8 90:7 94:15,17 95:9
**assignment** 8:19 65:11
**assignments** 7:23,24 10:1
**Assistant** 7:1,16 9:2,3,5 28:9 44:2 60:14 72:2 74:3 82:10 84:9 90:11 92:6,8 95:6
**associate** 6:3
**Associates** 113:16
**assume** 67:11
**assure** 64:14
**Attendees** 83:7
**attention** 19:12 60:7 75:25 76:7
**attorney** 12:21 22:14 24:16 25:20 28:9 29:7,22 30:2 31:19,24 36:15,20 37:3,15 38:14 82:11 112:11
**attorneys** 26:5 112:13
**Attorney's** 21:7,19,22 23:5,11,14,24 24:15 25:25 26:21 27:2,13,14 28:15,17,19 29:10,17 30:5 38:20 39:5,7,13,14,16,22 40:4,9,13,17,21 41:20 53:6 80:7,17 82:23 108:14
**at-will** 35:1,2
**August** 72:9,11,19,20,23 82:7 83:15
**authorize** 12:14
**authorized** 17:11 27:15 112:6
**authorizes** 11:18,19
**authors** 83:2
**automatic** 51:7
**available** 113:8
**avenue** 2:12 101:25 113:4
**aware** 25:6 37:5 56:19 57:4,13 58:18 60:2 67:23 69:22 74:1 76:9 79:25 80:14,22 87:13 89:22
**away** 49:4,5 65:11 70:19 71:22 72:2 102:2

B

**bachelor's** 6:4,9,12
**background** 6:1,8,21
**badge** 70:19 71:22 102:2
**Bales** 59:7
**ballpark** 6:13
**Banks** 90:10 94:14,18
**bargaining** 34:23
**Barquin** 47:19,22,24
**B-A-R-Q-U-I-N** 47:20
**base** 77:8,9 105:3 106:15
**based** 12:10 34:16 44:22 73:10 86:20 93:19 104:7 107:7,25

108:2

**basically** 9:24 22:15 23:5 25:21 29:22 46:2 48:5 69:7 91:8 94:6 95:16,22 98:4,9 101:21

**basis** 31:22 90:17

**Bate** 21:1

**Beach** 1:8 2:20,22 5:14,18 7:7 8:2 13:20,22 17:9,10 22:24 24:14 36:19 41:10 44:7,8,21,23 46:23 50:11 53:2 81:12 82:7 97:19 108:13 111:3 112:3 113:6 114:4

**became** 7:1 8:2 24:24 50:12 87:14

**become** 79:25 91:14

**begun** 72:5

**behalf** 2:2,10 52:21 79:13 88:18 98:25

**behavior** 15:9 16:4 17:14 37:6 58:19 61:16

**belief** 79:12 85:1

**believe** 6:11 15:8 20:22 21:23 22:24 24:19 48:23 49:4 52:10 72:14 91:13 102:23 103:3 104:3

**beneath** 90:16

**benefit** 15:17

**best** 36:7 43:5 103:9 109:1

**better** 36:14 67:2

**beyond** 38:8

**Bill** 5:7 10:20 33:24 42:12 70:25 71:6 83:22 86:1

**bit** 24:22

**black** 65:14,19 68:13,16,17, 18 75:15 78:18 84:3,13,16 89:8,13,16 90:8 91:2 94:11

**blacked** 49:13,16

**boss** 22:6 34:5 88:3,6

**Box** 2:21

**Brannon** 43:2,6,8,14 44:9,16,24 46:6,7,8 47:5,9,23 48:3,4,10,12 ,25 49:22 50:2 51:12 52:13 53:19,23 54:15,19,21 55:3,11,21,2 3 61:3 63:18,21 64:10,17 65:4,5,23,24 66:7 67:1,2,6,10, 19 70:3,12 72:18 73:1,8,14,23 76:17,20,21, 24 77:2,3,5 78:6 89:6 91:7 101:3

**Brannon's** 54:4 56:9 64:4 70:11 72:10

**Branon** 47:4

**break** 42:17 52:17 63:5 71:9 97:14

**breakfast** 64:3,9 65:2 68:7 76:11 91:10

**BRIAN** 1:9

**Brickell** 109:17,19,20 ,22 113:16

**B-R-I-C-K-E-L-L** 109:23

**briefed** 21:25 27:13

**briefing** 21:25 28:4 40:6

**briefly** 5:25

**bring** 19:11 60:7 89:18 95:11,20

**brought** 60:14,16 68:12 74:15 76:7 89:19 92:6

**Broward** 6:3 7:4

**brown** 84:23 85:6,20 92:6

**Bruens** 1:20 111:5,13 112:5,19

**bumping** 75:3

**bunch** 57:10 70:8

**Bureau** 7:5 9:12 89:7,12 90:8

**bus** 25:21

**business** 99:11

**Bye** 110:17

C

**c/o** 113:3

**Cameron** 87:9

**capacity** 34:13 38:7 42:7 52:18 79:10 97:2

**captain** 6:25 7:13,14 8:12,15,18,1 9,20,22 10:4 19:13 29:4,9 60:14 87:1,7,8,11 90:14,15 97:12 98:5

**career** 10:19

**case** 1:3 12:22,23 16:21 19:17,23 20:7 22:1,11 23:16 24:12,17 26:23,24 35:10 37:16 38:13 41:12

51:14
62:19,20
63:15 75:16
107:3
108:1,3,4,6,
9 113:7
114:4
**cases** 10:12,13
43:10 46:24
62:13
**cause** 1:23
11:12,14
22:17,19
23:8,25
24:19 27:16
35:1
**caused** 43:24
89:15
**causing** 58:25
87:23
89:2,11 90:2
94:12
**cc** 113:23
**cc'd**
82:18,21,22
**cell** 22:2 35:4
62:23
**certain** 24:19
57:16
**Certificate**
4:7,8 111:1
112:1
**certify** 111:6
112:6,10
**chain** 70:21
72:5
**Change** 114:7
**CHANGES** 114:2
**Chapman** 22:4
**Chapman's** 22:6
**character** 14:9
**charge** 7:4

8:8,24
9:2,22,23
10:4,7 22:7
23:18 24:13
28:18
34:2,3,4
36:17 38:25
39:11 40:3
41:5,7 53:7
78:24
80:1,10
81:24
83:18,19,25
87:7,8 88:24
94:14 108:13
**charges** 30:6,9
79:18 90:5
108:11
**charging** 84:15
**Charles** 5:11
**chief**
5:7,16,17
7:1,2,7,16,1
7,18,20
9:2,3,4,5
19:25
20:12,25
29:15 30:12
31:4
32:2,7,10
33:7 34:10
35:2
39:11,15
40:1 42:25
44:1,2 50:13
52:17
54:19,23
60:15,17
63:4
68:3,4,13,18
,22 69:4,6,7
72:2,25
73:13
74:3,14,19
75:2,5 79:9
80:19
83:16,17

84:8,9
88:13,14,20,
25
90:11,15,16,
19
91:6,12,19
92:6,8,9,15,
23 93:13
95:6 99:24
100:7 102:15
104:11
108:12,21
**Chiefs** 97:25
98:1
**choice** 31:20
32:2 53:13
70:5 73:5
**CIB** 95:7
**citizen's**
86:21
**city** 1:8 2:20
5:9,12,14,17
,22 7:2,7
8:24,25 9:17
30:23
31:10,19,23,
24 32:1,22
33:1,14
34:3,4,5
46:1 52:22
54:20 56:2
59:15
79:7,11,13,1
6 80:7
81:12,19
82:10,11,23
84:7,8,15,18
,19,21,25
87:4,6,13,18
,20,24,25
88:9
89:12,16,17
90:1,2,3
95:3,9 96:1
113:6 114:4
**city1754** 21:1

**city1764** 21:2
**claim** 49:9
**claimed** 49:6,8
74:17
**claims** 43:22
92:20
**clarity** 102:16
**clearly** 17:2
46:3 47:3
53:16 64:12
106:3
**close**
84:6,9,10,17
,20,24 95:11
96:4
**Coast** 6:5
**code** 87:8 88:1
89:23
**collect** 42:2
**collected** 57:5
**College** 6:4
**colon** 84:4
**Colonel** 7:3
**comes** 16:21
19:17
22:14,16
23:19
24:17,23
29:24 34:24
73:12 79:5
89:6
**comfort** 24:2
**comfortable**
23:23 24:2
**coming** 97:9
**command** 72:6
90:11
**comment** 91:1
**comments** 93:1
**Commission**

5:22 78:23 79:6 81:10 82:8 111:14,15

**commit** 18:18,20 36:18,19 38:17 41:1

**commits** 17:18

**committed** 11:16 36:25 38:21 48:5

**common** 14:3 50:21

**communicate** 66:2,4

**communication** 28:10 66:7 84:23

**communications** 22:20 25:2,14,16 26:1 37:9 107:1

**Community** 6:4 7:5 8:14,20

**compared** 67:1

**compelled** 17:19 18:2 105:9,13,16, 17

**complain** 76:12

**complainants** 89:24

**complained** 65:13 80:23

**complaining** 57:5,6 74:4 80:14 87:24 89:20 103:18

**complaint** 69:19,22 79:5,22 81:6 85:23 86:21 87:15

**complaints** 92:5,16,23

**complete** 113:12

**completed** 14:6 16:14,23 51:20,22 52:1

**completely** 48:18 49:12,13

**comply** 13:7

**concerned** 17:4 76:16

**concerning** 20:1 22:20 25:7 38:3 59:4 60:3 91:6 96:2,11 99:25

**conclude** 52:11

**concluded** 96:22 110:18

**conclusion** 24:24 26:23 36:5 41:12 51:8 90:5 92:21 97:5 104:24 108:2

**conclusions** 97:8 109:2

**conduct** 11:18

**conducted** 53:3,8 87:16 99:11

**conducting** 52:25

**conducts** 81:17

**conference** 76:25

77:4,7,20 83:7,14,16

**confident** 89:8,14

**confidential** 38:4 55:25

**confirmation** 78:13

**confirmed** 5:22

**conflicts** 101:21

**confused** 79:3

**connected** 112:13

**consider** 30:9 59:9

**considered** 25:3 109:3

**constantly** 43:23

**contact** 47:6 98:16

**contained** 103:11 106:5

**context** 19:5

**continue** 60:24

**continued** 46:4 75:20

**continues** 60:23

**continuing** 46:25

**contract** 34:22

**contribute** 85:3

**controlled** 98:1

**conversation** 21:19 28:12,13,14 31:18 32:12,15 33:5,15 41:21 63:20 66:1 77:2,13,14,17 83:1 99:10 100:13

**conversations** 26:8 67:18 75:15

**coordinated** 56:5 57:12

**copy** 42:11 110:6,10,12

**Corbell** 45:6

**corporate** 42:8 52:18

**corporation** 1:8

**correct** 12:2,19 16:17 20:20 26:2 30:12 35:12 40:9 45:17 57:6 58:12 64:4 67:4 70:17 82:21 86:23 87:5 96:23 100:17 105:6 106:7 107:8,15 108:7 112:9

**correctly** 9:19 65:5 86:5 108:5

**counsel** 109:9 112:11,13

**County** 24:14 36:19 41:10 111:3 112:3

**County's** 108:14

**couple** 52:12 68:13 99:18

**course** 19:8 20:8 45:20 51:13 53:10 69:24 102:25

**courses** 81:20

**court** 1:1,20 19:22 27:24 63:11 76:3 109:14,15,17,19,22 110:1,8,11,14,16 111:5,13 112:5,19

**Court's** 15:16

**covered** 18:7

**co-workers** 61:21 84:4

**CP** 84:21

**Craig** 48:7,8

**credible** 96:13

**crime** 9:12,25 11:16 13:3 14:14,23 17:11 18:19 26:18,20 36:25 37:10,11,14 38:17,21 39:8,17,21 41:1,15 48:5 94:14 104:12 105:6 106:6

**crimes** 36:17,20 94:16

**criminal** 6:4,5 13:18 14:6,9,10 15:9 16:4,12,14,15,19,20,23 17:4,14,18,24 18:1,10,17 19:5,7,17 20:7 23:1 24:12 25:4 26:10,14,24 30:6 36:1,5,9,13 37:6,13 38:14 40:20 42:10 53:3 94:10,13 102:19 104:22,24 107:4,25 108:3,6,9,11

**criminally** 36:17 40:24 53:7

**criticized** 58:20

**Cross** 102:12

**Cross-Examination** 4:4 102:13

**Crow** 84:11,20

**culture** 84:11,20

**currently** 5:12,14

D

**daily** 90:17

**damn** 102:7

**date** 25:10 114:23

**Dated** 112:16

**dates** 72:10

**Davis** 48:7,8,9

**day** 29:20 64:16 94:4 99:16 111:8,9 112:16

**days** 73:12 113:12

**DEA** 8:4 9:9,15,17

**deadly** 45:22,23

**deal** 19:19

**dealers** 106:23

**dealing** 10:15 61:20

**deals** 16:13,22 96:17

**dealt** 75:16

**decide** 37:4

**decided** 38:25 43:4 46:5 53:6 61:4

**decision** 30:22 32:20 36:16 40:25 41:8 42:3 73:15 99:3 108:12

**declare** 114:18

**declined** 98:24

**Dees** 97:12

**Defendants** 1:11 2:10

**definitely** 28:21 78:13 79:2 105:21

**definition** 96:10

**degree** 6:3,5,6,10,12

**demonstrably** 96:13

**demoted** 98:12

**denies** 84:19 85:2

**department** 6:23,24 17:9,11,23 20:8 22:24 34:2 37:14 39:12,24 42:4 53:3 55:25 56:1,2,3 64:12 75:12,14,21 81:7 84:13 87:18 96:3 97:19 98:5 99:15

**deponent** 38:6 42:7

**depos** 34:10

**deposition** 1:13,17,22 62:17 110:18,20 112:7 113:7 114:6

**Deputy** 29:15 31:4 91:6 92:6

**DESCRIPTION** 4:13

**deserved** 78:3

**deserves** 78:7

**desk** 95:3

**detective** 8:3 9:8,12 19:9,10 89:7,11 90:7

**detectives** 18:13 23:6 25:24

**determination** 42:5 43:4 105:4 106:15

**determine** 19:13 101:17

**determined** 51:9 53:4

**detracting** 58:20,22

**DeVito** 90:14

**difference** 41:4 49:1 67:13 101:10

**different** 33:24 57:18 77:21 96:16

**differently** 98:22

**direct** 4:3 5:5 34:5

**directed** 33:13 74:12

**directing** 23:6

**direction** 12:24 23:14,22 29:22

**directly** 24:15

**disagreed** 64:10,13

**discipline** 61:13,18,19, 22 62:13 100:14,16 101:24 102:1

**discovered** 37:7

**discriminate** 91:3

**discriminated** 74:9 84:14

**discrimination** 74:5,11,18 78:24 79:19 80:1,10,15,2 4 81:6,24 83:19,20 84:1

**discuss** 68:7,8

**discussed** 25:12 61:9,10,11

**discussion** 19:14 43:3 60:17 61:13 64:1 68:22,25 69:2,4 75:1 87:12 93:10

**disprove** 86:10 96:20

**disruption** 58:17 74:20 87:23 89:3,11,16 90:3 94:12 100:10

**disruptions** 43:24

**district** 1:1 8:24

**Diva** 21:23 40:2 41:21

**division** 7:5 8:7,13,14,16 ,18,20,22,24 10:7 16:25 94:10,13

**doctor** 46:15 67:9

**doctors** 67:6

**document** 20:22 56:1,8,10,12 ,13 78:15,20,22 82:6,13,20 86:20 114:19

**documented** 98:8

**documents** 103:11

**done** 11:4 18:16 24:25 26:6,25 44:6 60:5 64:2 66:6 68:23 72:18 89:10 104:6 107:25

**DOUGLAS** 2:25

**Dr** 43:2,6,8,14 44:9,16,24 46:20 47:9,23 48:3,10 49:22 50:2 51:12 52:13 54:15,19 55:3,11,21 63:18 64:4 65:24 66:20,22 67:4,10,19 72:10 73:8,23

**drama** 95:11,16,20, 22

**drug** 9:25 37:20 106:23

**drugs** 14:1 48:5

**Duces** 1:22

**due** 34:23 106:12

**duly** 5:3 111:8

**during** 10:19 17:17 19:7 37:7 45:12,20 51:13 53:10 59:25 64:9 65:2 68:7 76:11 92:3 105:20 109:10

**duty** 43:22 44:11,12,13, 16,19 46:7,8 47:10,13 48:17 50:16,19,22, 25 51:4,6,7 55:4,5,8,9,1 1,13 56:21 61:1,6 64:18 65:6,9 66:23 69:21 70:3,4,9,10, 16 71:15 73:3 77:9 78:9 91:7 96:3 98:11,15 100:11,14 102:3 103:14,16

**dyeargin@wpb.org** 2:24

E

**Education** 6:2

**educational** 5:25 6:8

**EEOC** 78:23,25 80:15,16,17, 23 81:10,16,19 85:4

**effort** 30:6

**eight** 7:2,18,21 59:8,10,13,1 8

**eighteen** 84:7,18

**either** 9:14 33:20 55:14

66:14 96:12
**else** 6:8 22:5 39:23 66:4 69:1
**email** 113:23
**employed** 5:15
**employee** 34:8 35:2 112:11,12
**employees** 34:22
**employment** 31:10 32:13,17 33:11 34:25 48:6 54:8 79:6 82:8 104:5
**enforcement** 10:1 59:23 60:1 64:21 88:2
**engage** 99:10
**engaged** 58:19
**entailed** 22:12 28:14
**ENTER** 114:2
**entitled** 106:12
**environment** 60:25 65:12
**Equal** 79:6 82:8
**ERRATA** 114:1
**ESQUIRE** 2:8,17,18,25 113:3
**estimate** 10:18
**ethnic** 84:22
**evaluate** 43:25 76:21
**evaluated** 46:11 53:24 60:23
**evaluation** 43:15 44:10,22 53:12,24 64:1,4 66:17,19,22 70:11,14 71:16,18,23 72:3,17 73:1,14,21 76:17,18 77:19,25 78:4,11 89:6 91:11
**evening** 74:22
**events** 70:21 102:25
**eventually** 19:15 60:10 87:14 98:12
**everybody** 46:23 75:18 87:24 88:1
**everyone** 48:23
**everything** 36:6 40:7 49:14,17 63:20 75:24 95:18 103:3 107:25
**evidence** 11:15 12:10,23 13:2 14:14,23 15:8 16:4,10 17:14 18:25 25:6 26:22 36:25 37:5 38:21 39:8 41:16 42:2 84:25 96:13 103:10 107:3
109:1
**evidentiary** 51:25
**exact** 25:10
**exactly** 28:13
**examination** 4:3,5 5:5 45:11 72:11 85:2 103:14 104:9
**examined** 5:4
**Excuse** 10:6 92:9
**execute** 20:4 22:2 23:25 24:21
**executing** 15:6
**execution** 27:10
**Exhibit** 4:14 20:12 21:1,3 56:6 57:21 72:4 78:16 82:1 84:25 85:21
**exhibits** 4:11,12 62:18 108:18
**exist** 27:6 75:20
**existence** 84:19
**experience** 10:15 13:1 25:13
**Expires** 111:15
**explain** 17:3 22:19 36:7
**explained** 38:23
**explaining** 19:4
**explains** 22:14
**extent** 34:14 38:7 52:19
**extortion** 10:12

F

**Fabian** 2:18 110:3 113:3
**fabian.ruiz@gray-robinson.com** 2:16 113:5
**fact** 84:21
**facts** 11:17 12:12 58:15 114:19
**factual** 106:2,5
**fair** 26:10 64:15 76:18 77:18
**false** 96:13
**familiar** 11:6 65:20 82:14 85:7 89:25 97:18
**Faye** 88:6,8,9
**February** 1:15 111:8 113:7 114:6
**feel** 12:14 15:1 26:8 38:15,24 40:24 75:19
**feeling** 92:19
**feels** 12:11 36:20 38:14 53:14 60:24 78:7
**fellow** 56:21

69:9

**felt** 16:4 22:17 25:20 26:5 27:16 39:19 41:22 45:24 46:8 47:16 48:15,24 57:16 74:9 77:15 78:3,6 89:13 90:25 100:21

**female** 40:1 68:17 89:16

**fentanyl** 47:25

**fifteen** 42:13 73:11

**fifth** 77:1

**figure** 99:19

**file** 30:6,9 55:19 85:22

**filed** 1:23 78:25 80:9,11,20 83:20,24 108:11

**files** 55:19

**filing** 80:13 83:18

**filled** 86:20

**financially** 112:14

**finding** 55:7,8

**findings** 51:24

**fine** 63:6

**finish** 63:5 99:20

**finished** 86:3

**fire** 34:8,20 47:25

**fired** 30:12,15 31:5,21 32:3 33:20 35:1 47:24 106:9

**first** 5:3 8:18 14:13 45:5 48:22 50:4,10 53:2 57:2,3 66:12 71:15,18,23 72:11,17 79:1 85:19 97:23 100:5

**fit** 43:21 44:12,16,19 47:10,12 55:8,11,13 61:1 64:17 65:6,9,10 70:4 73:3 78:9 100:11,13 101:5

**fitness** 103:14

**FIU** 6:14

**five** 7:14 59:6 71:8

**five-minute** 42:17

**Florida** 1:1,8,21 2:5,13,22 5:13 6:5,7 78:22 81:9 111:2,6,14 112:2 113:5

**focus** 17:7

**focused** 16:20

**follow-up** 108:20

**FOP** 54:12 55:15 98:17,19,24 99:3,8,11,14

**force** 8:5 9:9,15 45:22,23 51:10 53:9

**foregoing** 114:19

**form** 5:20 10:22 11:11 12:3,8 13:4 14:2,15 15:10,12,17 16:5,18 17:15 18:8 19:2 20:3 23:2,12 25:18 26:3,12 28:25 29:5,18 30:7,16 31:1,13 32:18 33:9,21 34:9 35:13,19 36:3,11 37:21 39:3 40:10 42:6 43:5 46:21 49:23 50:6 51:16 52:2,15 56:22 60:4 61:24 65:15 66:5,11,24 67:5,20 69:16,23 71:17 72:13 73:9,24 74:6 75:22 76:14 77:10 78:1 79:9,20 80:2 81:4 82:25 85:1 86:8,24 88:17 91:15 92:7,10,17 93:16 96:5,15,24 99:1 100:4 101:13 102:4 104:14,20 105:7,24 106:17 107:9,16 108:16

**formal** 79:21

**Fort** 2:5 5:12 6:22,24 7:2,20 8:2,9,25 13:9,17,24 43:9,17 44:3 54:20,22 55:15,18,22 56:1

**forth** 85:3

**Forty-four** 59:24

**forty-six** 59:25

**forward** 30:2 97:15

**forwarded** 79:19 88:12

**forwarding** 72:5

**four-and-a-half** 97:23

**fourth** 67:21

**Frank** 1:18 4:2 5:2 84:9 111:6 112:7 113:3,20 114:6,23

**Franklin** 5:11

**frequently** 41:9

**Friday** 113:11

**front** 61:25 62:6,14 102:10 107:23

**fucked** 96:4

**full** 5:9,11

G

**gambling** 10:11

**game** 26:10

**gathered** 12:10 56:20 59:20 73:20

**Gellin** 1:9 57:4,11,19 59:8 72:4 87:6,10 88:12 93:14,18,19 94:2 99:25 100:6

**generally** 103:17

**Getman** 93:17

**gets** 26:15

**getting** 11:7 23:7 31:20 106:10

**given** 93:8 105:5

**giving** 28:4 31:5 37:9,13,19 38:3 93:7

**Goldberger** 59:3

**Gomberg** 109:17,19,20 ,23 113:16

**G-O-M-B-E-R-G** 109:23

**gone** 34:10

**gotten** 10:19,20 91:21,22

**grade** 24:22

**graduated** 6:2

**Granberry** 82:12

**GRAYROBINSON** 2:11 113:4

**great** 95:18 99:16

**green** 30:1

**Greg** 75:16 89:13

**group** 40:14 43:23 60:20

**groups** 10:7

**guess** 37:23 83:8 93:5 94:3 98:13

**guides** 12:24

**Gulf** 6:5

**gun** 70:19 71:22 72:2 102:2

**guy** 40:25 41:1 45:24 46:2 47:6,16 53:14 57:8 68:11 70:9,13 77:6,16 89:11 93:11 94:12 95:15,17 98:9,14 101:4

**guys** 110:16

H

**half** 42:19

**Hall** 56:2 79:7,16 87:4,7,18,24 ,25 89:12,17 90:2,3 95:3,10 96:1

**hand** 104:13

**handed** 102:24 103:6,10 104:18

**handled** 79:23 81:22 82:23 88:13,20,21

**hands** 106:10

**handy** 57:22

**happen** 30:1 72:25

**happened** 24:20 27:7 30:3 50:12 63:24 70:18,22 75:9 89:23

**happens** 36:18

**hard** 101:6

**Harrell** 1:5 3:2 5:8 22:21,25 25:3,7,14,16 26:1,9 30:6 37:1,6,19 38:21 43:1 44:25 48:12 57:6,16 58:19 61:23 63:1,12,24 64:3,8 65:1,14 66:10 67:24 68:8 69:8,15 71:14 73:19 74:4 75:4,10 76:12 77:14,15,18 78:3,25 80:1,11,23 87:17 90:18 91:9,13,21 92:4,16,24 93:14,22 94:2,9,15,19 95:5,9 98:25 99:9 100:1,9 101:1,18,24 103:16 105:4 108:10 109:7 113:6 114:4

**Harrell's** 22:2,12 35:12 39:17,18 61:6,15 72:8 91:6 102:20 103:18 104:4 105:16

**haven't** 86:3 108:17

**having** 5:3 23:7 43:23 78:13 98:5,9,15,23 102:8

**head** 23:17 24:13

**hear** 71:6 91:2

**heard** 27:20 56:23 64:21 66:16 67:25 68:11 75:13 94:4 97:20

**hearing** 77:21 109:7

**he'd** 12:13

**help** 20:13 46:10 48:16 78:14 100:19 101:1,24

**helping** 100:21 101:25 102:3

**Herb** 27:8,18,19 28:3,10,21,2 3 29:2 36:2

**Herb's** 28:8

**hereby** 113:18

**he's** 15:17 33:23 44:18 57:12 60:6 61:19 64:12 95:17,24

**hey** 90:24 109:15

**HH** 111:14

**High** 6:2 102:11

**Hilaire** 86:19

**hired** 6:22

**history** 61:19 64:12 69:8

**Hold** 10:20 40:18 63:3 70:2 86:7

**home** 72:9,22

**homicide** 107:2

**hornet** 84:23 85:6,20

**hour** 42:13,19

**hours** 113:10

**house** 11:21 15:4,5 98:15

**HR** 43:3 56:1,2,17 64:11 66:7,9 78:4 80:17 82:23

**huge** 58:17

**Huh** 29:12 62:22

**Human** 78:23 79:7 81:10,23 82:7 83:17 96:3

**hundreds** 10:23

**hurt** 78:14

I

**IA** 103:3,7 108:22 109:3,4,6

**Ibis** 90:22

**I'd** 9:18 31:9 75:13

**idea** 69:17 88:3 97:22 104:15

**identification** 21:4

**identifies** 84:16

**ignore** 15:18 18:1,15,17 70:15

**I'll** 83:11

**I'm** 5:17 14:24 15:13 17:10,24 19:4 23:23 24:23 27:18 30:8,18 31:22 32:1 35:24 36:12 38:9 42:10 44:18 46:15 49:11 50:10 56:25 57:13 58:5 59:15 60:13,19 61:12 65:18,20,24 68:24 72:15 74:1 76:8 77:21 78:7,17,18 79:8 80:19 81:21 82:3,22 83:10 85:7,15,19 89:22 91:2 92:1 94:23 97:4 99:10 105:13 107:21 109:18

**immediate** 18:22 88:6 90:13

**immediately** 50:20,23

**imposed** 84:21

**improper** 15:5

**inappropriate** 26:5 94:8

**Inc** 113:16

**incident** 48:19 89:23 90:1

**incidents** 61:22 62:11 76:6,8 98:4 100:16 107:3,17

**include** 37:18

**included** 32:15 80:12

**including** 9:16 109:3

**inconsistency** 106:1

**independent** 81:17

**INDEX** 4:1,11

**indicate** 61:16

**indicating** 80:8

**indication** 53:11

**indications** 45:21

**Indictment** 56:11

**individual** 23:16 38:6 42:7 52:18 55:19 79:10 97:2

**individually** 1:9,10

**individuals** 47:3

**information** 12:12 18:3,14 25:9 26:10 36:9,13 37:9,13,18,19 38:2,4,8 39:17,21 52:21 85:1 104:25 105:3 106:2,5,14,23 107:7,22

**informed** 25:9 32:20 80:10 83:19

**initial** 64:4

**initiated** 23:13

**input** 82:24

**insight** 100:25

**instance** 35:9

**instead** 63:23

**instituted** 23:10

**instruct** 65:23,24

**instructs** 104:12

**interested** 112:14

**interesting** 65:9

**internal** 8:11 10:2 13:9,12,17,25 14:5 16:3,6,9,24 17:10,20 18:3,6,14,21 19:15 24:11 26:11,14,15,19,20 27:4,5 35:11,12,14,16,18,21 36:6 40:7,8,11,12,19 41:12 62:12 74:8,12 79:23 81:2,8,9 87:15 90:4 96:11 97:10 98:8 100:1 101:16 102:24 104:13,18,25 105:5 106:9,14,19 107:18,24

**International** 6:7

**interpersonal** 103:19

**intimidated** 91:1

**investigate** 90:5 100:2 106:12

**investigated** 81:2 88:10,15

**investigation** 13:18 14:6,7 16:7,14,15,20,24 17:6,18,24 18:2,18 19:6,7,8 22:8 23:21 24:11,25 25:1,4,8,11 26:14 27:4,5 28:5 29:23 36:5 37:20,23 38:12 40:20 42:10 45:21 51:9,13 53:1,4,8,10 80:18 81:13 86:4,12,15,16,19 87:16 94:10,13 97:3,5,7 102:19,20 104:22,25 106:20 107:5,24 108:22 109:3,4,6

**investigations** 8:22 9:2 10:6 81:17 96:11

**investigative** 9:21 10:5 85:22

**investigator** 10:2 16:19 17:4 18:10 23:21,22

**investigators** 18:24

**involve** 26:10

**involved** 12:21 22:25 45:25 50:21 51:5 108:4

**involvement** 22:13

**involving** 83:16

**isn't** 26:19,20 102:3

**issuance** 20:1

**issue** 89:1 100:11

**issued** 14:1 41:25

**issues** 61:20 64:11 89:15 103:19

**items** 11:22 17:14

**it's** 37:10 69:11

**I've** 11:4 44:6 56:23 60:5 66:16 67:25 68:11 84:7 85:16

J

**Jason** 47:19

**Jerry** 90:10 94:14,17

**jibe** 72:12

**Jim** 84:11,20

**job** 5:16,19 17:22 18:21 36:22 67:2 75:23 95:12,16,22,25

**Joe** 90:14

**Johnson** 88:6,8,9

**joke** 93:23 94:3

**joking** 93:21 94:1

**Jose** 83:17

**judge** 11:17,19,20,21,24,25 12:11,13,15,17,25 14:19,25 15:3 20:18 21:10 27:15 28:16

**judgement** 52:7 62:2

**JULIE** 2:17

**julie.zolty@gray-robinson.com** 2:15

**July** 45:15 72:6

**June** 5:22

**justice** 6:4,5 37:12

**Justin** 22:4

K

**Kevin** 1:5 3:2 5:8 101:1 113:6 114:4

**kid** 106:24

**kinds** 101:22

**King** 91:5,8

**knew** 33:15

**knowledge** 34:17 38:9 52:20 79:12

**known** 8:9

L

**LALLY** 1:9

**Large** 1:21

**last** 7:2,6 9:13 20:17 21:24 40:2 45:12 62:7 63:9,11

99:12
**later** 89:9
**Lauderdale** 2:5 5:13 6:22,24 7:3,20 8:2,9,25 13:10,17,24 43:10,17 44:3,6,19 54:20,22 55:15,18,22 56:1
**law** 59:22 60:1 64:21
**lawsuit** 80:8,9,12,13,20 83:24
**lawyer** 54:13 109:7
**lead** 12:22 21:23,25 23:6,19,22
**learned** 107:18
**leave** 52:25 73:16 89:5
**led** 45:12 48:23 53:11 63:15 89:16 100:13 102:20
**legal** 22:16
**legalities** 27:1
**less** 7:16 9:5 100:12
**let's** 7:11 15:20 46:3 83:7 101:1
**letter** 33:3,16 59:3 82:7 84:25 113:1
**letters** 56:20 57:5,7,10,14 58:7,10,11 59:20 60:2,8 63:2,13 65:16,21 68:21,22 69:14 70:8,20 73:8,20 74:15,23,24,25 88:11 99:24 101:12 103:18
**level** 9:25
**levels** 90:16
**liability** 102:11
**lieutenant** 19:12 27:8,18,19 28:3,8,10,21,23 29:2 36:2 60:9,13 73:18,22 75:1 86:23 87:2,4,5,6 89:13 90:14 95:17,23,24
**lieutenants** 84:11
**light** 30:1
**Line** 114:7
**list** 14:20 106:20
**listen** 95:17,23
**little** 24:22
**live** 5:9
**living** 5:10
**Lloyd** 82:11
**lobby** 87:19,25 89:19 90:2
**long** 7:8,9,18 9:16,19 11:4 13:10,11,12 42:15 50:24 51:1,3,7 73:7
**Lopez** 59:7
**lot** 28:20 36:19 58:24 59:2,9,19 69:12 75:13 98:1 101:21 102:18 103:22 105:13,22 107:11 108:21 110:16
**Luis** 83:17
**lunch** 42:16,18
**lying** 105:20

M

**major** 6:25 7:15 8:3,23 9:13 10:8 97:12
**male** 89:8
**man** 43:18 78:18 91:2
**managers** 18:13
**manner** 15:13
**March** 111:9 112:16 113:2
**marked** 4:12 20:12 21:3 78:16
**master's** 6:6,14,18
**material** 12:1,7 13:2 18:7 105:4
**materials** 13:25 14:8 16:2,3 17:12 24:8 72:5
**may** 16:2 80:4
**maybe** 7:12,14 59:14 65:11 80:7
**mayor** 5:21 30:21 32:12,16 33:10 34:2,3,6,19 62:24
**McGinley** 59:6
**MD** 46:16
**mean** 10:23 11:2 12:9,20 13:5 14:16,19 15:1,5,11 16:6 17:2,3,16,19,22 19:18 23:13,15 24:22 29:6,21 30:21 31:23 34:16,21 36:12,13 37:8,12 38:11,12,16 39:4,19 40:15 41:21 42:1 43:9,11 44:6 45:20,21 47:11 48:6 52:23 55:7,13 57:20 58:2,8,16 60:22 61:18,19 62:11,14 63:14,17,25 64:16 65:3,23 67:11

70:12,14 71:3,4 72:25 73:4 74:7 75:14,17 77:5 78:2,8,10,12,13 80:16 82:22 85:6,16,20 86:6 88:24,25 89:1,21 91:2,8 92:25 97:6 99:2,3 101:6,19,23 105:19,21 106:25 107:22

**means** 86:9 95:2 96:17,19 97:21,22

**meet** 27:8,15 28:23 29:4,9,15,24 76:22

**meeting** 27:12 29:1,7 62:25 68:8 91:5 92:3 109:10

**meetings** 29:19,21 40:23

**members** 61:20 84:13

**memo** 60:9

**memory** 58:13 71:5 72:12,14,16

**men** 83:9

**mention** 74:15

**mentioned** 89:18

**message** 62:24

**met** 69:13 76:20 77:15,19 78:2,6 91:10

**Miami** 2:13 113:5

**Michael** 1:10 43:2

**middle** 45:16

**midnight** 67:24 68:5,9,10,11 84:5 85:9,11,13 93:1,6,11,15,22,24

**midst** 49:21

**military** 84:6

**Miller** 46:13,20,22,23,25 47:17 48:24 53:13 66:20,22,25 67:4,7 100:21

**minute** 35:8 71:9 91:16

**minutes** 85:9,14 99:18

**misspelled** 79:1

**mistaken** 59:15

**mobile** 84:22

**moment** 20:13 21:24

**Monday** 113:11

**months** 51:18 52:12

**morning** 5:7

**Morris** 29:15 30:12 31:5,9 32:2,7,10,24 33:3,7,16 35:2 69:3 83:8,16 91:6,12,17,19,23,25 92:1,6,15,19

**move** 30:2

**moved** 94:9,20,24 95:6

**moving** 97:15

**municipal** 1:8

**murdered** 106:24

N

**narcotics** 8:2,3 9:8,11,13,16 10:8 13:22,24 23:11 25:8

**necessarily** 43:9

**news** 57:13,20

**Nicholas** 1:20 111:5,13 112:5,19

**Nick** 109:15 110:9

**nickname** 93:5,24

**nicknamed** 68:4

**nine** 9:18

**nominated** 5:21

**non-criminal** 27:4,5

**nor** 112:12,14

**normally** 12:20 64:2 104:7

**north** 59:15

**Northeast** 2:4

**Notary** 1:21 111:6,14

**notes** 112:9

**nothing** 104:17 107:4

**notice** 1:22 71:4,14

**NOTIFICATION** 113:1

**Numeral** 96:10

O

**Oath** 4:7 111:1

**object** 10:22 31:22 38:9 79:8

**objected** 79:2

**objecting** 15:13,17 78:8

**objection** 5:20 11:11 12:3,8 13:4 14:2,15 15:10,12 16:5,18 17:15 18:8 19:2 20:3 23:2,12 25:18 26:3,12 28:25 29:5,18 30:7,16 31:1,13 32:5,18 33:9,21 34:9 35:13,19 36:3,11 37:21 38:5 39:3 40:10 42:6 46:21 49:23 50:6 51:16

52:2,15,16 56:22 60:4 61:24 65:15 66:5,11,24 67:5,20 69:16,23 71:17 72:13 73:9,24 74:6 75:22 76:5,14 77:10 78:1 79:20 80:2 81:4,15 82:25 86:7,24 88:17 91:15 92:7,10,17 93:16 96:5,15,24 99:1 100:4 101:13 102:4 104:14,20 105:7,24 106:17 107:9,16 108:16

**objective** 47:5,7

**obligation** 60:6

**obstructing** 37:12

**obtain** 24:20 106:23

**obtained** 6:24 14:1 21:16 36:10

**Obviously** 29:20

**occur** 50:14

**occurred** 50:15 101:18

**OCS** 102:24 103:6

**October** 6:23 97:12,13

**offended** 68:19 93:2,4,7 94:5

**office** 2:21 7:4 8:11 10:2 21:7,20,22 23:5,11,15,24 24:14,15 25:25 26:21 27:2,13,14 28:15,17,19 29:17 30:5 38:20 39:5,7,13,14,16,22 40:4,9,13,17,21 41:20 53:6 54:16 60:10,12 75:3,6,7,11,19 79:23 80:7,17 81:2,7,8 82:23 87:15 88:12 107:18 108:14 109:16

**officer** 7:23,25 10:14 17:13,17 21:13 22:2,12,20,25 25:3,6,14,16 26:1,9 30:6 35:11 36:25 37:6,19 38:21 39:18 43:1 44:25 45:5,9,16 47:19,22 49:9,21 50:16 51:14 52:13 56:19,21 57:6,16 58:19,21,22 59:1,3,4,5,6,7 60:3 61:5,6,15,23 63:1,12,24 64:3,8 65:1,14,23 66:9 67:24 68:8 69:15,20,21,22 71:14 72:8 73:19 74:4 75:3,10 76:11,12 78:25 80:1,11,23 83:17 84:4,17 87:17 89:2 90:18 91:6,13,21 92:3,4,16,24 93:14 94:9,15,19 95:5,9 98:6,25 99:9 100:1 101:2,18,20 102:9 103:16 105:4,16 108:9 109:7

**officers** 17:23 18:12 20:2,5 56:20 57:5 58:4,18 60:3 61:17 65:13 67:23 68:9,13,16,19 69:9 75:16 100:6,18

**officer's** 55:19

**Oh** 6:19 43:18,21 54:24 56:13 65:16 93:19 105:19

**Okay** 6:14 7:8 9:20 10:14 11:1,3 15:20 27:24 34:19 42:14,21 43:6 44:15 50:14 55:10 56:7 63:14 71:8 72:20 77:3 78:4,17,18 80:7,9 82:6 85:10 97:21 99:17 102:18 103:9 104:3 105:19 109:12,14,24 110:7,8

**ones** 16:25 55:2 56:4 58:8,9

**one-year-old** 106:24

**ongoing** 25:7

**operating** 96:9

**operations** 37:13 88:25

**opinion** 28:20 46:6 47:2,4,7 53:18 65:6

**Opportunity** 79:6 82:8

**opposed** 44:17 56:3 103:24

**order** 13:7 14:17 28:16 47:16

**ordered** 73:19,22,25

**ordering** 110:3

**Organized** 9:12 17:11 104:12 105:5 106:6
**Original** 110:11
**OSWALD** 1:10
**outcome** 86:4
**outside** 15:1
**outstands** 28:21
**overall** 59:22
**overview** 22:11

P

**P.A** 2:3,11 113:4
**p.m** 1:15 84:6 110:19 113:11
**Padgett** 45:1,16 46:20,22 47:12 48:12,14,15,16 49:9,11,21 50:16 51:14 52:13
**Padgett's** 45:5 48:19
**P-A-G** 45:7
**page** 4:2,13 20:13,17 83:6,14 84:2 102:10 114:2,7
**pages** 21:1
**Palm** 1:8 2:20,22 5:14,18 7:7 13:20,22 17:9,10 22:23 24:14 36:19 41:10 43:16 44:7,8,21,23 46:23 50:11 81:12 82:7 97:19 108:13 111:3 112:3 113:6 114:4
**Panamefs** 82:11
**Pardon** 62:10
**paren** 84:6,9,10,20
**Parentheses** 84:20
**particular** 11:22 64:16
**parties** 112:12,13
**party** 84:15
**patrol** 7:25 8:1,6,13,18,24 53:15 88:25 94:21,22,25 95:1,2,3,7
**pay** 52:25
**penalties** 114:18
**pending** 70:10 80:8
**people** 34:21,25 36:14,19 43:14,19,21,22 44:15,19,20,23 45:24 46:25 48:11 54:18,25 55:10,12 57:14 58:3,4,14,25 59:2,9,10,13,17 60:20 61:20 68:12 74:24 75:13 88:2 91:2 98:1,7 99:12 102:7
**per** 59:14
**Performance** 73:21
**performed** 15:24 27:25 76:4
**period** 67:16 84:24
**perjury** 114:18
**permission** 25:25
**permit** 42:5
**person** 12:23 18:18 24:13 28:18 30:18 38:16 46:1,10,12 59:16,19 60:22,25 61:2 79:4 97:7 99:5 100:23 102:8
**personal** 34:11,17 38:9 52:20 79:10,12
**personalities** 101:21
**personally** 25:5 35:6 39:23 80:22 111:7
**personnel** 99:25
**persons** 68:12
**PhD** 46:14,16 67:4,13
**phone** 22:3 32:24 33:12 35:4 39:17,18 40:8,11,12,19 62:23 106:10 109:25
**phonetic** 82:11,12 87:9
**phrase** 97:18
**placed** 52:24
**Plaintiff** 1:6 2:2 3:2
**Plaintiff's** 4:12 20:12 21:3
**plan** 42:15 46:9 47:13 48:15 53:21 60:25 61:3
**platoon** 59:12,14 74:20 89:2
**played** 105:10
**please** 5:8 6:21 15:23 20:25 27:23 56:6 76:2 109:13 113:10,12
**plus** 59:24
**point** 25:11 48:16 49:14
**pointed** 73:11
**police** 5:16,17 6:22,24 7:2,6,17,18,20,23,25 9:4 10:14 17:9,11,13 18:12 19:25 21:13 22:24

28:24 29:10 34:2 37:14 38:4 39:12,24 45:9 50:13 53:3 54:19,23 55:24 56:3,19,20,21 57:5 60:2,3 67:23 75:5,15 81:7 84:3,8,10,13,17 87:18 89:1,19 97:19 99:14 101:2

**Policing** 8:20

**policy** 53:9 79:5 95:23 100:10

**poor** 62:2

**portion** 51:25

**position** 74:8

**possibly** 29:13,19 75:24 76:9 83:5

**Post** 2:21 102:10

**practice** 14:3 50:21 81:1

**prepare** 62:16

**presence** 28:8 93:12 94:7

**present** 3:1 109:10

**presentation** 30:25 31:5

**presented** 23:24

**pretty** 14:24 24:1 42:10

46:15 49:11 61:12 68:24 78:21

**prevent** 75:23

**previous** 61:15 109:7

**prior** 19:25 21:12 27:10 54:7 62:8 69:20 71:15,18,22 73:23 80:9,13,19 82:9 83:18 96:2 106:9

**privilege** 31:23

**privy** 104:21

**proactive** 8:1

**probable** 11:12,14 22:17,19 23:8,25 24:19 27:16

**probably** 6:12 28:12 42:18 75:9 100:18,24 103:11

**probative** 16:16 17:12

**problem** 58:25 59:16,18 60:21 74:21 75:11 100:17

**problems** 46:5,25 90:19 95:13

**procedure** 96:9

**proceeding** 113:8

**process** 34:23 64:15 106:12

**product** 67:1

**professional** 6:1,20 102:8

**promoted** 7:11 8:5,12,17,23 9:1,14

**properly** 12:13 89:9

**prosecute** 36:21 37:16 38:16,24 39:9,20 40:25 41:3,6,17,23

**prosecutor** 12:22 14:18,25 21:23,25 22:4 28:4

**prostitution** 9:25 10:9,11

**protected** 34:22

**prove** 11:15 86:9 96:18,19 98:9

**P-S-Y** 67:16

**psychologists** 43:25 67:12

**PsyD** 46:14 67:14,15

**PTSD** 46:2,9,10 47:14 48:15,24 53:14,19 54:2

**public** 1:21 6:6,19 53:16 61:20 111:6,14

**Publix** 75:4 90:22,25

**pulled** 49:14,17

**pursuant** 1:22 24:9 35:4 91:7

**pursue** 27:4

**pushed** 40:14

**putting** 23:6 47:15

Q

**question** 15:14,21,22 27:2,7,23 30:17 38:10 47:21 63:9,11 74:14 76:1,2 85:14 86:1,17 95:4 97:9 99:4 108:20

**questioned** 107:14

**questions** 34:15 99:19 102:16,18 103:13,22 104:8 108:22 109:12

**quite** 41:9

**quote** 84:3,16,17,20,23,24 95:10,11 96:4

R

**race** 74:4,17 80:14,23

**racial** 74:10 84:22

**racially** 91:3

**racism**

75:11,14,20, 23 76:13

**racist** 84:4,10 90:21

**racketeering** 10:13 23:16,17 24:14 39:11,15 40:3 108:13

**radio** 84:5

**Raiders** 8:10

**rank** 6:25 7:3 8:5,12,17,23 9:1,15

**ranks** 84:12

**rather** 47:15 78:14

**RE** 113:6

**reached** 109:2

**readback** 15:24 27:25 76:4

**reading** 25:10 62:21,23 83:10,12 85:19 110:20

**ready** 82:4

**realize** 64:16

**really** 17:7 28:2,14 29:13,21 30:8 37:17 44:5 55:14 65:18,20 83:5 85:5 92:21 100:21 104:4

**reason** 22:24 33:7 95:5 114:7

**reasons** 22:17

**reassigned** 87:18

**re-assigning** 96:1

**recall** 21:24 22:22 23:3 28:13 29:1,11,13,14 30:10 39:10,25 40:2 44:18 48:4 54:14,25 55:2,3 63:19 64:8 70:18,23 71:1,24 73:2 74:19 75:3,10 76:15 78:21 80:25 81:25 83:5,25 84:1 85:20 86:3 88:20 91:5,12,23,25 92:1,18,21 93:13 94:9 95:15,21

**recalled** 72:22

**receive** 57:14

**received** 20:22 35:14 99:24 103:18

**recognize** 85:22

**recollection** 72:9

**recommendation** 46:4 53:16 54:4 77:9

**recommended** 43:6

**record** 11:9 42:22,23 61:7 62:14 63:7,8 71:11,12 99:21,22 112:9

**records** 72:10

**Recross-Examination** 4:6 108:24

**Redirect** 4:5 104:9

**re-evaluated** 66:10

**refer** 23:4 67:24 68:11 100:1

**referred** 68:1,9 93:11,14,22

**referring** 43:1 74:23

**refresh** 71:5

**refreshed** 72:15

**refreshes** 72:16

**refreshing** 58:13

**refutes** 106:3

**regular** 110:12

**rehabilitated** 64:19 65:10 70:5,13 73:3 78:10 101:5 102:6

**reiterated** 91:9

**relates** 102:19

**relating** 103:13 104:4

**Relations** 78:23 79:7 81:10

**relationship** 89:14 95:18 98:17,21 99:13,14

**relative** 112:11,12

**relayed** 92:24 93:20

**released** 50:23

**relied** 29:21 43:25

**relief** 51:7 96:3

**relieve** 50:16,19 70:9,10 77:9

**relieved** 50:22,24 51:3,6 55:4,5 56:21 70:2,16 71:15 72:21 91:7

**relieving** 69:20 102:3 103:15

**remain** 57:15

**remaining** 85:2

**remember** 9:19 43:18 45:2 46:14 58:3 62:7,19 65:5 69:3,6 70:21 75:8 76:19 86:5 92:11,14,15, 23 102:21 103:1,4,16,20,25 108:5 109:9

**remembered** 49:14,17

**remind** 15:16

**removed** 61:5 90:1

**rental** 5:13

**repeat** 86:1

**rephrase** 15:6 92:14

**report** 18:21 19:10 55:22 56:9 74:3 91:7 107:23 112:6

**reported** 10:13 90:15

**Reporter** 1:20 4:8 25:15 27:22,24 63:10,11 76:3 109:14,17,19 ,22 110:1,8,11,1 4,16 111:5,13 112:1,5,19

**reporter's** 109:15

**reports** 24:15 90:14

**represent** 5:8

**representative** 34:14 42:8 52:19 79:11

**representatives** 98:18,19

**represented** 54:10

**representing** 99:8

**request** 87:20 91:11

**reserved** 110:21 112:8

**reside** 5:12

**resign** 31:12 32:8,11 33:8,20

**resignation** 30:24 31:6,7,8,9 33:17

**resigned** 30:13,14 31:9 32:14

**resigning** 31:20 32:3 33:3,4

**Resources** 81:23 82:8 83:17 96:3

**respect** 79:12 103:15 104:4

**respond** 52:19 85:17

**responded** 81:19

**responding** 5:3

**response** 64:23,25 73:14 82:10,24 84:14 85:4

**responses** 49:1

**result** 109:2

**results** 97:3

**retired** 75:15

**review** 24:8 26:24 61:5,6 112:7 113:9,12

**reviewed** 40:22

**reviews** 61:16

**Richard** 25:7

**Rick** 31:9 33:3,16 69:3 91:5,8,17,23

**RICO** 10:12 28:18

**Rideau** 75:16 87:5 89:13

**riding** 25:21

**Riviera** 53:2

**road** 7:25 46:3 53:22

**Roble** 29:4,9

**Rodriguez** 83:17

**role** 18:12 42:25 43:19,20 105:10

**Roman** 96:10

**roughly** 9:18

**rounds** 93:23

**route** 78:12 100:20

**routine** 81:1

**Ruiz** 2:18 4:4,6 5:20 10:20,22 11:11 12:3,8 13:4 14:2,15 15:10,13 16:5,18 17:15 18:8 19:2 20:3 23:2,12 25:18 26:3,12 27:20,21 28:25 29:5,18 30:7,16 31:1,7,13,22 32:5,18 33:9,21,23 34:9,13 35:13,19 36:3,11 37:21 38:5 39:3 40:10 42:6,12,15,1 9,21 46:21 49:23 50:6 51:16 52:2,15 56:22 57:21,23 60:4 61:24 63:4 65:15 66:5,11,24 67:5,20 69:16,23 70:24 71:6,8,17 72:13 73:9,24 74:6 75:22 76:5,14 77:10 78:1 79:8,20 80:2 81:4,15 82:4,25 83:21 86:1,7,24 88:17 91:15 92:7,10,17 93:16 96:5,15,24 97:1,6,14 99:1,18 100:4 101:13 102:4,14 104:14,20 105:7,17,24 106:17 107:9,16 108:16,20,25 109:15,18,20 ,24 110:5,7,12,1 3 113:3

**run** 99:14

**running** 49:4,5

S

**safety** 58:21,22 59:1

**Saint** 86:18

**Saturday** 90:23

**saw** 57:7,15

**schedule** 113:10

**scheduled** 48:16

**School** 6:3

**scope** 15:1

**SCOTT** 1:9

**Seal** 97:18,24 98:2,13

**search** 4:14 10:15,18 11:5,7,10,18 ,20,21 12:15 13:1,6 14:1 15:4,7 18:6,7,24,25 19:21,22 20:1,4,13,17 ,19,23,24 21:6,9,12,15 22:2 23:8,10 24:4,9,10,20 ,21 25:17,25 27:1,3,6,9 28:10,24 29:16 35:5,12,15,1 6,21,25 36:1,10 37:1,7 40:14 41:24 104:12

**searching** 12:7,18

**second** 15:4 27:24 40:18,19 46:5 47:2,4 49:2,3,9,24 50:14 51:5 53:18 57:23 65:6 66:13,17 70:2,22 76:3 77:24 78:3,7 86:7 89:6 91:11

**section** 17:11 23:11 96:9 104:13 105:6

**seeing** 78:21

**seeking** 22:13

**seem** 89:1

**seems** 20:21,23 46:25

**seen** 17:25 31:9 56:8,10,12 58:7 60:5 78:20 82:6,13 108:17

**sees** 18:10 19:8

**seize** 13:2 14:13,17,20, 22 16:16 17:12

**seized** 15:7,8 24:9 26:11,22 35:4,24 106:6

**selected** 47:4

**self-identifies** 84:16

**send** 43:14 45:19 47:22 48:9 50:1,7 51:12 53:11 54:15,18,21 61:4 62:24 63:3

**sending** 43:19 63:5

**sent** 21:10 44:9,15,20,2 4 45:1,11,17 46:20,22 47:10 48:3 49:22 52:13 54:25 55:2,10,20 61:2 63:17 72:9,22 73:8,23

**separate** 16:13,22 29:10

**separations** 34:24

**sergeant** 6:25 7:8,11,22 8:6,8,11 9:15,20,22 10:2,15 13:15 19:10,11 39:17 48:7,9 56:20 57:4,6 59:8,13 60:2 72:4,8 74:25 86:21,22,25 87:10 88:11 89:8 90:8 93:14 94:12,14,18 99:25

**sergeants** 9:23 67:24 84:11

**serious** 70:14 73:4 74:21 78:10

**served** 7:6 8:6,13,23 9:11 21:13 84:7,18

**Service** 7:5 8:14

**serving** 8:3

**settings** 43:23

**seven** 59:8

**several** 43:10

**sex** 98:15

**shared** 92:16

**sharing** 92:15

**SHEET** 114:1

**Shephard** 20:18 21:10

**Sheriff's** 7:4 54:16

**She's** 93:1

**shift** 74:22

**shooting** 45:12,14,25 48:19 49:2,3,7,10 50:11,14,17, 20,22 51:6

**shoots** 52:23

**shop** 47:25 90:25

**shopping** 91:4

**shortage** 94:21,22,25 95:1,7

**shot** 49:4 78:7

**showed** 53:9

**shown** 21:6,9,12 69:14

**signature** 113:18

**signed** 20:18 58:5 74:24

97:11,13 111:9

**significance** 85:10,17

**signing** 110:20

**signs** 14:18

**similarly** 84:14

**simply** 35:11 88:1

**Sincerely** 113:14

**sir** 6:15 11:8

**sitting** 38:6 79:9

**situation** 56:19 75:25 91:13,20 101:8 104:6

**situations** 103:23

**six** 59:7 97:18,24 98:2,13

**sixteen** 73:11

**sixth** 104:23

**slur** 84:22

**solely** 108:4

**soliciting** 60:2

**somebody** 39:23 46:16 55:20

**someone** 17:18,25 19:8 22:5 36:17 50:21 54:21 60:23 64:11 70:3 78:9 79:21 81:5 106:11

**sometime** 56:15

**somewhere** 6:13

**sorry** 17:10 27:18 32:1 56:25 65:24 82:3 83:10 105:12 107:21 109:18

**sort** 61:16 82:14 103:25

**sound** 35:20

**sounds** 24:1

**Southeast** 2:12 113:4

**SOUTHERN** 1:1

**Spatara** 90:12,15,16, 19,21,24 95:6

**speak** 21:21 41:18,19 62:15 79:11 99:2

**speaking** 28:3 52:21

**special** 8:21 10:6 99:13

**specific** 12:6

**specifically** 22:22 24:10 75:8 83:25 84:19 89:21

**specifics** 12:9 92:20

**spell** 109:20

**spelled** 11:23 79:4

**spelling** 45:8

**spent** 6:23 8:4 9:9

**squad** 10:12

39:11 58:14

**stamped** 21:1

**standard** 96:9

**starts** 94:17

**State** 1:21 12:21 21:7,19,21 22:14 23:4,11,14,2 4 24:14,15 25:19,24 26:4,21 27:2,12,13 28:9,15,17,1 9 29:7,10,16,2 2 30:2,5 36:15,20 37:3,15 38:13,20 39:5,7,12,14 ,15,21 40:3,9,13,16 ,21 41:19 42:5 53:5 80:17 108:14 111:2,6,14 112:2

**stated** 114:19

**statement** 49:13 101:7 105:9,13,15, 16,20,21,23

**statements** 107:11,13

**states** 1:1 84:2

**stating** 68:14 84:23

**station** 28:24 29:10 89:19

**steps** 23:20 26:21 103:17

**stole** 47:24

**stood** 28:14 55:14 58:9 77:14 106:21

**stories** 67:25 75:18 77:21

**story** 69:10 90:20

**Stranahan** 6:2

**street** 2:4 8:1,9 9:23,24,25 10:8,9 47:1,16,17,1 8 53:15,20 102:8,10

**strong** 34:6 41:16

**structure** 34:1,15

**structured** 46:9 53:21

**stuff** 14:17 16:16

**subject** 25:17

**submitted** 21:7 33:16

**subordinates** 98:10

**subordinate's** 98:15

**substantiated** 96:18

**successfully** 37:16 38:15,24 39:20 41:3,6,23

**sudden** 49:16 101:4

**suffered** 48:15

**suffering** 46:9 48:24

74:16,17
**suffers** 53:19
**sufficient** 12:12 77:8 85:1
**Suite** 2:4,12 113:4
**supermarket** 91:4
**supervise** 89:9 90:17
**supervisor** 17:17 18:22 60:6 90:13
**supervisors** 17:22 18:13 84:4
**supervisor's** 60:7
**support** 96:14
**Suppression** 8:9 9:23,24 10:8
**sure** 14:24 15:22 42:10,20 43:21 44:18 46:15 49:12 60:13,19 61:12 65:18,19 68:24 71:10 72:16 81:21 105:13
**surround** 98:3
**surveilling** 98:14
**suspect** 41:16 49:4 52:24
**suspending** 43:1 63:1,12,15
**suspension** 84:21
**sustained** 86:5,6 90:6 96:19,25 97:11
**sworn** 5:3 20:2 49:13 111:8
**Sylvia** 82:11
**system** 84:23 104:7

T

**tactics** 98:13
**taking** 1:22 19:5 58:5 102:2,25
**talk** 29:25
**talked** 77:6,16 83:9
**talking** 83:13,15 85:18 96:16
**Tamica** 60:15 84:10
**Task** 8:5 9:9,15
**Team** 8:9 9:23,24 97:18,24 98:2,13
**Teams** 10:8
**Tecum** 1:22
**Teleconference** 1:13
**telephone** 35:17 37:2,7,18 38:3,22 40:5 62:21 104:13 106:6,16 107:8,14
**ten** 7:12 9:18 59:14,17
**term** 95:21 97:20
**terminate** 32:13,17 33:11 106:11
**terminated** 30:18 32:25 51:10 54:8 62:8 107:8
**terminating** 48:6
**termination** 33:4 45:13 63:16 102:21
**testified** 5:4 52:9 72:14 102:23 103:19
**testify** 52:9
**testifying** 88:18
**testimony** 4:2 20:22 103:4 104:1
**text** 62:24 63:3,5
**Thank** 99:16 102:12 108:19 110:7,15
**Thanks** 110:16
**that's** 11:1 14:3,10 15:5,18 16:14 17:2,22 20:21 27:1 30:22,23 32:21 36:6,21 37:14,16,17, 24 41:2,7,8,10 43:11 48:23 53:23 55:24 57:12,19,20 59:5,6,8,12 60:8 61:2 63:6,25 64:2 68:6 73:4 75:17 76:1 78:12 90:16 99:3 101:6,7
**theft** 48:5
**therefore** 85:2
**there's** 19:14 71:3
**Thereupon** 5:1 15:24 21:3 27:25 76:4 110:18
**they're** 16:25 17:19 24:18 26:21 36:20 41:2 55:8 67:6 83:13 85:18
**third** 45:1 50:15
**thirty-six** 6:23
**timeline** 83:21 106:25
**today** 82:9
**total** 59:14
**totally** 47:5
**towards** 91:20
**track** 100:19
**transcript** 110:20 112:8 113:8 114:2
**treat** 47:13
**treated** 53:21

54:1
**treatment** 47:16
**tried** 101:25
**trigger** 49:15,17
**true** 100:3 101:12,14 112:9 114:20
**try** 102:16
**trying** 100:17 102:1 106:22
**Tuesday** 1:15
**turn** 13:23,24 14:5,8 16:9 18:6
**turned** 16:2 26:11 63:21
**twenty** 42:13 61:7
**two-and-a-half** 7:6
**type** 65:12
**types** 34:24 100:15
**typically** 69:19 79:18 103:23,24 104:5

U

**unarmed** 49:4 52:24
**unconsciously** 49:19
**understand** 12:22 15:15 35:10,20 68:14 85:17 86:17,18 93:6
**understanding** 34:17 39:1,2 40:22 71:25 79:17
**unfit** 44:11,13,17,21 46:7,8 48:13,14,18 57:8 66:23 70:13 102:6
**unfounded** 96:10,17
**uniformed** 53:15
**union** 54:9,10 55:16 99:5
**unit** 8:1,3 9:13 10:9,10,11 13:18 23:17 28:19 40:3 108:13
**UNITED** 1:1
**units** 9:21 10:5 34:23
**University** 6:6,7
**unjustified** 51:9
**Unlike** 46:10 47:17
**unprofessional** 58:16,20
**unsubstantiated** 96:12,22
**unusual** 75:17
**update** 23:7
**upon** 107:7

V

**vacation** 72:1 73:12,19,23
**validity** 92:19
**version** 63:24
**via** 80:17 113:23
**Vice** 10:10,11
**victim** 76:13
**video** 76:25 77:4,7,20
**Vielma** 22:21,25 25:3
**violated** 53:9
**violation** 17:19,20,25 18:11,12,16,20 19:9,17 38:14
**violations** 16:10,17 17:1,13 19:1 26:25
**violent** 94:14,15
**visit** 65:4
**vs** 1:7 113:6 114:4

W

**wait** 6:11 42:1 70:2 83:11 91:16
**waiting** 51:23 52:7
**waive** 113:18
**walked** 90:24
**warrant** 4:14 11:5,7,10,23,25 12:15 14:1 15:7 18:7,25 19:21 20:1,5,14,17,19,23,24 21:6,9,12,15 22:2 23:8,10 24:1,4,9,11,20,21 25:17 27:1,3,6,9 28:24 29:16 35:5,12,15,17,21,25 36:1 40:15 41:24 104:12
**warrants** 10:16,18 13:1 19:22 28:11
**wasn't** 28:2 41:16 45:25 50:7 53:16 90:11 100:21 106:9
**ways** 33:24 57:18
**We'd** 14:12
**weight** 28:20 100:12 105:14,22
**we'll** 20:25 42:21 110:6,9
**we're** 19:16 41:7 48:6 51:23 78:12 91:4 97:16
**West** 1:8 2:20,22 5:14,17 7:7 13:20,22 17:9,10 22:23 43:16 44:7,8,21,23 46:23 50:11 60:15,17 68:3,4,13,17,22 69:4,6,7 72:25 74:3,14,19

81:12 82:7 83:8,16 84:10 88:13,14,20 92:9,23 93:13 97:19 100:7 113:6 114:4

**we've** 19:19 34:10 42:12 59:16,18

**whatever** 28:21 29:21,25

**whether** 35:24 36:24 55:20 58:18 73:18 77:3 79:16,18 81:13 88:15 90:18 94:19,23 95:4 100:2 101:11,17 103:24

**white** 65:19

**whom** 21:21 39:2 55:10

**Whose** 78:22 105:15

**WILLIAM** 2:8

**wish** 12:1

**wishes** 34:8,20

**witness** 5:21 10:23 11:12 12:4,9 13:5 14:3,16 15:11,20,25 16:6,19 17:16 18:9 19:3 20:4,7 23:3,13 25:19 26:4,13 28:2 29:1,6,19 30:8,17 31:2,8,14 32:19 33:10,22 35:14,20 36:4,12 37:22 38:11 39:4 40:11,18 42:9 46:22 49:24 50:7 51:17 52:3,23 56:23 57:24 60:5 61:25 63:14,19 65:16,18 66:6,12,15,25 67:6,21 69:17,24 71:1,3,18,20 72:17,20,24 73:10,25 74:7 75:23 76:6,15 77:11 78:2,17 79:14,21 81:5,16 83:1 86:9,25 88:18,19 91:16 92:8,11,18 93:17,19 96:6,16,25 97:10 99:2 100:5 101:14 102:5 104:15,21 105:8,25 106:18 107:10,17 108:17,23 113:1

**witnesses** 52:8

**work** 43:23 59:15,17 60:24 61:6 65:12 67:1 69:9 87:6 95:18

**worked** 7:25 10:9,11 43:8,12 87:7 89:12 95:13

**working** 17:24 57:17 98:21 99:13 100:22

**works** 34:1 95:15

**worse** 57:24 58:1

**Wow** 57:24

**wramlong@theamlongfirm.com** 2:7 113:23

**WRITE** 114:2

**writing** 108:15

**written** 69:19 71:3,4,14

**wrong** 26:21

**wrote** 60:9

Y

**YEARGIN** 2:25

**Yep** 72:7 110:13

**yet** 50:7 75:3 86:3

**you've** 10:15 12:20 14:19 16:23 19:20 23:16,21 24:13 28:17 34:4,21 42:10 58:14 59:13,14,17 70:8,9 71:4 74:25 95:23

Z

**ZOLTY** 2:17

**zone** 24:2

**Zoom** 1:13

FRANK ADDERLEY
02-27-2024 NB
Ex30

**1 Count in violation of Florida State Statute, 838.21 Disclosure or Use of Confidential Criminal Justice Information**

NOW THEREFORE, the Sheriff of Palm Beach County, Florida, and the Sheriff's deputies and/or any police officer in Palm Beach County within whose jurisdiction the aforesaid property to be searched is found, or the Commissioner of the Florida Department of Law Enforcement, or any of his duly constituted Agents, are hereby commanded with lawful and proper assistance as may be necessary in the name of the State of Florida, to search the body of **Kevin Harrell**, making the search in the daytime or the nighttime, as the exigencies may demand or require, or on Sunday, you are hereby commanded, to search the said person for the items previously described as **cellular device(s), and to use the amount of reasonable force necessary to execute the search warrant**, and to bring the same before a court of competent jurisdiction.

You are further commanded, in the event that you seize any of the said property heretofore described, to make up, at the time and place of seizure, a full, true and itemized list and inventory of all things seized and taken, in duplicate, signed by you, and to then and there give and deliver the said duplicate copy thereof to the person from whom possession shall be taken, if taken from the possession of anyone, together with a duplicate copy of this warrant.

Further, any property seized or taken shall be impounded for use as evidence at any trial of any criminal or penal cause growing out of the having or possession of said property.

FURTHER, this court directs that the Affiant keep original Search Warrant, original Affidavit and Application for Search Warrant and original Return and Inventory in the custody of the executing agency until further Order of the Court or until release by the executing agency.

WITNESS MY HAND AND SEAL this 15 of July in the year 2022.

Caroline Shepherd

Caroline Cahill Shepherd
15TH Judicial Circuit
In and for PALM BEACH County, Florida
July 15 2022 05:01:14 PM

PLAINTIFF'S
EXHIBIT

Friday, July 15, 2022 17:01:14

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000435 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

IN THE CIRCUIT/COUNTY COURT
OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

AFFIDAVIT AND APPLICATION FOR SEARCH WARRANT

THE STATE OF FLORIDA
COUNTY OF PALM BEACH

COMES NOW, **Agent Thomas Viale (I.D. 1988) of the West Palm Beach Police Department,** herein after referred to as "Affiant" being first duly sworn, deposes and says that he has probable cause to believe that certain cellular phone communication storage located in Palm Beach County, Florida, described as:

**SAMSUNG GALAXY S21 MODEL:SM-G998U IMSI: 310410264790988**

Being the property of, or occupied by, or under the control of:

**Kevin Harrell, B/M 07/25/1971**

now contains certain property within said cellular phone, to wit:

**Data related to communications between Officer Harrell, Richard Althouse, Amanda Vielma and any known associates created between the time period between May 15th 2021 and the date of the execution of the warrant, including:**

1. Call logs, to include incoming, outgoing, and missed calls.
2. Phonebook and contacts to include phone numbers.
3. SMS / MMS messages and attached multimedia files, to include incoming and outgoing.
4. Digital Images (Video & Photographs) with EXIF/METADATA Information
5. Location Services Information.
6. Any data from applications that have their own respective messaging system (I.E. WhatsAPP, Facebook Messager, G-Mail etc.)

constitutes evidence relevant to proving that a felony has been committed to wit:

**1 Count in violation of Florida State Statute, 838.21 Disclosure or Use of Confidential Criminal Justice Information,**

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

Affiant's reasons for believing that the crime noted above has been committed, that the cellular phone was being used as stated above, and that the cellular phone data are being stored, possessed, or otherwise held at/in said cellular phone and the facts establishing the grounds for this Affidavit as well as the probable cause for believing that such facts exist, are as follows:

Agent Thomas Viale has been an Organized Crime Section investigator since May 2020 and a part of the West Palm Beach Special Investigations Division since November of 2017. Agent Thomas Viale has been employed with the City of West Palm Beach Police Department since October of 2014 and a certified sworn Florida law enforcement officer since May of 2015. Agent Thomas Viale has received extensive training pertaining to narcotic investigations and the investigation of various crimes, which arise from drug trafficking activities. He has been a member of the West Palm Beach Police Department's Special Weapons and Tactics Team since April of 2018. His educational background includes Saint Vincent College (Bachelor of Science in Psychology, Bachelor of Arts in Criminology, Law and Society), Basic Recruit Police Academy at the Palm Beach County Criminal Justice Institute. Agent Viale has completed the following course: Advanced Report Writing, Advanced Search and Seizure and DEA's Hidden Compartment and Traps course. (This was a sample of courses taken, not a comprehensive list of all advanced and specialized training completed by Agent Thomas Viale).

Your Affiant is currently assigned to the West Palm Beach Police Department's Organized Crime Section.

**NECESSITY TO SEIZE CELLULAR PHONE AND PERIPHERALS**

Your Affiant requests permission to search the physical cellular phone(s) belonging to KEVIN HARRELL, including by way of example and not limitation, the aforesaid:

**SAMSUNG GALAXY S21 MODEL:SM-G998U IMEI: 310410264790988**

1. This phone contains necessary evidence to establish a particular person was able to and has the ability to commit the acts alleged.
2. Your Affiant knows from training and experience that searches and seizures of modern cellular telephones require agents to seize the actual phone as well as most or all the hardware, software, passwords and instructions for the phone to be forensically processed and examine at a later time, by a qualified person, in a laboratory or other controlled environment. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data to determine

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

CITY 01755

whether it is included in the warrant. This sorting process renders it impractical to attempt this kind of data search on the site from which the digital devices were seized.

**NECESSITY TO REMOVE CELLULAR PHONE FROM THE CITY OF WEST PALM BEACH POLICE DEPARTMENT AND CONDUCT A THOROUGH SEARCH OF DIGITAL DEVICES AND STORAGE DEVICES**

1. Your Affiant knows from training and experience that searching a cellular telephone for criminal evidence requires experience in the computer field and must be done in a properly controlled environment to protect the integrity of the evidence and recover even "hidden", erased, compressed, password-protected, or encrypted files. Since cellular telephone evidence is extremely vulnerable to tampering or destruction (both from external sources and/or from destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.
2. Your Affiant knows from training and experience that in order to fully retrieve data from a cellular telephone, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data or connect to the internet (whether stored on hard drives or on external media) as well as documentation, items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.
3. Your Affiant knows from training and experience that searching for a particular piece of evidence can be a painstaking and complicated process. A suspect may try to conceal criminal evidence by storing it in random order with deceptive file names. File extensions can be intentionally altered to make graphic files appear to be text files and text files appear to be graphic files. Such difficulties can also arise even when the user is not intentionally trying to conceal the nature of his or her files. For example, documents are frequently stored on computers after having been scanned and converted into digital format. When stored in this manner, such documentary evidence is converted to a graphical image format much like a photograph. Therefore, it is necessary for the forensic examiner to inspect files stored in graphical format to see if the relevant documents have been so stored.
4. Your Affiant knows from training and experience that various software applications may be used to access the internet as well as used to disguise the source and identification number of the device accessing the internet and requests this be searched as well. In the search for this type of evidence it is possible to locate the hidden source of the initiating device used to access the internet and/or the system or device used to record incoming or outgoing calls.

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

CITY 01756

Therefore, based on all the above reasons, your affiant requests this court to authorize the forensic processing and examination of these digital devices to be done at a later time, by a qualified person, in a laboratory or other controlled environment.

During the months of May through September in 2021, Your Affiant and other members of the West Palm Beach Police's Organized Crime section were involved in an ongoing investigation utilizing a Judicially authorized T-III telecommunications interception of **VERNON TANKSLEY (B/M 06/03/1980) and HENRY MANN's (W/M 02/13/1981)** telephones (WPBPD Case 20200014433). It should be noted that both targets were street level narcotics traffickers involved with the **4th STREET GANG (TANKSLEY CRIME FAMILY)**, also a case that has since been completed and charged in part of a R.I.C.O prosecution.

On July 21st, 2021, a phone call made to **TANKSLEY** on phone number 5615073661 from **AVENS LEMIEUX** utilizing phone number 5613242859 [CALL#26897]. During the call, **LEMIEUX** explained to **TANKSLEY** that he thinks because of all the recent traffic stops and police interaction involving the **4th STREET GANG** via the **WEST PALM BEACH DEPARTMENT** he believes that police are "going to come through," or investigate the organization. **LEMIEUX** then explains to **TANKSLEY** on how he will talk to **RICHARD ALTHOUSE** to see if he could help the organization.

On Wednesday, August 18th, 2021, at approximately 1748 a City of West Palm Beach Police Department (Car number 2193 bearing City tag XG9776) which is assigned to and operated by **OFFICER KEVIN HARRELL** arrived in the parking lot of the U.S. Post Office located at 640 Clematis Street. Agent Jerrell Negron (I.D. 1862) was already positioned in the parking lot of the U.S. Post Office as he was assigned to work surveillance on this date for the wiretap. As Agent Negron continued to sit in the parking lot, he observed **RICHARD ALTHOUSE (W/M 03/20/1964)**, who is a known associate of the **4th STREET GANG (TANKSLEY DRUG TRAFFICKING ORGANIZATION)**, drive into the U.S. Post Office parking lot and pull alongside **HARRELL's** vehicle so that the vehicles were facing in opposite directions and the two driver's side front windows were next to each other. **ALTHOUSE** and **HARRELL** could be seen speaking with one another. Agent Negron, knowing **ALTHOUSE's** role in the conspiracy of the **4th STREET GANG**, began to film the interaction. It should further be noted that **ALTHOUSE** acts in the DTO as a "street lawyer," or is hired by local drug dealers or individuals charged with narcotic related charges to conduct public record requests on the cases associated with the charges and even conducts public record requests on the charging officer's department/internal affairs records, if applicable. **ALTHOUSE** is not a Florida BAR member or registered paralegal. **ALTHOUSE** does this with the intent on getting charges dropped for his clients or to bring attention to what **ALTHOUSE** believes is Law Enforcement misconduct or to

investigations from the downtown West Palm Beach area. **ALTHOUSE** does this for local drug dealers and in return is paid in either money or narcotics, specifically prescription pills. **RICHARD ALTHOUSE** also constantly harasses sworn officers and has shown a distain for the department, filming himself and posting the videos on the internet. The meeting between **HARRELL and RICHARD ALTHOUSE** lasted approximately 15 minutes, part of the meeting was recorded by Agent Jerrell Negron. It should be noted that as the vehicles separated, **RICHARD ALTHOUSE** could be seen smiling and appears to chuckle. This gesture suggests that the relationship between **ALTHOUSE** and **HARRELL** is a comfortable and friendly one.

Information used to identify **ALTHOUSE** as an associate of the **4th STREET GANG** as well as his role as a legal advisor to said organization and the way he is compensated for his services is outlined in a sworn, recorded profer given by **HENRY MANN (W/M 05/10/1987)** on 02/25/2022. **MANN** is a co-conspirator in the R.I.C.O. case. **MANN** provides sworn testimony identifying **ALTHOUSE** as "Basically the neighborhood jail house lawyer" and that "Everyone downtown knows him". In this instance "downtown" refers to the neighborhood and its residents. **MANN** adds that **ALTHOUSE** will perform services for the members of the organization such as assisting them with getting back seized evidence and acting as a nuisance to the West Palm Beach Police Department by filing frivolous complaints on Officers. **MANN** also states that **ALTHOUSE** has done work for him personally. **MANN** confirms that **ALTHOUSE** gets paid for his services and that payment comes in the form of cash and/or prescription pills, specifically Percocet.

In February of 2022, following the arrest and charging of approximately 20 members of the **4th STREET GANG,** Your Affiant and Agent Matthew Steinberg were conducting an interview with a confidential informant (hereinafter referred to as CI) who was utilized during the R.I.C.O Case for the **4th STREET GANG**. During the interview, the CI advised us that he learned that a co-conspirator charged in the **4th STREET GANG** R.I.C.O case, **AVENS LEMIEUX (B/M 06/28/1985)**, met with **ALTHOUSE** regarding ongoing cases with the **WEST PALM BEACH POLICE DEPARTMENT. LEMIEUX** told the CI that **ALTHOUSE** set up a meeting with a connection he had within the department, who **LEMIEUX** described to the CI as a black male **WEST PALM BEACH POLICE** officer who "works in the lobby of City Hall." It should be noted that **OFFICER KEVIN HARRELL** was assigned as the City Hall Lobby Officer during the R.I.C.O investigation. **LEMIEUX** also told the CI that he and **ALTHOUSE** met with **OFFICER HARRELL** in the lobby of City Hall to discuss any open cases involving **LEMIEUX** and the **WEST PALM BEACH POLICE DEPARTMENT**. It should be noted that this CI is a reliable source, used in previous investigations wherein their information was proven to be consistent with the findings of the investigations they were utilized in.

It should be noted that to show routine communications with **ALTHOUSE** telephone tolls of **OFFICER HARRELL's** personal phone number (5615682677) were requested periodically, specifically in August of 2021 when **OFFICER HARRELL** was investigated for disseminating the **4th STREET GANG** case facts to **ALTHOUSE**, and in February of 2022 when it was learned through the CI that **OFFICER HARRELL** was meeting with **4th STREET GANG**

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

CITY 01758

member **LEMIEUX**. These telephone tolls revealed that **OFFICER HARRELL** had numerous telecommunication contacts, over 200, with **ALTHOUSE** during the timeframe of the wiretap and the apprehension of the **4th STREET GANG** members.

In March of 2022, following the arrest of the **4th STREET GANG** members for the R.I.C.O. investigation, search warrants for all arrested subject's cellular phones were written and judicially authorized by the honorable Judge Jeffrey Gillen. Upon reviewing the cell phone extract of **QUENTAVIOUS BROWN**, a known drug dealer/violent individual of the **4th STREET GANG,** a text message chain between **BROWN** (5614205128) and 5129389485, belonging to a **4th STREET GANG** associate who lives in Texas, **TAHJA HEADEN**. In the text thread, **HEADEN** sends **BROWN** a case involving another gang and them facing a R.I.C.O. charge, followed up by **HEADEN** saying "the RICO shit." **BROWN** replies with "Bra I honestly don't know wat 2 do cause look at Sama gang case das the same shit troll [street term for police] been doing to us all year," **BROWN** referring to the number of rips/seizures conducted by the Organized Crime Section during the judicially authorized TIII wiretap. **HEADEN** replied with "see if you got a warrant." Bam then says, "I don't, but we definitely under investigation, Dey [they] told rich [**ALTHOUSE**] months ago why u think buddy [**MARCUS TANKSLEY**, head of organization] left." It should be noted that the wiretap and R.I.C.O investigation into the **4th STREET GANG** was confidential in nature and not common knowledge to other members of the police department. Reports and associated facts were locked within the Records Division preventing dissemination based on public records requests. However, your Affiant knows that even though a unit such as the Organized Crime Section tries to conceal their investigations and prevent the targets/methods of investigations from leaking to the uninvolved sections of the police department, investigations still leak. In this instance Your Affiant knows that **ALTHOUSE** would only have learned of said investigation from a source inside of the police department. The thread then ends by **HEADEN** suggesting to **BROWN** to leave Florida, in which it should be noted that prior to the signing of all the arrest warrants for the R.I.C.O charge of the **4th STREET GANG** members in February of 2022, **BROWN** was discovered to be living in Texas per cell phone GPS pings conducted by the United States Marshall Service in preparation of the apprehension of **BROWN.**

On July 12th, 2022, **SERGEANT SMITH** of the Organized Crime Section spoke with the CI who was asked if there were ever conversations among the **4th STREET GANG** criminal drug trafficking organization about **ALTHOUSE** using police officers to get information. The CI stated that there were several conversations over time wherein members of the organization spoke about **ALTHOUSE** having a police officer who would provide **ALTHOUSE** with information. The CI added that it is his/her understanding that this police officer is the same officer that **ALTHOUSE** took **LEMIEUX** to meet at city hall. The CI also mentioned that **ALTHOUSE** was provided information from this police officer about the **WEST PALM BEACH POLICE DEPARTMENT ORGANIZED CRIME SECTION** installing cameras in the alley, specifically in a tree. The confidential informant stated that **ALTHOUSE** armed with that information climbed into the tree and cut the camera down and took it. This was information

that was already known to the **WEST PALM BEACH POLICE DEPARTMENT ORGANIZED CRIME SECTION**, because **ALTHOUSE** cutting down the camera was captured on the cameras video recording.

Described above is a pattern of **OFFICER HARRELL** disseminating information with intent, whether directly or indirectly to obstruct and or impede Your Affiant's investigation into the **4th STREET GANG.** The leaking of information caused Your Affiant and other Agents of the Organized Crime Section to alter their tactics and efforts in investigating the **4th STREET GANG** during and after the judicially authorized TIII wiretap. **OFFICER HARREL's** direct contact with and dissemination of active criminal investigative or intelligence information to **ALTHOUSE** caused subjects with pending arrest warrants to flee the state of Florida and require the unit and Agency to rely on federal law enforcement, the United States Marshall Service to assist in locating **QUENTAVIOUS BROWN**. Additionally, the dissemination of the protected information to **ALTHOUSE** led directly to **ALTHOUSE** finding and removing a hidden camera that would have been capable of recording the **4TH STREET GANG's** activities in their base location. **OFFICER HARRELL's** direct contact with **4th STREET GANG** member **LEMIEUX** caused not only fear of personal safety to a reliable confidential informant but also impeded on the R.I.C.O investigation by minimizing the confidential informants trust with Your Affiant and members of the **WEST PALM BEACH POLICE DEPARTMENT**. In addition, during the wire-tap investigation, after it was learned that **OFFICER HARRELL** had direct contact with **ALTHOUSE**, Your Affiant and members had to change their department issued undercover vehicles in fear that the information to include, make, model, color, year and license plate were disseminated to **ALTHOUSE** via **OFFICER HARRELL**. This also disrupted and could have interfered with Agent's abilities to conduct physical surveillance for the entire Organized Crime Section for the length of the judicially authorized wiretap and R.I.C.O. investigation. This also could have jeopardized the safety of undercover agents who were at the time, conducting direct undercover narcotics buys with members of the **4th STREET GANG**, by recognizing them inside of their department issued vehicles after learning about the vehicle's connection to the police department and the investigation. This could have led to **4th STREET GANG** members potentially following them either home or to locations of their families.

On July 12th, 2022, the telephone number (561) 568-2677 was provided to the West Palm Beach Regional Office of the Drug Enforcement Administration for the purpose of obtaining subscriber information. Their query identified **KEVIN HARRELL** as the subscriber of the phone as well as the below IMSI number which is specific to that handheld device. Your Affiant is confident that the data within **OFFICER HARRELL's** cell phone, **SAMSUNG GALAXY S21 MODEL:SM-G998U IMSI: 310410264790988,** will reveal communication that exist between **ALTHOUSE** and **OFFICER HARRELL**, regarding the sensitive information of Your Affiants investigation, that included the identities of not only confidential informants, but undercover narcotics agents. Information within **OFFICER HARRELL's** cell phone would assist the **ORGANIZED CRIME SECTION** in determining the mode, substance, and extent of

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

CITY 01760

those communications that have obstructed the **ORGANIZED CRIME SECTION's** investigations in violation of Florida State Statute 838.21(21).

**THINGS SOUGHT TO BE SEIZED WITHIN THE CELLULAR PHONE:**

**Data related to communications between Officer Harrell, Richard Althouse, Amanda Vielma and any known associates created between the time period between May 15th 2021 and the date of the execution of the warrant, including:**

1. Call detail records (CDR's.) CDRs are similar to the records found in a customer's phone bill and include the type of communication such as phone call, Short Message Service (SMS) text message, Multimedia Message service (MMS) messages, data events, and/or video calls, the originating phone number, the terminating phone number, the date and time of the event, and the duration. Your affiant believes these records would show communications between other parties, including those whose identity and involvement are unknown and/or clear.
2. Contact listings and phone book information that will identify associates, friends, and others including witnesses or potential suspects involved in said investigation. The contact list often contains first name, last name, monikers, or nickname, and one or more phone numbers that's associated with the individuals.
3. Application Message Data. These messages may be sent using one or more of the following techniques or platforms: public or private postings in social media chat rooms, electronic mail (email), short message service (SMS) text messages, multimedia message service (MMS) messages, which can include pictures, video, and/or audio files, and instant messages. Your affiant is aware that evidence illustrating criminal activity may have been transmitted or received using these messaging services by one or more suspects, including those who may be involved but not yet identified. Your affiant believes the production of these records would reveal evidence that is relevant and material to the investigation of this crime.
4. Digital images or video images from within the application or service. These pictures or videos may be sent using one or more of the following techniques or platforms: public or private postings to a common message board, forum, or wall, public or private postings in chat rooms, electronic mail (email), short message service (SMS) text messages, multimedia message service (MMS) messages which can include pictures and videos and instant messages. Your affiant is aware that evidence illustrating criminal activity may have been transmitted or received using these messaging services by one or more suspects, including those who may be involved but of not yet identified. Your affiant believes the production of these records would produce evidence that is relevant and material to the investigation of this crime. Your affiant also knows through training and experience that people frequently log their daily activities through photographs and/or

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

CITY 01761

videos shared through social media. This "Life Logging" lifestyle will allow your affiant to identify a timeline of events which can help corroborate, confirm and/or disprove statements provided during the investigation and evidence gathered. Your affiant also knows that certain messaging service (for example snapchat) use almost exclusively photos and/or short videos for communication. This type of message will most likely be stored in the video and picture directories of the device. Your affiant is aware through research, documentation, prior training, education, and experience that **cellular phones or mobile devices** allows users to store, send, and/or receive digital images/pictures/videos/documents/and other types through their service. Your affiant is further aware that digital files, whether pictures, images, videos, documents, spreadsheets, or other files, contain Meta data. Meta data can be described as information about file type and can consist of different components. This may include the file creation date and time, the date and time the file was last modified, and the author of the document. Meta data for digital images is known as EXIF data. EXIF data includes information about the camera such as the type of device that took the picture, whether a flash was used, the orientation of the device, the focal point, and the distance from the camera to the object depicted in the picture. EXIF data may include additional information about the image including the date and time it was taken and, in some cases, the global positioning system (GPS) coordinates where the camera was when the image was taken. Your affiant has received numerous forensic extractions or downloads from cellular phones or mobile devices where photographs or video images of firearms or drugs have been captured along with EXIF/Metadata highlighting the location where the images were captured. Your affiant is aware that prohibited persons in possession of firearms view firearms as status symbols among many of their peers; that prohibited person in possession of firearms commonly keep and maintain photographs of themselves in possession of their firearms; or of firearms in their possession. As with a significant portion of society in the present era, these images or photographs are commonly taken, stored, and maintained in digital format, in cellular telephones and computers.

5. Passive and active location data. The purpose of these location features is to record, collect, and store the user's location history. Also, to broadcast the user's presence at a particular place, business, or event. The location information is usually sometimes shared or not shared publicly and is used to bring location-based content and the advertising to the user. The location information is derived from Global Positioning System (GPS) that is incorporated in most mobile modern portable or mobile devices. Location information is also derived from Wireless Fidelity (Wi-Fi) access points, and readings and calculations from nearby cell sites (commonly referred to as cell towers). The cellular site location information received from cellular phone carriers only provides location information based on the phone being within a specific geographic region. Because a cellular phone site (tower) has a potential radio range or coverage area ranging from a few hundred meters to more than fifteen miles, detectives are not able to pinpoint a location for the cellular phone or mobile device. However, through the location services information embedded with the cellular phone, detectives are provided with enhanced accuracy information.

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

CITY 01762

WHEREFORE, Affiant makes this affidavit and prays that a search warrant be issued commanding the Sheriff of Palm Beach County, Florida, and all of his deputies, any police officer in Palm Beach County, Florida, within whose jurisdiction the aforesaid property to be searched is found, the Commissioner of the Florida Department of Law Enforcement, and any of his duly constituted Agents, with proper and necessary assistance, to search the above-described **cellular phone communications storage** for the property hereinbefore described, and for the seizure and safe keeping of the property hereinbefore described, subject to the order of this Honorable Court or such other Court having jurisdiction over the offense, by the duly-constituted officers of the law, making the search in the daytime or the nighttime, as the exigencies may demand or require, or on Sunday, and to bring the property before a court having jurisdiction of the offense.

YOUR AFFIANT also prays the court to direct that the Affidavit and Application for the search warrant, be kept in the custody of the executing agency until further order of the court or until release by the executing agency, to maintain the integrity of the ongoing investigation, pursuant to Florida Pub. Co. v. State, 706 So.2d 54 (Fla. App 1 Dist., 1988).

Thomas Viale

Agent Thomas A Viale (I.D.#1988)
July 15 2022 03:06:39 PM

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |

The foregoing Affidavit and Application for Search Warrant was sworn to (or affirmed) and subscribed before me this 15 day of July, 2022.

Gary Smith

Sergeant Gary Smith (I.D.# 1474)
July 15 2022 03:40:14 PM
Law Enforcement Officer Authorized to Administer Oaths under F.S. 117.10.

Friday, July 15, 2022 16:56:55

| Agency Name: West Palm Beach Police Department | Warrant No.: WPB_2022_000434 |
|---|---|
| Agency Case No.: 20220008876 | Reviewing Prosecutor:Justin Chapman |