# ATTACHMENT 3

1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3                    CASE NO.: 9:22-cv-81275-AHS

4

5    KEVIN HARRELL,

6         Plaintiff,

7    vs.

8    CITY OF WEST PALM BEACH, a
     Florida municipal corporation;
9    BRIAN GELLIN, individually;
     SCOTT LALLY, individually, and
10   MICHAEL OSWALD, individually,

11        Defendants.
     _____/
12

13                   Zoom Deposition Teleconference

14

15                   Wednesday, February 21, 2024
                        10:48 a.m. to 12:39 p.m.
16

17                        DEPOSITION OF

18                        JOSEPH HERB

19

20        Taken before Nicholas Bruens, Court Reporter,

21       a Notary Public for the State of Florida at Large,

22       pursuant to Notice of Taking Deposition Duces Tecum

23       filed in the above-styled cause.

24

25

2

```
 1                    APPEARANCES:

 2        On Behalf of the Plaintiff:

 3        AMLONG & AMLONG, P.A.

 4        500 Northeast 4th Street, Suite 101

 5        Fort Lauderdale, Florida 33301

 6        (954) 462-1983

 7        wramlong@theamlongfirm.com

 8        BY:  WILLIAM R. AMLONG, ESQUIRE

 9

10        On Behalf of the Defendants:

11        GRAYROBINSON, P.A.

12        333 Southeast 2nd Avenue, Suite 3200

13        Miami, Florida 33131

14        (305) 416-6880

15        julie.zolty@gray-robinson.com

16        fabian.ruiz@gray-robinson.com

17        BY:  JULIE ZOLTY, ESQUIRE

18        BY:  FABIAN RUIZ, ESQUIRE

19

20        CITY OF WEST PALM BEACH

21        Post Office Box 3366

22        West Palm Beach, Florida 33402

23        (305) 822-1350

24        dyeargin@wpb.org

25        BY:  DOUGLAS YEARGIN, ESQUIRE
```

3

1                         INDEX

2      TESTIMONY OF JOSEPH HERB                    PAGE

3      Direct Examination by Mr. Amlong            4

4      Cross-Examination by Mr. Ruiz              53

5      Certificate of Oath                        57

6      Certificate of Reporter                    58

7

8

9

10                  INDEX OF EXHIBITS

11                       None

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    THEREUPON:

2                    JOSEPH HERB,

3            having been first duly sworn and responding,

4        "Yes," was examined and testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. AMLONG:

7        Q.   Mr. Herb, is your last name pronounced Herb or

8    Herb?

9        A.   With the H, sir.  It is Herb.

10       Q.   Herb?

11       A.   Yes, sir.

12       Q.   Okay.  Can you give us your full name, tell us

13   what city you live in and what you do for a living?

14       A.   Lieutenant Joseph Herb, H-E-R-B.  My ID number

15   is 1477.  I live in Palm Beach County, Florida.

16       Q.   And what do you do for a living?

17       A.   I am a lieutenant for the City of West Palm

18   Beach and I oversee the Organized Crime Unit, Major

19   Narcotics.

20       Q.   A, how long have you been with the City of

21   West Palm Beach as a police officer, and B, how long

22   have you been in the Narcotics Unit?

23       A.   I have been a police officer for going on

24   thirty-four years.  I have been at the City of West Palm

25   Beach for twenty-four, plus, years.  And I have been in

5

1   the Organized Crime Unit since January of 2019.

2       Q.   Tell me what interactions if any, you have

3   ever had with Officer Kevin Harrell?

4       A.   I'm sorry.  What was the first part of the

5   question?

6       Q.   What interactions have you had in your career

7   with Officer Kevin Harrell?

8           MR. RUIZ:  Object to the form.  You can

9       answer.

10          THE WITNESS:  I supervised him briefly, back

11      in between 2018 to 2019.  Maybe it may have been

12      2017.  For about a year-and-a-half I was a road

13      lieutenant in the south end of the city.  Kevin was

14      assigned to me.  And I supervised him for about a

15      year and a half before I was transferred over to

16      organized crime.

17  BY MR. AMLONG:

18      Q.   Was Officer Harrell a problematic police

19  officer at that time?

20      A.   For me, no.

21      Q.   What was your involvement in the investigation

22  of the I believe you call it the 4th Street Gang?

23      A.   Yes, sir.

24      Q.   And what was your involvement in that

25  investigation?

6

```
 1        A.   I was the lieutenant who oversaw the

 2   investigation.

 3        Q.   How many persons were involved in that

 4   investigation?

 5        A.   At the time, probably, I had twenty-two at the

 6   time.  I think twenty-two or twenty-three detectives

 7   were assigned to me, plus two sergeants.

 8        Q.   And how many were involved in the 4th Street

 9   investigation?

10        A.   As the lead detectives or as a whole unit?

11        Q.   Well, both.

12        A.   There were three assigned detectives to the

13   case.  That was Officer Thomas Viale, Officer Dan,

14   Detective Dan Fuchsman, Detective Matthew Ward, were the

15   three main detectives on the case.  And then the rest of

16   the guys were supporting detectives on the case itself.

17        Q.   Okay.  Thomas Viale and who were the other

18   people?

19        A.   Dan Fuchsman, F-U-C-H-S-M-A-N and Matthew

20   Ward, W-A-R-D.

21        Q.   Was any one of those three the lead?

22        A.   Thomas Viale.  That is V-I-A-L-E.

23        Q.   When did that investigation start?

24        A.   I think late 2020 or early 2021 if my memory

25   serves me.
```

7

1          Q.   And how many of the members of the 4th Street

2     Gang did you arrest?

3          A.   Personally, none.  But our unit arrested -- I

4     think we arrested probably ten to fifteen people.

5          Q.   Was that all of them?

6          A.   Yes, sir, if I remember correctly.  I don't

7     have an exact number, but I'm just going off of --

8          Q.   No.  I mean, was that the entire gang?

9          A.   Pretty much.  Yes, sir.

10          Q.   I'm sure I've asked you this before.  But when

11     did you get into organized crime?

12          A.   January of 2019.

13          Q.   Are you familiar with search warrant

14     affidavits?

15          A.   Yes.

16          Q.   How many search warrant affidavits have you

17     done, personally?

18              MR. RUIZ:  Object to the form; hearsay.  You

19          can respond.

20              THE WITNESS:  I haven't written one for

21          probably twelve years back when I was a detective

22          back in the Organized Crime Unit, back in the day.

23          I wrote probably -- I don't know how many, a lot, I

24          can say.

25     BY MR. AMLONG:

8

1      Q.   All right.  So, you are familiar with the

2   requirements for a search warrant affidavit?

3      A.   Correct.

4      Q.   Did you review the search warrant affidavit

5   that Agent Viale did?

6      A.   Viale, no.  I did not.  It was sent over to

7   Justin Chapman of the Public Corruption Unit and they

8   reviewed it.

9      Q.   How close was your supervision of the 4th

10   Street Gang investigation?

11           MR. RUIZ:  Object to the form.

12           THE WITNESS:  I don't understand the question.

13   BY MR. AMLONG:

14      Q.   Oh.  How involved were you in the

15   investigation for the 4th Street Gang?

16      A.   As a lieutenant, I just oversaw what they were

17   doing on a daily basis, to make sure that they stayed

18   within the parameters of the policies and procedures of

19   the police department and, obviously, within the law of

20   the State of Florida.

21      Q.   Were you aware that Agent Viale, am I saying

22   that correct?

23      A.   I'm sorry?

24      Q.   Am I pronouncing Agent Viale's name correctly?

25      A.   Viale.  Viale.

9

1      Q.   Viale?

2      A.   There you go.

3      Q.   All right.  Were you familiar with Agent

4  Viale's desire to obtain a search warrant for Officer

5  Kevin Harrell's phone?

6      A.   Yes.

7      Q.   What do you know about that?

8      A.   We were on the Title III of the Tanksley

9  organization.  Officer Harrell kind of crossed our path

10  with one of the targets inside the Tanksley

11  organization.  They approached me and informed me of

12  this information.

13      At which point, we decided to pull tolls on Kevin's

14  phone.  And when we pulled the toll phone there were

15  fifteen to twenty phone calls between him and the target

16  in the alleyway.  At which point, we decided to include

17  Kevin into the investigation of the Tanksley

18  organization.

19      Q.   And you said fifteen to -- there were fifteen

20  -- or I'm sorry.  Fifty phone calls?

21      A.   Correct.

22      Q.   Did you have any audio of any of those phone

23  calls?

24      A.   No.  We just pulled the tolls on them.

25           MR. RUIZ:  And just a point of clarification,

1      Bill.  Are you saying fifteen or fifty?

2            MR. AMLONG:  Five-zero.

3            MR. RUIZ:  Oh.  Okay.  Thank you.

4   BY MR. AMLONG:

5      Q.   That is correct, right, Lieutenant?

6      A.   Yes, sir.

7      Q.   And with whom was Officer Harrell having these

8   phone conversations?

9      A.   A gentleman by the name of Richard Althouse.

10     Q.   And when did these phone calls take place?

11           MR. RUIZ:  Object to the form.

12           THE WITNESS:  I -- without having the

13        paperwork in front of me, I can't -- I don't

14        recall.

15           MR. AMLONG:  We sent you the exhibits,

16        correct?

17           MR. RUIZ:  Bill, I received the exhibits.  I

18        haven't been able to open them.  Can I have a

19        minute to see if someone else in the office has

20        been able to open them?

21           MR. AMLONG:  Okay.  I -- for this deposition

22        I'm really only interested in two.  Exhibit 29, the

23        search warrant, and 30, the search warrant

24        affidavit.

25           MR. RUIZ:  Repeat that.  Exhibit 2, 29 and 30?

1          MR. AMLONG:  No.  29 and 30.

2          MR. RUIZ:  Okay.  29 and 30.  I'll try to see

3      if I can open those.  I can't --

4          MR. AMLONG:  And those are the -- it is the

5      affidavit and the search warrant.

6          MR. RUIZ:  Okay.  Just give me minute or two,

7      to see if I --

8          MR. AMLONG:  Okay.

9          MR. RUIZ:  -- can get those.  I don't know if

10     you want to go off or you want to keep going, but

11     I'll try.

12         MR. AMLONG:  Just let me know when you're

13     ready.

14     (Off the record.)

15     (Back on the record.)

16 BY MR. AMLONG:

17     Q.  All right.  Lieutenant Herb, when did you

18 first find out that there were phone calls between

19 Richard Althouse and Officer Harrell?

20     A.  Early in the investigation of the 4th Street

21 Title III.  I can't give you an exact date.  I don't

22 have the police reports in front of me unless you want

23 me to go through all of them.

24     Q.  So, that would have been in late 2020?

25     A.  Once again, I don't recall.  I mean, I could

1    read through this and give you the date on the affidavit

2    if that's what you want.  Or once again, I know it is

3    part of the police report that I don't have in front of

4    me.  But it was late 2020, or early 2021.  August.  It

5    says August 18th, 2021.

6         Q.   And did you have an active wiretap on

7    Mr. Althouse's telephone?

8         A.   No.  We had the Title III on the Tanksley

9    organization, which was Richard, on the two brothers

10   Tanksleys.  We had one on him and then we had one on

11   another one.  And I don't remember the one guy's name we

12   had it on.

13        Q.   Okay.  And just for people who are reading

14   this and don't know what Title III is, that is a

15   Federally approved search warrant, correct?

16        A.   So, the Title III is a, what at this juncture

17   we had a Title III, State Title III wiretap on the

18   Tanksleys.

19        Q.   That is code for when you go to the court and

20   get an authorization for a wiretap?

21        A.   Correct.

22        Q.   Did you ever have a Title III on Mr. Althouse?

23        A.   No.

24        Q.   For how long had you been monitoring

25   Mr. Althouse's telephone?

1            MR. RUIZ:  Objection to form.

2            THE WITNESS:  We never monitored Mr. Althouse.

3    BY MR. AMLONG:

4        Q.   For how long had you been looking at what

5    calls were coming in and going out?

6            MR. RUIZ:  Objection to the form.

7            THE WITNESS:  I can't answer that.  I don't

8        know.

9    BY MR. AMLONG:

10       Q.   Did you ever question Mr. Althouse?  And

11   Mr. Reporter, Althouse is A-L-T-H-O-U-S-E.

12           MR. RUIZ:  Objection to the form.  And I

13       think, Bill, we -- I probably have voiced some of

14       these objections.  Are you asking Lieutenant Herb

15       about him individually, or are you asking about the

16       investigation as a whole?  What is it that you are

17       asking?

18   BY MR. AMLONG:

19       Q.   Well, to your knowledge, did the investigation

20   ever question Mr. Althouse about his involvement with

21   Officer Harrell?

22       A.   Richard Althouse was not the target of the

23   investigation.  It was Ronnie Tanksley and Henry Mann

24   who were the targets of the investigation.  Richard

25   Althouse was a participant in the organization.  When we

1    did the takedown of the Tanksley family, Richard

2    Althouse fled Palm Beach County to unknown whereabouts.

3        Q.   My question was did anybody from your agency

4    ever question Mr. Althouse concerning Officer Harrell?

5            MR. RUIZ:  Objection to the form.

6            THE WITNESS:  I just answered that question.

7        I -- we couldn't question him about anything.  He

8        fled.

9    BY MR. AMLONG:

10       Q.   So, you did not question him before he fled?

11           MR. RUIZ:  Objection to the form.

12           THE WITNESS:  No.

13   BY MR. AMLONG:

14       Q.   Did you ever, prior to getting the search

15   warrant for Officer Harrell's phone, did anybody from

16   your unit question Officer Harrell?

17           MR. RUIZ:  Objection to the form.

18           THE WITNESS:  No.

19   BY MR. AMLONG:

20       Q.   Why not?

21           MR. RUIZ:  Objection to the form.

22           THE WITNESS:  I'm confused on the question.

23       You are asking me why I didn't -- why didn't we

24       interview Harrell prior to what?

25   BY MR. AMLONG:

1       Q.   Prior to getting the wiretap?  I'm sorry.

2   Prior to getting the search warrant?

3       A.   Why would we do that?  That makes no sense.

4   Why would we question somebody we would get a search

5   warrant for their phone?  I don't understand your

6   question.  That would screw up the integrity of the

7   investigation.

8       Q.   Well, you already knew that there were phone

9   calls between him and Mr. Althouse, correct?

10      A.   Yes.

11      Q.   How would it screw up the investigation to ask

12  Officer Harrell -- when were the arrests made in the --

13      A.   I'll clarify this for you.  When we did the

14  search warrant, Sergeant Smith and I did the search

15  warrant on taking Kevin's phone.  We asked him, we read

16  him his rights, and asked him if he wished to speak to

17  us.

18      He denied any involvement with anything.  He denied

19  any involvement with Richard Althouse.  He denied all of

20  that.  At which time, he was let go with an

21  administrative leave and we continued the investigation.

22      Q.   Was that interview tape recorded?

23      A.   I believe so.  Yes.

24      Q.   Did you ever attempt to interview him prior to

25  getting the search warrant?

1       A.   No.

2       Q.   Why not?

3       A.   Once again, why would we do that when we have

4  a search warrant for his telephone?  There was no reason

5  to interview him.

6       Q.   If I wished to get a copy of a tape recording

7  of your interview with Officer Harrell, what would I ask

8  for?

9       A.   You would go down to the police department for

10  a public records request for that tape, and they will

11  give you that tape.

12       Q.   And who did the interview?  You and who else?

13       A.   Sergeant Fred Smith.

14       Q.   Was Sergeant Smith, you named the three agents

15  who were the primary people.  Officer, or Agent Viale,

16  Dan Fuchsman, and Mr. Ward.  What role, if any, did

17  Sergeant Smith have in that?

18       A.   After we dumped Kevin's phone, Sergeant Smith

19  was the supervisor that went over all the data inside

20  that phone.

21       Q.   The arrest of the 4th Street Gang was in the

22  spring of 2021, correct?

23       A.   I don't have an exact date.  It was I think

24  after -- I think it might have been 2022.  But I don't

25  really know.  I don't have an exact date.

17

```
 1        Q.   It was several months before you asked for the
 2    search warrant, correct?
 3             MR. RUIZ:  Objection to the form.
 4             THE WITNESS:  Can you -- what is the question,
 5        sir?
 6    BY MR. AMLONG:
 7        Q.   You made the arrest on the 4th Street Gang
 8    several months before you requested the search warrant,
 9    is that correct?
10        A.   I don't know.  I can't answer that.
11        Q.   Do you know what prompted you to request the
12    search warrant when you did?
13             MR. RUIZ:  Objection to the form.
14             THE WITNESS:  I can't answer that.  I don't
15        have that information.
16    BY MR. AMLONG:
17        Q.   Do you know who initiated the request for the
18    search warrant?
19        A.   Agent or Detective Viale.
20        Q.   Did you speak to anybody outside of organized
21    crime concerning getting a search warrant for Officer
22    Harrell's phone?
23        A.   With the exception of the State Attorney's
24    Office, no.
25        Q.   Did you approve the search warrant affidavit
```

 1   before it was submitted?

 2        A.   I don't approve the search warrant affidavit.

 3   The State Attorney's Office does that.

 4        Q.   Did you review the search warrant affidavit

 5   before it was submitted?

 6        A.   No.

 7        Q.   Did anyone higher than Officer Viale review

 8   it?

 9             MR. RUIZ:  Objection to the form.

10             THE WITNESS:  The State Attorney's Office,

11        Justin Chapman with Public Corruption.

12   BY MR. AMLONG:

13        Q.   I'm talking about within the West Palm Beach

14   Police Department.

15        A.   No.

16        Q.   All right.  At the bottom of page six of the

17   search warrant affidavit, they aren't numbered, but it

18   is bates stamped city01758.

19             MR. RUIZ:  What exhibit is this?

20             MR. AMLONG:  Exhibit --

21             MR. RUIZ:  30?

22             MR. AMLONG:  I believe so.  Yes.  It is the

23        affidavit.

24             MR. RUIZ:  And you said it is city01758?

25             MR. AMLONG:  Yes.

19

 1          MR. RUIZ:  Do you see where that it?

 2          THE WITNESS:  Yeah.  I do.

 3   BY MR. AMLONG:

 4      Q.   And read the last paragraph from that,

 5   beginning that should be noted that you should retain

 6   communications.

 7      A.   Okay.

 8      Q.   It says that Officer Harrell was investigation

 9   for dissemination the 4th Street Gang case facts to

10   Althouse.  What was Officer Harrell supposed to be

11   disseminating?

12          MR. RUIZ:  Objection to the form.

13          THE WITNESS:  I'm not the lead detective.  I

14      can't answer that.  You'd have to ask Officer

15      Viale.

16   BY MR. AMLONG:

17      Q.   Did you ever inquire what he was supposed to

18   be disseminating?

19      A.   The only information that was relayed to me

20   was when Kevin was working at City Hall.  Here at City

21   Hall he had met, like, a target by the name of Avis

22   Lemieux (phonetic).  Here at the -- at City Hall and was

23   relaying information to Avis Lemieux about the Organized

24   Crime Unit.  And police department information.

25      Q.   Where is the Organized Crime Unit housed?

1          A.   It is at an off-site in Palm Beach County.

2          Q.   So, it is not even in the police department?

3          A.   No, sir.

4          Q.   What information would a uniformed patrolman

5     have about the Organized Crime Unit?

6               MR. RUIZ:  Objection to the form.

7               THE WITNESS:  I can't answer that.  I don't

8          know.  I don't know what information other than

9          what the CI was telling us, that he was relaying

10         information from the police department to Avis,

11         saying he was a target of the Tanksley

12         organization.

13    BY MR. AMLONG:

14         Q.   What was -- was Officer Harrell at this point

15    in City Hall or was he in the courthouse?

16         A.   No.  He was assigned to City Hall.

17         Q.   Does the Organized Crime Division routinely

18    share information about its undercover investigations

19    with uniformed patrol officers?

20         A.   No.

21         Q.   Do you have any idea how Officer Harrell would

22    have obtained any information about the investigation?

23         A.   We had received information from confidential

24    sources and through another policeman in the police

25    department that when we were entering overtime into the

1   Telestaff system and putting the case number for the

2   Tanksley organization, the original case number, the

3   police officer was questioned by Officer Harrell as to

4   why the Organized Crime Unit was working so much

5   overtime.

6       We had assumed at the time that Kevin had pulled

7   that case number while he was at -- back at the police

8   department and found out that we were investigating the

9   Tanksley organization.

10      Q.   Okay.  Who was the other police officer?

11      A.   Sergeant Casey Goetz.

12      Q.   I'm sorry?

13      A.   Sergeant Casey Goetz.

14      Q.   And what was Sergeant Goetz's relationship

15  with Officer Harrell?

16          MR. RUIZ:  Objection to the form.

17          THE WITNESS:  None, as far as I knew.

18      Sergeant Goetz was assigned to the street team in

19      the police department.  And he was approached by

20      Officer Harrell and asked about why we were working

21      so much overtime under that case number.

22  BY MR. AMLONG:

23      Q.   Did the overtime request have anything except

24  simply a case number on it?

25      A.   Yeah.  We had our overtime in the Telestaff.

1    We're required to put a case number into the Telestaff

2    system for document purposes.

3        After we had learned that information, we ended up

4    having to put a fake case number into the Telestaff

5    system, so our investigation wouldn't be compromised by

6    Officer Harrell anymore.

7        Q.   But when a case number, when -- from back when

8    you were in patrol, when a case number is assigned to

9    any case, you have the case number, what the case is

10   about, who the officer is, and other such information,

11   correct?

12       A.   Correct.

13       Q.   Okay.  When organized crime has a case number,

14   do you have any information connected to that case

15   number?

16       A.   No.  No.  We do not.

17       Q.   So, what was the case number for this case?

18       A.   The original case number that was assigned to

19   the 4th Street, Tanksley organization was the original

20   case number assigned to that Title III.

21       Q.   Do you recall what it was?

22       A.   Yeah.  It was during the investigation.

23       Q.   No.  Do you recall what the case number was?

24       A.   No.  I do not offhand.

25       Q.   How would Officer Harrell know that that was a

23

1    drug investigation?

2        A.   Because when you pull the case -- when you

3    pull the case number, the lead sheet says drug

4    investigation, 600 Banyan, which is the police

5    department.

6        Q.   Okay.  How many drug investigations do you

7    have going on at any one time?

8        A.   Multiple.

9        Q.   So, how would he know that this case, whatever

10   number it was, was the 4th Street Gang?

11       A.   You would have to ask your client that.  I

12   have no idea.

13       Q.   Do you have any reason to believe that he knew

14   that this was the 4th Street Gang case number?

15       A.   I can't answer that.  I don't know.

16       Q.   What was Sergeant Goetz's role at the time?

17       A.   None.

18       Q.   Well, how was he in any position to know that

19   Officer Harrell was asking about this particular case

20   number?

21       A.   Because your client specifically asked

22   Sergeant Goetz why the Organized Crime Unit was working

23   a multitude of overtime under that case number to

24   Sergeant Goetz.  Sergeant Goetz then related to us that

25   Kevin was asking about that specific case number

24

1    assigned to the Tanksley organization.

2         Q.   Is Sergeant Goetz black or white?

3         A.   White.

4         Q.   Was the conversation between Officer Harrell

5    and Sergeant Goetz tape recorded?

6              MR. RUIZ:  Objection to the form.

7              THE WITNESS:  I don't believe so.  I think it

8         was casual conversation.  My understanding of the

9         conversation was Kevin Harrell approached Sergeant

10        Goetz and asked him why the Organized Crime Unit

11        was working all that overtime under that case

12        number, under casual conversation.  So, no.  It

13        would have never been recorded.

14   BY MR. AMLONG:

15        Q.   What was Sergeant Goetz's assignment?

16        A.   If I remember correctly, which he's still in,

17   he is one of the sergeants on the street team.

18        Q.   Which street team?

19        A.   Street Narcotics Level Unit.

20        Q.   Does the Street Narcotics Unit operate out of

21   the police department or is that also off-site?

22        A.   No.  That operates out of the police

23   department.

24        Q.   What interaction was there between the street

25   narcotics team and the courthouse guard?

1        MR. RUIZ:  Objection to the form.

2   BY MR. AMLONG:

3        Q.   You are aware that at the time that Officer

4   Harrell was stationed in the courthouse in the lobby?

5        A.   No.  He was stationed at City Hall, not the

6   courthouse.

7        Q.   And what interaction did he have with the

8   Street Narcotics Unit?

9        A.   I have no idea.  How would I know that?

10       Q.   Did you speak to Sergeant Goetz personally?

11       A.   No.

12       Q.   Who did?

13       A.   I don't remember where the information or

14  which agent or which detective.  Either Officer Viale or

15  I'm guessing.  I don't know.  I'd have to read the

16  police report.  Because I don't know that.

17       Q.   At the bottom of page seven, read that

18  paragraph.  At the bottom of page seven of the search

19  warrant, it reads, and this is starting like the fifth

20  line up.

21       MR. RUIZ:  And Bill, what page number is that?

22  Just so I'm following along.

23       MR. AMLONG:  1759.

24       MR. RUIZ:  Thank you.

25  BY MR. AMLONG:

1       Q.   And towards the end of that paragraph, it

2  begins, the CI also mentioned that Althouse was provided

3  information from the police officer about the West Palm

4  Beach Police Department Organized Crime Section

5  installing cameras in the alley.  Specifically, in a

6  tree.

7       The confidential informant says that Althouse,

8  armed with that information, climbed into the tree and

9  took the camera down and took it.

10      This was information that was already known to the

11 West Palm Beach Police Department Organized Crime

12 Section.  Because Althouse shutting down the camera was

13 captured on the camera's video recording.  Did I read

14 that correctly?

15      A.   Yes, sir.

16      Q.   So, where was the camera?

17           MR. RUIZ:  Objection to the form.

18           THE WITNESS:  In a tree in the alley, I guess.

19 BY MR. AMLONG:

20      Q.   Do you know on what street?

21      A.   Yes.  4th Street.

22      Q.   And would Mr. Althouse's taking that camera

23 down constitute criminal behavior?

24      A.   Yeah.  It is a misdemeanor in the State of

25 Florida.

27

1       Q.   But what would the crime be?

2       A.   Theft.

3       Q.   How about hampering with a police

4    investigation?

5       A.   If we want to stretch it to that, I suppose we

6    could.  The State Attorney would never file that, but I

7    guess you could, if you wanted to try to throw down

8    paper and do that.

9       Q.   But it would at least be theft?

10      A.   At the very least.  Yes.

11      Q.   And police officers observed this?

12      A.   Correct.

13      Q.   Was Mr. Althouse arrested for it?

14      A.   No.

15      Q.   Why not?

16      A.   Because of the big picture of the of the

17   investigation.  Why would we charge somebody with a

18   minor theft violation when we are going after an entire

19   organization for a RICO and a conspiracy?  It made no

20   sense.

21      Q.   Because that would have made Mr. Althouse a

22   conspirator in that drug organization, correct?

23      A.   That is certainly not up to me.

24      Q.   Who made the decision to not go after

25   Mr. Althouse for cutting down the camera?

28

```
1          A.    That would be Diva O'Bryan of the State

2   Attorney's Office.

3          Q.    Spell Diva for me.

4          A.    D-I-V-A.

5          Q.    Okay.

6          A.    Diva O'Bryan.

7          Q.    O'Bryan with an A or Brian with an E or Y?

8          A.    Give me a second.  I don't recall.  I think it

9   was -- I don't remember how she spells her name.

10         Q.    How would -- Officer Harrell have known about

11  the camera?

12              MR. RUIZ:  Objection to the form.

13              THE WITNESS:  I have no idea.  You would have

14      to ask your client that.

15  BY MR. AMLONG:

16         Q.    If Officer O'Bryan -- I'm sorry.  If Officer

17  Harrell had told Mr. Althouse that there was a

18  surveillance camera in a tree on 4th Street, would that

19  have been a crime?

20         A.    So, if I -- so I understand your question, you

21  are asking me if Kevin told Althouse that there was a

22  camera in the tree, would that have been a crime?

23         Q.    Yes.

24         A.    Probably.  Yes.

25         Q.    What crime?
```

```
 1        A.   Probably obstruction at the very least.

 2        Q.   Is that a felony?

 3        A.   Obstruction?  No.  That is a misdemeanor.  But

 4   he could probably be wrapped up in whatever Diva wanted

 5   to bring him into that we could have proved, and we had

 6   probable cause to believe that.  But once again, the

 7   police department does not file the charges.  That would

 8   be the State Attorney's Office.  She decides what she is

 9   going to file, not us.

10        Q.   Did you make any effort to bring criminal

11   charges against Officer Harrell for telling Mr. Althouse

12   about the camera in the tree?

13             MR. RUIZ:  Objection to the form of the

14        question.

15             THE WITNESS:  I don't recall.

16   BY MR. AMLONG:

17        Q.   Did Mr. Althouse -- did you ever inform

18   Mr. Althouse that you had become aware that he had cut

19   down the camera?

20        A.   No.  He fled Palm Beach County, once again.

21        Q.   Well, you'd been to his house upstate, have

22   you not, or somebody from your agency has?

23        A.   I don't know if they have or they haven't.  I

24   can't answer that.  Me, personally, no.  I have no idea

25   where Richard Althouse is at the present moment.
```

1           MR. RUIZ:  Hey, Bill, while you read through

2       that, we've been going for about an hour.  Do you

3       mind if we take a five-minute break?

4           MR. AMLONG:  Sure.  No problem.

5           MR. RUIZ:  Okay.  Thank you.

6           MR. AMLONG:  See you in five.

7       (Off the record.)

8       (Back on the record.)

9   BY MR. AMLONG:

10      Q.   Lieutenant, aren't lieutenants required to

11  review all search warrant applications?

12      A.   No.

13      Q.   Is anybody required, anybody above an agent

14  required to approve it?

15      A.   Yeah.  The State Attorney's Office.

16      Q.   I'm talking about internally.

17      A.   No.

18      Q.   So, on page 1759, which is the page we left

19  off reading about the camera in the tree, in the second

20  paragraph before the end.  It says it talks about how

21  the thread ends by evidence suggesting Brown to leave

22  Florida in which it would be noted the card and signing

23  of all the arrest warrants for the RICO charge of the

24  4th Street members in February 2022, Brown was

25  discovered to be living in Texas.  Did you issue the

```
 1    search warrants in February?

 2              MR. RUIZ:  Objection to the form.

 3    BY MR. AMLONG:

 4        Q.   Actually, did you issue the arrest warrants in

 5    February?

 6        A.   I can't answer that.  I'd have to look at the

 7    paper, the police paperwork, when we got the arrest

 8    warrant.

 9        Q.   Typically, after you obtain an arrest warrant,

10    how long does it take you to make the arrest assuming

11    that person was available?

12        A.   There is no timeframe on when we have to make

13    the arrest.  In this case, what we did was we did one

14    major takedown and arrested the majority of the people,

15    and then picked up the stragglers over the next week or

16    two.

17        Q.   When was the major takedown?

18        A.   I can't answer that.  I don't have the

19    paperwork in front of me.

20        Q.   Would it have been approximately to February

21    2022 when you obtained the warrants?

22              MR. RUIZ:  Object to the form.

23              THE WITNESS:  Once again, I would have to

24         read.  I don't want to misquote anybody, and I

25         don't want to say a date that I'm wrong.  I'd have
```

1          to see the police report to say when exactly we did

2          the takedown.

3    BY MR. AMLONG:

4          Q.   So, after you did the takedown, why was the

5    investigation into Officer Harrell not started until

6    mid-July of 2022?

7               MR. RUIZ:  Objection to the form.  Are you

8          talking about a criminal investigation, Bill?

9    BY MR. AMLONG:

10         Q.   I'm talking about the -- I'm talking about

11   their investigation for which they got the search

12   warrant.

13         A.   We had a ton of work to do.  I don't know if

14   you know anything about writing Title IIIs and

15   affidavits and taking all fifteen people on RICO and

16   conspiracy, but I have limited manpower in my unit.  And

17   that was just the date we picked and how we picked it.

18         Q.   You were already monitoring Mr. Althouse's

19   telephone, right?

20              MR. RUIZ:  Objection to form.

21              THE WITNESS:  No.  We never were on Richard

22         Althouse's phone.

23   BY MR. AMLONG:

24         Q.   Then how did you find out that Officer Harrell

25   and Mr. Althouse had a number of phone calls?

33

```
 1            MR. RUIZ:  Objection to the form.  Bill, let
 2       me just go back to what I said before.  If you are
 3       asking generally how the investigation learned
 4       something -- are you asking him specifically how he
 5       learned something and when he learned it?  Just
 6       help me, you know, if you can make that
 7       distinction.
 8   BY MR. AMLONG:
 9       Q.   Okay.  Do you know how organized crime learned
10   about the phone calls between Officer Harrell and
11   Mr. Althouse?
12       A.   Yes.
13       Q.   How?
14       A.   We saw during the Tanksley investigation when
15   we were up under Title III, Agent Jerrell Negron was
16   sitting in the parking lot of the post office across the
17   street from the police department.
18       While we were doing surveillance on the Tanksley
19   organization, a marked police car pulled up into the
20   post office and went side-by-side with another vehicle.
21   That vehicle turned out to be Richard Althouse.
22       The marked police vehicle happened to be Officer
23   Harrell.  Pictures were taken of those two chatting and
24   chuckling and having a good time in the parking lot.  At
25   which time, they spoke for about ten minutes.
```

```
 1        And Officer Harrell then drove near the 4th Street

 2   alleyway where we had our investigation up and running

 3   after his shift in the lobby.  We found that interesting

 4   and found that suspicious.

 5        At which point, we pull Kevin's phone tolls off of

 6   his cellular telephone and found out the multiple phone

 7   calls between him and Richard Althouse.

 8        Q.   Did you have a warrant?  Was this a city

 9   phone, a city cell phone?

10        A.   No.  It was his personal cell phone.

11        Q.   Did you have a search warrant for that?

12        A.   Don't need a search warrant to get phone tolls

13   from a telephone company.

14        Q.   All right.  So, you already knew about his

15   phone calls to Mr. Althouse or from Mr. Althouse,

16   correct?

17        A.   We knew he was contacting Richard Althouse

18   through Kevin's tolls.  There were multiple phone calls

19   between Althouse and Harrell once we received those

20   tolls back from Kevin's phone.

21        Q.   So, once you learn that he was having these

22   phone calls with Mr. Althouse, why did you need to get a

23   search warrant to see if he was having phone calls with

24   Mr. Althouse?

25        A.   We --
```

```
 1              MR. RUIZ:  Objection to the form.  Go ahead.
 2              THE WITNESS:  We decided, once we started,
 3         once we saw that first interaction, Kevin became
 4         part of the investigation.
 5              And then with all of the other information
 6         that we had received that Kevin was possibly doing,
 7         which was, obviously, all in the affidavit of the
 8         search warrant.
 9              We found that it was necessary to get a search
10         warrant for Kevin's phone to get probable cause, to
11         see if we could charge him criminally with the
12         organization and with any criminal activity he was
13         doing.
14    BY MR. AMLONG:
15         Q.   What did you learn from the search warrant
16    about telephone contacts between Mr. Althouse and
17    Officer Harrell that you did not already know from
18    having pulled his phone numbers?
19         A.   I can't answer specifics on that.  I never
20    looked at the dump on the phone.  That would be Agent
21    Viale and Sergeant Smith.
22         Q.   On page 1760, the second paragraph towards the
23    lower middle.  It says in addition, during the wiretap
24    investigation, after it was learned that Officer Harrell
25    had direct contact with Althouse, your assigned members
```

1    had to change their department issued undercover

2    vehicles, in fear that the information to -- in fear

3    that the information could include make, model, color,

4    year, and license plate were disseminated to Althouse by

5    Officer Harrell.  When you changed undercover vehicles,

6    was that just three vehicles for the three main agents

7    assigned to the investigation?

8        A.   No.  That was probably the entire unit.

9        Q.   What sort of paperwork would have been created

10   for that to happen?

11       A.   Paperwork to what?  Change the vehicles out?

12       Q.   Yes.

13       A.   Nothing.  We had a rental program with

14   Enterprise at the time.  And we would take our vehicles

15   to Enterprise and switch them out through Enterprise.

16       Q.   So, there would be paperwork with Enterprise

17   about when you switched the vehicles out, correct?

18           MR. RUIZ:  Objection to the form.

19           THE WITNESS:  I would assume Enterprise has

20      that information.  I guess.

21   BY MR. AMLONG:

22       Q.   Does the West Palm Beach Police Department

23   have that information?

24           MR. RUIZ:  Objection to the form.

25           THE WITNESS:  I can't answer that.  I have no

```
 1        idea.
 2   BY MR. AMLONG:
 3        Q.   Did you find any information that Officer
 4   Harrell had run the tags on any of the undercover
 5   vehicles?
 6             MR. RUIZ:  Objection to the form.
 7             THE WITNESS:  Once again, you'd have to ask
 8        Agent Viale or Sergeant Smith.
 9             MR. AMLONG:  Tell me what evidence you had to
10        suggest that there was probable cause to believe
11        that Amanda Vielma was involved in the 4th Street
12        Gang drug trafficking.
13             MR. RUIZ:  Again, Bill, just you know, I made
14        -- I'm going to continue to object to the form of
15        the question.  I can make a blanket objection to
16        the entirety of the deposition.  I want to make
17        sure that you're specific with your questions.  Are
18        you asking him about his personal knowledge?
19   BY MR. AMLONG:
20        Q.   Do you -- well, either personal knowledge or
21   knowledge as a lieutenant of organized crime, what
22   information did the West Palm Beach Police Department
23   have in July 2022 about Amanda Vielma being involved in
24   the 4th Street Gang drug trafficking operation?
25        A.   Once again, I'll go back to what I've said
```

38

 1    right from the beginning.  I am not the lead detective

 2    in this.  I am the lieutenant that oversees the unit.

 3    This is one part of my duty as a lieutenant to run the

 4    unit.

 5         All of these questions you're asking me, you need

 6    to ask Detective Viale.  He is the one that is going to

 7    answer all of these questions for you, not me.  I cannot

 8    answer them for you.

 9         Q.   Did Agent Viale ever discuss with you any

10    evidence that they had involving Amanda Vielma?

11         A.   I'm sure they did.  And once again, I go back

12    to once again, I have a twenty-two-man unit and two

13    sergeants I have to supervise.  I do not remember

14    everything that my guys tell me on a daily basis,

15    especially four years ago.

16         Q.   I'm asking you if you remember -- well, you

17    know who Amanda Vielma is, correct?

18         A.   Acura Amanda.  Yes.  She is the blogger.

19         Q.   Did anyone ever tell you A, that they were

20    looking for phone calls between Officer Harrell and

21    Ms. Vielma?

22         A.   Yeah.  It says right here in the affidavit.

23         Q.   Did anyone ever tell you that?

24         A.   Once again, I cannot answer that.  I do not

25    remember.

1     Q.   With which police departments were you

2  previously employed?

3     A.   I was employed with the City of Melbourne.

4  So, Melbourne, Florida.  The City of Belle Glade, Belle

5  Glade, Florida.  When Belle Glade still had a police

6  department.

7     Q.   What did you say about Belle Glade?

8     A.   Belle Glade is no longer there.  The Sheriff's

9  Department took them over.  I worked for the City of

10  Belle Glade when Belle Glade still had a police

11  department.  I worked for them for eleven months.

12     Q.   Why did you leave Melbourne?

13     A.   Why did I leave Melbourne?

14     Q.   Yes.

15     A.   To come down here and be a policeman in Palm

16  Beach County.

17     Q.   Were you terminated?

18     A.   No.  I was not.

19     Q.   Were you involved in a physical altercation

20  with a black man?

21     A.   No.

22     Q.   Were you ever investigated for use of force

23  against a black man?

24     A.   Here in West Palm or there in Melbourne?

25     Q.   In Melbourne.

1          A.   I do not recall.

2          Q.   Give me just a minute, please.  Lieutenant

3     Herb, what involvement, if any, did you have in

4     transferring the information obtained from the search

5     warrant to Internal Affairs?

6          A.   The day that Sergeant Smith told me that he

7     was finished with the criminal investigation of Kevin, I

8     contacted Lieutenant Davila at internal affairs and

9     informed him that we were finished with the criminal

10    investigation and that we were turning over the

11    information to him at Internal Affairs.

12         Q.   And with how many search warrants would you

13    estimate you have been involved with during your career

14    with the West Palm Beach Police Department?

15         A.   Hundreds.

16         Q.   Of those hundreds of search warrants, have you

17    ever turned over the search warrant fruits to any agency

18    that was not investigating the crime that was listed in

19    the search warrant affidavit?

20              MR. RUIZ:  Objection to the form of the

21         question.

22              THE WITNESS:  No.  I don't think so.  And as a

23         detective in the Organized Crime Unit, I have

24         worked hundreds of search warrants, drug search

25         warrants.

1            If the question is have I ever turned it over

2        to Internal Affairs, that -- I wouldn't do that

3        because I was just a detective and not a supervisor

4        at the time.

5    BY MR. AMLONG:

6        Q.   Well, why did you turn this over to Internal

7    Affairs when it was outside the -- the search warrant

8    did not authorize Internal Affairs to do a search

9    warrant, correct?

10           MR. RUIZ:  Bill, Bill, just a second.  I'm

11       trying to get your attention.  Your camera is off.

12           MR. AMLONG:  Oh.  Thank you.

13           MR. RUIZ:  There you go.

14   BY MR. AMLONG:

15       Q.   Your search warrant did not authorize giving

16   any information to Internal Affairs, did it?

17           MR. RUIZ:  Objection to the form.

18           THE WITNESS:  I have nothing to do with

19       Internal Affairs if that is your question.

20   BY MR. AMLONG:

21       Q.   Well, then why did you give them the search

22   warrant material?

23       A.   Because we were ordered to by the Police

24   Chief.  That's why.

25       Q.   When did the Police Chief order you to turn

 1     the material over to Internal Affairs?

 2          A.   When the criminal investigation was completed.

 3          Q.   Did you have a conversation with the Police

 4     Chief about this?

 5          A.   The Chief of Police was in the chain of

 6     command the entire investigation.  He was up to date on

 7     all the information we were.

 8          Q.   Who told you to turn the material over to

 9     Internal Affairs?

10               MR. RUIZ:  Objection; asked and answered.

11               THE WITNESS:  The Chief of Police.

12     BY MR. AMLONG:

13          Q.   Personally?

14          A.   Yes.  The Chief of Police.

15          Q.   And when did he tell you this?

16          A.   I don't remember when he told us.  He was up

17     to date on all the information.  And Internal Affairs

18     was brought on the day we served the search warrant when

19     Kevin was placed on administrative leave.

20          They -- what they do is they hold their

21     investigation until the criminal investigation is

22     completed.  At which time, we finish the criminal

23     investigation and by policy and procedure in the police

24     department and the Chief of Police, we are then to turn

25     over all information to Internal Affairs.

43

1        Q.   Had you ever turned over search warrant

2   information to Internal Affairs before?

3        A.   In my career at the West Palm Beach Police

4   Department?

5        Q.   Yes.

6        A.   This was the first time we had ever wrote a

7   search warrant for an officer's phone.  So, this would

8   be the first time we turned that information over.

9        We have investigated other policemen and Internal

10  Affairs has been notified of our investigation, but this

11  is the first time we wrote a search warrant for an

12  officer's phone.

13       Q.   What is your understanding of what a search

14  warrant entitles you to do?

15       A.   The search warrant entitled us to get a dump

16  on the phone and go through the information on the phone

17  looking for particular criminal activity associated with

18  what we were looking for in the affidavit.

19       Q.   Did the search warrant authorize you to give

20  the information to Internal Affairs?

21       A.   Once again, we don't worry about what Internal

22  Affairs does.  My job is to be a criminal investigator.

23  What Internal Affairs does after we are completed is on

24  Internal Affairs, not us.

25       Q.   The -- yeah.  Read the question back please,

1    Mr. Reporter.

2          THE COURT REPORTER:  All right.  Give me a

3       second.

4       (Thereupon, a readback was performed.)

5          THE WITNESS:  It would be -- I can't even say

6       no.  Because we are required by policy when we do a

7       criminal investigation, everything is then turned

8       over to Internal Affairs.

9          So, I don't need the authorization in the

10      search warrant to turn it over to Internal Affairs.

11      So, it is not a no question.

12   BY MR. AMLONG:

13      Q.   But you have never before turned over fruits

14   of a search warrant to Internal Affairs?

15      A.   That's not what I answered.  I answered we

16   have only wrote one search warrant for one officer's

17   phone.  That's Kevin Harrell's.  We have investigated

18   other policemen for criminal violations.

19      And when we have done that -- all information was

20   then turned over to Internal Affairs.  So, yes, we have

21   done that before.  So, if that answers your question,

22   that's what I've done.

23      Q.   And in those other investigations, did -- had

24   you obtained search warrants?

25          MR. RUIZ:  Objection to the form.  I think he

```
 1          has answered this a few times already, Bill.

 2               THE WITNESS:  I've answered it.  But once

 3          again, this is the third time I will answer it.  We

 4          have only wrote one search warrant for one police

 5          officer's phone in my career in twenty-four years

 6          with the West Palm Beach Police Department that I'm

 7          aware of.

 8               That was Kevin Harrell.  We have investigated

 9          other policemen on numerous occasions for criminal

10          violations.  Once that criminal investigation is

11          completed, we turn that information over to

12          Internal Affairs.

13     BY MR. AMLONG:

14          Q.   Other than just telephones, have you -- in

15     your investigations of law enforcement officers, have

16     you ever obtained a search warrant for any material, not

17     just cell phones?

18          A.   For policemen?

19          Q.   Yes.

20          A.   No.

21          Q.   Other than in this case, had you ever turned

22     the fruits of a search warrant over to any law

23     enforcement agency other than the State Attorney's

24     Office or the US Attorney?

25          A.   If we uncovered it.  I don't know offhand.
```

46

1    But if we are doing a search warrant at anywhere,

2    whether it be a house search warrant, a car search

3    warrant, telephone search warrant -- if there were

4    fruits of a crime that we uncover that does not happen

5    within the jurisdiction of West Palm Beach, yes, we

6    would turn that information over.

7        Q.   But that is subjective.  Have you ever done

8    it?

9        A.   I don't recall.  I could have.  Yes.  But I --

10   if you're looking for a specific, I don't know.

11       Q.   Are you aware that when you obtain a search

12   warrant that you're supposed to get only the material

13   that is delineated in the search warrant and only use

14   that for the prosecution of the crime that is listed in

15   the search warrant?

16       MR. RUIZ:  Objection to the form.  You can

17       answer if you understood the question.

18       THE WITNESS:  We follow the search warrant the

19       way the search warrant is written.  If the search

20       warrant tells us to do certain things, that's what

21       we do.

22   BY MR. AMLONG:

23       Q.   Did this search warrant tell you -- and let's

24   look at the search warrant, which is Exhibit Number 29.

25   Please read that and tell me what you think.

```
 1        A.   I'm ready.  Ask away.
 2        Q.   Where in this search warrant does it say that
 3   you should turn material over to Internal Affairs?
 4             MR. RUIZ:  Objection to the form.
 5             THE WITNESS:  We would never write that in a
 6        search warrant.  But they are signing the search
 7        warrant that we would do that.
 8   BY MR. AMLONG:
 9        Q.   The only thing that you were authorized to
10   search for was material that would support a violation
11   of the Florida State Statute 838.21, peren, disclosure
12   or use of confidential criminal justice information,
13   close peren, correct?
14             MR. RUIZ:  Objection to the form.
15             THE WITNESS:  I guess.  Sure.  Totally
16        confused, but go ahead.
17             MR. RUIZ:  Well, if you don't understand the
18        question --
19             THE WITNESS:  Yeah.  I don't understand the
20        question and I don't know what --
21   BY MR. AMLONG:
22        Q.   Well, this is, you know, you did not turn over
23   to Internal Affairs any evidence that Officer Harrell
24   had violated Section 838.21 of the Florida Statute,
25   correct?
```

48

```
1              MR. RUIZ:  And again, I'm just going to lodge

2         -- I think this is already a standing objection.

3         If you are asking him personally what he did,

4         that's one thing.  If you are --

5    BY MR. AMLONG:

6         Q.   Well, you -- as a lieutenant, you were --

7    Officer, who turned it over?

8              MR. RUIZ:  Objection.  Objection to the form.

9         I don't think he has ever answered that, but go

10        ahead.

11             THE WITNESS:  The Organized Crime Unit turned

12        it over to Internal Affairs.

13   BY MR. AMLONG:

14        Q.   Who was the person who did this?

15        A.   Sergeant Smith.

16        Q.   Did you order Sergeant Smith to do it?

17        A.   No.  I didn't have to order Sergeant Smith to

18   do anything.  We are required by department policy to do

19   that.

20        Q.   You are required to turn over search warrant

21   materials to investigators that are not involved in the

22   obtaining of the search warrant?

23        A.   Yes.  For the fifth time I'm going to answer

24   that.

25        Q.   But you've never done it before?
```

49

```
 1        A.   No.

 2        Q.   The search warrant --

 3        A.   Sir, with all due respect, I have answered

 4   this question multiple times.

 5        Q.   Okay.

 6        A.   You keep asking the same question over and

 7   over.  I'm going to give you the same answer.  Okay.  I

 8   have answered that question five times already.  The

 9   only search warrant we've ever wrote on a phone is Kevin

10   Harrell.  We have done search warrants, multiple search

11   warrants.

12        We have investigated other policemen before.  All

13   that information has been turned over to Internal

14   Affairs.  That is the sixth time I've answered that.

15   And I'm sorry to --

16        Q.   All right.  On page 665, which is the third

17   page of the search warrant, the next to last paragraph,

18   authors the use of the search warrant to seize any and

19   all of the herein before described property if found

20   there, and to bring the same before a court of competent

21   jurisdiction.  Did you bring any of the material that

22   you found before any court of a competent jurisdiction?

23        A.   I did not bring anything.  Nothing.

24        Q.   Did your personnel bring anything before a

25   court of a competent jurisdiction?
```

```
 1          A.   All the information that we received was

 2     turned over to public corruption, Justin Chapman, State

 3     Attorney's Office.

 4          Q.   Did the Chief of Police put the order to give

 5     the material to Internal Affairs in writing?

 6          A.   No.  It is in policy and procedure.

 7          Q.   Now, did the Chief tell you to do this?

 8          A.   The Chief does not have to tell me to do this.

 9     This is my job.  Okay.  As a --

10          Q.   Well --

11          A.   Let me finish.  As a lieutenant of the

12     Organized Crime Unit, I am required by policy and

13     procedure.  The Chief of Police does not have to be my

14     mother or have to hold my hand, so when I finish an

15     investigation to turn everything over to Internal

16     Affairs.  That is my job as a lieutenant and I have a

17     duty to do that regardless of what your client has told

18     you.

19          Q.   I asked you before who told you to give this

20     to Internal Affairs and you said the Chief of Police.

21     Do you recall that?

22          A.   Yes.

23          Q.   So, did the Chief of Police tell you to do it

24     or not?

25          A.   Again, I just answered that.  The Chief of
```

1    Police already knew what we were doing.  He was up to

2    date on all the information.

3        It was very clear in the multiple meetings we had

4    with the Chief of Police and the command staff that once

5    we were finished with the criminal investigation,

6    everything would be turned over to Internal Affairs.

7        Q.   How many meetings did you have about Officer

8    Harrell with the Chief of Police and the command staff?

9        A.   I do not remember.  Multiple.

10       Q.   Were you present during those meetings?

11       A.   Yes.

12       Q.   Who else was there from the command staff?

13       A.   My Captain, Dennis Wrobbell.

14       Q.   Spell Wrobbell.

15       A.   W-R-O-B-B-E-L-L.

16       Q.   And he is the Captain of Organized Crime?

17       A.   Yes.

18       Q.   Was anyone else present?  Was the Chief there?

19       A.   Yes.  Deputy Chief Morris who is no longer

20   employed with the City.  Assistant Chief Tony Spatara

21   was also there.

22       Q.   Who else?

23       A.   That would probably be it.

24       Q.   And when did these meetings take place?

25       A.   Probably after.  As soon as we started

```
 1    investigating Officer Harrell, the command staff was

 2    notified, including the Chief of Police that Officer

 3    Harrell was possibly involved in the parts of the

 4    investigation.  He was brought in right at the beginning

 5    of the investigation.

 6         Q.   How many meetings did you have with the Chief

 7    and the command staff?

 8         A.   I can't answer that.  Multiple.

 9         Q.   Were any minutes kept of these meetings?

10         A.   Any what?

11         Q.   Any minutes?

12         A.   I have no idea what you are talking about.

13         Q.   Is there any written record of what went on in

14    these meetings?

15              MR. RUIZ:  Objection to the form.

16              THE WITNESS:  No.  No.

17              MR. AMLONG:  Give me just a moment, please.

18         Lieutenant Herb, thank you very much.

19              MR. RUIZ:  Is that it, Bill?

20              MR. AMLONG:  That's it.  Do you have any

21         cross?

22              MR. RUIZ:  Yeah.  Can you give me five

23         minutes?

24              MR. AMLONG:  Sure.

25              MR. RUIZ:  I think it will be short.
```

53

```
 1         (Off the record.)

 2         (Back on the record.)

 3                    CROSS-EXAMINATION

 4    BY MR. RUIZ:

 5         Q.   Lieutenant Herb, I'm just going to ask you a

 6    couple of follow-up questions.  You were asked a lot of

 7    -- at the beginning of the deposition, you didn't

 8    receive a lot of instruction from Mr. Amlong regarding

 9    the deposition and what the scope of it was and the,

10    kind of, the flow of the deposition.

11         A.   Correct.

12         Q.   You would agree with that.  You were asked a

13    lot of questions about very specific times, dates and

14    events.  Do you recall that?

15         A.   Yes.

16         Q.   Would you agree with me that the best evidence

17    of when exactly something would have occurred would be

18    found in the documents and found in the police reports,

19    correct?

20         A.   Yes.

21         Q.   And that would include the affidavit, for

22    example, and the multitude of police reports that are

23    associated with, obviously, the search warrant and the

24    affidavit?

25         A.   Yeah.
```

```
 1          Q.   You were asked a lot of questions, and I
 2    objected to this a couple of times, more than a couple
 3    of times, about -- that seemed to ask what OCS is, what
 4    OCS had done.  Do you recall that?
 5          A.   Yes.
 6          Q.   And the questions seemed to indicate that you
 7    had knowledge about everything that occurred with regard
 8    to the Tanksley investigation and with regard to the
 9    affidavit, the search warrant, et cetera.
10          A.   Right.
11          Q.   You are here in your individual capacity
12    today, right?
13          A.   I am.
14          Q.   The responses that you have provided were
15    based upon your personal knowledge?
16          A.   Correct.
17          Q.   So, it is possible that certain things outside
18    of your personal knowledge may have occurred, you just
19    don't know about it.  Is that fair?
20          A.   That's fair.
21               MR. AMLONG:  Objection; speculation.
22    BY MR. RUIZ:
23          Q.   You were asked questions about handing over
24    information from OCS to Internal Affairs.  Do you
25    remember that?
```

```
 1        A.   Yes.

 2        Q.   Physically, what was handed over through OCS

 3   to Internal Affairs?

 4        A.   Thumb drive.

 5        Q.   Okay.  Did you personally review that thumb

 6   drive?

 7        A.   No.

 8        Q.   Did you know what was in the thumb drive

 9   specifically?

10        A.   No.

11        Q.   Okay.  No further questions.

12             MR. AMLONG:  We'll take a copy.  I mean, we'll

13        take it.

14             MR. RUIZ:  We'll read.

15             THE COURT REPORTER:  Okay.  Do you want that

16        regular?

17             MR. AMLONG:  Yes.

18             THE COURT REPORTER:  Did you say you'll read?

19             MR. RUIZ:  Yes.

20             THE COURT REPORTER:  Okay.  Would you like a

21        copy as well?

22             MR. RUIZ:  Please.

23             THE COURT REPORTER:  Okay.

24             MR. AMLONG:  And I want mine -- I want no word

25        index on it.
```

1          THE COURT REPORTER:  Okay.

2          MR. AMLONG:  I just want the transcript.

3          THE COURT REPORTER:  All right.  No problem.

4          MR. RUIZ:  I don't need a word index, either.

5          THE COURT REPORTER:  Okay.

6     (Thereupon, the deposition was concluded at

7  12:39 p.m.)

8     (Reading and signing of the deposition transcript

9  was reserved.)

1                    CERTIFICATE OF OATH

2     STATE OF FLORIDA

3     COUNTY OF PALM BEACH

4

5               I, Nicholas Bruens, Court Reporter,

6          Notary Public, State of Florida, certify that

7          Joseph Herb, personally appeared before me on the

8          21st day of February 2024, and was duly sworn.

9               Signed this 9th day of March, 2024.

10

11

12

13          _____

14          Nicholas Bruens, Court Reporter

15          Notary Public, State of Florida

16          Commission No.: HH 332386

17          Commission Expires: 03/11/27

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY OF PALM BEACH

 4

 5              I, Nicholas Bruens, Court Reporter,

 6         certify that I was authorized to and did report the

 7         deposition of Joseph Herb; that a review of the

 8         transcript was reserved; and that the transcript is

 9         a true and correct record of my notes.

10              I further certify that I am not a

11         relative, employee, attorney, or counsel of any of

12         the parties, nor am I a relative or employee of any

13         of the parties' attorneys or counsel connected with

14         the action, nor am I financially interested in the

15         action.

16              Dated this 9th day of March 2024.

17

18

19         _____

20         Nicholas Bruens, Court Reporter

21

22

23

24

25
```

59

```
 1              WITNESS NOTIFICATION LETTER

 2

 3   March 11, 2024

 4   JOSEPH HERB
     C/O: FABIAN RUIZ, ESQUIRE
 5   333 Southeast 2nd Avenue, Suite 3200
     Miami, Florida 33131
 6   fabian.ruiz@gray-robinson.com

 7   RE:  KEVIN HARRELL vs. CITY OF WEST PALM BEACH
          CASE NO.: 9:22-cv-81275-AHS
 8
     Deposition taken on February 21, 2024.
 9

10   The transcript of the above proceeding is now available

11   for your review.

12   Please call to schedule an appointment between the hours

13   of 9:00 a.m. and 4:00 p.m., Monday through Friday.

14   Please complete your review within 30 days.

15

16   Sincerely,

17

18   Brickell, Gomberg & Associates, Inc.

19

20   I do hereby waive my signature:

21

22   _____
          JOSEPH HERB
23

24
     cc: via email:
25       wramlong@theamlongfirm.com
```

60

1                        ERRATA SHEET

2              DO NOT WRITE ON THE TRANSCRIPT
               ENTER CHANGES ON THIS PAGE
3

4      KEVIN HARRELL vs. CITY OF WEST PALM BEACH
       CASE NO.: 9:22-cv-81275-AHS
5
       DEPOSITION OF JOSEPH HERB
6      TAKEN FEBRUARY 21, 2024

7      Page No.          Line No.          Change        Reason

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     Under penalties of perjury, I declare that I have read

19     the foregoing document and that the facts stated in it

20     are true.

21

22     _____

23         JOSEPH HERB                            Date

24

25