# EXHIBIT B

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 9:22-cv-81275-AHS


KEVIN HARRELL,

     Plaintiff,

vs.

CITY OF WEST PALM BEACH, a
Florida municipal corporation;
BRIAN GELLIN, individually;
SCOTT LALLY, individually, and
MICHAEL OSWALD, individually,

     Defendants.
_____/


Zoom Deposition Teleconference


Tuesday, February 27, 2024
10:52 a.m. to 3:18 p.m.


DEPOSITION OF

FRANK ADDERLEY


Taken before Nicholas Bruens, Court Reporter,

a Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition Duces Tecum

filed in the above-styled cause.

2

```
1                    APPEARANCES:

2        On Behalf of the Plaintiff:

3        AMLONG & AMLONG, P.A.

4        500 Northeast 4th Street, Suite 101

5        Fort Lauderdale, Florida 33301

6        (954) 462-1983

7        wramlong@theamlongfirm.com

8        BY:  WILLIAM R. AMLONG, ESQUIRE

9

10       On Behalf of the Defendants:

11       GRAYROBINSON, P.A.

12       333 Southeast 2nd Avenue, Suite 3200

13       Miami, Florida 33131

14       (305) 416-6880

15       julie.zolty@gray-robinson.com

16       fabian.ruiz@gray-robinson.com

17       BY:  JULIE ZOLTY, ESQUIRE

18       BY:  FABIAN RUIZ, ESQUIRE

19

20       CITY OF WEST PALM BEACH

21       Post Office Box 3366

22       West Palm Beach, Florida 33402

23       (305) 822-1350

24       dyeargin@wpb.org

25       BY:  DOUGLAS YEARGIN, ESQUIRE
```

3

1    Also Present:

2    KEVIN HARRELL, PLAINTIFF

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                              INDEX

2      TESTIMONY OF FRANK ADDERLEY                 PAGE

3      Direct Examination by Mr. Amlong            5

4      Cross-Examination by Mr. Ruiz               102

5      Redirect Examination by Mr. Amlong          104

6      Recross-Examination by Mr. Ruiz             109

7      Certificate of Oath                         111

8      Certificate of Reporter                     112

9

10

11                       INDEX OF EXHIBITS

12                  PLAINTIFF'S EXHIBITS MARKED

13     NUMBER                DESCRIPTION           PAGE

14     Exhibit 30    Search Warrant Affidavit      21

15

16

17

18

19

20

21

22

23

24

25

5

1    THEREUPON:

2                        FRANK ADDERLEY,

3         having been first duly sworn and responding,

4      "Yes," was examined and testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. AMLONG:

7         Q.   Good morning, Chief Adderley.  My name is Bill

8    Amlong, I represent Kevin Harrell.  Please give us your

9    full name, tell us what city you live in and what you do

10   for a living.

11        A.   Full name is Franklin Charles Adderley.  I am

12   the -- I currently reside in the City of Fort

13   Lauderdale, Florida.  And I have a rental apartment in

14   the City of West Palm Beach, where I am currently

15   employed.

16        Q.   And your job is Chief of Police?

17        A.   Yes.  I'm the Police Chief in the City of West

18   Palm Beach.

19        Q.   How did you get that job?

20             MR. RUIZ:  Objection to the form.  You can --

21             THE WITNESS:  I was nominated by the Mayor and

22        confirmed by the City Commission back in June of

23        2019.

24   BY MR. AMLONG:

25        Q.   And take me briefly through your educational

6

1  and professional background.

2      A.   Education, I graduated from Stranahan High

3  School.  I have an associate degree at the Broward

4  Community College in Criminal Justice, a bachelor's

5  degree in criminal justice from Florida Gulf Coast

6  University, and I have a master's degree in public

7  administration from Florida International University.

8  That is my educational background.  What else?

9      Q.   Well, what -- when did you get your bachelor's

10  degree?

11      A.   I believe it was like 1992.  Wait.  No, no.

12  Let me back up.  Bachelor's degree probably was 2002,

13  somewhere in that ballpark.

14      Q.   Okay.  And your master's is from FIU?

15      A.   Yes, sir.

16      Q.   And what is that in?

17      A.   That year was 2014.

18      Q.   And what is your master's in?

19      A.   Oh.  What is it in, public administration.

20      Q.   And take me through your professional

21  background, please.

22      A.   I got hired at Fort Lauderdale Police

23  Department in October of 1980.  I spent thirty-six years

24  in Fort Lauderdale Police Department, where I obtained

25  the rank of Sergeant, Captain, Major.

7

1          I was the Assistant Chief, and then I became the

2     Police Chief my last eight years in the City of Fort

3     Lauderdale.  After that, I had a rank of Colonel at the

4     Broward Sheriff's Office for two years, in charge of the

5     Community Service Division, Service Bureau.  And for the

6     last two-and-a-half years I have served as the Police

7     Chief here in the City of West Palm Beach.

8          Q.   Okay.  How long were you a sergeant?

9          A.   How long?

10         Q.   Yes.

11         A.   Let's see.  I got promoted to sergeant, I

12    don't know, ten years maybe.

13         Q.   And captain?

14         A.   I was a captain for about, maybe, five years

15    or so.  I was a major for about a year.  I was the

16    Assistant Chief for less than a year before they made me

17    the Police Chief.

18         Q.   Police Chief for how long?  Eight years you

19    said?

20         A.   I was the Police Chief for Fort Lauderdale for

21    eight years.

22         Q.   And when you were a sergeant, what were your

23    assignments?  When you were a police officer, what were

24    your assignments?

25         A.   As a police officer, I worked road patrol.  I

8

1    was on a proactive street patrol unit assigned to the

2    Fort Lauderdale Beach.  And then I became a narcotics

3    detective serving in the Major Narcotics Unit.

4         And before, I spent about three years in the DEA

5    Task Force before I got promoted to the rank of

6    sergeant.  As a sergeant, I served in the Patrol

7    Division.

8         I was then in charge of the sergeant assigned to

9    the Street Suppression Team in Fort Lauderdale, known as

10   the Raiders was our name.  And then I went from there to

11   the Office of Internal Affairs as a sergeant.

12        After that, I was promoted to the rank of captain,

13   where I served in the Patrol Division.  I then went to

14   the Community Service Division.  I then took over the --

15        Q.   After you were captain you went to what

16   division?

17        A.   As -- when I got promoted to the rank of

18   captain, I was in the Patrol Division with my first

19   assignment as a captain.  From there, I went to the

20   Community Policing Division as a captain.

21        And from there, I went to the Special

22   Investigations Division as a captain.  And from there, I

23   got promoted to the rank of major, where I served in the

24   Patrol Division in charge of a district in our city at

25   the time, the City of Fort Lauderdale.

9

1       And from there, I got promoted to the rank of

2   Assistant Chief in Charge of Investigations.  And from

3   Assistant Chief, I then took over the agency as the

4   Chief, Police Chief.

5       Q.   And you were the Assistant Chief for less than

6   a year?

7       A.   Yes.

8       Q.   You said that you were a narcotics detective

9   and you spent three years with the DEA Task Force.  Was

10   that at the same time?

11       A.   As I served in the narcotics.  Yeah.  I was

12   assigned to the Organized Crime Bureau as a detective,

13   into the Major Narcotics Unit.  And I think the last,

14   either, two or three years before I got promoted to the

15   rank of sergeant, I was in the DEA Task Force.

16       Q.   So, how long were you in Narcotics, including

17   both for the City and DEA?

18       A.   I'd say roughly, like, nine years, nine to ten

19   years if I remember correctly.  It has been so long.

20       Q.   Okay.  And as a sergeant, were you in any

21   investigative units?

22       A.   Yeah.  As a sergeant, I was in charge of the

23   Street Suppression Team, one of the sergeants in charge

24   of the Street Suppression Team.  And it is, basically,

25   street level drug, prostitution, and other street crime

10

1   enforcement assignments.  And then from there, I was a

2   sergeant investigator assigned to the Office of Internal

3   Affairs.

4        Q.   And as a captain, were you in charge of any

5   investigative units?

6        A.   Excuse me?  Yes.  Special Investigations

7   Division I was in charge of.  It is all of the groups

8   like the Major Narcotics, the Street Suppression Teams,

9   the Street Prostitution Unit that worked -- the Street

10  Vice Unit, I would say.

11       The Vice Unit that worked prostitution, gambling

12  cases, extortion cases.  And then I had a RICO Squad

13  that reported to me that did racketeering cases.

14       Q.   Okay.  So, as both a police officer and as a

15  sergeant, you've had experience in dealing with search

16  warrants?

17       A.   Yes.

18       Q.   How many search warrants would you estimate

19  that you have gotten during your career?

20            MR. RUIZ:  Hold on.  Bill, did you say gotten?

21            MR. AMLONG:  Yes.

22            MR. RUIZ:  Object to the form.

23            THE WITNESS:  Well, I mean, hundreds.  I mean

24       --

25  BY MR. AMLONG:

11

1      Q.    Okay.  That's good enough.

2      A.    Yeah.  I mean --

3      Q.    Okay.

4      A.    -- it has been a long time since I've done a

5  search warrant.

6      Q.    All right.  But you're familiar with what you

7  have to do with getting a search warrant?

8      A.    Yes, sir.

9      Q.    And just for the record, what do you need to

10  get a search warrant?

11            MR. RUIZ:  Objection to the form.

12            THE WITNESS:  You need probable cause.

13  BY MR. AMLONG:

14      Q.    Probable cause for what?

15      A.    To prove that there is a, you know, evidence

16  that the crime was committed or about to be committed.

17  And you have to take, like, those facts to a judge who

18  then authorizes you to conduct the search.

19      Q.    All right.  When the judge authorizes a

20  search, does the Judge just say go in and search the

21  house, or does the Judge tell you to search the house

22  for particular items?

23      A.    It is spelled out in the warrant.

24      Q.    So, when you go to the judge to get the

25  warrant, you need to tell the judge not just why you

12

1   want to get material but what material you wish to get,

2   correct?

3          MR. RUIZ:  Objection to the form.

4          THE WITNESS:  Yes.

5   BY MR. AMLONG:

6      Q.   And how specific do you need to be about what

7   material it is that you are searching for?

8          MR. RUIZ:  Objection to the form.

9          THE WITNESS:  Well, I mean, specifics are

10         based on the evidence that you have gathered.  And

11         you know, if the judge feels that you have

12         sufficient information and those facts have been

13         articulated properly for the judge, then he'd

14         authorize it.  And if he doesn't feel that way,

15         then the judge won't give you the search warrant.

16   BY MR. AMLONG:

17     Q.   But you have to tell the judge what it is that

18   you are searching for and why you are searching for it,

19   correct?

20     A.   Yes.  I mean, you know, normally, you've got a

21   State Attorney that is involved that, actually, is the

22   lead prosecutor in the case.  And they understand what

23   the evidence in the case is.  And that person kind of

24   guides the affiant on the direction on what they are

25   articulating to the judge.

13

1      Q.   Does -- in your experience, do search warrants

2   allow you to seize material that is not evidence of a

3   crime?

4           MR. RUIZ:   Objection to the form.

5           THE WITNESS:   No.   I mean, it tells you what

6        you can search and what you can't search.   And you

7        have to comply to that order.

8   BY MR. AMLONG:

9      Q.   When you were in Internal Affairs at Fort

10  Lauderdale, how long was that?

11     A.   How long ago that was?

12     Q.   How long were you in the Internal Affairs?

13     A.   I think I was about, you know, two or three

14  years.

15     Q.   And you were there as a sergeant?

16     A.   Yes.

17     Q.   In Fort Lauderdale is Internal Affairs a

18  Criminal Investigation Unit or an Administrative Unit?

19     A.   Administrative.

20     Q.   How about West Palm Beach?

21     A.   Same.

22     Q.   When you were in Narcotics in West Palm Beach,

23  did you ever turn over to administrative -- when you

24  were in Narcotics in Fort Lauderdale, did you ever turn

25  over to Internal Affairs any materials that you had

14

1  obtained from a search warrant issued for drugs?

2        MR. RUIZ:  Objection to the form.

3        THE WITNESS:  Yeah.  That's a common practice.

4  BY MR. AMLONG:

5     Q.   What would you turn over to Internal Affairs?

6     A.   The investigation.  The completed criminal

7  investigation.

8     Q.   Would you turn over materials that were not

9  criminal in character?

10    A.   That's not criminal?

11    Q.   Yes.

12    A.   We'd give them --

13    Q.   Well, first of all, would you seize anything

14  that is not evidence of a crime?

15        MR. RUIZ:  Objection to the form.

16        THE WITNESS:  Well, no.  I mean, when you

17     seize stuff, you know, you have an order that you

18     take back before the prosecutor signs off and the

19     judge.  I mean, they -- you've got to just give

20     them a list of what you seize.

21  BY MR. AMLONG:

22    Q.   And did you seize anything that is not

23  evidence of a crime?

24    A.   Well, I'm pretty sure that would be addressed

25  when you give it to the prosecutor and the judge.  I

15

1   mean, if they feel that it was outside the scope then

2   that would be addressed with them.

3        So, you can't go back to the judge and say yeah,

4   you told me to search this house, but I went to a second

5   house.  I mean, no.  I mean, that's improper.

6        Q.   Let me rephrase that.  When you were executing

7   a search warrant, have you ever seized anything that you

8   did not, at the time you seized it, believe was evidence

9   of criminal behavior?

10            MR. RUIZ:  Objection to the form.

11            THE WITNESS:  What do you mean when you say

12        objection to the form when I --

13            MR. RUIZ:  I'm just objecting to the manner in

14        which he was asking the question.  But if you

15        understand, you can answer.

16            MR. AMLONG:  Just to remind, for the Court's

17        benefit, so when he's saying objecting to the form,

18        ignore that.  If he tells you not to answer, that's

19        when you don't answer.

20            THE WITNESS:  Okay.  So, let's get back to the

21        question.  Because --

22            MR. AMLONG:  Sure.  Read that question back to

23        me, please.

24        (Thereupon, a readback was performed.)

25            THE WITNESS:  No.

16

1   BY MR. AMLONG:

2        Q.   And so, any materials that you may have turned

3   over to Internal Affairs would have been materials that

4   you felt were -- was evidence of criminal behavior?

5            MR. RUIZ:  Objection to the form.

6            THE WITNESS:  Yeah.  I mean, Internal Affairs

7        did the investigation.

8   BY MR. AMLONG:

9        Q.   But you would not turn over to Internal

10  Affairs evidence of administrative violations, would

11  you?

12       A.   I don't think criminal has anything to do with

13  administrative.  They are two separate deals.  So, if it

14  is a criminal investigation and once that's completed,

15  you then give over the criminal investigation.

16       Q.   But you don't seize stuff that is probative

17  only of administrative violations, correct?

18           MR. RUIZ:  Objection to the form.

19           THE WITNESS:  Again, the criminal investigator

20       is focused on a criminal investigation.  When it

21       comes to the administrative case, that is two

22       separate deals.

23           So, if you've got a completed criminal

24       investigation and you give it to the Internal

25       Affairs Division, and they're the ones that look

17

1        into the administrative violations.

2             And I mean, that's the only way I can clearly

3        explain it to you.  I mean, I don't think the

4        criminal investigator is concerned about what is

5        happening on the administrative -- or what is

6        happening in the administrative investigation.

7        Because that is not really their focus.

8   BY MR. AMLONG:

9        Q.   Is the West Palm Beach Police Department

10  Internal Affairs -- I'm sorry.  Is the West Palm Beach

11  Police Department Organized Crime Section authorized to

12  seize materials that would be probative of

13  administrative violations by a police officer if those

14  items are not also evidence of criminal behavior?

15            MR. RUIZ:  Objection to the form.

16            THE WITNESS:  Well, I mean, if you are a what

17       is it, supervisor or officer and you see during

18       your criminal investigation that someone commits an

19       administrative violation, I mean, they're compelled

20       to give it to -- that violation to Internal

21       Affairs.

22            I mean, that's their job as supervisors and

23       officers in the department.  You can't say just

24       because I'm working a criminal investigation, and

25       someone is seen doing some administrative violation

18

1          that you ignore because it is a criminal

2          investigation.  They are compelled to give that

3          information to Internal Affairs.

4     BY MR. AMLONG:

5          Q.  So, you are saying that you are allowed to

6     search for, if you turn it over to Internal Affairs,

7     material that is not covered by the search warrant?

8               MR. RUIZ:  Objection to the form.

9               THE WITNESS:  No.  I did not say that at all.

10          I said that if the criminal investigator sees a

11          violation that could be an administrative

12          violation, their role as police officers,

13          detectives, supervisors, managers, have to give

14          that information to Internal Affairs.

15               They can't ignore it.  They can't say, you

16          know, I see that a violation was done here, and I

17          can ignore it because this is a criminal

18          investigation, and the person didn't commit a

19          crime.

20               If they commit an administrative violation,

21          they -- it is their job to report that to Internal

22          Affairs or their immediate supervisor.

23     BY MR. AMLONG:

24          Q.  Are investigators allowed to use a search

25     warrant to search for evidence of administrative

19

1    violations?

2          MR. RUIZ:  Objection to the form.

3          THE WITNESS:  Well, again, and I think -- I

4    think I'm explaining it to you right, but you're

5    taking it in another context.  You have a criminal

6    investigation.

7          And in the criminal investigation, during the

8    course of that investigation, someone sees an

9    administrative violation.  If it is a detective,

10   the detective has to report that to his sergeant.

11         The sergeant needs to bring that to the

12   attention of their lieutenant.  The lieutenant has

13   to determine -- has to give that to the captain.

14   And then there's a discussion as to where it goes

15   to, and it eventually goes to Internal Affairs.

16         We're not going to look at an administrative

17   violation if it comes up in a criminal case and not

18   do anything about it.  I mean, it is there, and

19   we've got to deal with it.

20         But you know, it doesn't say you've got the

21   right to go and do a search warrant.  Because the

22   Court doesn't give search warrants for an

23   administrative case.

24   BY MR. AMLONG:

25         Q.   As Chief of Police, are you advised prior to

20

1  the issuance of any search warrant concerning one of

2  your sworn officers?

3          MR. RUIZ:  Objection to the form.

4          THE WITNESS:  If they go to execute a search

5      warrant on one of our officers?

6          MR. AMLONG:  Yeah.

7          THE WITNESS:  In a criminal case, yes.  If it

8      is within the -- our department.  Yeah.  Of course

9      I would know about it.

10  BY MR. AMLONG:

11      Q.   All right.  Let me ask you to look at what has

12  been marked as Plaintiff's Exhibit 30.  And Chief, just

13  help me for a moment.  Is page 1753 part of a search

14  warrant affidavit?

15      A.   No.  It is not.

16      Q.   All right.

17      A.   That is the last page of the search warrant

18  signed by the judge, I think it was Shephard.

19      Q.   And the search warrant goes from 1754 through

20  1764, correct?

21      A.   Yeah.  It seems to me that that's one

22  document.  I believe you received testimony that there

23  was another search warrant.  But this seems to be one

24  search warrant, here.

25      Q.   So, Chief, please look at -- and we'll make

21

1  this Exhibit 30, Bate stamped pages city1754 through

2  city1764.

3       (Thereupon, Plaintiff's Exhibit 30 was marked for

4  identification.)

5  BY MR. AMLONG:

6       Q.   Were you shown this search warrant affidavit

7  before it was submitted to the State Attorney's Office?

8       A.   No.

9       Q.   Were you shown this search warrant affidavit

10 before it was sent to Judge Shephard?

11      A.   No.

12      Q.   Were you shown this search warrant prior to it

13 being served on the police officer?

14      A.   No.

15      Q.   Were you advised of the search warrant before

16 it was obtained?

17      A.   Yes.

18      Q.   Who advised you?

19      A.   I had a conversation with the State Attorney's

20 Office.

21      Q.   And with whom did you speak at the State

22 Attorney's Office?

23      A.   I believe it was the lead prosecutor, Diva.  I

24 don't recall her last name at the moment, but she was

25 the lead prosecutor.  And they -- briefing, they briefed

22

1   us on this case.  They said that they were going to

2   execute a search warrant on Officer Harrell's cell

3   phone.

4        Q.   Did the prosecutor -- was that Justin Chapman

5   or was it someone else?

6        A.   I think it would have been Chapman's boss

7   because I think she is the one that was in charge of

8   this investigation.

9        Q.   And did she tell you what they were going to

10  be looking for?

11       A.   Well, she gave us an overview of what the case

12  entailed and how, you know, Officer Harrell's

13  involvement and what they were seeking.  But, you know,

14  the State Attorney comes in and explains that -- you

15  know, I think that they, basically, then articulate all

16  of those things on their own when it comes to legal

17  reasons and why they felt that they probable cause to do

18  it.

19       Q.   Did she explain to you what probable cause

20  they had concerning communications between Officer

21  Harrell and Amanda Vielma?

22       A.   I don't recall that specifically.

23       Q.   Did anybody ever tell you that the West Palm

24  Beach Police Department had any reason to believe that

25  Officer Harrell and Ms. Vielma were involved in a

23

1  criminal activity?

2          MR. RUIZ:  Objection to the form.

3          THE WITNESS:  And I don't recall any of that.

4      No.  I would have to refer back to the State

5      Attorney's Office.  Because they, basically, were

6      the lead in directing our detectives and putting

7      his update together and getting the -- having

8      probable cause for the search warrant.

9  BY MR. AMLONG:

10     Q.  Well, who instituted the search warrant, the

11  State Attorney's Office or the Narcotics Section?

12         MR. RUIZ:  Objection to the form.

13         THE WITNESS:  Well, I mean it is initiated by

14     us under the direction of the State Attorney's

15     Office.  I mean, before you just go and get the

16     individual case, you've got a racketeering case

17     that the head of the Racketeering Unit that is in

18     charge.

19         And she, actually, was the lead when it comes

20     down to what steps were being made in this

21     investigation.  You've got an investigator that was

22     the lead investigator that took direction from her.

23         So, you know, I'm very comfortable with the

24     State Attorney's Office.  And when they presented

25     it to me that they had probable cause to execute

24

1       this warrant, it sounds very -- I was pretty

2       comfortable in my comfort zone.

3  BY MR. AMLONG:

4       Q.    Have you read the search warrant?

5       A.    No.

6       Q.    Ever?

7       A.    No.

8       Q.    Did you review any of the materials that were

9  seized pursuant to the search warrant?

10      A.    I don't know specifically about the search

11 warrant.  All I know is the internal investigation that

12 came to me.  The -- as far as the criminal case, you

13 know, again, you've got the head person in charge of the

14 Racketeering Office with the Palm Beach County State

15 Attorney's Office who reports directly to the State

16 Attorney.

17      And she comes in and says that this is their case,

18 and this is what they're going to do.  And they have

19 probable cause to believe that certain things have

20 happened, so that they can obtain a search warrant and

21 that they are going to execute the search warrant.

22      I mean, that is a little bit above my grade when it

23 comes to that.  And I'm going to take her word for it.

24 And at the conclusion, this became part of an

25 investigation that was done, an administrative

25

1  investigation.

2       Q.  Do you know how communications between

3  Ms. Vielma and Officer Harrell were considered to be

4  part of a criminal investigation?

5       A.  Do I personally know?  No.

6       Q.  Are you aware of any evidence that Officer

7  Harrell gave Richard Althouse concerning an ongoing

8  narcotics investigation?

9       A.  I was informed that he gave some information.

10  Can I tell you the exact date without reading the

11  investigation at this point?  No.  But yeah, I know that

12  was being discussed.

13       Q.  In your experience, did that make all of the

14  communications between Officer Harrell and Mr. Althouse

15  -- and Mr. Reporter, that is A-L-T-H-O-U-S-E.  Does that

16  make all of the communications between Officer Harrell

17  and Mr. Althouse subject to the search warrant?

18            MR. RUIZ:  Objection to the form.

19            THE WITNESS:  Again, you know, if the State

20        Attorney felt that it was, then you know, they were

21        basically riding the bus on that one.  So, I would

22        say that was their call.

23  BY MR. AMLONG:

24       Q.  Well, your detectives asked the State

25  Attorney's Office to give them permission to search all

26

1   communications between Mr. Althouse and Officer Harrell,

2   correct?

3           MR. RUIZ:  Objection to the form.

4           THE WITNESS:  Yeah.  And if the State

5       Attorneys felt that it was inappropriate, they

6       wouldn't have done it.

7   BY MR. AMLONG:

8       Q.   And do you feel that all conversations between

9   Mr. Althouse and Officer Harrell, even if they did not

10  involve criminal information, were fair game for being

11  seized and turned over to Internal Affairs?

12          MR. RUIZ:  Objection to the form.

13          THE WITNESS:  Well, if it had been part of the

14      criminal investigation and they gave it to Internal

15      Affairs, then yeah.  Internal Affairs gets to see

16      it.

17  BY MR. AMLONG:

18      Q.   Even if it is not a crime?

19      A.   Well, again, Internal Affairs isn't part of

20  the crime.  Internal Affairs isn't there to tell the

21  State Attorney's Office that they're wrong in the steps

22  that they did and what evidence that was seized.

23      They are here at the conclusion of the case to

24  review the criminal case and see if there is any

25  administrative violations that were done.  As far as the

27

1   legalities of the search warrant and the -- that's a

2   question for the State Attorney's Office.

3       Q.   Have you ever had a search warrant used to

4   pursue a non-criminal Internal Affairs investigation?

5       A.   A non-criminal Internal Affairs investigation

6   search warrant does not exist.  So, the answer to that

7   question is no.  It never happened.

8       Q.   Did you meet with Lieutenant Herb about the

9   search warrant?

10      A.   Prior to the execution of it?

11      Q.   Yes.

12      A.   Yeah.  He was at the meeting with the State

13  Attorney's Office when they briefed him in the State

14  Attorney's Office, saying that they were going to get

15  this thing authorized after they meet with the judge.

16  And they felt that they had probable cause to do what

17  they did.

18      Q.   What did Lieutenant Herb -- I'm sorry?

19      A.   Would Lieutenant Herb do what?

20      Q.   I thought I heard Mr. Ruiz saying something.

21          MR. RUIZ:  No, no.  I think it was you.

22          MR. AMLONG:  All right.  Mr. Reporter, read

23      the question back, please.

24          THE COURT REPORTER:  Okay.  Give me a second.

25      (Thereupon, a readback was performed.)

28

1          MR. AMLONG:  Yes.

2          THE WITNESS:  Well, again, it wasn't really

3      Lieutenant Herb speaking.  It would be the

4      prosecutor that is giving the briefing and telling

5      us, you know, where they were in the investigation

6      and what actions were going to be taken.

7  BY MR. AMLONG:

8      Q.   Other than Lieutenant Herb's presence when the

9  Assistant State Attorney called you, did you have any

10  communication with Lieutenant Herb about the search

11  warrants?

12      A.   You know, I probably had a conversation with

13  him, but don't recall exactly what that conversation

14  entailed.  But the conversation that really stood out is

15  from the State Attorney's Office.

16      Because, you know, in order to get to the judge,

17  you've got to go through the State Attorney's Office.

18  And she was the person, again, in charge of the RICO

19  Unit in the State Attorney's Office.

20      So, she has a lot of weight and her opinion

21  definitely outstands whatever Lieutenant Herb would have

22  had to say.

23      Q.   Did you ever meet with Lieutenant Herb at the

24  police station about the search warrant?

25          MR. RUIZ:  Objection to the form.

29

1          THE WITNESS:  I don't recall meeting with

2      Lieutenant Herb.  No.

3   BY MR. AMLONG:

4      Q.   Did you ever meet with Captain Roble about --

5          MR. RUIZ:  Objection to the form.

6          THE WITNESS:  I mean, yeah.  I think they were

7      in the same meeting with the State Attorney.

8   BY MR. AMLONG:

9      Q.   Did you ever meet with Captain Roble at the

10  police station separate from the State Attorney's call?

11     A.   I don't recall that.

12     Q.   Huh?

13     A.   I don't recall.  Possibly, but I don't really

14  recall that.

15     Q.   Did you ever meet with Deputy Chief Morris

16  before this search warrant affidavit went to the State

17  Attorney's Office?

18          MR. RUIZ:  Objection to the form.

19          THE WITNESS:  Possibly.  I had meetings with

20      them.  Obviously, I see them every day.  But again,

21      I mean, whatever those meetings were really relied

22      basically on what the direction the State Attorney

23      was going to take in this investigation.

24          We can meet all we want when it comes to that.

25      But we can talk when we need to talk or whatever.

30

1        But it doesn't happen until you get the green light

2        from the State Attorney to move forward with it,

3        and that is what happened.

4   BY MR. AMLONG:

5        Q.   Did the State Attorney's Office make any

6   effort to file criminal charges against Officer Harrell?

7            MR. RUIZ:  Objection to the form.

8            THE WITNESS:  I'm not really -- yeah.  I think

9        they did consider them.  Did they file charges?  I

10       don't think so.  I don't recall.

11  BY MR. AMLONG:

12       Q.   And Chief Morris had been fired, correct?

13       A.   Well, I was told that he already resigned.

14       Q.   If he had not resigned, would he have been

15  fired?

16           MR. RUIZ:  Objection to the form.

17           THE WITNESS:  Well, that is not a question for

18       me because I'm not the person that terminated him.

19  BY MR. AMLONG:

20       Q.   Who did?

21       A.   The Mayor.  I mean, the Mayor would have made

22  that decision.  Because that's the one we -- well, it

23  would be the City Administrator because that's who he

24  gave his resignation to.

25       Q.   What presentation did he give?

31

1          MR. RUIZ:  Objection to the form.

2          THE WITNESS:  What?

3    BY MR. AMLONG:

4    Q.   You say -- you were saying that Deputy Chief

5    Morris was fired after giving a presentation?

6    A.   No, no, no.  Resignation.

7          MR. RUIZ:  Resignation.

8          THE WITNESS:  He gave a resignation.  I got a

9          -- I'd seen a resignation with Rick Morris resigned

10         from his place of employment here in the City.

11   BY MR. AMLONG:

12   Q.   Was he asked to resign?

13         MR. RUIZ:  Objection to the form.

14         THE WITNESS:  Well, that was -- I don't know

15         how that, actually --

16   BY MR. AMLONG:

17   Q.   Did the --

18   A.   Not part of the conversation.

19   Q.   Did the City Attorney tell you that he was

20   going to give him a choice between resigning or getting

21   fired?

22         MR. RUIZ:  I'm going to object on the basis of

23         privilege.  Did you mean City Administrator?  You

24         said City Attorney.

25   BY MR. AMLONG:

32

1      Q.   I'm sorry.  Did the City Administrator tell

2   you that he was going to give Chief Morris a choice

3   between resigning and being fired?

4      A.   No.

5          MR. RUIZ:  Same objection.

6   BY MR. AMLONG:

7      Q.   Did they ever tell you why Chief Morris was

8   asked to resign?

9      A.   No.

10     Q.   Did anyone tell you why Chief Morris was being

11   asked to resign?

12     A.   The only conversation I had was when the Mayor

13   said that he was going to terminate his employment.  And

14   then the next thing I know, he resigned.  So, I was not

15   included in that conversation.

16     Q.   Why did the Mayor tell you he was going to

17   terminate his employment?

18          MR. RUIZ:  Objection to the form.

19          THE WITNESS:  He said that that was the

20      decision that he was making.  And he informed me

21      that that's what he was going to do and that he was

22      going to follow up with the City Administrator and

23      that was it.

24          He called Morris on the phone, told him that

25      he was being terminated, and to follow up with the

33

1      City Administrator.

2            And then the next thing I know, there was the

3      letter of Rick Morris resigning.  So, to tell you

4      how it goes from termination to resigning, I was

5      not part of that conversation.

6   BY MR. AMLONG:

7      Q.   What was the reason that Chief Morris was

8   being asked to resign?

9            MR. RUIZ:  Objection to the form.

10           THE WITNESS:  Again, the Mayor said that he

11     was going to terminate employment.  And he called

12     him on the phone, told him that.

13           And he was then directed to follow up with the

14     City Administrator in which I was not a part of

15     that conversation.  And the next thing I knew there

16     was a letter saying that Rick Morris submitted his

17     resignation, so --

18  BY MR. AMLONG:

19     Q.   Did anyone ever tell you why he was being told

20  to either resign or be fired?

21           MR. RUIZ:  Objection to the form.

22           THE WITNESS:  No.

23           MR. RUIZ:  I think he's answered this a few

24     different ways now, Bill, so --

25  BY MR. AMLONG:

34

1      Q.   So, tell me how the structure works there.   Is

2  the Mayor in charge of the police department?

3      A.   The Mayor is in charge of the City.   And then

4  you've got the City Administrator that is also in charge

5  of the City that is my direct boss.

6      Q.   Well, is the Mayor a strong mayor?

7      A.   Yes.

8      Q.   So, he can fire any employee he wishes?

9           MR. RUIZ:  Objection to the form.  And I know

10          we've gone through this in other depos, but Chief

11          Adderley is here in his personal --

12          MR. AMLONG:  I know.

13          MR. RUIZ:  -- capacity.  And he is not here as

14          a representative.  So, you know, to the extent that

15          you're asking questions about the structure, this

16          is all, I mean, if we can agree, this is all based

17          on his personal knowledge and understanding.

18  BY MR. AMLONG:

19      Q.   Okay.  Okay.  Do you know if the Mayor can

20  fire anyone he wishes to?

21      A.   Well, I mean, you've got people that are --

22  have contract employees and protected in the you know,

23  bargaining units that are allowed you know, due process

24  when it comes to those types of separations from

25  employment.  And then you have people like me, that are,

35

1  you know, at-will, that can be fired without cause.

2      Q.   Was Chief Morris an at-will employee?

3      A.   Yes.

4      Q.   Have you ever seized a cell phone pursuant to

5  a search warrant?

6      A.   Me, personally?

7      Q.   Yes.

8      A.   Let me think about that for a minute.  No.

9      Q.   All right.  Do you know of any instance other

10  than in the case of -- well, you do understand that

11  Internal Affairs simply gave the -- gave Officer

12  Harrell's search warrant to Internal Affairs, correct?

13          MR. RUIZ:  Objection to the form.

14          THE WITNESS:  Internal Affairs received the

15      search warrant.

16          MR. AMLONG:  Internal Affairs got the search

17      warrant, got the telephone, and then gave it to

18      Internal Affairs.

19          MR. RUIZ:  Objection to the form.

20          THE WITNESS:  I don't understand.  You sound

21      as if they did a search warrant for Internal

22      Affairs.  Is that what you're asking me?

23  BY MR. AMLONG:

24      Q.   No.  I'm asking you whether or not they seized

25  the search warrant.  And then when they found no

36

1   criminal activity, they gave the search warrant to

2   Lieutenant Herb?

3           MR. RUIZ:  Objection to the form.

4           THE WITNESS:  Well, let me say this.  I think

5       at the conclusion of the criminal investigation,

6       everything went to Internal Affairs.  That's the

7       best way I can explain it.

8   BY MR. AMLONG:

9       Q.   Even though there was no criminal information

10  that was obtained in the search?

11          MR. RUIZ:  Objection to the form.

12          THE WITNESS:  Well, I mean, I'm not saying

13      that there was no criminal information.  I mean,

14      the people that can articulate that better would be

15      the State Attorney.

16          You know, they have a decision if they are

17      going to criminally charge someone with the crimes

18      that they commit or not.  It just so happens, here

19      in Palm Beach County, a lot of people commit

20      crimes, and the State Attorney feels that they're

21      not going to prosecute them.  But you know, that's

22      their job.

23  BY MR. AMLONG:

24      Q.   Do you know whether or not there is any

25  evidence of any crime that was committed by Officer

37

1    Harrell that was found in his search -- on his

2    telephone?

3         A.   Again, that is up to the State Attorney to

4    decide.

5         Q.   Are you aware of any -- evidence of any

6    criminal behavior on the part of Officer Harrell that

7    was discovered during the search of his telephone?

8         A.   Well, I mean, I think there are some

9    communications with him, you know, giving information to

10   Althouse that could be a crime.  I would think it's a

11   crime.

12        I mean, you know, if you are obstructing justice

13   and giving criminal information about the operations of

14   the police department to me, I think that's a crime.

15   But you know, the State Attorney doesn't think that

16   that's -- they can successfully prosecute the case,

17   that's really their call.

18        Q.   What information did the telephone include

19   about Officer Harrell giving -- Mr. Althouse information

20   about any drug investigation?

21             MR. RUIZ:  Objection to the form.

22             THE WITNESS:  I think it is in the

23        investigation.  Do you want me to read -- I guess

24        if I can find it, right?  If that's what you're

25        asking for.

38

1          MR. AMLONG:  I want to know not what they

2     were looking for.  I want to know what information

3     was found on his telephone concerning his giving

4     confidential police information to Mr. Althouse.

5          MR. RUIZ:  Same objection as before.  The

6     deponent is sitting here in his individual

7     capacity.  So, you know, to the extent that you're

8     asking him about information that is beyond his

9     personal knowledge, I'm going to object to the

10    question.

11         THE WITNESS:  Yeah.  I mean, I think that

12    would be in the investigation.  Again, I mean, you

13    know, if you look at the case, if the State

14    Attorney feels that it is a criminal violation that

15    they don't feel that they can successfully

16    prosecute, it doesn't mean that the person didn't

17    commit a crime.

18 BY MR. AMLONG:

19    Q.   Had anybody told you -- has anybody from the

20 State Attorney's Office told you that they found

21 evidence that Officer Harrell had committed a crime on

22 his telephone?

23    A.   It was explained to me that they just didn't

24 feel that they could successfully prosecute.  Yeah.  So,

25 they decided not to charge him.  That is my

39

1    understanding.

2         Q.    What -- from whom did that understanding come?

3              MR. RUIZ:  Objection to the form.

4              THE WITNESS:  Who said that?  You mean in the

5         State Attorney's Office?

6    BY MR. AMLONG:

7         Q.    Did the State Attorney's Office tell you that

8    they found evidence of a crime, but they didn't think

9    they could prosecute it?

10        A.    Yeah.  That was my -- as I recall, that came

11   from the chief in charge of the Racketeering Squad.

12        Q.    In the police department or the State

13   Attorney's Office?

14        A.    State Attorney's Office.

15        Q.    So, the Chief of Racketeering in the State

16   Attorney's Office told you that they had found

17   information of a crime on Sergeant Harrell's phone, on

18   Officer Harrell's phone?

19        A.    Yeah.  I mean, you know, they felt that they

20   didn't have enough to successfully prosecute him.

21        Q.    What information of a crime did the State

22   Attorney's Office tell you?  Did they tell you

23   personally or did they tell somebody else from the

24   police department?

25        A.    That was what I recall.  I recall that that

40

1  came from -- that was from the chief there, female,

2  Diva.  I don't recall her last name, but she is in

3  charge of the Racketeering Unit there at the State

4  Attorney's Office.

5      Q.  So, you had -- was this a telephone call?

6      A.  That could have been a briefing, afterwards,

7  before everything went over to Internal Affairs.

8      Q.  Well, the phone went to Internal Affairs

9  before it went to the State Attorney's Office, correct?

10      MR. RUIZ:  Objection to the form.

11      THE WITNESS:  The phone went to Internal

12      Affairs.  Why would the phone go to Internal

13      Affairs before the State Attorney's Office, the

14      group that, actually, pushed to get the search

15      warrant?  I mean, no.  It is --

16      MR. AMLONG:  You're saying the State

17      Attorney's Office --

18      THE WITNESS:  Hold on a second.  Just one

19      second.  The phone did not go to Internal Affairs.

20      It goes -- it is part of a criminal investigation.

21      It went to the State Attorney's Office.

22          They reviewed it.  It was my understanding

23      through our follow up meetings with them that they

24      didn't feel that they had enough to criminally

25      prosecute the guy.  They made the decision.

41

1          Not to say that the guy didn't commit a crime.

2      That's not what they're saying.  They just didn't

3      think that they could successfully prosecute.  So,

4      there is a big difference between the two.

5          You know, it is do you have enough to charge

6      him, yeah.  can we successfully prosecute him, no.

7      That's why we're not going to charge him.  So, you

8      know, that's the decision that they made.

9          And you know, they do that quite frequently

10     here in Palm Beach County.  So, that's something

11     that they would have to answer to.  At the

12     conclusion of that, yeah, the case goes to Internal

13     Affairs.

14  BY MR. AMLONG:

15     Q.   What crime did they find?  What crime did they

16  suspect that they found evidence of that wasn't strong

17  enough to prosecute?

18     A.   I cannot speak for them.

19     Q.   Did you speak to anybody at the State

20  Attorney's Office about this?

21     A.   Yeah.  I mean, I had a conversation with Diva.

22  But, you know, she felt that they didn't have enough to

23  successfully prosecute him.

24     Q.   Was that before or after the search warrant

25  was issued?

42

1      A.   I would say after.  I mean, they need to wait

2  until they collect all of the evidence until they make a

3  decision.

4      Q.   Did the -- what did the department give the

5  State to permit the State to make that determination?

6           MR. RUIZ:  Objection to the form.  Again, the

7      deponent is here in his individual capacity, not as

8      a corporate representative.  But if you know.

9           THE WITNESS:  Well, it was part of the

10     criminal investigation.  I'm pretty sure you've got

11     a copy of it.

12          MR. RUIZ:  Bill, we've been going for about an

13     hour and fifteen, hour twenty.

14          MR. AMLONG:  Okay.

15          MR. RUIZ:  How long do you plan on going?

16     Just so to know if we should take a lunch or just a

17     five-minute break.

18          MR. AMLONG:  Probably a lunch.

19          MR. RUIZ:  Do you want to do half an hour?

20          MR. AMLONG:  Sure.

21          MR. RUIZ:  Okay.  We'll be back here at --

22     (Off the record.)

23     (Back on the record.)

24  BY MR. AMLONG:

25     Q.   Chief Adderley, what role, if any, did you

43

1    have in suspending Officer Harrell in 2020 and referring

2    him to Dr. Michael Brannon?

3        A.   That was the discussion that we had with HR,

4    and that was the determination that we decided, that

5    that was the best form of action.

6        Q.   Okay.  Who recommended Dr. Brannon?

7        A.   I did.

8        Q.   Had you worked with Dr. Brannon before?

9        A.   Not necessarily.  I mean no.  We, in Fort

10   Lauderdale, had several cases with him.

11       Q.   Well, that's what I mean.  In -- have you

12   worked with him before?

13       A.   Yes.

14       Q.   How many people did you send to Dr. Brannon

15   for evaluation?

16       A.   In West Palm?

17       Q.   In Fort Lauderdale.

18       A.   Oh.  Man, I don't remember.

19       Q.   In what role were you sending people to him?

20   What was your role when you were doing this?

21       A.   Oh.  We want to make sure people are fit for

22   duty.  You know, when you have claims that people can't

23   -- don't work well in group settings, constantly having

24   disruptions in the agency, what caused these things.

25   You know, we relied on psychologists to evaluate them.

44

1          Q.    All right.  Was this when you're Chief or

2     Assistant Chief or what?

3          A.    In Fort Lauderdale?

4          Q.    Yes.

5          A.    Yeah.  I can't really say the number of times

6     we did it in Lauderdale.  I mean, I've done it, I think,

7     it was three times now in West Palm Beach.  Two or three

8     times in West Palm Beach.

9          Q.    Have you ever sent anybody to Dr. Brannon for

10    an evaluation in which the evaluation did not come back

11    that he was unfit for duty?

12         A.    Saying that they were fit for duty?

13         Q.    Unfit for duty.

14         A.    Can you just ask that again?  I think the --

15         Q.    Okay.  Of the people that you sent to

16    Dr. Brannon, how many if any did he find fit for duty,

17    as opposed to being unfit?

18         A.    I can't recall.  I'm sure he's found some

19    people fit for duty in Lauderdale.  But you know, when

20    you have -- I think when you look at the people we sent

21    to him in West Palm Beach, it was -- they were all unfit

22    based on the evaluation.

23         Q.    And who were the people in West Palm Beach

24    that you sent to Dr. Brannon?

25         A.    Harrell was one.  We had another officer,

45

1  Padgett, that was sent.  I think there is a third one I

2  can't remember right now.  Well, I think those two; it

3  could be the two.

4      Q.   Do you think there were just -- what is

5  Officer Padgett's first name?

6      A.   Corbell.

7      Q.   P-A-G?

8      A.   Yeah.  I don't have the spelling with me.

9      Q.   Was officer -- is he a police officer?

10     A.   Yeah, he was.

11     Q.   And when was he sent for an examination?

12     A.   During his last shooting, which led to his

13  termination.

14     Q.   When did the shooting take place?

15     A.   In July of '22.

16     Q.   And Officer Padgett was in the middle of an

17  arbitration when you sent him, correct?

18     A.   No.

19     Q.   When did you send him?

20     A.   Well, I mean during the course of his

21  investigation.  I mean, he made some indications of

22  using the deadly force and not even knowing that he was

23  using deadly force.

24     He had a number of people that felt that the guy

25  wasn't himself after he was involved in a shooting years

46

1   ago.  We had a -- we got a person in the City who,

2   basically, kept saying yeah, the guy has PTSD, but, you

3   know, let's put him back on the road, which clearly was

4   not a good recommendation because he continued to have

5   problems with it.  So, we decided to get a second

6   opinion and we used Brannon.

7       Q.   And Brannon found him unfit for duty?

8       A.   Brannon found him unfit for duty, felt that he

9   was suffering from PTSD, and he had a structured plan to

10  help him with his PTSD.  Unlike the other person that

11  evaluated him.

12      Q.   Who was the other person?

13      A.   I think his name was Miller.

14      Q.   Do you remember, was he a PhD or PsyD?

15      A.   Well, he got a doctor.  So, I'm pretty sure

16  somebody gave him a PhD or an MD or something to go with

17  it.

18      Q.   Was that the same -- you said --

19      A.   It was -- I think so.

20      Q.   You sent Padgett to Dr. Miller?

21           MR. RUIZ:  Objection to the form.

22           THE WITNESS:  Padgett was sent to Miller.

23      Everybody in West Palm Beach goes to Miller.  And

24      then you have these cases which, you know, you have

25      people with continuing problems, and Miller seems

47

1          to think put them back on the street.

2               And I think that we need a second opinion.

3          And clearly, we have individuals you know, that I

4          think need a second opinion.  We selected Branon.

5          Brannon is totally, you know, objective.  He is no

6          contact.  You know, he is a guy that give an

7          objective opinion.

8     BY MR. AMLONG:

9          Q.   Have you ever had -- has Dr. Brannon ever

10    found anybody to be fit for duty when you sent them?

11         A.   Yeah.  I mean, when you, actually, think about

12    -- I think he is saying Padgett could have been fit for

13    duty.  He just had a plan as to how you treat him for

14    PTSD.

15         You know, rather than putting him back on the

16    street, he felt that the guy needed treatment in order

17    to be able to go back to the street.  Unlike Miller, who

18    said just put him back on the street.

19         Q.   How about Officer Jason Barquin,

20    B-A-R-Q-U-I-N?

21         A.   Is that a question?

22         Q.   Yeah.  Did you send Officer Barquin to

23    Dr. Brannon?

24         A.   No.  Barquin got fired because he stole

25    fentanyl from the fire shop.

48

1     Q.   And you --

2     A.   So, he --

3     Q.   You never sent him to Dr. Brannon?

4     A.   I don't recall him going to Brannon.  But, you

5  know, he committed basically a crime of theft of drugs.

6  So, I mean, you know, we're terminating his employment.

7     Q.   What about Sergeant Craig Davis?

8     A.   Craig Davis?

9     Q.   Yes.  Did you send Sergeant Davis to

10 Dr. Brannon?

11    A.   No.  Like I said before, just two people that

12 went to Brannon; Harrell and Padgett.

13    Q.   And he found both of them to be unfit?

14    A.   Again, he didn't say Padgett was unfit.  He

15 felt that Padgett suffered from PTSD.  He had a plan

16 scheduled that could help Padgett get back to a point

17 where he could come back to duty.  He didn't say it was

18 -- he was just completely unfit and couldn't do it.

19    Q.   When was Padgett's shooting incident?

20    A.   Which one?  He had two.

21    Q.   All right.  Tell me when each of them was.

22    A.   He had the first one before I was even here.

23 And that's the one that everyone was led to believe he

24 was suffering from PTSD.  Miller felt the same way.  So

25 did Brannon.  Brannon agreed.  But again, there was a

49

1   difference in their responses.

2       Q.   When was the second shooting?

3       A.   The second shooting was, again, in '22, I

4   believe, where he shot an unarmed suspect running away

5   with -- running away from him.

6       Q.   And he claimed it to be an accidental

7   shooting, right?

8       A.   Who claimed that?

9       Q.   Did not Officer Padgett claim that the second

10  shooting was an accidental shooting?

11      A.   Is that what Padgett says?  Yeah.  I'm pretty

12  sure he said that.  He said he completely -- in his

13  sworn statement, he said he completely blacked out.  He

14  remembered everything up to the point where he pulled

15  the trigger.

16      He blacked out, and then all the sudden after he

17  pulled the trigger, he remembered everything after that.

18  So, you know, if he said that it was accidental, I don't

19  know how it could be accidental if he was unconsciously,

20  at the time, he didn't know he was, actually, doing it.

21      Q.   In the -- was Officer Padgett in the midst of

22  an arbitration when you sent him to Dr. Brannon?

23           MR. RUIZ:  Objection to the form.

24           THE WITNESS:  For the second time, no.

25  BY MR. AMLONG:

50

1      Q.   So, he -- how many times did you send him to

2  Dr. Brannon?

3      A.   Once.

4      Q.   Was that -- the first time was before you got

5  here, right?

6           MR. RUIZ:  Objection to the form.

7           THE WITNESS:  I can't send him yet if I wasn't

8      here.

9  BY MR. AMLONG:

10     Q.   Yeah.  I'm saying the first time, the first

11 shooting was before you arrived in West Palm Beach?

12     A.   Yeah.  That happened before I became the

13 Police Chief.  Yes.

14     Q.   Okay.  And when did the second shooting occur?

15     A.   For the third time, it occurred in 2022.

16     Q.   Did you relieve Officer Padgett from duty as

17 soon as the shooting took place?

18     A.   Yeah.

19     Q.   When did you relieve him of duty?

20     A.   It was immediately after the shooting.  That

21 is the common practice.  Every time someone is involved

22 in a shooting they are relieved of duty.  They are

23 released immediately.

24     Q.   How long was he out when you relieved him of

25 duty?

51

1        A.    How long was he out?

2        Q.    Yes.

3        A.    How long was he out before I relieved him of

4    duty?

5        Q.    No.   How -- he was involved in the second

6    shooting, and you relieved from duty because that is

7    automatic.   How long was that relief from duty?

8        A.    He was out until the conclusion of the

9    investigation that determined that he was unjustified in

10   the use of force.   And we terminated him, so he never

11   came back.

12       Q.    When did you send him to Dr. Brannon?

13       A.    During the course of the investigation.

14       Q.    Had Officer Padgett taken his case to

15   arbitration?

16            MR. RUIZ:  Objection to the form.

17            THE WITNESS:  Yeah.  We did his arbitration a

18       few months ago.

19   BY MR. AMLONG:

20       Q.    And was the arbitration completed?

21       A.    Was it what?

22       Q.    Was it completed?

23       A.    No, no, no.  We're waiting on the arbitrator's

24   findings.

25       Q.    Is the evidentiary portion of the arbitration

52

1  completed?

2          MR. RUIZ:  Objection to the form.

3          THE WITNESS:  I don't know if I -- I don't

4      know how to answer that.

5  BY MR. AMLONG:

6      Q.    Well, is the arbitration still going on?

7      A.    No.  We are waiting for a judgement.

8      Q.    Have all of the witnesses who are going to

9  testify before the arbitrator testified?

10     A.    I believe so.

11     Q.    And when did that conclude?

12     A.    A couple of months ago.

13     Q.    Was Officer Padgett sent to Dr. Brannon before

14 or after the arbitration began?

15         MR. RUIZ:  Objection to the form.  Again, I

16     just want to add the same objection I had before we

17     went on break.  Chief Adderley is here in his

18     individual capacity, not as a corporate

19     representative.  So, he can respond to the extent

20     that his personal knowledge, he has that

21     information.  He is not speaking on behalf of the

22     City.

23         THE WITNESS:  Yeah.  I mean, he shoots at an

24     unarmed suspect.  He is placed on administrative

25     leave with pay.  We are conducting an

53

1    investigation.

2         I was -- well, first of all, the Riviera Beach

3    Police Department conducted a criminal

4    investigation, determined that he should have been

5    arrested for aggravated assault, and the State

6    Attorney's Office decided that they were not going

7    to criminally charge him.

8         We then conducted an admin investigation which

9    showed that he violated the use of force policy.

10   And during the course of our investigation, he made

11   some indication that led us to send him for

12   evaluation.

13        We got a choice.  We had Miller, who says that

14   he has PTSD.  And he feels that we can put this guy

15   back on the street in a uniformed patrol in the

16   public, and clearly his recommendation wasn't a

17   good one.

18        We asked for a second opinion.  It went to

19   Brannon.  Brannon then says he suffers from PTSD,

20   shouldn't be back on the street, but here is a

21   structured plan as to how he can be treated before

22   he goes back to the road.

23        So, Brannon came in, you know, and that's how

24   he was evaluated.  That was his evaluation.  So, he

25   didn't say he can't go back.  He just said that

54

1          before he goes back he needs to be treated for

2          PTSD.

3     BY MR. AMLONG:

4          Q.   And when was Brannon's recommendation?

5          A.   When was it?

6          Q.   Yes.

7          A.   Well, it would have been prior to before we

8     terminated him at his employment.

9          Q.   And is this a union arbitration?

10         A.   Yeah.  He was represented by the union.

11         Q.   Which one?

12         A.   FOP.

13         Q.   Do you know who his lawyer is?

14         A.   I don't recall his name.

15         Q.   Did you ever send anybody to Dr. Brannon while

16    you were with the Sheriff's Office?

17         A.   No.

18         Q.   How many people -- did you ever send anybody

19    to Dr. Brannon other than when you were Chief of Police

20    at the City of Fort Lauderdale?

21         A.   Did I ever send someone to Brannon when I was

22    in Fort Lauderdale?

23         Q.   No.  Other than when you were Chief of Police?

24         A.   Oh.  No.

25         Q.   Do you recall how many people you sent?

55

1      A.    No.

2      Q.    Do you recall the ones you sent?  Do you

3  recall how many, if any, Dr. Brannon said should not be

4  relieved of duty?

5      A.    Should not be relieved of duty?

6      Q.    Yes.

7      A.    Well, that wouldn't be his finding.  I mean,

8  his finding would be if they're fit for duty or not fit

9  for duty.

10     Q.    Okay.  How many of the people whom you sent to

11  Dr. Brannon did he find fit for duty?

12     A.    I would say there were a number of people that

13  were found fit for duty.  I mean, I don't think any of

14  it really stood out either way.

15     Q.    When you were in Fort Lauderdale, was the FOP

16  the union?

17     A.    Yes.

18     Q.    In Fort Lauderdale, do you know if there would

19  be any file other than the individual officer's files

20  that would show whether or not you had sent somebody to

21  Dr. Brannon?

22     A.    I don't think Fort Lauderdale has a report of

23  who went to Brannon and who didn't go to Brannon.  I

24  think that's something that would -- at the police

25  department.  No.  I think that one, it is a confidential

56

1   document through the HR Department in Fort Lauderdale.

2       Q.   You're saying the City Hall HR Department, as

3   opposed to the police department?

4       A.   They would know.  They were the ones that

5   would have coordinated that.

6       Q.   Look at Exhibit 10, please.

7       A.   Okay.

8       Q.   Have you ever seen that document before?

9       A.   Yeah.  This is Brannon's report, right?  Yeah.

10      Q.   It is.  Have you seen that document before?

11      A.   Indictment?  No.

12      Q.   No.  Have you seen that document before?

13      A.   Oh, the document.  Yes.

14      Q.   When did you see it.

15      A.   I would say sometime in 2020.

16      Q.   How did you come to see it?

17      A.   That would have come from HR.

18      Q.   Had you ever had, in all of your years as a

19  police officer, are you aware of any situation in which

20  a sergeant has gathered letters from police officers

21  asking that a fellow police officer be relieved of duty?

22          MR. RUIZ:  Objection to the form.

23          THE WITNESS:  No.  I've never heard of that.

24  BY MR. AMLONG:

25      Q.   I'm sorry?

57

1    A.    No.

2    Q.    So, this is the first time?

3    A.    The first time for what?

4    Q.    Well, you are aware that Sergeant Gellin

5  collected letters from police officers complaining about

6  sergeant -- complaining about Officer Harrell, correct?

7    A.    I saw a number of anonymous letters that came

8  up, saying that this guy was unfit, saying that they

9  didn't want to put the name on it.  And there were a

10  bunch of anonymous letters.

11      I didn't know -- if you're telling me that Gellin

12  said that he's the one that coordinated that, that's

13  news to me, because I'm not aware of that.

14      We did receive a number of letters from people

15  who wanted to remain anonymous, saying that they saw

16  certain things with Officer Harrell, and they felt

17  that, you know, he was not working well with them in

18  a number of different ways.  But, you know, if you're

19  saying Gellin told you that, then that's a new one.

20  I mean, that's news to me.

21          MR. AMLONG:  Mr. Ruiz, do you have Exhibit

22      Number 6 handy?

23          MR. RUIZ:  Yeah.  Give me a second.

24          THE WITNESS:  Wow.  That makes it even worse.

25  BY MR. AMLONG:

58

1      Q.    Did you say it makes it even worse?

2      A.    Yeah.  I mean, I -- to have all of these

3   people, and I remember, I thought it was a number of

4   anonymous people.  But now you have officers -- now that

5   I'm taking a look at this they, actually, signed their

6   names.

7      Q.    Have you seen these letters before?

8      A.    Yeah.  But, you know, I mean, the ones that

9   kind of stood out were the ones that were, like,

10  anonymous letters and --

11     Q.    Well, the anonymous letters, there were only

12  two.  Is that correct?

13     A.    But now that it is refreshing my memory,

14  you've got a number of people that are in his squad that

15  are articulating some facts about him being

16  unprofessional and -- I mean, this is more of a

17  disruption than I, actually, thought and this is huge.

18     Q.    Are you aware of whether or not these officers

19  had engaged in behavior that Officer Harrell had

20  criticized as being unprofessional or as detracting from

21  his officer safety?

22     A.    Detracting from his officer safety?

23     Q.    Yes.

24     A.    Well, let me see, here.  I think this is a lot

25  of people saying that he is causing the problem with

59

1    officer safety.

2         Q.   When you say we have a lot of people, we have

3    Officer Goldberger then we have an anonymous letter.

4    That is two.  We have a concerning officer, which is

5    anonymous.  That's three.  We then have Officer Abreau.

6    That's four.  We have Officer McGinley.  That's five.

7    We have Officer Bales.  That is six.  Officer Lopez.

8    That's seven.  And Sergeant Gellin.  That's eight.  Do

9    you consider that to be a lot of people?

10        A.   You said eight people, right?

11        Q.   Yes.

12        A.   Yeah.  That's a platoon.  So, that's a -- you

13   know, you've got eight people with a sergeant.  And I

14   think you've got a total of maybe ten per platoon, if

15   I'm not mistaken, that work in the north end of the city

16   that says we've got a problem with this one person.

17        So, you've got ten people that work together, and

18   eight of them are saying that we've got a problem with

19   one person.  Yeah.  I think that is a lot.

20        Q.   Do you know how these letters were gathered?

21        A.   No.  I don't.

22        Q.   How many years overall have you been in law

23   enforcement?

24        A.   Forty-four, plus two.

25        Q.   So, forty-six.  During the forty-six years

60

1  that you have been in law enforcement, have you ever

2  been aware of a sergeant soliciting letters from police

3  officers concerning another police officer?

4          MR. RUIZ:  Objection to the form.

5          THE WITNESS:  I've never seen it done before.

6      But I think as a supervisor, he's got an obligation

7      to bring it to his supervisor's attention.  And

8      that's what he did here.  He put the letters

9      together and he wrote a memo to his lieutenant,

10      which eventually ended up in my office.

11  BY MR. AMLONG:

12      Q.   And how did it get in your office?

13      A.   Well, I'm sure his lieutenant took it to his

14  captain, and his captain brought it to the Assistant

15  Chief.  Who, at the time, would have been Tamica West

16  and she brought it to me.

17      Q.   Did you have any discussion with Chief West

18  about this?

19      A.   I'm sure I did.  But you know, when you look

20  at again, this group of people that are saying that we

21  have a problem then how do we address this?

22      I mean, can you say, you know, the person had been

23  evaluated by someone who continues to let him -- who

24  feels that they should continue to work in the same

25  environment without a plan as to how to make this person

61

1   more fit for duty.

2        That's why we sent him to the person that had the

3   plan.  And Brannon is, I think, is the one that we

4   decided to send him to.

5        Q.   Did you review Officer -- before you removed

6   him from duty, did you review Officer Harrell's work

7   record for approximately twenty years?

8        A.   Yeah.  I think that was being -- that was

9   discussed.

10       Q.   You think it was discussed or it was

11  discussed?

12       A.   I'm pretty sure it was.  When we have a

13  discussion about discipline, we look at all of those

14  things.  Yeah.

15       Q.   Did anything in Officer Harrell's previous

16  reviews indicate the sort of behavior that the other

17  officers are articulating now?

18       A.   Well, I mean, if you look at his discipline

19  history -- I mean, he's got some discipline where he has

20  issues dealing with people.  Members of the public, you

21  know, co-workers.

22       Q.   And how many incidents of discipline did

23  Officer Harrell have?

24            MR. RUIZ:  Objection to the form.

25            THE WITNESS:  I don't have it right in front

62

1          of me here, but there are some which, you know, I

2          think he used poor judgement in.

3    BY MR. AMLONG:

4          Q.    How many?

5          A.    I don't know the number.  I don't have it

6    right in front of me.

7          Q.    Do you remember when the last one was?

8          A.    I -- prior to this one that he was terminated,

9    right?

10          Q.    Pardon?  Yes.

11          A.    Yeah.  Well, I mean, we had incidents of -- I

12    don't have it here.  Do we have it here, his Internal

13    Affairs discipline cases, or no?  No.  I don't have it

14    in front of me.  I mean, I think his -- that record can

15    speak for itself.

16          Q.    What if anything did you do to prepare for

17    this deposition?

18          A.    I looked at some of these exhibits that you

19    have here.  But I remember the case.  I remember the

20    case.

21          Q.    What are you reading on your telephone?

22          A.    Huh?

23          Q.    What are you reading on your cell phone?

24          A.    I have to send a text message to the Mayor

25    because I can't make it to his 1:30 meeting.

63

1      Q.   Before suspending Officer Harrell, did you ask
2  him about these letters?
3      A.   Hold on.  Let me just send this text.
4           MR. RUIZ:  Yeah.  Chief Adderley is asking for
5      a break so he can finish sending this text.
6           MR. AMLONG:  All right.  That's fine.
7      (Off the record.)
8      (Back on the record.)
9           MR. AMLONG:  What was my last question,
10     Mr. Reporter?
11          THE COURT REPORTER:  Your last question was
12     before suspending Officer Harrell, did you ask him
13     about these letters.
14          THE WITNESS:  Okay.  It was -- do you mean
15     suspending him for this case that led to his
16     termination?
17          MR. AMLONG:  No.  I mean before you sent him
18     to Dr. Brannon.
19          THE WITNESS:  I don't recall that
20     conversation.  You know, we gave everything to
21     Brannon and turned it all over to them.
22  BY MR. AMLONG:
23     Q.   Why would you do that instead of asking
24  Officer Harrell for his version of what happened?
25     A.   Well, I mean, I think that's -- you get the

64

1    evaluation and then you have a discussion about it.

2    That's how it was normally done.

3         Q.   You had breakfast with Officer Harrell

4    following Dr. Brannon's initial evaluation, correct?

5         A.   Yes.

6         Q.   Was it just the two of you?

7         A.   Yes.

8         Q.   What do you recall Officer Harrell telling you

9    during that breakfast?

10        A.   Well, he disagreed with Brannon.  And, you

11   know, he had some issues I think with someone in the HR

12   Department.  Clearly, he's had some history with them

13   that he disagreed with them on.

14        And, you know, I wanted to assure him that, you

15   know, we want to have a fair process.  And, you know, I

16   don't realize -- I mean, at that day, at that particular

17   time, Brannon was saying not only was he not fit for

18   duty, but he also didn't think he could be

19   rehabilitated.

20        Which I had been, you know, in the many years of

21   law enforcement, I had never heard anybody say that

22   about anyone.

23        Q.   What, if anything, did you do in response?

24        A.   Did do when?

25        Q.   What, if anything, did you you do in response

65

1  to your -- to what Officer Harrell was telling you

2  during that breakfast?

3      A.  Well, I mean, you know, we looked back at it

4  again.  I think he had another -- a visit with Brannon,

5  if I remember correctly.  And then, you know, Brannon

6  says that he is fit for duty, was his second opinion of

7  it.

8      But he still -- but, still again, I think it is

9  kind of interesting you go from not fit for duty, can't

10 be rehabilitated, to well, yeah, he is fit.  But, you

11 know, maybe his assignment needs to be away from this

12 type of work environment.

13     Q.  Were any of the officers who complained about

14 Officer Harrell black?

15          MR. RUIZ:  Objection to the form.

16          THE WITNESS:  Oh.  In the letters?

17          MR. AMLONG:  Yes.

18          THE WITNESS:  I'm not really sure.  I'm not

19     sure about the -- if they were black or white

20     because I'm not really familiar with all of the

21     names that are on the letters.

22 BY MR. AMLONG:

23     Q.  Did you instruct Officer Brannon -- I mean,

24 I'm sorry.  Did you instruct Dr. Brannon what you wanted

25 him to find?

66

1        A.    Never had a conversation with him.

2        Q.    Did you communicate with him in any other way?

3        A.    No.

4        Q.    Did you have anyone else communicate with him?

5              MR. RUIZ:  Objection to the form.

6              THE WITNESS:  That would have been done

7        through HR.  I had no communication with Brannon.

8  BY MR. AMLONG:

9        Q.    Did you tell HR why and how you wanted Officer

10  Harrell re-evaluated?

11             MR. RUIZ:  Objection to the form.

12             THE WITNESS:  No.  It is just -- for the first

13       time or the second time?

14             MR. AMLONG:  Either.

15             THE WITNESS:  No.  I just said to them. I said

16       I've never heard of anything like this before.  I

17       think we need to get a second evaluation from him.

18  BY MR. AMLONG:

19       Q.    Were you -- you already had an evaluation from

20  Dr. Miller, did you not?

21       A.    Say that again?

22       Q.    You already had an evaluation from Dr. Miller

23  saying that he was not unfit for duty, did you not?

24             MR. RUIZ:  Objection to the form.

25             THE WITNESS:  Yeah.  And again, Miller, when

67

1    you look at his work product compared to Brannon, I

2    think Brannon does a much better job.

3  BY MR. AMLONG:

4    Q.   Dr. Miller is a PhD, correct?

5         MR. RUIZ:  Objection to the form.

6         THE WITNESS:  They're both doctors, Brannon

7    and Miller.

8  BY MR. AMLONG:

9    Q.   But do you know what kind of doctor

10  Dr. Brannon is?

11    A.   Well, I mean, I would assume that they are

12  psychologists.

13    Q.   Do you know the difference between a PhD and a

14  PsyD?

15    A.   And a PsyD?

16    Q.   Yes.  P-S-Y, period, D.

17    A.   No.

18    Q.   Did you have any conversations with

19  Dr. Brannon?

20         MR. RUIZ:  Objection to the form.

21         THE WITNESS:  For the fourth time, no.

22  BY MR. AMLONG:

23    Q.   Were you aware that police officers and

24  sergeants would refer to Officer Harrell as midnight?

25    A.   I've heard stories about that.  I was told

68

1    that that was a name that he referred to himself as.

2         Q.   Who told you that?

3         A.   Chief West.

4         Q.   Chief West told you that he nicknamed himself

5    midnight?

6         A.   That's what she told me.

7         Q.   Did you discuss that during your breakfast

8    meeting with Officer Harrell?  Did he discuss being

9    referred to by other officers as midnight?

10        A.   No.  I don't know anything about midnight.

11   I've never heard anyone refer to the guy as midnight.

12   The only persons that brought that up were people like

13   Chief West and a couple of other black officers that

14   were stating I don't even understand why he would say

15   that about himself.

16        Q.   Which black officers?

17        A.   West, she is a black female.  She is the

18   Chief.  And, you know, she says that a number of black

19   officers were offended that he would, actually, say that

20   about himself.

21        Q.   Did -- when you got these letters, did you and

22   Chief West have a discussion about the letters and what

23   should be done?

24        A.   I'm pretty sure she was a part of that

25   discussion.

69

1      Q.   Who -- you say she was a part, who else was a

2  part of that discussion?

3      A.   I remember Rick Morris being a part of that

4  discussion and Chief West.  I think the -- I think it

5  was just the three of us.

6      Q.   Do you remember what Chief West said?

7      A.   Chief West, basically, gave us, like, the

8  history of Harrell.  Saying that you know, he has -- he

9  doesn't work well with his fellow officers.

10     Q.   Did she say that was his story?

11     A.   Yeah.  It's been for a while, according to

12 her.  A lot before.  Much more before I came here,

13 before I even met him.

14     Q.   Do you know why these letters were never shown

15 to Officer Harrell?

16          MR. RUIZ:  Objection to the form.

17          THE WITNESS:  I have no idea.

18 BY MR. AMLONG:

19     Q.   Typically, when there is a written complaint

20 about an officer, prior to relieving the officer from

21 duty, do you show the officer the -- do you make the

22 officer aware of the complaint?

23          MR. RUIZ:  Objection to the form.

24          THE WITNESS:  Of course.

25 BY MR. AMLONG:

70

1      Q.   But you didn't --

2      A.   Wait.  Hold on a second.  He was relieved of

3 duty when you have someone like a Brannon saying that he

4 can't -- he is not fit for duty, and he can't be

5 rehabilitated.  I think we have no other choice but to

6 do that.

7      Q.   Did you --

8      A.   Just because you've got a bunch of letters,

9 don't say you've got to relieve the guy of duty.

10     Q.   But you did relieve him from duty pending

11 Brannon's evaluation, right?

12     A.   Well, yeah.  I mean, when Brannon said that

13 the guy is unfit and he can't be rehabilitated, I think

14 that is a very serious evaluation.  I mean, you can't

15 ignore that.

16     Q.   But you relieved him from duty before that,

17 correct?

18     A.   I don't recall that if it happened that way.

19     Q.   Did you take away his badge and gun as soon as

20 you got these letters?

21     A.   I don't remember the chain of events here of

22 when it, actually, happened.  One second.  I don't

23 recall that.

24          MR. RUIZ:  I think he just gave an answer,

25     Bill.

71

1          THE WITNESS:  Yeah.  I don't recall that.

2          MR. AMLONG:  Well, the --

3          THE WITNESS:  I mean, there's a written

4      notice.  I mean, if you've got that written notice,

5      that would refresh my memory.

6          MR. RUIZ:  Bill, we can't hear you.

7          MR. AMLONG:  I know.

8          MR. RUIZ:  Okay.  Do you want to take a five-

9      minute break or something?

10          MR. AMLONG:  Sure.

11      (Off the record.)

12      (Back on the record.)

13  BY MR. AMLONG:

14      Q.   Did you give Officer Harrell written notice

15  that he was being relieved of duty prior to the first

16  evaluation?

17          MR. RUIZ:  Objection to the form.

18          THE WITNESS:  Prior to the first evaluation?

19          MR. AMLONG:  Yes.

20          THE WITNESS:  No.

21  BY MR. AMLONG:

22      Q.   Did you take away his badge and gun prior to

23  the first evaluation?

24      A.   I don't recall that.  That would have been

25  something that -- to my understanding, you know, he

72

1  wanted a vacation.  And then he was assigned to the

2  Assistant Chief, so I don't think she took his gun away

3  until the evaluation came in.

4       Q.   In Exhibit 6, it appears as if Sergeant Gellin

5  has begun forwarding these materials up the chain of

6  command on July 30, 2020.

7       A.   Yep.

8       Q.   Sergeant Harrell's -- Officer Harrell's

9  recollection is that he was not sent home until August

10 13, 2020.  And Dr. Brannon's records show that the dates

11 of examination, the first one was August 15, 2020.  Does

12 that jibe with your memory?

13          MR. RUIZ:  Objection to the form.  I don't --

14      I believe he just testified to what his memory was.

15      I don't know if he needs it refreshed.  I'm not

16      sure how this refreshes his memory anyways, but --

17          THE WITNESS:  Well, the first evaluation was

18      done by Brannon on when?

19          MR. AMLONG:  On August 15, 2020.

20          THE WITNESS:  Okay.  August 15th.  And he was

21      relieved when?

22          MR. AMLONG:  He recalled being sent home

23      August 13th.

24          THE WITNESS:  I don't know how that could

25      happen.  I mean, he was assigned to Chief West.

73

1        And then when we got the Brannon evaluation, of

2        what I recall, the -- you know, when he says he

3        can't be rehabilitated and not fit for duty, I

4        mean, that's very serious.  I mean, I don't think

5        we have much of a choice at that time.

6   BY MR. AMLONG:

7        Q.   But how long was it between when you got the

8   letters and when you, actually, sent him to Dr. Brannon?

9             MR. RUIZ:  Objection to the form.

10            THE WITNESS:  Well, based on what you just

11       pointed out, it was, I don't know, fifteen, sixteen

12       days.  He goes on vacation, and then he comes back

13       and he is assigned to the Chief.  He goes in for

14       his evaluation.  We get a response from Brannon,

15       and then the decision is to put him on

16       administrative leave.

17  BY MR. AMLONG:

18       Q.   Do you know whether or not a lieutenant

19  ordered Officer Harrell to take a vacation after these

20  letters were gathered?

21       A.   Performance evaluation?

22       Q.   No.  Was ordered by a lieutenant to take a

23  vacation prior to being sent to Dr. Brannon?

24            MR. RUIZ:  Objection to the form.

25            THE WITNESS:  Why would -- no -- ordered to

74

1      take a -- no.  I'm not aware of anything like that.

2  BY MR. AMLONG:

3      Q.   Did Assistant Chief West report to you that

4  Officer Harrell had been complaining about race

5  discrimination?

6           MR. RUIZ:  Objection to the form.

7           THE WITNESS:  Well, I mean, she is in a

8       position to take that to Internal Affairs if she

9       felt that he got discriminated in any of those

10      things that would have came up as far as racial

11      discrimination.  Not just to him, to anyone, would

12      be directed to Internal Affairs.

13 BY MR. AMLONG:

14     Q.   No.  My question to you is when Chief West

15 brought these letters to you, did she mention to you

16 that he had been -- that he was suffering from -- that

17 he claimed to have been suffering from race

18 discrimination?

19     A.   I don't recall that.  I recall Chief West

20 saying that she had a disruption in this platoon which

21 he was assigned to.  And this was a very serious problem

22 on the evening shift.

23     Q.   Referring to the letters?

24     A.   The letters, the people that signed the

25 letters.  You know, you've got a sergeant and a

75

1  lieutenant that are now part of that discussion.

2      Q.   When you had been named Chief but had not

3  taken office yet, do you recall bumping into Officer

4  Harrell at Publix?

5      A.   Before I was the Police Chief?

6      Q.   Before you, actually, took office.  After you

7  had been named, but before you took office.

8      A.   Specifically, no.  I don't remember that.  But

9  could it have happened?  Probably.

10     Q.   Do you recall Officer Harrell telling you

11 before you took office that racism was a problem in the

12 department?

13     A.   Well, yeah.  I'd heard a lot of people say

14 that there was racism in the department.  I mean, I had

15 a number of conversations with retired black police

16 officers.  We dealt with the Greg Rideau case.  Yeah.  I

17 mean, that's not something unusual.  I mean, I think

18 everybody has got those stories.

19     Q.   Do you feel that since you have taken office,

20 that racism has continued to exist within the

21 department?

22          MR. RUIZ:  Objection to the form.

23          THE WITNESS:  My job is to prevent racism.

24     And I did everything I possibly can to address

25     every situation that came to my attention.

76

1          MR. AMLONG:  That's not the question.  Read

2     the question back, please.

3          THE COURT REPORTER:  Give me a second.

4     (Thereupon, a readback was performed.)

5          MR. RUIZ:  Same objection.

6          THE WITNESS:  Not incidents that have been

7     brought to my attention.  I think we have addressed

8     them.  Could there be other incidents that I'm not

9     aware of?  Possibly.

10 BY MR. AMLONG:

11     Q.   During the breakfast you had with Officer

12 Harrell, did Officer Harrell complain that he was the

13 victim of racism?

14          MR. RUIZ:  Objection to the form.

15          THE WITNESS:  I don't recall that.  I think

16     that, you know, he was concerned about this

17     evaluation with Brannon.  He didn't think that it

18     was a fair evaluation.

19          One of the things that I do remember, he said

20     that he never met with Brannon.  And I didn't know

21     how Brannon could, actually, evaluate him if he

22     didn't meet with him.

23 BY MR. AMLONG:

24     Q.   Well, did Brannon ever tell you that he had a

25 video conference with him?

77

1      A.   Again, for the fifth time, I never had a
2  conversation with Brannon.
3      Q.   Okay.  You don't know whether or not Brannon
4  had a video conference with him?
5      A.   I don't know what Brannon did.  I mean, I
6  never talked to the guy.
7      Q.   Do you think a video conference would be
8  sufficient to base a -- would be sufficient on which to
9  base a recommendation to relieve him from duty?
10         MR. RUIZ:  Objection to the form.
11         THE WITNESS:  Well, I don't know what that
12     was.  I don't know what he did.  I never had a
13     conversation with him.  I can tell you about the
14     conversation that stood out with me and Harrell,
15     and that was Harrell felt that he never met with
16     the guy, never talked to the guy.
17         So, if you say that my conversation with
18     Harrell was that he didn't think that it was a fair
19     evaluation because he never met with him, and now
20     you're telling me he had a video conference with
21     him, then I'm hearing just two different stories on
22     your end.
23  BY MR. AMLONG:
24     Q.   Why did you say that you wanted a second
25  evaluation?

78

1          MR. RUIZ:  Objection to the form.

2          THE WITNESS:  Well, I mean, after I met with

3     Harrell, he felt that he deserved a second

4     evaluation.  Okay.  We called up HR and said can

5     you look into this.

6          He felt that he never met with Brannon and

7     that he feels that he deserves a second shot.  I'm

8     not objecting to it.  I mean, you know, when

9     someone says not fit for duty and can't be

10     rehabilitated, I mean, that is a very serious

11     evaluation.

12          So, I mean, if that's the route we're going to

13     take, I mean, having confirmation would definitely

14     help us rather than hurt us.

15          MR. AMLONG:  Look at this document that has

16     been marked as Exhibit 16.

17          THE WITNESS:  Okay.  What is -- I'm a very

18     black man.  I'm a very black -- all right.  Okay.

19 BY MR. AMLONG:

20     Q.   Have you ever seen that document before?

21     A.   I don't recall seeing this.  This is pretty

22 new to me.  Whose document is this?  What -- Florida

23 Commission on Human Relations and the EEOC?

24     Q.   That is the charge of discrimination that

25 Officer Harrell filed with the EEOC.  Officer --

79

1     A.   First of all, my name is misspelled here.  So,

2  I definitely would have objected to that because I don't

3  want to get my -- I don't want to be confused with the

4  person that spelled their name that way.

5     Q.   And what is the policy when a complaint comes

6  in to the Equal Employment Opportunity Commission, does

7  it go to Human Relations at City Hall?

8          MR. RUIZ:  Again, I'm going to object to the

9       form.  Chief Adderley is sitting here in his

10      personal individual capacity, not as a

11      representative of the City.  So, he can speak with

12      respect to his personal knowledge or belief, but

13      not on behalf of the City.

14          THE WITNESS:  Yeah.  This would go to --

15  BY MR. AMLONG:

16     Q.   Do you know whether it goes to City Hall?

17     A.   It is my understanding.

18     Q.   Do you know whether, typically, charges of

19  discrimination are forwarded to you?

20          MR. RUIZ:  Objection to the form.

21          THE WITNESS:  Well, if someone makes a formal

22      complaint that is in our agency, that would be

23      handled by the Office of Internal Affairs.

24  BY MR. AMLONG:

25     Q.   How, if at all, did you become aware that

80

1   Officer Harrell had made a charge of discrimination?

2            MR. RUIZ:  Objection to the form.

3   BY MR. AMLONG:

4        Q.   And this was on May 27, 2021.

5        A.   '21?

6        Q.   2021.  Yes.

7        A.   Okay.  Maybe from the City Attorney's Office,

8   indicating that we have a pending lawsuit.

9        Q.   Okay.  Prior to a lawsuit being filed, were

10  you ever informed there was a charge of discrimination

11  that had been filed by Officer Harrell?

12       A.   If that is included in his lawsuit.

13       Q.   I said prior to his filing a lawsuit, were you

14  ever made aware that he was complaining about race

15  discrimination to the EEOC?

16       A.   Well, I mean, yeah.  The EEOC, that would go

17  to the State Attorney's Office via HR and the EEOC does

18  their investigation.

19       Q.   I'm asking you, Chief, prior to there being a

20  lawsuit filed --

21       A.   No.  I don't --

22       Q.   -- were you ever personally made aware that

23  Officer Harrell had complained to the EEOC about race

24  discrimination?

25       A.   I don't recall that.  I don't recall that.

81

1      Q.   You say that under your routine practice, the

2    Internal Affairs Office would have investigated this?

3      A.   Yeah.  It would have made --

4           MR. RUIZ:  Objection to the form.

5           THE WITNESS:  No, no.  It says if someone

6      would have made a complaint of discrimination to

7      the police department, it goes to the Office of

8      Internal Affairs.  This didn't go to the Office of

9      Internal Affairs.  It goes to the Florida

10      Commission of Human Relations and the EEOC.

11    BY MR. AMLONG:

12      Q.   Do you know after the City of West Palm Beach

13    got this, whether there was any investigation into this

14    -- into these allegations?

15           MR. RUIZ:  Same objection.

16           THE WITNESS:  No.  This is -- no.  The EEOC

17      conducts their own independent investigations.

18    BY MR. AMLONG:

19      Q.   Do you know if the City responded to the EEOC?

20      A.   Well, there were courses that they had for it.

21    Yeah.  I'm sure we did, but that wouldn't be something

22    that would be handled by me.

23      Q.   Did anybody from Human Resources ever show you

24    this charge of discrimination?

25      A.   I don't recall.

82

1      Q.    Let me ask you to look at Exhibit 21.

2      A.    Yeah, yeah, yeah.

3      Q.    I'm sorry?

4            MR. RUIZ:  I think he is ready.

5  BY MR. AMLONG:

6      Q.    Okay.  Have you ever seen the document, the

7  August 3, 2021 letter from West Palm Beach Human

8  Resources to the Equal Employment Opportunity Commission

9  prior to today?

10     A.    This is the response by then City -- Assistant

11 City Attorney Lloyd Panamefs (phonetic) and Sylvia

12 Granberry (phonetic).

13     Q.    Have you ever seen this document before?

14     A.    Yes.  This sort of looks familiar to me.

15     Q.    When did you see it?

16     A.    This would have been back when they -- back in

17 2021.

18     Q.    But you aren't -- you are not cc'd on it?

19     A.    Did what?

20     Q.    You were not -- the document did not show that

21 you were cc'd, correct?

22     A.    I'm not cc'd on it.  No.  Again, I mean, this

23 is handled by HR and the City Attorney's Office.

24     Q.    Did you have any input into this response?

25           MR. RUIZ:  Objection to the form.

83

1          THE WITNESS:  I might have had a conversation

2      with the two authors of it.

3    BY MR. AMLONG:

4      Q.    You might have had or you did?

5      A.    I don't really recall.  Possibly.

6      Q.    On page three --

7      A.    Let's see.  A conference call.  Attendees,

8    Adderley, Morris, West.  Yeah.  A number of -- I guess,

9    men, talked about it.

10      Q.    I'm sorry.  Where are you reading from?

11      A.    Go ahead.  I'll wait for you.

12      Q.    No.  Where were you reading from?

13      A.    It is here on the -- they're talking about a

14    conference call on page four, so --

15      Q.    Well, this is talking about an August 4, 2020

16    conference call involving you, Chief Morris, Chief West,

17    and Chief Human Resources Officer, Jose Luis Rodriguez.

18    That was prior to the filing of the charge of

19    discrimination.  Were you ever informed that a charge of

20    discrimination had been filed?

21          MR. RUIZ:  Do you want to give a timeline,

22      Bill?

23    BY MR. AMLONG:

24      Q.    Well, ever, up until this lawsuit was filed?

25      A.    I don't recall specifically this charge of

84

1   discrimination and it going to -- no.  I don't recall.

2        Q.   On page three under allegation one it states,

3   quote, I am a very black African American police

4   officer, colon, racist supervisors and co-workers

5   calling me midnight or sometimes on the radio, 2397,

6   paren, military time for 11:57 p.m., close paren.

7        I've served the City eighteen years.  Even though

8   the City now has an African American as Chief of Police,

9   paren, Frank Adderley, close paren, Assistant Chief of

10  Police, paren, Tamica West, close paren, racist

11  lieutenants and sergeants have a Jim Crow culture in the

12  ranks.

13       Other black members of the police department are

14  being similarly discriminated against.  The response

15  says, the City admits that the charging party

16  identifies, self-identifies as a, quote, very black

17  African American police officer, close quote, and that

18  he has served the City for eighteen years.

19       The City specifically denies the existence of a,

20  quote, Jim Crow culture, close paren.  Parentheses, the

21  City, in fact, imposed one suspension on a CP himself,

22  for using a racial or ethnic slur on a mobile

23  communication system by stating, quote, go brown hornet,

24  period, close quote.

25       This is evidence Exhibit 3, the letter.  The City

85

1    is without sufficient information to form a belief, and

2    therefore, denies the remaining examination of this set

3    forth above.  Were you ever asked to contribute to this

4    response to the EEOC?

5         A.   No.  I don't really -- I don't even know

6    anything about go brown hornet.  What does that mean?

7    And I don't even -- I'm not even familiar with the 2397.

8    I don't even know what that is.

9         Q.   That is three minutes before midnight.

10        A.   Okay.  What is the significance of that?

11   Midnight would be 0:00.

12        Q.   Right.  Did you ever --

13        A.   Why would it be, if it is midnight in

14   question, why would it be three minutes before it?

15        Q.   Yeah.  I'm not the one who said this.

16        A.   Yeah.  I've been -- I mean, I don't even

17   understand the significance.  So, for me to respond to

18   that, I don't even know what they're talking about.  And

19   this is the first time I'm reading something about go

20   brown hornet.  I mean, no.  I don't recall any of that.

21        Q.   Let me ask you to look at Exhibit 19.  Do you

22   recognize that as being the investigative file on the

23   complaint?

24        A.   Yes.

25        Q.   And --

86

1          MR. RUIZ:  Can you repeat your question, Bill?

2    BY MR. AMLONG:

3          Q.   I haven't finished it yet.  Do you recall the

4    outcome of this investigation?

5          A.   It was not sustained, if I remember correctly.

6          Q.   What does not sustained mean?

7          MR. RUIZ:  Hold on one second.  Objection to

8          the form.

9          THE WITNESS:  That means you can't prove or

10         disprove the allegation.

11   BY MR. AMLONG:

12         Q.   Do you know if there was any investigation

13   into how the allegation came to be made?

14         A.   Say that again.

15         Q.   Do you know if there was any investigation

16   into how the investigation came to be made?

17         A.   I don't even understand the question.

18         Q.   Do you understand how and why Ms. Saint

19   Hilaire made the investigation?

20         A.   Well, based on this document, she filled out a

21   citizen's complaint and gave it to her sergeant.

22         Q.   And should the -- and the sergeant should have

23   taken it to the lieutenant, correct?

24         MR. RUIZ:  Objection to the form.

25         THE WITNESS:  The sergeant at that time would

87

1       have taken it to his captain.  He didn't have a

2       lieutenant.

3  BY MR. AMLONG:

4       Q.   Well, the lieutenant in City Hall was

5  Lieutenant Rideau, correct?

6       A.   Gellin didn't work for the lieutenant at City

7  Hall.  He worked for the captain in charge of -- that

8  was in charge of code at the time.  That captain would

9  have been Cameron (phonetic).

10      Q.   Do you know if Sergeant Gellin took it to the

11 captain?

12      A.   I know that there was a discussion about it.

13 I know that the City Administrator was aware of it and

14 that the -- it went to the -- it eventually became a

15 complaint that went to the Office of Internal Affairs

16 who conducted an investigation.

17      Q.   Do you know why Officer Harrell was taken out

18 of City Hall and reassigned to the Police Department

19 lobby?

20      A.   That was a request that came from the City

21 Administrator.

22      Q.   Did he say why or she say why?

23      A.   He said that he was causing a disruption at

24 City Hall, and everybody was complaining about him, and

25 that she wanted him out of the lobby of City Hall.

88

1      Q.    Did everybody -- was that, simply, the code

2   enforcement people?

3      A.    I have no idea.  You know, my boss told me to

4   do it and I did it.

5      Q.    Your who told you to do it?

6      A.    My immediate boss, Faye Johnson, told me to do

7   it and I did it.

8      Q.    Who is Faye Johnson?

9      A.    Faye Johnson is the City Administrator.

10      Q.    Do you know if anybody ever investigated the

11   allegations that were made in letters that Sergeant

12   Gellin forwarded to your office?

13      A.    That was handled by Chief West.

14      Q.    So, Chief West said that she just gave them to

15   you.  Do you know whether anyone ever investigated the

16   allegations?

17            MR. RUIZ:  Objection to the form.  You're

18        testifying on behalf of the witness.

19            THE WITNESS:  You know, I think that was all

20        handled by Chief West, the way I recall.  That

21        wouldn't be something that I would have handled.

22   BY MR. AMLONG:

23      Q.    You would have or would not have?

24      A.    Well, I would have.  I mean, she is in charge

25   of operations and patrol.  I mean, I am the Chief of

89

1   Police.  I mean, that would seem like the issue was we

2   had one officer in a platoon that was causing a

3   disruption.

4        And it was being addressed.  So, you know, would --

5   he was on administrative leave.  And then we had a

6   second evaluation by Brannon, he comes back.

7        We put him in the Detective Bureau, which he was

8   assigned to a black male sergeant who was very confident

9   that he could properly supervise him.  He later came

10  back and says it can't be done.

11       This guy is causing a disruption in the Detective

12  Bureau.  Then they put him to City Hall, where he worked

13  for a black lieutenant, Greg Rideau, who felt very

14  confident, said he had a good relationship with him.

15       He caused a number of issues that were a

16  disruption.  That led to the black female City

17  Administrator saying that he could not be in City Hall

18  and that we had to bring him to -- that we had mentioned

19  we brought him to the lobby of the police station.

20       Q.   Did she say who was complaining about him?

21       A.   No.  I didn't get it specifically.  I mean,

22  I'm aware this was right around the same time this

23  incident happened with code.  So, who were the

24  additional complainants to her?  I don't know.

25       All I know is that we were familiar with this

90

1   incident.  The City Administrator wanted him removed

2   from the lobby of the City Hall; was causing a

3   disruption in City Hall.

4       We did that.  We gave it to the Internal Affairs to

5   investigate.  And the conclusion was that the charges

6   were not sustained.

7       Q.   You said he was assigned to the Detective

8   Bureau under a black sergeant.  What black sergeant was

9   that?

10      A.   Jerry Banks.

11      Q.   Wasn't he under the command of Assistant Chief

12  Spatara?

13      A.   No.  His immediate supervisor would have been

14  Lieutenant DeVito, who reports to Captain Joe Ahern.

15  And Captain J. Ahern reported to Chief Spatara.  So,

16  that's three levels beneath Chief Spatara, who doesn't

17  supervise him on a daily basis.

18      Q.   Do you know whether or not Officer Harrell had

19  any problems with Chief Spatara?

20      A.   Yeah.  He told me a story once that he thought

21  that Spatara was a racist.  And I asked him why and he

22  says that they -- were at the Publix out near Ibis one

23  Saturday.

24      And Spatara walked up to him and said hey, I see

25  you shop at the same Publix that I shop at.  And he felt

91

1    that he was being intimidated by that comment.

2        I mean, I'm a black man.  I mean, I hear people,

3    you know, racially discriminate against me.  But they

4    didn't say we're shopping at the same supermarket.

5        Q.   Do you recall meeting with Rick King and

6    Deputy Chief Morris concerning Officer Harrell's being

7    relieved of duty pursuant to the Brannon report?

8        A.   Yeah.  I mean, Rick King, basically,

9    reiterated the same things that Harrell said to me when

10   I met him for breakfast, saying that there -- they

11   wanted to request that -- his second evaluation.

12       Q.   Do you recall Chief Morris saying that he did

13   not believe the situation with Officer Harrell would

14   have become as aggressive against him as it had?

15           MR. RUIZ:  Objection to the form.

16           THE WITNESS:  Wait a minute.  He said -- what

17       did Rick Morris say?

18   BY MR. AMLONG:

19       Q.   Did you -- did Chief Morris say that he had

20   not thought the situation of the antagonism towards

21   Officer Harrell would have gotten as aggressive as it

22   had gotten?

23       A.   No.  I don't recall what Rick Morris says.  It

24   was more --

25       Q.   Not -- Morris, you don't recall what he said?

92

1          A.   I'm not -- I don't recall Morris saying any of

2     that.

3          Q.   During the meeting that you had with Officer

4     Harrell, did you tell Officer Harrell that you had never

5     been advised of any of his complaints that he had

6     brought to Deputy Chief Morris or Assistant Chief Brown?

7               MR. RUIZ:  Objection to the form.

8               THE WITNESS:  Assistant Chief?

9               MR. AMLONG:  Excuse me.  Chief West.

10              MR. RUIZ:  Objection to the form.

11              THE WITNESS:  Yeah.  I don't remember any of

12         that.

13    BY MR. AMLONG:

14         Q.   Let me rephrase.  Do you remember any -- do

15    you remember Chief Morris sharing with you any of the

16    complaints that Officer Harrell had shared with him?

17              MR. RUIZ:  Objection to the form.

18              THE WITNESS:  The only thing I recall is

19         Morris feeling that there was no validity to his

20         claims.  But with specifics about why he came to

21         that conclusion, I really don't recall how.

22    BY MR. AMLONG:

23         Q.   Do you remember any complaints that Chief West

24    relayed to you that Officer Harrell had made to her?

25         A.   Well, I mean -- again, I mean, that goes back

93

1  to saying the midnight comments.  She's the one that

2  said that he gave himself that name and he was offended

3  by that.

4       Q.   Who was offended by that?

5       A.   That, I guess, he gave himself that nickname

6  himself, midnight, and she didn't understand why he

7  would be offended if he is giving himself that name.

8       Q.   Did you ever ask him if he had given himself

9  that name?

10      A.   No.  I don't even have a discussion with him

11  about it.  No one ever referred to the guy as midnight

12  in my presence.

13      Q.   Do you not recall Chief West saying that

14  Sergeant Gellin had referred to Officer Harrell as

15  midnight?

16          MR. RUIZ:  Objection to the form.

17          THE WITNESS:  Getman?

18          MR. AMLONG:  Gellin.

19          THE WITNESS:  Oh.  Gellin.  Yeah.  I -- based

20      on her account and what she relayed to me, it was

21      that, you know, it was, like, a joking thing that

22      you know, Harrell referred to himself as midnight

23      and that they would joke on the rounds about his

24      nickname being midnight.  You know --

25  BY MR. AMLONG:

94

1    Q.   Who was joking around?

2    A.   Harrell and Gellin.  That that was, like, a

3  joke between the two of them.  And then it -- I guess

4  she got -- she heard them saying it one day and was

5  offended and told them not to say that again.  So, she,

6  basically, admonished the both of them by not -- telling

7  them not to say that in her presence or that it was

8  inappropriate.

9    Q.   Do you recall why Officer Harrell was moved

10 out of the Criminal Investigation Division?

11   A.   Yeah.  We had a -- again, we had a black

12 sergeant who says that the guy was causing a disruption

13 in the Criminal Investigation Division.  His name is

14 Jerry Banks, sergeant in charge of violent crime.

15   Q.   And was Officer Harrell assigned to violent

16 crimes?

17   A.   He starts as -- he was assigned to Jerry

18 Banks.  That was his sergeant.

19   Q.   Do you know whether or not Officer Harrell was

20 told that he was being moved out because there was a

21 patrol shortage?

22   A.   A patrol shortage?

23   Q.   I'm saying do you know whether he was told

24 that he was being moved out by -- because there was a

25 patrol shortage?

95

1    A.   Well, if there was a patrol shortage, then

2    that means he would have went to patrol.  He didn't go

3    to patrol.  He went to City Hall at a desk.

4    Q.   The question is do you know whether or not

5    Officer Harrell was told that the reason he was -- by

6    Assistant Chief Spatara, that he was being moved out of

7    CIB because of a patrol shortage?

8    A.   No.  I don't know anything about that.

9    Q.   When Officer Harrell was assigned to City

10   Hall, did you tell him that he should not, quote, to

11   bring any drama over there, close quote?

12   A.   Yeah.  I just told him to just do his job and

13   he shouldn't have any problems.  He worked in --

14   Q.   Well --

15   A.   He only works with a guy.  I don't recall the

16   drama.  But basically, you know, just go and do your job

17   and listen to your lieutenant.  He's got a guy, he --

18   they have a great relationship.  Everything should work

19   out.  And that was my advice to him.

20   Q.   Did you tell him to not bring any drama over?

21   A.   I don't recall, actually, using the term

22   drama.  But basically, just go and do your job, follow

23   the policy, listen to your lieutenant.  You've got a

24   good lieutenant.  He's going to look out for you, and

25   just do your job.

96

1          Q.   When you were re-assigning him to City Hall,

2     do you -- did you tell him that concerning his prior

3     relief from duty, that the Human Resources Department

4     had, quote, fucked up, close quote?

5               MR. RUIZ:  Objection to the form.

6               THE WITNESS:  No.  I don't know anything about

7          that.

8     BY MR. AMLONG:

9          Q.   In your standard operating procedure, section

10    Roman Numeral 4-22, is the definition of unfounded

11    concerning Internal Affairs investigations as being --

12    or unsubstantiated as being the allegation is either

13    demonstrably false or there is no credible evidence to

14    support it?

15              MR. RUIZ:  Objection to the form.

16              THE WITNESS:  You're talking two different

17         deals.  Unfounded means that there was -- that they

18         couldn't prove the allegation.  Not substantiated

19         or not sustained means you couldn't prove or

20         disprove the allegation.

21    BY MR. AMLONG:

22         Q.   Well, you concluded it was unsubstantiated,

23    correct?

24              MR. RUIZ:  Objection to the form.

25              THE WITNESS:  It says not sustained.

97

1          MR. RUIZ:  Are you asking him in his

2     individual capacity or are you asking what the

3     results of the investigation?

4          MR. AMLONG:  I'm asking him what he -- what

5     his conclusion was in the investigation.

6          MR. RUIZ:  I mean, if you look at the

7     investigation, itself, he is not the person who

8     made the conclusions.  So, I don't know where that

9     question is coming from.

10          THE WITNESS:  That came from Internal Affairs.

11     Not sustained, number one allegation, signed by

12     then Captain, now Major Dees, on October 7, 2021.

13     I signed on October 12, 2021.  No action taken.

14          MR. RUIZ:  Can we go on a break or are we

15     moving forward?

16          MR. AMLONG:  No.  We're ending, almost.

17  BY MR. AMLONG:

18     Q.   Are you familiar with the phrase Seal Team Six

19  within the West Palm Beach Police Department?

20     A.   Yeah.  I heard that term.

21     Q.   Okay.  Can you tell me what it means?

22     A.   I have no idea what it means, but I was told

23  when I first came here four-and-a-half years ago that

24  Seal Team Six was going to go after me.

25          And they went after all the Chiefs and they

98

1    controlled the Chiefs, and you know, a lot of people

2    said this, the Seal Team Six.

3        And then, you know, I surround them.  Just,

4    basically, they just had some incidents where you had a

5    captain of the department years ago that was having an

6    affair with another officer.

7        And, you know, these people got together and

8    documented it and gave it to Internal Affairs to,

9    basically, prove that this guy was not only just having

10   an affair with one of his subordinates, but doing it on

11   duty.

12       And he eventually got demoted.  And they named them

13   Seal Team Six because I guess by the tactics of

14   surveilling this guy, you know, going out and -- to this

15   subordinate's house and having sex with her on duty.

16       Q.  What contact, if any, did you have -- what

17   relationship, if any, did you have with the FOP

18   representatives?

19       A.  FOP representatives?

20       Q.  Yes.

21       A.  You know, we have a working relationship.  You

22   know, they see things one way, I see it differently, and

23   we end up having arbitrations.

24       Q.  Do you know why the FOP has declined to

25   arbitrate on behalf of Officer Harrell?

99

1          MR. RUIZ:  Objection to the form.

2          THE WITNESS:  Well, I mean, I can't speak for

3     them.  I mean, that's the decision for the FOP and

4     a question for them to answer.  And I don't want to

5     be the person to answer for the union.

6  BY MR. AMLONG:

7     Q.   Has anyone ever told you -- has anyone from

8  the FOP ever told you why they were not representing

9  Officer Harrell?

10     A.   Well, I'm not going to engage any conversation

11  with the FOP as to how they conducted business.  Because

12  the last thing I want is people to think that I have a

13  special relationship with them.  We have a working

14  relationship.  They run the FOP and I run the police

15  department.

16     Q.   Thank you.  Have a great day.

17     A.   Okay.

18          MR. RUIZ:  Can I have a couple of minutes,

19     just to figure out if I have any questions, and

20     then we can go back on and finish up?

21     (Off the record.)

22     (Back on the record.)

23  BY MR. AMLONG:

24     Q.   Chief, when you received the letters from

25  Sergeant Gellin and the other personnel concerning

100

1   Officer Harrell, why did you not refer that to Internal

2   Affairs to investigate whether the allegations were

3   true?

4          MR. RUIZ:  Objection to the form.

5          THE WITNESS:  Well, first of all, I didn't get

6      them from Gellin and the other officers.  I got it

7      from Chief West.

8          And at the time, was there an allegation, you

9      know, we looked at is as is Harrell, actually, a --

10     I don't know.  Is this a disruption of a policy or

11     this is an issue of his being fit for duty.

12         I think that was more or less the weight of

13     the conversation that led to him being fit for

14     duty, not one of discipline.

15         And I think when you look at these types of

16     incidents, were we looking to discipline him or are

17     we trying to correct a problem.  And when you get

18     into this, of, you know, officers that probably

19     need some help to kind of get them back on track,

20     that was the route we went.

21         So, I felt that Miller wasn't really helping

22     him if he had been working with him all these

23     years.  And now we get a new person that would

24     probably take another look at it, give us some

25     insight.

101

1           Let's help Kevin Harrell get back to being a

2      good police officer.  And that was the approach we

3      took.  We took him to Brannon, and now all of the

4      sudden it goes up to not only that the guy is not

5      fit, but he also can't even be rehabilitated.

6      Which, you know, to me, I mean, that's a very hard

7      statement.  And that's why we ended up in that

8      situation.

9 BY MR. AMLONG:

10      Q.  Well, would it not have made a difference as

11 to whether or not the allegations that were made in the

12 letters were true or not?

13         MR. RUIZ:  Objection to the form.

14         THE WITNESS:  True?

15 BY MR. AMLONG:

16      Q.  Would Internal Affairs not have been able to

17 determine whether or not the allegations that were being

18 made against Officer Harrell had, actually, occurred?

19      A.  Well, again, I mean if it is, you know, making

20 some allegations against this officer, which are,

21 basically, a lot of personalities, conflicts and those

22 kinds of things.

23      And again, I mean, you know, are we looking to

24 discipline for Harrell or help him.  And I think we took

25 the other approach.  We tried the avenue of helping him,

102

1    not trying to discipline.

2         Q.   Well, taking his gun and badge away and

3    relieving him of duty isn't helping him, is it?

4              MR. RUIZ:  Objection to the form.

5              THE WITNESS:  If he is being -- if we are

6         being told he is unfit and can't be rehabilitated,

7         damn right it does.  We can't put people on the

8         street having a person, a professional person, say

9         something like that as far as an officer on the

10        street.  That would be the front page of the Post.

11        High liability.

12             MR. AMLONG:  All right.  Thank you.  Cross?

13                     CROSS-EXAMINATION

14   BY MR. RUIZ:

15        Q.   Chief Adderley, just some follow up on some of

16   those questions to try to get some clarity on some

17   things.

18        Okay.  You were asked a lot of questions about the

19   criminal investigation as it relates to the

20   administrative investigation that led to Harrell's

21   termination.  Do you remember that?

22        A.   Yes.

23        Q.   And then I believe you testified as to what

24   was -- what OCS handed over to Internal Affairs in the

25   course of, you know, those events taking place.  Do you

103

1  remember that?

2       A.   Yes.

3       Q.   I believe you said everything went to IA.  Do

4  you remember that testimony?

5       A.   Yes.

6       Q.   Do you, actually, know what OCS handed over to

7  IA?

8       A.   No.

9       Q.   Okay.  Would you agree with me that the best

10 evidence of what was, actually, handed over would

11 probably be contained in these documents here?

12      A.   Yes.

13      Q.   You were asked questions relating to the

14 fitness for duty examination and the actions that the --

15 the things that you did with respect to relieving

16 Officer Harrell of duty.  Do you remember that?

17      And just generally, the steps that you took after

18 you received the letters complaining about Harrell's

19 interpersonal issues you just testified about.  Do you

20 remember that?

21      A.   Yes.

22      Q.   I think you were asked a lot of questions

23 about what you would typically do in those situations

24 and whether you would typically do this as opposed to

25 that and that sort of thing.  Do you remember that

104

1  testimony?

2     A.   Yes.

3     Q.   Okay.  Do you believe that you did anything

4  with respect to really anything relating to Harrell's

5  employment that was not what you would have typically

6  done in that situation?

7     A.   Based on the system, what we normally do.

8     Q.   I have no further questions.

9               REDIRECT EXAMINATION

10 BY MR. AMLONG:

11    Q.   Chief, is there anything as the -- anything in

12 the search warrant that instructs the Organized Crime

13 Section to hand the telephone over to Internal Affairs?

14         MR. RUIZ:  Objection to the form.

15         THE WITNESS:  I have no idea.

16 BY MR. AMLONG:

17    Q.   Well, if there was nothing in there, then it

18 should not have been handed over to Internal Affairs,

19 should it have been?

20         MR. RUIZ:  Objection to the form.

21         THE WITNESS:  Not privy to that.  All I know

22         is you have a criminal investigation.  I don't

23         know.  We went over this.  This is about the sixth

24         time, now.  And at the conclusion of that criminal

25         investigation, that information went to Internal

105

1          Affairs.

2     BY MR. AMLONG:

3          Q.   And all of the information on which you base

4     determination of Officer Harrell came from the material

5     that was given to Internal Affairs by the Organized

6     Crime Section, correct?

7               MR. RUIZ:  Objection to the form.

8               THE WITNESS:  No.  I think there are other

9          things.  Like, you know, his compelled statement

10         played a big role in that as well.

11    BY MR. AMLONG:

12         Q.   Sorry?

13         A.   I'm sure his compelled statement had a lot of

14    weight into it.

15         Q.   Whose statement?

16         A.   Officer Harrell's compelled statement.

17              MR. RUIZ:  Compelled.

18    BY MR. AMLONG:

19         Q.   Oh.  Okay.  You mean his being accused of

20    lying during that statement?

21         A.   Yeah.  I mean, his statement definitely had a

22    lot of weight in it.

23         Q.   Well, what did he admit in his statement?

24              MR. RUIZ:  Objection to the form.

25              THE WITNESS:  I think that there are some

106

1       things that show some inconsistency of what he

2       said.  And there is factual information that

3       clearly refutes it.

4  BY MR. AMLONG:

5       Q.  But all the factual information was contained

6  in his telephone that was seized by Organized Crime,

7  correct?

8       A.  No.  No.

9       Q.  Then why wasn't he fired prior to Internal

10 Affairs getting its hands on the phone?

11      A.  Well, before you terminate someone, they are

12 entitled to due process, and you have to investigate

13 them.

14      Q.  What information did Internal Affairs have on

15 which to base determination that did not come from his

16 telephone?

17          MR. RUIZ:  Objection to the form.

18          THE WITNESS:  Well, you know, I think that the

19      -- you know, you look into the internal

20      investigation, there is a list of things that -- I

21      think one of the things that stood out is that, you

22      know, he says that you know, that he was trying to

23      obtain information through the drug dealers about

24      the one-year-old kid that was murdered.

25          And if you look at the timeline, I mean, his

107

1        communications with them were, you know, before the

2        actual homicide.  So, I think when you look at the

3        evidence of other incidents in that case, it has

4        absolutely nothing to do with the criminal

5        investigation.

6    BY MR. AMLONG:

7        Q.   Well, all of the information based upon which

8    you terminated him came from the telephone, correct?

9              MR. RUIZ:  Objection to the form.

10             THE WITNESS:  I don't think so.  I think that

11       his statements had a lot to do with it, you know.

12   BY MR. AMLONG:

13       Q.   Those are his statements that were made when

14   he was being questioned about what was on the telephone,

15   correct?

16             MR. RUIZ:  Objection to the form.

17             THE WITNESS:  That and other incidents, you

18       know, that we learned by the Office of Internal

19       Affairs.

20   BY MR. AMLONG:

21       Q.   I'm sorry.  That was what?

22       A.   Other information.  I mean, I don't have the

23   report in front of me right now, but I think if you read

24   that Internal Affairs investigation, it is not going to

25   say everything was done based on, you know, a criminal

108

1    case.

2          It was based on that, that which was the conclusion

3    of the criminal case, and other things that were

4    involved in that.  I don't think it was solely that case

5    if I remember correctly.

6          Q.   Well, there was no criminal case against him,

7    correct?

8          A.   You say there was or there was not?

9          Q.   There was not a criminal case against Officer

10   Harrell, was there?

11         A.   There were no criminal charges filed against

12   him.  And that was the decision made by the chief in

13   charge of the Racketeering Unit of the Palm Beach

14   County's State Attorney's Office.

15         Q.   Is that in writing?

16              MR. RUIZ:  Objection to the form.

17              THE WITNESS:  I haven't seen it, and it is not

18         one of your exhibits here.  So, it could be.

19              MR. AMLONG:  All right.  Thank you.

20              MR. RUIZ:  I just have one follow-up question.

21         Chief Adderley, you were just asked a lot of

22         questions again about the IA investigation.

23              THE WITNESS: Yes.

24                        RECROSS-EXAMINATION

25   BY MR. RUIZ:

109

1      Q.   Would you agree with me that the best evidence

2  about the conclusions that were reached as a result of

3  the IA investigation, including what was considered, is

4  going to be the IA investigation, itself?

5      A.   Yes.

6      Q.   Following the IA investigation, did you have a

7  previous lawyer and hearing with Officer Harrell?

8      A.   Yes.

9      Q.   As far as you remember, was his counsel

10  present during that meeting?

11      A.   Yes.

12      Q.   Okay.  No further questions.  We will read,

13  please.

14           THE COURT REPORTER:  Okay.

15           MR. RUIZ:  Hey, Nick, what court reporter's

16      office are you with?

17           THE COURT REPORTER:  Brickell Gomberg.

18           MR. RUIZ:  I'm sorry.  Say that again.

19           THE COURT REPORTER:  Brickell Gomberg.

20           MR. RUIZ:  Brickell Gomberg.  Can you spell

21      that for me?

22           THE COURT REPORTER:  Brickell,

23      B-R-I-C-K-E-L-L, Gomberg, G-O-M-B-E-R-G.

24           MR. RUIZ:  Okay.  And what's the -- do you

25      have the phone number?

110

```
 1          THE COURT REPORTER:  Yeah.  Let me give it to
 2     you.
 3          MR. AMLONG:  So, Fabian, are you ordering
 4     this?
 5          MR. RUIZ:  Yes, I am.
 6          MR. AMLONG:  All right.  We'll take a copy.
 7          MR. RUIZ:  Okay.  Thank you.
 8          THE COURT REPORTER:  Okay.  So --
 9          MR. AMLONG:  All right.  Nick, we'll take a
10     copy.
11          THE COURT REPORTER:  Yes.  Original to
12     Mr. Ruiz, a copy to Mr. Amlong, regular.
13          MR. RUIZ:  Yep.
14          THE COURT REPORTER:  All right.
15          MR. AMLONG:  Thank you.
16          THE COURT REPORTER:  Thanks a lot, guys.
17          MR. AMLONG:  Bye now.
18     (Thereupon, the deposition was concluded at
19  3:18 p.m.)
20     (Reading and signing of the deposition transcript
21  was reserved.)
22
23
24
25
```

111

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5              I, Nicholas Bruens, Court Reporter,

6        Notary Public, State of Florida, certify that Frank

7        Adderley, personally appeared before me on the 27th

8        day of February 2024, and was duly sworn.

9              Signed this 13th day of March, 2024.

10

11

12                    *Nicholas Bruens*

13        _____
         Nicholas Bruens, Court Reporter
14        Notary Public, State of Florida
         Commission No.: HH 332386
15        Commission Expires: 03/11/27

16

17

18

19

20

21

22

23

24

25

112

```
1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5              I, Nicholas Bruens, Court Reporter,

6         certify that I was authorized to and did report the

7         deposition of Frank Adderley; that a review of the

8         transcript was reserved; and that the transcript is

9         a true and correct record of my notes.

10             I further certify that I am not a

11        relative, employee, attorney, or counsel of any of

12        the parties, nor am I a relative or employee of any

13        of the parties' attorneys or counsel connected with

14        the action, nor am I financially interested in the

15        action.

16             Dated this 13th day of March 2024.

17

18

19        _____
                     Nicholas Bruens
20        Nicholas Bruens, Court Reporter

21

22

23

24

25
```

113

WITNESS NOTIFICATION LETTER

March 9, 2024

FRANK ADDERLEY
c/o:  FABIAN RUIZ, ESQUIRE
GRAYROBINSON, P.A.
333 Southeast 2nd Avenue, Suite 3200
Miami, Florida 33131
fabian.ruiz@gray-robinson.com

RE:  KEVIN HARRELL vs. CITY OF WEST PALM BEACH
     CASE NO.: 9:22-cv-81275-AHS
     Deposition taken on February 27, 2024.

The transcript of the above proceeding is now available

for your review.

Please call to schedule an appointment between the hours

of 9:00 a.m. and 4:00 p.m., Monday through Friday.

Please complete your review within 30 days.


Sincerely,


Brickell, Gomberg & Associates, Inc.


I do hereby waive my signature:


      _____
      FRANK ADDERLEY



cc: via email:
wramlong@theamlongfirm.com

114

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS PAGE

KEVIN HARRELL vs. CITY OF WEST PALM BEACH
CASE NO.: 9:22-cv-81275-AHS

DEPOSITION OF FRANK ADDERLEY
TAKEN FEBRUARY 27, 2024

Page No.        Line No.        Change        Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read

the foregoing document and that the facts stated in it

are true.


_____

FRANK ADDERLEY                          Date

| | | | |
|---|---|---|---|
| **0** | **2021** 80:4,6 | **4-22** 96:10 | **accused** 105:19 |
| **0:00** 85:11 | 82:7,17 | **462-1983** 2:6 | **action** 43:5 |
| **03/11/27** | 97:12,13 | **4th** 2:4 | 97:13 |
| 111:15 | **2022** 50:15 | | 112:14,15 |
| | **2024** 1:15 | **5** | **actions** 28:6 |
| **1** | 111:8,9 | **5** 4:3 | 103:14 |
| **1:30** 62:25 | 112:16 | **500** 2:4 | **activity** 23:1 |
| **10** 56:6 | 113:2,7 | | 36:1 |
| **10:52** 1:15 | 114:6 | **6** | **actual** 107:2 |
| **101** 2:4 | **21** 4:14 80:5 | **6** 57:22 72:4 | **actually** 12:21 |
| **102** 4:4 | 82:1 | | 23:19 31:15 |
| **104** 4:5 | **22** 45:15 49:3 | **7** | 40:14 47:11 |
| **109** 4:6 | **2397** 84:5 85:7 | **7** 97:12 | 49:20 |
| **11:57** 84:6 | **27** 1:15 80:4 | | 58:5,17 |
| **111** 4:7 | 113:7 114:6 | **8** | 68:19 70:22 |
| **112** 4:8 | **27th** 111:7 | **822-1350** 2:23 | 73:8 75:6 |
| **12** 97:13 | **2nd** 2:12 113:4 | | 76:21 95:21 |
| **13** 72:10 | | **9** | 100:9 101:18 |
| **13th** 72:23 | **3** | **9** 113:2 | 103:6,10 |
| 111:9 112:16 | **3** 82:7 84:25 | **9:00** 113:11 | **add** 52:16 |
| **15** 72:11,19 | **3:18** 1:15 | **9:22-cv-81275-** | **Adderley** 1:18 |
| **15th** 72:20 | 110:19 | **AHS** 1:3 | 4:2 5:2,7,11 |
| **16** 78:16 | **30** 4:14 20:12 | 113:7 114:4 | 34:11 42:25 |
| **1753** 20:13 | 21:1,3 72:6 | **954** 2:6 | 52:17 63:4 |
| **1754** 20:19 | 113:12 | | 79:9 83:8 |
| **1764** 20:20 | **305** 2:14,23 | **A** | 84:9 102:15 |
| **19** 85:21 | **3200** 2:12 | **a.m** 1:15 | 108:21 111:7 |
| **1980** 6:23 | 113:4 | 113:11 | 112:7 |
| **1992** 6:11 | **33131** 2:13 | **able** 47:17 | 113:3,20 |
| | 113:5 | 101:16 | 114:6,23 |
| **2** | **332386** 111:14 | **above-styled** | **additional** |
| **2002** 6:12 | **333** 2:12 113:4 | 1:23 | 89:24 |
| **2014** 6:17 | **33301** 2:5 | **Abreau** 59:5 | **address** 60:21 |
| **2019** 5:23 | **33402** 2:22 | **absolutely** | 75:24 |
| **2020** 43:1 | **3366** 2:21 | 107:4 | **addressed** |
| 56:15 | | **accidental** | 14:24 15:2 |
| 72:6,10,11,1 | **4** | 49:6,10,18,1 | 76:7 89:4 |
| 9 83:15 | **4** 83:15 | 9 | **admin** 53:8 |
| | **4:00** 113:11 | **according** | **administration** |
| | **416-6880** 2:14 | 69:11 | 6:7,19 |
| | | **account** 93:20 | **administrative** |
| | | | 13:18,19,23 |
| | | | 16:10,13,17, |

21
17:1,5,6,13,
19,25
18:11,20,25
19:9,16,23
24:25 26:25
52:24 73:16
89:5 102:20

**Administrator**
30:23 31:23
32:1,22
33:1,14 34:4
87:13,21
88:9 89:17
90:1

**admit** 105:23

**admits** 84:15

**admonished**
94:6

**advice** 95:19

**advised** 19:25
21:15,18
92:5

**affair** 98:6,10

**Affairs** 8:11
10:3
13:9,12,17,2
5 14:5
16:3,6,10,25
17:10,21
18:3,6,14,22
19:15
26:11,15,19,
20 27:4,5
35:11,12,14,
16,18,22
36:6
40:7,8,12,13
,19 41:13
62:13
74:8,12
79:23
81:2,8,9
87:15 90:4
96:11 97:10

98:8 100:2
101:16
102:24
104:13,18
105:1,5
106:10,14
107:19,24

**affiant** 12:24

**affidavit** 4:14
20:14 21:6,9
29:16

**African**
84:3,8,17

**afterwards**
40:6

**against** 30:6
84:14
91:3,14
101:18,20
108:6,9,11

**agency** 9:3
43:24 79:22

**aggravated**
53:5

**aggressive**
91:14,21

**ago** 13:11 46:1
51:18 52:12
97:23 98:5

**agreed** 48:25

**ahead** 83:11

**Ahern** 90:14,15

**allegation**
84:2
86:10,13
96:12,18,20
97:11 100:8

**allegations**
81:14
88:11,16
100:2
101:11,17,20

**allow** 13:2

**allowed**
18:5,24
34:23

**already** 30:13
66:19,22

**Althouse**
25:7,14,17
26:1,9
37:10,19
38:4

**A-L-T-H-O-U-S-
E** 25:15

**am** 5:11,14
84:3 88:25
110:5
112:10,12,14

**Amanda** 22:21

**American**
84:3,8,17

**Amlong** 2:3,8
4:3,5
5:6,8,24
10:21,25
11:13
12:5,16 13:8
14:4,21
15:16,22
16:1,8 17:8
18:4,23
19:24
20:6,10 21:5
23:9 24:3
25:23
26:7,17
27:22 28:1,7
29:3,8
30:4,11,19
31:3,11,16,2
5 32:6
33:6,18,25
34:12,18
35:16,23
36:8,23
38:1,18 39:6

40:16 41:14
42:14,18,20,
24 47:8
49:25 50:9
51:19 52:5
54:3 56:24
57:21,25
60:11 62:3
63:6,9,17,22
65:17,22
66:8,14,18
67:3,8,22
69:18,25
71:2,7,10,13
,19,21
72:19,22
73:6,17
74:2,13
76:1,10,23
77:23
78:15,19
79:15,24
80:3
81:11,18
82:5 83:3,23
86:2,11 87:3
88:22 91:18
92:9,13,22
93:18,25
96:8,21
97:4,16,17
99:6,23
101:9,15
102:12
104:10,16
105:2,11,18
106:4
107:6,12,20
108:19
110:3,6,9,12
,15,17

**anonymous**
57:7,10,15
58:4,10,11
59:3,5

**answer**
15:15,18,19
27:6 41:11

52:4 70:24
99:4,5

answered 33:23

antagonism
91:20

anybody 22:23
38:19 41:19
44:9 47:10
54:15,18
64:21 81:23
88:10

anyone 32:10
33:19 34:20
64:22 66:4
68:11 74:11
88:15 99:7

anything
14:13,22
15:7 16:12
19:18 61:15
62:16
64:23,25
66:16 68:10
74:1 85:6
95:8 96:6
104:3,4,11

anyways 72:16

apartment 5:13

APPEARANCES
2:1

appeared 111:7

appears 72:4

appointment
113:10

approach
101:2,25

approximately
61:7

arbitrate
98:25

arbitration
45:17 49:22
51:15,17,20,

25 52:6,14
54:9

arbitrations
98:23

arbitrator
52:9

arbitrator's
51:23

aren't 82:18

arrested 53:5

arrived 50:11

articulate
22:15 36:14

articulated
12:13

articulating
12:25 58:15
61:17

assault 53:5

assigned 8:1,8
9:12 10:2
72:1,25
73:13 74:21
89:8 90:7
94:15,17
95:9

assignment
8:19 65:11

assignments
7:23,24 10:1

Assistant
7:1,16
9:2,3,5 28:9
44:2 60:14
72:2 74:3
82:10 84:9
90:11 92:6,8
95:6

associate 6:3

Associates
113:16

assume 67:11

assure 64:14

Attendees 83:7

attention
19:12 60:7
75:25 76:7

attorney 12:21
22:14 24:16
25:20 28:9
29:7,22 30:2
31:19,24
36:15,20
37:3,15
38:14 82:11
112:11

attorneys 26:5
112:13

Attorney's
21:7,19,22
23:5,11,14,2
4 24:15
25:25 26:21
27:2,13,14
28:15,17,19
29:10,17
30:5 38:20
39:5,7,13,14
,16,22
40:4,9,13,17
,21 41:20
53:6 80:7,17
82:23 108:14

at-will 35:1,2

August
72:9,11,19,2
0,23 82:7
83:15

authorize
12:14

authorized
17:11 27:15
112:6

authorizes
11:18,19

authors 83:2

automatic 51:7

available
113:8

avenue 2:12
101:25 113:4

aware 25:6
37:5 56:19
57:4,13
58:18 60:2
67:23 69:22
74:1 76:9
79:25
80:14,22
87:13 89:22

away 49:4,5
65:11 70:19
71:22 72:2
102:2

_____
B

bachelor's
6:4,9,12

background
6:1,8,21

badge 70:19
71:22 102:2

Bales 59:7

ballpark 6:13

Banks 90:10
94:14,18

bargaining
34:23

Barquin
47:19,22,24

B-A-R-Q-U-I-N
47:20

base 77:8,9
105:3 106:15

based 12:10
34:16 44:22
73:10 86:20
93:19 104:7
107:7,25

108:2

**basically** 9:24
22:15 23:5
25:21 29:22
46:2 48:5
69:7 91:8
94:6
95:16,22
98:4,9
101:21

**basis** 31:22
90:17

**Bate** 21:1

**Beach** 1:8
2:20,22
5:14,18 7:7
8:2 13:20,22
17:9,10
22:24 24:14
36:19 41:10
44:7,8,21,23
46:23 50:11
53:2 81:12
82:7 97:19
108:13 111:3
112:3 113:6
114:4

**became** 7:1 8:2
24:24 50:12
87:14

**become** 79:25
91:14

**begun** 72:5

**behalf** 2:2,10
52:21 79:13
88:18 98:25

**behavior** 15:9
16:4 17:14
37:6 58:19
61:16

**belief** 79:12
85:1

**believe** 6:11
15:8 20:22

21:23 22:24
24:19 48:23
49:4 52:10
72:14 91:13
102:23 103:3
104:3

**beneath** 90:16

**benefit** 15:17

**best** 36:7 43:5
103:9 109:1

**better** 36:14
67:2

**beyond** 38:8

**Bill** 5:7 10:20
33:24 42:12
70:25 71:6
83:22 86:1

**bit** 24:22

**black** 65:14,19
68:13,16,17,
18 75:15
78:18
84:3,13,16
89:8,13,16
90:8 91:2
94:11

**blacked**
49:13,16

**boss** 22:6 34:5
88:3,6

**Box** 2:21

**Brannon**
43:2,6,8,14
44:9,16,24
46:6,7,8
47:5,9,23
48:3,4,10,12
,25 49:22
50:2 51:12
52:13
53:19,23
54:15,19,21
55:3,11,21,2
3 61:3

63:18,21
64:10,17
65:4,5,23,24
66:7
67:1,2,6,10,
19 70:3,12
72:18
73:1,8,14,23
76:17,20,21,
24 77:2,3,5
78:6 89:6
91:7 101:3

**Brannon's** 54:4
56:9 64:4
70:11 72:10

**Branon** 47:4

**break** 42:17
52:17 63:5
71:9 97:14

**breakfast**
64:3,9 65:2
68:7 76:11
91:10

**BRIAN** 1:9

**Brickell**
109:17,19,20
,22 113:16

**B-R-I-C-K-E-L-
L** 109:23

**briefed** 21:25
27:13

**briefing** 21:25
28:4 40:6

**briefly** 5:25

**bring** 19:11
60:7 89:18
95:11,20

**brought**
60:14,16
68:12 74:15
76:7 89:19
92:6

**Broward** 6:3

7:4

**brown** 84:23
85:6,20 92:6

**Bruens** 1:20
111:5,13
112:5,19

**bumping** 75:3

**bunch** 57:10
70:8

**Bureau** 7:5
9:12 89:7,12
90:8

**bus** 25:21

**business** 99:11

**Bye** 110:17

_____

C

**c/o** 113:3

**Cameron** 87:9

**capacity** 34:13
38:7 42:7
52:18 79:10
97:2

**captain** 6:25
7:13,14
8:12,15,18,1
9,20,22 10:4
19:13 29:4,9
60:14
87:1,7,8,11
90:14,15
97:12 98:5

**career** 10:19

**case** 1:3
12:22,23
16:21
19:17,23
20:7 22:1,11
23:16
24:12,17
26:23,24
35:10 37:16
38:13 41:12

51:14
62:19,20
63:15 75:16
107:3
108:1,3,4,6,
9 113:7
114:4

**cases** 10:12,13
43:10 46:24
62:13

**cause** 1:23
11:12,14
22:17,19
23:8,25
24:19 27:16
35:1

**caused** 43:24
89:15

**causing** 58:25
87:23
89:2,11 90:2
94:12

**cc** 113:23

**cc'd**
82:18,21,22

**cell** 22:2 35:4
62:23

**certain** 24:19
57:16

**Certificate**
4:7,8 111:1
112:1

**certify** 111:6
112:6,10

**chain** 70:21
72:5

**Change** 114:7

**CHANGES** 114:2

**Chapman** 22:4

**Chapman's** 22:6

**character** 14:9

**charge** 7:4

8:8,24
9:2,22,23
10:4,7 22:7
23:18 24:13
28:18
34:2,3,4
36:17 38:25
39:11 40:3
41:5,7 53:7
78:24
80:1,10
81:24
83:18,19,25
87:7,8 88:24
94:14 108:13

**charges** 30:6,9
79:18 90:5
108:11

**charging** 84:15

**Charles** 5:11

**chief**
5:7,16,17
7:1,2,7,16,1
7,18,20
9:2,3,4,5
19:25
20:12,25
29:15 30:12
31:4
32:2,7,10
33:7 34:10
35:2
39:11,15
40:1 42:25
44:1,2 50:13
52:17
54:19,23
60:15,17
63:4
68:3,4,13,18
,22 69:4,6,7
72:2,25
73:13
74:3,14,19
75:2,5 79:9
80:19
83:16,17

84:8,9
88:13,14,20,
25
90:11,15,16,
19
91:6,12,19
92:6,8,9,15,
23 93:13
95:6 99:24
100:7 102:15
104:11
108:12,21

**Chiefs** 97:25
98:1

**choice** 31:20
32:2 53:13
70:5 73:5

**CIB** 95:7

**citizen's**
86:21

**city** 1:8 2:20
5:9,12,14,17
,22 7:2,7
8:24,25 9:17
30:23
31:10,19,23,
24 32:1,22
33:1,14
34:3,4,5
46:1 52:22
54:20 56:2
59:15
79:7,11,13,1
6 80:7
81:12,19
82:10,11,23
84:7,8,15,18
,19,21,25
87:4,6,13,18
,20,24,25
88:9
89:12,16,17
90:1,2,3
95:3,9 96:1
113:6 114:4

**city1754** 21:1

**city1764** 21:2

**claim** 49:9

**claimed** 49:6,8
74:17

**claims** 43:22
92:20

**clarity** 102:16

**clearly** 17:2
46:3 47:3
53:16 64:12
106:3

**close**
84:6,9,10,17
,20,24 95:11
96:4

**Coast** 6:5

**code** 87:8 88:1
89:23

**collect** 42:2

**collected** 57:5

**College** 6:4

**colon** 84:4

**Colonel** 7:3

**comes** 16:21
19:17
22:14,16
23:19
24:17,23
29:24 34:24
73:12 79:5
89:6

**comfort** 24:2

**comfortable**
23:23 24:2

**coming** 97:9

**command** 72:6
90:11

**comment** 91:1

**comments** 93:1

**Commission**

5:22 78:23
79:6 81:10
82:8
111:14,15

**commit**
18:18,20
36:18,19
38:17 41:1

**commits** 17:18

**committed**
11:16 36:25
38:21 48:5

**common** 14:3
50:21

**communicate**
66:2,4

**communication**
28:10 66:7
84:23

**communications**
22:20
25:2,14,16
26:1 37:9
107:1

**Community** 6:4
7:5 8:14,20

**compared** 67:1

**compelled**
17:19 18:2
105:9,13,16,
17

**complain** 76:12

**complainants**
89:24

**complained**
65:13 80:23

**complaining**
57:5,6 74:4
80:14 87:24
89:20 103:18

**complaint**
69:19,22
79:5,22 81:6

85:23 86:21
87:15

**complaints**
92:5,16,23

**complete**
113:12

**completed** 14:6
16:14,23
51:20,22
52:1

**completely**
48:18
49:12,13

**comply** 13:7

**concerned** 17:4
76:16

**concerning**
20:1 22:20
25:7 38:3
59:4 60:3
91:6 96:2,11
99:25

**conclude** 52:11

**concluded**
96:22 110:18

**conclusion**
24:24 26:23
36:5 41:12
51:8 90:5
92:21 97:5
104:24 108:2

**conclusions**
97:8 109:2

**conduct** 11:18

**conducted**
53:3,8 87:16
99:11

**conducting**
52:25

**conducts** 81:17

**conference**
76:25

77:4,7,20
83:7,14,16

**confident**
89:8,14

**confidential**
38:4 55:25

**confirmation**
78:13

**confirmed** 5:22

**conflicts**
101:21

**confused** 79:3

**connected**
112:13

**consider** 30:9
59:9

**considered**
25:3 109:3

**constantly**
43:23

**contact** 47:6
98:16

**contained**
103:11 106:5

**context** 19:5

**continue** 60:24

**continued** 46:4
75:20

**continues**
60:23

**continuing**
46:25

**contract** 34:22

**contribute**
85:3

**controlled**
98:1

**conversation**
21:19
28:12,13,14

31:18
32:12,15
33:5,15
41:21 63:20
66:1
77:2,13,14,1
7 83:1 99:10
100:13

**conversations**
26:8 67:18
75:15

**coordinated**
56:5 57:12

**copy** 42:11
110:6,10,12

**Corbell** 45:6

**corporate** 42:8
52:18

**corporation**
1:8

**correct**
12:2,19
16:17 20:20
26:2 30:12
35:12 40:9
45:17 57:6
58:12 64:4
67:4 70:17
82:21 86:23
87:5 96:23
100:17 105:6
106:7
107:8,15
108:7 112:9

**correctly** 9:19
65:5 86:5
108:5

**counsel** 109:9
112:11,13

**County** 24:14
36:19 41:10
111:3 112:3

**County's**
108:14

couple 52:12
  68:13 99:18
course 19:8
  20:8 45:20
  51:13 53:10
  69:24 102:25
courses 81:20
court 1:1,20
  19:22 27:24
  63:11 76:3
  109:14,15,17
  ,19,22
  110:1,8,11,1
  4,16
  111:5,13
  112:5,19
Court's 15:16
covered 18:7
co-workers
  61:21 84:4
CP 84:21
Craig 48:7,8
credible 96:13
crime 9:12,25
  11:16 13:3
  14:14,23
  17:11 18:19
  26:18,20
  36:25
  37:10,11,14
  38:17,21
  39:8,17,21
  41:1,15 48:5
  94:14 104:12
  105:6 106:6
crimes
  36:17,20
  94:16
criminal 6:4,5
  13:18
  14:6,9,10
  15:9
  16:4,12,14,1
  5,19,20,23

17:4,14,18,2
4 18:1,10,17
19:5,7,17
20:7 23:1
24:12 25:4
26:10,14,24
30:6
36:1,5,9,13
37:6,13
38:14 40:20
42:10 53:3
94:10,13
102:19
104:22,24
107:4,25
108:3,6,9,11
criminally
  36:14 40:24
  53:7
criticized
  58:20
Cross 102:12
Cross-
  Examination
  4:4 102:13
Crow 84:11,20
culture
  84:11,20
currently
  5:12,14

─────────────
      D
daily 90:17
damn 102:7
date 25:10
  114:23
Dated 112:16
dates 72:10
Davis 48:7,8,9
day 29:20
  64:16 94:4
  99:16
  111:8,9

112:16
days 73:12
  113:12
DEA 8:4
  9:9,15,17
deadly
  45:22,23
deal 19:19
dealers 106:23
dealing 10:15
  61:20
deals 16:13,22
  96:17
dealt 75:16
decide 37:4
decided 38:25
  43:4 46:5
  53:6 61:4
decision 30:22
  32:20 36:16
  40:25 41:8
  42:3 73:15
  99:3 108:12
declare 114:18
declined 98:24
Dees 97:12
Defendants
  1:11 2:10
definitely
  28:21 78:13
  79:2 105:21
definition
  96:10
degree
  6:3,5,6,10,1
  2
demonstrably
  96:13
demoted 98:12
denies 84:19

85:2
department
  6:23,24
  17:9,11,23
  20:8 22:24
  34:2 37:14
  39:12,24
  42:4 53:3
  55:25
  56:1,2,3
  64:12
  75:12,14,21
  81:7 84:13
  87:18 96:3
  97:19 98:5
  99:15
deponent 38:6
  42:7
depos 34:10
deposition
  1:13,17,22
  62:17
  110:18,20
  112:7 113:7
  114:6
Deputy 29:15
  31:4 91:6
  92:6
DESCRIPTION
  4:13
deserved 78:3
deserves 78:7
desk 95:3
detective 8:3
  9:8,12
  19:9,10
  89:7,11 90:7
detectives
  18:13 23:6
  25:24
determination
  42:5 43:4
  105:4 106:15

determine
  19:13 101:17

determined
  51:9 53:4

detracting
  58:20,22

DeVito 90:14

difference
  41:4 49:1
  67:13 101:10

different
  33:24 57:18
  77:21 96:16

differently
  98:22

direct 4:3 5:5
  34:5

directed 33:13
  74:12

directing 23:6

direction
  12:24
  23:14,22
  29:22

directly 24:15

disagreed
  64:10,13

discipline
  61:13,18,19,
  22 62:13
  100:14,16
  101:24 102:1

discovered
  37:7

discriminate
  91:3

discriminated
  74:9 84:14

discrimination
  74:5,11,18
  78:24 79:19
  80:1,10,15,2

4 81:6,24
  83:19,20
  84:1

discuss 68:7,8

discussed
  25:12
  61:9,10,11

discussion
  19:14 43:3
  60:17 61:13
  64:1
  68:22,25
  69:2,4 75:1
  87:12 93:10

disprove 86:10
  96:20

disruption
  58:17 74:20
  87:23
  89:3,11,16
  90:3 94:12
  100:10

disruptions
  43:24

district 1:1
  8:24

Diva 21:23
  40:2 41:21

division 7:5
  8:7,13,14,16
  ,18,20,22,24
  10:7 16:25
  94:10,13

doctor 46:15
  67:9

doctors 67:6

document 20:22
  56:1,8,10,12
  ,13
  78:15,20,22
  82:6,13,20
  86:20 114:19

documented

98:8

documents
  103:11

done 11:4
  18:16 24:25
  26:6,25 44:6
  60:5 64:2
  66:6 68:23
  72:18 89:10
  104:6 107:25

DOUGLAS 2:25

Dr 43:2,6,8,14
  44:9,16,24
  46:20
  47:9,23
  48:3,10
  49:22 50:2
  51:12 52:13
  54:15,19
  55:3,11,21
  63:18 64:4
  65:24
  66:20,22
  67:4,10,19
  72:10
  73:8,23

drama
  95:11,16,20,
  22

drug 9:25
  37:20 106:23

drugs 14:1
  48:5

Duces 1:22

due 34:23
  106:12

duly 5:3 111:8

during 10:19
  17:17 19:7
  37:7
  45:12,20
  51:13 53:10
  59:25 64:9
  65:2 68:7

76:11 92:3
  105:20
  109:10

duty 43:22
  44:11,12,13,
  16,19 46:7,8
  47:10,13
  48:17
  50:16,19,22,
  25 51:4,6,7
  55:4,5,8,9,1
  1,13 56:21
  61:1,6 64:18
  65:6,9 66:23
  69:21
  70:3,4,9,10,
  16 71:15
  73:3 77:9
  78:9 91:7
  96:3
  98:11,15
  100:11,14
  102:3
  103:14,16

dyeargin@wpb.o
  rg 2:24

―――――――――――
         E

Education 6:2

educational
  5:25 6:8

EEOC 78:23,25
  80:15,16,17,
  23
  81:10,16,19
  85:4

effort 30:6

eight
  7:2,18,21
  59:8,10,13,1
  8

eighteen
  84:7,18

either 9:14
  33:20 55:14

66:14 96:12

**else** 6:8 22:5
39:23 66:4
69:1

**email** 113:23

**employed** 5:15

**employee** 34:8
35:2
112:11,12

**employees**
34:22

**employment**
31:10
32:13,17
33:11 34:25
48:6 54:8
79:6 82:8
104:5

**enforcement**
10:1 59:23
60:1 64:21
88:2

**engage** 99:10

**engaged** 58:19

**entailed** 22:12
28:14

**ENTER** 114:2

**entitled**
106:12

**environment**
60:25 65:12

**Equal** 79:6
82:8

**ERRATA** 114:1

**ESQUIRE**
2:8,17,18,25
113:3

**estimate** 10:18

**ethnic** 84:22

**evaluate** 43:25
76:21

**evaluated**
46:11 53:24
60:23

**evaluation**
43:15
44:10,22
53:12,24
64:1,4
66:17,19,22
70:11,14
71:16,18,23
72:3,17
73:1,14,21
76:17,18
77:19,25
78:4,11 89:6
91:11

**evening** 74:22

**events** 70:21
102:25

**eventually**
19:15 60:10
87:14 98:12

**everybody**
46:23 75:18
87:24 88:1

**everyone** 48:23

**everything**
36:6 40:7
49:14,17
63:20 75:24
95:18 103:3
107:25

**evidence** 11:15
12:10,23
13:2
14:14,23
15:8 16:4,10
17:14 18:25
25:6 26:22
36:25 37:5
38:21 39:8
41:16 42:2
84:25 96:13
103:10 107:3

109:1

**evidentiary**
51:25

**exact** 25:10

**exactly** 28:13

**examination**
4:3,5 5:5
45:11 72:11
85:2 103:14
104:9

**examined** 5:4

**Excuse** 10:6
92:9

**execute** 20:4
22:2 23:25
24:21

**executing** 15:6

**execution**
27:10

**Exhibit** 4:14
20:12 21:1,3
56:6 57:21
72:4 78:16
82:1 84:25
85:21

**exhibits**
4:11,12
62:18 108:18

**exist** 27:6
75:20

**existence**
84:19

**experience**
10:15 13:1
25:13

**Expires** 111:15

**explain** 17:3
22:19 36:7

**explained**
38:23

**explaining**

19:4

**explains** 22:14

**extent** 34:14
38:7 52:19

**extortion**
10:12

—————————

F

**Fabian** 2:18
110:3 113:3

**fabian.ruiz@gr**
**ay-**
**robinson.com**
2:16 113:5

**fact** 84:21

**facts** 11:17
12:12 58:15
114:19

**factual**
106:2,5

**fair** 26:10
64:15 76:18
77:18

**false** 96:13

**familiar** 11:6
65:20 82:14
85:7 89:25
97:18

**Faye** 88:6,8,9

**February** 1:15
111:8 113:7
114:6

**feel** 12:14
15:1 26:8
38:15,24
40:24 75:19

**feeling** 92:19

**feels** 12:11
36:20 38:14
53:14 60:24
78:7

**fellow** 56:21

69:9

**felt** 16:4
22:17 25:20
26:5 27:16
39:19 41:22
45:24 46:8
47:16
48:15,24
57:16 74:9
77:15 78:3,6
89:13 90:25
100:21

**female** 40:1
68:17 89:16

**fentanyl** 47:25

**fifteen** 42:13
73:11

**fifth** 77:1

**figure** 99:19

**file** 30:6,9
55:19 85:22

**filed** 1:23
78:25
80:9,11,20
83:20,24
108:11

**files** 55:19

**filing** 80:13
83:18

**filled** 86:20

**financially**
112:14

**finding** 55:7,8

**findings** 51:24

**fine** 63:6

**finish** 63:5
99:20

**finished** 86:3

**fire** 34:8,20
47:25

**fired** 30:12,15

31:5,21 32:3
33:20 35:1
47:24 106:9

**first** 5:3 8:18
14:13 45:5
48:22
50:4,10 53:2
57:2,3 66:12
71:15,18,23
72:11,17
79:1 85:19
97:23 100:5

**fit** 43:21
44:12,16,19
47:10,12
55:8,11,13
61:1 64:17
65:6,9,10
70:4 73:3
78:9
100:11,13
101:5

**fitness** 103:14

**FIU** 6:14

**five** 7:14 59:6
71:8

**five-minute**
42:17

**Florida**
1:1,8,21
2:5,13,22
5:13 6:5,7
78:22 81:9
111:2,6,14
112:2 113:5

**focus** 17:7

**focused** 16:20

**follow-up**
108:20

**FOP** 54:12
55:15
98:17,19,24
99:3,8,11,14

**force** 8:5

9:9,15
45:22,23
51:10 53:9

**foregoing**
114:19

**form** 5:20
10:22 11:11
12:3,8 13:4
14:2,15
15:10,12,17
16:5,18
17:15 18:8
19:2 20:3
23:2,12
25:18
26:3,12
28:25
29:5,18
30:7,16
31:1,13
32:18
33:9,21 34:9
35:13,19
36:3,11
37:21 39:3
40:10 42:6
43:5 46:21
49:23 50:6
51:16
52:2,15
56:22 60:4
61:24 65:15
66:5,11,24
67:5,20
69:16,23
71:17 72:13
73:9,24 74:6
75:22 76:14
77:10 78:1
79:9,20 80:2
81:4 82:25
85:1 86:8,24
88:17 91:15
92:7,10,17
93:16
96:5,15,24
99:1 100:4
101:13 102:4

104:14,20
105:7,24
106:17
107:9,16
108:16

**formal** 79:21

**Fort** 2:5 5:12
6:22,24
7:2,20
8:2,9,25
13:9,17,24
43:9,17 44:3
54:20,22
55:15,18,22
56:1

**forth** 85:3

**Forty-four**
59:24

**forty-six**
59:25

**forward** 30:2
97:15

**forwarded**
79:19 88:12

**forwarding**
72:5

**four-and-a-**
**half** 97:23

**fourth** 67:21

**Frank** 1:18 4:2
5:2 84:9
111:6 112:7
113:3,20
114:6,23

**Franklin** 5:11

**frequently**
41:9

**Friday** 113:11

**front** 61:25
62:6,14
102:10
107:23

125

fucked 96:4

full 5:9,11

_____
G
gambling 10:11

game 26:10

gathered 12:10
56:20 59:20
73:20

Gellin 1:9
57:4,11,19
59:8 72:4
87:6,10
88:12
93:14,18,19
94:2 99:25
100:6

generally
103:17

Getman 93:17

gets 26:15

getting 11:7
23:7 31:20
106:10

given 93:8
105:5

giving 28:4
31:5
37:9,13,19
38:3 93:7

Goldberger
59:3

Gomberg
109:17,19,20
,23 113:16

G-O-M-B-E-R-G
109:23

gone 34:10

gotten
10:19,20
91:21,22

grade 24:22

graduated 6:2

Granberry
82:12

GRAYROBINSON
2:11 113:4

great 95:18
99:16

green 30:1

Greg 75:16
89:13

group 40:14
43:23 60:20

groups 10:7

guess 37:23
83:8 93:5
94:3 98:13

guides 12:24

Gulf 6:5

gun 70:19
71:22 72:2
102:2

guy 40:25 41:1
45:24 46:2
47:6,16
53:14 57:8
68:11
70:9,13
77:6,16
89:11 93:11
94:12
95:15,17
98:9,14
101:4

guys 110:16

_____
H
half 42:19

Hall 56:2
79:7,16
87:4,7,18,24
,25 89:12,17
90:2,3

95:3,10 96:1

hand 104:13

handed 102:24
103:6,10
104:18

handled 79:23
81:22 82:23
88:13,20,21

hands 106:10

handy 57:22

happen 30:1
72:25

happened 24:20
27:7 30:3
50:12 63:24
70:18,22
75:9 89:23

happens 36:18

hard 101:6

Harrell 1:5
3:2 5:8
22:21,25
25:3,7,14,16
26:1,9 30:6
37:1,6,19
38:21 43:1
44:25 48:12
57:6,16
58:19 61:23
63:1,12,24
64:3,8
65:1,14
66:10 67:24
68:8 69:8,15
71:14 73:19
74:4 75:4,10
76:12
77:14,15,18
78:3,25
80:1,11,23
87:17 90:18
91:9,13,21
92:4,16,24
93:14,22
94:2,9,15,19

95:5,9 98:25
99:9 100:1,9
101:1,18,24
103:16 105:4
108:10 109:7
113:6 114:4

Harrell's
22:2,12
35:12
39:17,18
61:6,15 72:8
91:6 102:20
103:18 104:4
105:16

haven't 86:3
108:17

having 5:3
23:7 43:23
78:13
98:5,9,15,23
102:8

head 23:17
24:13

hear 71:6 91:2

heard 27:20
56:23 64:21
66:16 67:25
68:11 75:13
94:4 97:20

hearing 77:21
109:7

he'd 12:13

help 20:13
46:10 48:16
78:14 100:19
101:1,24

helping 100:21
101:25 102:3

Herb
27:8,18,19
28:3,10,21,2
3 29:2 36:2

Herb's 28:8

126

hereby 113:18

he's 15:17
33:23 44:18
57:12 60:6
61:19 64:12
95:17,24

hey 90:24
109:15

HH 111:14

High 6:2
102:11

Hilaire 86:19

hired 6:22

history 61:19
64:12 69:8

Hold 10:20
40:18 63:3
70:2 86:7

home 72:9,22

homicide 107:2

hornet 84:23
85:6,20

hour 42:13,19

hours 113:10

house 11:21
15:4,5 98:15

HR 43:3
56:1,2,17
64:11 66:7,9
78:4 80:17
82:23

huge 58:17

Huh 29:12
62:22

Human 78:23
79:7
81:10,23
82:7 83:17
96:3

hundreds 10:23

hurt 78:14

_____

I

IA 103:3,7
108:22
109:3,4,6

Ibis 90:22

I'd 9:18 31:9
75:13

idea 69:17
88:3 97:22
104:15

identification
21:4

identifies
84:16

ignore 15:18
18:1,15,17
70:15

I'll 83:11

I'm 5:17 14:24
15:13
17:10,24
19:4 23:23
24:23 27:18
30:8,18
31:22 32:1
35:24 36:12
38:9 42:10
44:18 46:15
49:11 50:10
56:25 57:13
58:5 59:15
60:13,19
61:12
65:18,20,24
68:24 72:15
74:1 76:8
77:21
78:7,17,18
79:8 80:19
81:21
82:3,22
83:10
85:7,15,19

89:22 91:2
92:1 94:23
97:4 99:10
105:13
107:21
109:18

immediate
18:22 88:6
90:13

immediately
50:20,23

imposed 84:21

improper 15:5

inappropriate
26:5 94:8

Inc 113:16

incident 48:19
89:23 90:1

incidents
61:22 62:11
76:6,8 98:4
100:16
107:3,17

include 37:18

included 32:15
80:12

including 9:16
109:3

inconsistency
106:1

independent
81:17

INDEX 4:1,11

indicate 61:16

indicating
80:8

indication
53:11

indications
45:21

Indictment

56:11

individual
23:16 38:6
42:7 52:18
55:19 79:10
97:2

individually
1:9,10

individuals
47:3

information
12:12
18:3,14 25:9
26:10
36:9,13
37:9,13,18,1
9 38:2,4,8
39:17,21
52:21 85:1
104:25 105:3
106:2,5,14,2
3 107:7,22

informed 25:9
32:20 80:10
83:19

initial 64:4

initiated
23:13

input 82:24

insight 100:25

instance 35:9

instead 63:23

instituted
23:10

instruct
65:23,24

instructs
104:12

interested
112:14

interesting
65:9

127

**internal** 8:11
10:2
13:9,12,17,2
5 14:5
16:3,6,9,24
17:10,20
18:3,6,14,21
19:15 24:11
26:11,14,15,
19,20 27:4,5
35:11,12,14,
16,18,21
36:6
40:7,8,11,12
,19 41:12
62:12
74:8,12
79:23
81:2,8,9
87:15 90:4
96:11 97:10
98:8 100:1
101:16
102:24
104:13,18,25
105:5
106:9,14,19
107:18,24
**International**
6:7
**interpersonal**
103:19
**intimidated**
91:1
**investigate**
90:5 100:2
106:12
**investigated**
81:2
88:10,15
**investigation**
13:18 14:6,7
16:7,14,15,2
0,24
17:6,18,24
18:2,18

19:6,7,8
22:8 23:21
24:11,25
25:1,4,8,11
26:14 27:4,5
28:5 29:23
36:5
37:20,23
38:12 40:20
42:10 45:21
51:9,13
53:1,4,8,10
80:18 81:13
86:4,12,15,1
6,19 87:16
94:10,13
97:3,5,7
102:19,20
104:22,25
106:20
107:5,24
108:22
109:3,4,6
**investigations**
8:22 9:2
10:6 81:17
96:11
**investigative**
9:21 10:5
85:22
**investigator**
10:2 16:19
17:4 18:10
23:21,22
**investigators**
18:24
**involve** 26:10
**involved** 12:21
22:25 45:25
50:21 51:5
108:4
**involvement**
22:13
**involving**
83:16

**isn't** 26:19,20
102:3
**issuance** 20:1
**issue** 89:1
100:11
**issued** 14:1
41:25
**issues** 61:20
64:11 89:15
103:19
**items** 11:22
17:14
**it's** 37:10
69:11
**I've** 11:4 44:6
56:23 60:5
66:16 67:25
68:11 84:7
85:16

———————
J
———————
**Jason** 47:19
**Jerry** 90:10
94:14,17
**jibe** 72:12
**Jim** 84:11,20
**job** 5:16,19
17:22 18:21
36:22 67:2
75:23
95:12,16,22,
25
**Joe** 90:14
**Johnson**
88:6,8,9
**joke** 93:23
94:3
**joking** 93:21
94:1
**Jose** 83:17
**judge**
11:17,19,20,

21,24,25
12:11,13,15,
17,25
14:19,25
15:3 20:18
21:10 27:15
28:16
**judgement** 52:7
62:2
**JULIE** 2:17
**julie.zolty@gr**
**ay-**
**robinson.com**
2:15
**July** 45:15
72:6
**June** 5:22
**justice** 6:4,5
37:12
**Justin** 22:4

———————
K
———————
**Kevin** 1:5 3:2
5:8 101:1
113:6 114:4
**kid** 106:24
**kinds** 101:22
**King** 91:5,8
**knew** 33:15
**knowledge**
34:17 38:9
52:20 79:12
**known** 8:9

———————
L
———————
**LALLY** 1:9
**Large** 1:21
**last** 7:2,6
9:13 20:17
21:24 40:2
45:12 62:7
63:9,11

99:12

**later** 89:9

**Lauderdale** 2:5
5:13 6:22,24
7:3,20
8:2,9,25
13:10,17,24
43:10,17
44:3,6,19
54:20,22
55:15,18,22
56:1

**law** 59:22 60:1
64:21

**lawsuit**
80:8,9,12,13
,20 83:24

**lawyer** 54:13
109:7

**lead** 12:22
21:23,25
23:6,19,22

**learned** 107:18

**leave** 52:25
73:16 89:5

**led** 45:12
48:23 53:11
63:15 89:16
100:13
102:20

**legal** 22:16

**legalities**
27:1

**less** 7:16 9:5
100:12

**let's** 7:11
15:20 46:3
83:7 101:1

**letter** 33:3,16
59:3 82:7
84:25 113:1

**letters** 56:20
57:5,7,10,14

58:7,10,11
59:20 60:2,8
63:2,13
65:16,21
68:21,22
69:14
70:8,20
73:8,20
74:15,23,24,
25 88:11
99:24 101:12
103:18

**level** 9:25

**levels** 90:16

**liability**
102:11

**lieutenant**
19:12
27:8,18,19
28:3,8,10,21
,23 29:2
36:2 60:9,13
73:18,22
75:1 86:23
87:2,4,5,6
89:13 90:14
95:17,23,24

**lieutenants**
84:11

**light** 30:1

**Line** 114:7

**list** 14:20
106:20

**listen**
95:17,23

**little** 24:22

**live** 5:9

**living** 5:10

**Lloyd** 82:11

**lobby** 87:19,25
89:19 90:2

**long** 7:8,9,18
9:16,19 11:4

13:10,11,12
42:15 50:24
51:1,3,7
73:7

**Lopez** 59:7

**lot** 28:20
36:19 58:24
59:2,9,19
69:12 75:13
98:1 101:21
102:18
103:22
105:13,22
107:11
108:21
110:16

**Luis** 83:17

**lunch** 42:16,18

**lying** 105:20

——————
M
——————

**major** 6:25
7:15 8:3,23
9:13 10:8
97:12

**male** 89:8

**man** 43:18
78:18 91:2

**managers** 18:13

**manner** 15:13

**March** 111:9
112:16 113:2

**marked** 4:12
20:12 21:3
78:16

**master's**
6:6,14,18

**material**
12:1,7 13:2
18:7 105:4

**materials**
13:25 14:8
16:2,3 17:12

24:8 72:5

**may** 16:2 80:4

**maybe** 7:12,14
59:14 65:11
80:7

**mayor** 5:21
30:21
32:12,16
33:10
34:2,3,6,19
62:24

**McGinley** 59:6

**MD** 46:16

**mean** 10:23
11:2 12:9,20
13:5
14:16,19
15:1,5,11
16:6
17:2,3,16,19
,22 19:18
23:13,15
24:22
29:6,21
30:21 31:23
34:16,21
36:12,13
37:8,12
38:11,12,16
39:4,19
40:15 41:21
42:1 43:9,11
44:6
45:20,21
47:11 48:6
52:23
55:7,13
57:20
58:2,8,16
60:22
61:18,19
62:11,14
63:14,17,25
64:16
65:3,23
67:11

70:12,14
71:3,4 72:25
73:4 74:7
75:14,17
77:5
78:2,8,10,12
,13 80:16
82:22
85:6,16,20
86:6
88:24,25
89:1,21
91:2,8 92:25
97:6 99:2,3
101:6,19,23
105:19,21
106:25
107:22

**means** 86:9
95:2
96:17,19
97:21,22

**meet** 27:8,15
28:23
29:4,9,15,24
76:22

**meeting** 27:12
29:1,7 62:25
68:8 91:5
92:3 109:10

**meetings**
29:19,21
40:23

**members** 61:20
84:13

**memo** 60:9

**memory** 58:13
71:5
72:12,14,16

**men** 83:9

**mention** 74:15

**mentioned**
89:18

**message** 62:24

**met** 69:13
76:20
77:15,19
78:2,6 91:10

**Miami** 2:13
113:5

**Michael** 1:10
43:2

**middle** 45:16

**midnight** 67:24
68:5,9,10,11
84:5
85:9,11,13
93:1,6,11,15
,22,24

**midst** 49:21

**military** 84:6

**Miller**
46:13,20,22,
23,25 47:17
48:24 53:13
66:20,22,25
67:4,7
100:21

**minute** 35:8
71:9 91:16

**minutes**
85:9,14
99:18

**misspelled**
79:1

**mistaken** 59:15

**mobile** 84:22

**moment** 20:13
21:24

**Monday** 113:11

**months** 51:18
52:12

**morning** 5:7

**Morris** 29:15
30:12 31:5,9
32:2,7,10,24

33:3,7,16
35:2 69:3
83:8,16
91:6,12,17,1
9,23,25
92:1,6,15,19

**move** 30:2

**moved**
94:9,20,24
95:6

**moving** 97:15

**municipal** 1:8

**murdered**
106:24

────────────
N
**narcotics**
8:2,3
9:8,11,13,16
10:8
13:22,24
23:11 25:8

**necessarily**
43:9

**news** 57:13,20

**Nicholas** 1:20
111:5,13
112:5,19

**Nick** 109:15
110:9

**nickname**
93:5,24

**nicknamed** 68:4

**nine** 9:18

**nominated** 5:21

**non-criminal**
27:4,5

**nor** 112:12,14

**normally** 12:20
64:2 104:7

**north** 59:15

**Northeast** 2:4

**Notary** 1:21
111:6,14

**notes** 112:9

**nothing** 104:17
107:4

**notice** 1:22
71:4,14

**NOTIFICATION**
113:1

**Numeral** 96:10

────────────
O
**Oath** 4:7 111:1

**object** 10:22
31:22 38:9
79:8

**objected** 79:2

**objecting**
15:13,17
78:8

**objection** 5:20
11:11 12:3,8
13:4 14:2,15
15:10,12
16:5,18
17:15 18:8
19:2 20:3
23:2,12
25:18
26:3,12
28:25
29:5,18
30:7,16
31:1,13
32:5,18
33:9,21 34:9
35:13,19
36:3,11
37:21 38:5
39:3 40:10
42:6 46:21
49:23 50:6
51:16

52:2,15,16
56:22 60:4
61:24 65:15
66:5,11,24
67:5,20
69:16,23
71:17 72:13
73:9,24 74:6
75:22
76:5,14
77:10 78:1
79:20 80:2
81:4,15
82:25
86:7,24
88:17 91:15
92:7,10,17
93:16
96:5,15,24
99:1 100:4
101:13 102:4
104:14,20
105:7,24
106:17
107:9,16
108:16

**objective**
47:5,7

**obligation**
60:6

**obstructing**
37:12

**obtain** 24:20
106:23

**obtained** 6:24
14:1 21:16
36:10

**Obviously**
29:20

**occur** 50:14

**occurred** 50:15
101:18

**OCS** 102:24
103:6

**October** 6:23

97:12,13

**offended** 68:19
93:2,4,7
94:5

**office** 2:21
7:4 8:11
10:2
21:7,20,22
23:5,11,15,2
4 24:14,15
25:25 26:21
27:2,13,14
28:15,17,19
29:17 30:5
38:20
39:5,7,13,14
,16,22
40:4,9,13,17
,21 41:20
53:6 54:16
60:10,12
75:3,6,7,11,
19 79:23
80:7,17
81:2,7,8
82:23 87:15
88:12 107:18
108:14
109:16

**officer**
7:23,25
10:14
17:13,17
21:13
22:2,12,20,2
5
25:3,6,14,16
26:1,9 30:6
35:11 36:25
37:6,19
38:21 39:18
43:1 44:25
45:5,9,16
47:19,22
49:9,21
50:16 51:14
52:13

56:19,21
57:6,16
58:19,21,22
59:1,3,4,5,6
,7 60:3
61:5,6,15,23
63:1,12,24
64:3,8
65:1,14,23
66:9 67:24
68:8
69:15,20,21,
22 71:14
72:8 73:19
74:4 75:3,10
76:11,12
78:25
80:1,11,23
83:17
84:4,17
87:17 89:2
90:18
91:6,13,21
92:3,4,16,24
93:14
94:9,15,19
95:5,9
98:6,25 99:9
100:1
101:2,18,20
102:9 103:16
105:4,16
108:9 109:7

**officers** 17:23
18:12 20:2,5
56:20 57:5
58:4,18 60:3
61:17 65:13
67:23
68:9,13,16,1
9 69:9 75:16
100:6,18

**officer's**
55:19

**Oh** 6:19
43:18,21
54:24 56:13

65:16 93:19
105:19

**Okay** 6:14 7:8
9:20 10:14
11:1,3 15:20
27:24 34:19
42:14,21
43:6 44:15
50:14 55:10
56:7 63:14
71:8 72:20
77:3
78:4,17,18
80:7,9 82:6
85:10 97:21
99:17 102:18
103:9 104:3
105:19
109:12,14,24
110:7,8

**ones** 16:25
55:2 56:4
58:8,9

**one-year-old**
106:24

**ongoing** 25:7

**operating** 96:9

**operations**
37:13 88:25

**opinion** 28:20
46:6
47:2,4,7
53:18 65:6

**Opportunity**
79:6 82:8

**opposed** 44:17
56:3 103:24

**order** 13:7
14:17 28:16
47:16

**ordered**
73:19,22,25

**ordering** 110:3

Organized 9:12
17:11 104:12
105:5 106:6

Original
110:11

OSWALD 1:10

outcome 86:4

outside 15:1

outstands
28:21

overall 59:22

overview 22:11

_____
P

P.A 2:3,11
113:4

p.m 1:15 84:6
110:19
113:11

Padgett
45:1,16
46:20,22
47:12
48:12,14,15,
16
49:9,11,21
50:16 51:14
52:13

Padgett's 45:5
48:19

P-A-G 45:7

page 4:2,13
20:13,17
83:6,14 84:2
102:10
114:2,7

pages 21:1

Palm 1:8
2:20,22
5:14,18 7:7
13:20,22
17:9,10
22:23 24:14

36:19 41:10
43:16
44:7,8,21,23
46:23 50:11
81:12 82:7
97:19 108:13
111:3 112:3
113:6 114:4

Panamefs 82:11

Pardon 62:10

paren
84:6,9,10,20

Parentheses
84:20

particular
11:22 64:16

parties
112:12,13

party 84:15

patrol 7:25
8:1,6,13,18,
24 53:15
88:25
94:21,22,25
95:1,2,3,7

pay 52:25

penalties
114:18

pending 70:10
80:8

people
34:21,25
36:14,19
43:14,19,21,
22
44:15,19,20,
23 45:24
46:25 48:11
54:18,25
55:10,12
57:14
58:3,4,14,25
59:2,9,10,13
,17 60:20

61:20 68:12
74:24 75:13
88:2 91:2
98:1,7 99:12
102:7

per 59:14

Performance
73:21

performed
15:24 27:25
76:4

period 67:16
84:24

perjury 114:18

permission
25:25

permit 42:5

person 12:23
18:18 24:13
28:18 30:18
38:16
46:1,10,12
59:16,19
60:22,25
61:2 79:4
97:7 99:5
100:23 102:8

personal
34:11,17
38:9 52:20
79:10,12

personalities
101:21

personally
25:5 35:6
39:23 80:22
111:7

personnel
99:25

persons 68:12

PhD 46:14,16
67:4,13

phone 22:3

32:24 33:12
35:4
39:17,18
40:8,11,12,1
9 62:23
106:10
109:25

phonetic
82:11,12
87:9

phrase 97:18

placed 52:24

Plaintiff 1:6
2:2 3:2

Plaintiff's
4:12 20:12
21:3

plan 42:15
46:9 47:13
48:15 53:21
60:25 61:3

platoon
59:12,14
74:20 89:2

played 105:10

please 5:8
6:21 15:23
20:25 27:23
56:6 76:2
109:13
113:10,12

plus 59:24

point 25:11
48:16 49:14

pointed 73:11

police 5:16,17
6:22,24
7:2,6,17,18,
20,23,25 9:4
10:14
17:9,11,13
18:12 19:25
21:13 22:24

132

28:24 29:10
34:2 37:14
38:4
39:12,24
45:9 50:13
53:3
54:19,23
55:24
56:3,19,20,21 57:5
60:2,3 67:23
75:5,15 81:7
84:3,8,10,13,17 87:18
89:1,19
97:19 99:14
101:2
**Policing** 8:20
**policy** 53:9
79:5 95:23
100:10
**poor** 62:2
**portion** 51:25
**position** 74:8
**possibly**
29:13,19
75:24 76:9
83:5
**Post** 2:21
102:10
**practice** 14:3
50:21 81:1
**prepare** 62:16
**presence** 28:8
93:12 94:7
**present** 3:1
109:10
**presentation**
30:25 31:5
**presented**
23:24
**pretty** 14:24
24:1 42:10

46:15 49:11
61:12 68:24
78:21
**prevent** 75:23
**previous** 61:15
109:7
**prior** 19:25
21:12 27:10
54:7 62:8
69:20
71:15,18,22
73:23
80:9,13,19
82:9 83:18
96:2 106:9
**privilege**
31:23
**privy** 104:21
**proactive** 8:1
**probable**
11:12,14
22:17,19
23:8,25
24:19 27:16
**probably** 6:12
28:12 42:18
75:9
100:18,24
103:11
**probative**
16:16 17:12
**problem** 58:25
59:16,18
60:21 74:21
75:11 100:17
**problems**
46:5,25
90:19 95:13
**procedure** 96:9
**proceeding**
113:8
**process** 34:23
64:15 106:12

**product** 67:1
**professional**
6:1,20 102:8
**promoted** 7:11
8:5,12,17,23
9:1,14
**properly** 12:13
89:9
**prosecute**
36:21 37:16
38:16,24
39:9,20
40:25
41:3,6,17,23
**prosecutor**
12:22
14:18,25
21:23,25
22:4 28:4
**prostitution**
9:25 10:9,11
**protected**
34:22
**prove** 11:15
86:9
96:18,19
98:9
**P-S-Y** 67:16
**psychologists**
43:25 67:12
**PsyD** 46:14
67:14,15
**PTSD** 46:2,9,10
47:14
48:15,24
53:14,19
54:2
**public** 1:21
6:6,19 53:16
61:20
111:6,14
**Publix** 75:4
90:22,25

**pulled**
49:14,17
**pursuant** 1:22
24:9 35:4
91:7
**pursue** 27:4
**pushed** 40:14
**putting** 23:6
47:15

_____

Q

**question**
15:14,21,22
27:2,7,23
30:17 38:10
47:21
63:9,11
74:14 76:1,2
85:14
86:1,17 95:4
97:9 99:4
108:20
**questioned**
107:14
**questions**
34:15 99:19
102:16,18
103:13,22
104:8 108:22
109:12
**quite** 41:9
**quote**
84:3,16,17,20,23,24
95:10,11
96:4

_____

R

**race** 74:4,17
80:14,23
**racial** 74:10
84:22
**racially** 91:3
**racism**

75:11,14,20,
23 76:13

**racist** 84:4,10
90:21

**racketeering**
10:13
23:16,17
24:14
39:11,15
40:3 108:13

**radio** 84:5

**Raiders** 8:10

**rank** 6:25 7:3
8:5,12,17,23
9:1,15

**ranks** 84:12

**rather** 47:15
78:14

**RE** 113:6

**reached** 109:2

**readback** 15:24
27:25 76:4

**reading** 25:10
62:21,23
83:10,12
85:19 110:20

**ready** 82:4

**realize** 64:16

**really** 17:7
28:2,14
29:13,21
30:8 37:17
44:5 55:14
65:18,20
83:5 85:5
92:21 100:21
104:4

**reason** 22:24
33:7 95:5
114:7

**reasons** 22:17

**reassigned**

87:18

**re-assigning**
96:1

**recall** 21:24
22:22 23:3
28:13
29:1,11,13,1
4 30:10
39:10,25
40:2 44:18
48:4
54:14,25
55:2,3 63:19
64:8
70:18,23
71:1,24 73:2
74:19
75:3,10
76:15 78:21
80:25 81:25
83:5,25 84:1
85:20 86:3
88:20
91:5,12,23,2
5 92:1,18,21
93:13 94:9
95:15,21

**recalled** 72:22

**receive** 57:14

**received** 20:22
35:14 99:24
103:18

**recognize**
85:22

**recollection**
72:9

**recommendation**
46:4 53:16
54:4 77:9

**recommended**
43:6

**record** 11:9
42:22,23
61:7 62:14
63:7,8

71:11,12
99:21,22
112:9

**records** 72:10

**Recross-
Examination**
4:6 108:24

**Redirect** 4:5
104:9

**re-evaluated**
66:10

**refer** 23:4
67:24 68:11
100:1

**referred**
68:1,9
93:11,14,22

**referring** 43:1
74:23

**refresh** 71:5

**refreshed**
72:15

**refreshes**
72:16

**refreshing**
58:13

**refutes** 106:3

**regular** 110:12

**rehabilitated**
64:19 65:10
70:5,13 73:3
78:10 101:5
102:6

**reiterated**
91:9

**relates** 102:19

**relating**
103:13 104:4

**Relations**
78:23 79:7
81:10

**relationship**
89:14 95:18
98:17,21
99:13,14

**relative**
112:11,12

**relayed** 92:24
93:20

**released** 50:23

**relied** 29:21
43:25

**relief** 51:7
96:3

**relieve**
50:16,19
70:9,10 77:9

**relieved**
50:22,24
51:3,6
55:4,5 56:21
70:2,16
71:15 72:21
91:7

**relieving**
69:20 102:3
103:15

**remain** 57:15

**remaining** 85:2

**remember** 9:19
43:18 45:2
46:14 58:3
62:7,19 65:5
69:3,6 70:21
75:8 76:19
86:5
92:11,14,15,
23 102:21
103:1,4,16,2
0,25 108:5
109:9

**remembered**
49:14,17

**remind** 15:16

134

removed 61:5
  90:1
rental 5:13
repeat 86:1
rephrase 15:6
  92:14
report 18:21
  19:10 55:22
  56:9 74:3
  91:7 107:23
  112:6
reported 10:13
  90:15
Reporter 1:20
  4:8 25:15
  27:22,24
  63:10,11
  76:3
  109:14,17,19
  ,22
  110:1,8,11,1
  4,16
  111:5,13
  112:1,5,19
reporter's
  109:15
reports 24:15
  90:14
represent 5:8
representative
  34:14 42:8
  52:19 79:11
representative
  s 98:18,19
represented
  54:10
representing
  99:8
request 87:20
  91:11
reserved
  110:21 112:8

reside 5:12
resign 31:12
  32:8,11
  33:8,20
resignation
  30:24
  31:6,7,8,9
  33:17
resigned
  30:13,14
  31:9 32:14
resigning
  31:20 32:3
  33:3,4
Resources
  81:23 82:8
  83:17 96:3
respect 79:12
  103:15 104:4
respond 52:19
  85:17
responded
  81:19
responding 5:3
response
  64:23,25
  73:14
  82:10,24
  84:14 85:4
responses 49:1
result 109:2
results 97:3
retired 75:15
review 24:8
  26:24 61:5,6
  112:7
  113:9,12
reviewed 40:22
reviews 61:16
Richard 25:7
Rick 31:9

33:3,16 69:3
  91:5,8,17,23
RICO 10:12
  28:18
Rideau 75:16
  87:5 89:13
riding 25:21
Riviera 53:2
road 7:25 46:3
  53:22
Roble 29:4,9
Rodriguez
  83:17
role 18:12
  42:25
  43:19,20
  105:10
Roman 96:10
roughly 9:18
rounds 93:23
route 78:12
  100:20
routine 81:1
Ruiz 2:18
  4:4,6 5:20
  10:20,22
  11:11 12:3,8
  13:4 14:2,15
  15:10,13
  16:5,18
  17:15 18:8
  19:2 20:3
  23:2,12
  25:18
  26:3,12
  27:20,21
  28:25
  29:5,18
  30:7,16
  31:1,7,13,22
  32:5,18
  33:9,21,23
  34:9,13

35:13,19
  36:3,11
  37:21 38:5
  39:3 40:10
  42:6,12,15,1
  9,21 46:21
  49:23 50:6
  51:16
  52:2,15
  56:22
  57:21,23
  60:4 61:24
  63:4 65:15
  66:5,11,24
  67:5,20
  69:16,23
  70:24
  71:6,8,17
  72:13
  73:9,24 74:6
  75:22
  76:5,14
  77:10 78:1
  79:8,20 80:2
  81:4,15
  82:4,25
  83:21
  86:1,7,24
  88:17 91:15
  92:7,10,17
  93:16
  96:5,15,24
  97:1,6,14
  99:1,18
  100:4 101:13
  102:4,14
  104:14,20
  105:7,17,24
  106:17
  107:9,16
  108:16,20,25
  109:15,18,20
  ,24
  110:5,7,12,1
  3 113:3
run 99:14
running 49:4,5

_____
S
_____

**safety**
58:21,22
59:1

**Saint** 86:18

**Saturday** 90:23

**saw** 57:7,15

**schedule**
113:10

**scheduled**
48:16

**School** 6:3

**scope** 15:1

**SCOTT** 1:9

**Seal** 97:18,24
98:2,13

**search** 4:14
10:15,18
11:5,7,10,18
,20,21 12:15
13:1,6 14:1
15:4,7
18:6,7,24,25
19:21,22
20:1,4,13,17
,19,23,24
21:6,9,12,15
22:2 23:8,10
24:4,9,10,20
,21 25:17,25
27:1,3,6,9
28:10,24
29:16
35:5,12,15,1
6,21,25
36:1,10
37:1,7 40:14
41:24 104:12

**searching**
12:7,18

**second** 15:4
27:24
40:18,19

46:5 47:2,4
49:2,3,9,24
50:14 51:5
53:18 57:23
65:6
66:13,17
70:2,22 76:3
77:24 78:3,7
86:7 89:6
91:11

**section** 17:11
23:11 96:9
104:13 105:6

**seeing** 78:21

**seeking** 22:13

**seem** 89:1

**seems** 20:21,23
46:25

**seen** 17:25
31:9
56:8,10,12
58:7 60:5
78:20
82:6,13
108:17

**sees** 18:10
19:8

**seize** 13:2
14:13,17,20,
22 16:16
17:12

**seized** 15:7,8
24:9
26:11,22
35:4,24
106:6

**selected** 47:4

**self-
identifies**
84:16

**send** 43:14
45:19 47:22
48:9 50:1,7
51:12 53:11

54:15,18,21
61:4 62:24
63:3

**sending** 43:19
63:5

**sent** 21:10
44:9,15,20,2
4 45:1,11,17
46:20,22
47:10 48:3
49:22 52:13
54:25
55:2,10,20
61:2 63:17
72:9,22
73:8,23

**separate**
16:13,22
29:10

**separations**
34:24

**sergeant** 6:25
7:8,11,22
8:6,8,11
9:15,20,22
10:2,15
13:15
19:10,11
39:17 48:7,9
56:20 57:4,6
59:8,13 60:2
72:4,8 74:25
86:21,22,25
87:10 88:11
89:8 90:8
93:14
94:12,14,18
99:25

**sergeants** 9:23
67:24 84:11

**serious** 70:14
73:4 74:21
78:10

**served** 7:6
8:6,13,23

9:11 21:13
84:7,18

**Service** 7:5
8:14

**serving** 8:3

**settings** 43:23

**seven** 59:8

**several** 43:10

**sex** 98:15

**shared** 92:16

**sharing** 92:15

**SHEET** 114:1

**Shephard** 20:18
21:10

**Sheriff's** 7:4
54:16

**She's** 93:1

**shift** 74:22

**shooting**
45:12,14,25
48:19
49:2,3,7,10
50:11,14,17,
20,22 51:6

**shoots** 52:23

**shop** 47:25
90:25

**shopping** 91:4

**shortage**
94:21,22,25
95:1,7

**shot** 49:4 78:7

**showed** 53:9

**shown**
21:6,9,12
69:14

**signature**
113:18

**signed** 20:18
58:5 74:24

97:11,13
111:9

**significance**
85:10,17

**signing** 110:20

**signs** 14:18

**similarly**
84:14

**simply** 35:11
88:1

**Sincerely**
113:14

**sir** 6:15 11:8

**sitting** 38:6
79:9

**situation**
56:19 75:25
91:13,20
101:8 104:6

**situations**
103:23

**six** 59:7
97:18,24
98:2,13

**sixteen** 73:11

**sixth** 104:23

**slur** 84:22

**solely** 108:4

**soliciting**
60:2

**somebody** 39:23
46:16 55:20

**someone**
17:18,25
19:8 22:5
36:17 50:21
54:21 60:23
64:11 70:3
78:9 79:21
81:5 106:11

**sometime** 56:15

**somewhere** 6:13

**sorry** 17:10
27:18 32:1
56:25 65:24
82:3 83:10
105:12
107:21
109:18

**sort** 61:16
82:14 103:25

**sound** 35:20

**sounds** 24:1

**Southeast** 2:12
113:4

**SOUTHERN** 1:1

**Spatara**
90:12,15,16,
19,21,24
95:6

**speak** 21:21
41:18,19
62:15 79:11
99:2

**speaking** 28:3
52:21

**special** 8:21
10:6 99:13

**specific** 12:6

**specifically**
22:22 24:10
75:8 83:25
84:19 89:21

**specifics** 12:9
92:20

**spell** 109:20

**spelled** 11:23
79:4

**spelling** 45:8

**spent** 6:23 8:4
9:9

**squad** 10:12

39:11 58:14

**stamped** 21:1

**standard** 96:9

**starts** 94:17

**State** 1:21
12:21
21:7,19,21
22:14
23:4,11,14,2
4 24:14,15
25:19,24
26:4,21
27:2,12,13
28:9,15,17,1
9
29:7,10,16,2
2 30:2,5
36:15,20
37:3,15
38:13,20
39:5,7,12,14
,15,21
40:3,9,13,16
,21 41:19
42:5 53:5
80:17 108:14
111:2,6,14
112:2

**stated** 114:19

**statement**
49:13 101:7
105:9,13,15,
16,20,21,23

**statements**
107:11,13

**states** 1:1
84:2

**stating** 68:14
84:23

**station** 28:24
29:10 89:19

**steps** 23:20
26:21 103:17

**stole** 47:24

**stood** 28:14
55:14 58:9
77:14 106:21

**stories** 67:25
75:18 77:21

**story** 69:10
90:20

**Stranahan** 6:2

**street** 2:4
8:1,9
9:23,24,25
10:8,9
47:1,16,17,1
8 53:15,20
102:8,10

**strong** 34:6
41:16

**structure**
34:1,15

**structured**
46:9 53:21

**stuff** 14:17
16:16

**subject** 25:17

**submitted** 21:7
33:16

**subordinates**
98:10

**subordinate's**
98:15

**substantiated**
96:18

**successfully**
37:16
38:15,24
39:20
41:3,6,23

**sudden** 49:16
101:4

**suffered** 48:15

**suffering** 46:9
48:24

74:16,17

**suffers** 53:19

**sufficient**
12:12 77:8
85:1

**Suite** 2:4,12
113:4

**supermarket**
91:4

**supervise** 89:9
90:17

**supervisor**
17:17 18:22
60:6 90:13

**supervisors**
17:22 18:13
84:4

**supervisor's**
60:7

**support** 96:14

**Suppression**
8:9 9:23,24
10:8

**sure** 14:24
15:22
42:10,20
43:21 44:18
46:15 49:12
60:13,19
61:12
65:18,19
68:24 71:10
72:16 81:21
105:13

**surround** 98:3

**surveilling**
98:14

**suspect** 41:16
49:4 52:24

**suspending**
43:1
63:1,12,15

**suspension**
84:21

**sustained**
86:5,6 90:6
96:19,25
97:11

**sworn** 5:3 20:2
49:13 111:8

**Sylvia** 82:11

**system** 84:23
104:7

---

**T**

**tactics** 98:13

**taking** 1:22
19:5 58:5
102:2,25

**talk** 29:25

**talked** 77:6,16
83:9

**talking**
83:13,15
85:18 96:16

**Tamica** 60:15
84:10

**Task** 8:5
9:9,15

**Team** 8:9
9:23,24
97:18,24
98:2,13

**Teams** 10:8

**Tecum** 1:22

**Teleconference**
1:13

**telephone**
35:17
37:2,7,18
38:3,22 40:5
62:21 104:13
106:6,16
107:8,14

**ten** 7:12 9:18
59:14,17

**term** 95:21
97:20

**terminate**
32:13,17
33:11 106:11

**terminated**
30:18 32:25
51:10 54:8
62:8 107:8

**terminating**
48:6

**termination**
33:4 45:13
63:16 102:21

**testified** 5:4
52:9 72:14
102:23
103:19

**testify** 52:9

**testifying**
88:18

**testimony** 4:2
20:22 103:4
104:1

**text** 62:24
63:3,5

**Thank** 99:16
102:12
108:19
110:7,15

**Thanks** 110:16

**that's** 11:1
14:3,10
15:5,18
16:14
17:2,22
20:21 27:1
30:22,23
32:21
36:6,21
37:14,16,17,

24
41:2,7,8,10
43:11 48:23
53:23 55:24
57:12,19,20
59:5,6,8,12
60:8 61:2
63:6,25 64:2
68:6 73:4
75:17 76:1
78:12 90:16
99:3 101:6,7

**theft** 48:5

**therefore** 85:2

**there's** 19:14
71:3

**Thereupon** 5:1
15:24 21:3
27:25 76:4
110:18

**they're** 16:25
17:19 24:18
26:21 36:20
41:2 55:8
67:6 83:13
85:18

**third** 45:1
50:15

**thirty-six**
6:23

**timeline** 83:21
106:25

**today** 82:9

**total** 59:14

**totally** 47:5

**towards** 91:20

**track** 100:19

**transcript**
110:20 112:8
113:8 114:2

**treat** 47:13

**treated** 53:21

54:1

**treatment**
47:16

**tried** 101:25

**trigger**
49:15,17

**true** 100:3
101:12,14
112:9 114:20

**try** 102:16

**trying** 100:17
102:1 106:22

**Tuesday** 1:15

**turn** 13:23,24
14:5,8 16:9
18:6

**turned** 16:2
26:11 63:21

**twenty** 42:13
61:7

**two-and-a-half**
7:6

**type** 65:12

**types** 34:24
100:15

**typically**
69:19 79:18
103:23,24
104:5

———————
U
———————
**unarmed** 49:4
52:24

**unconsciously**
49:19

**understand**
12:22 15:15
35:10,20
68:14 85:17
86:17,18
93:6

**understanding**

34:17 39:1,2
40:22 71:25
79:17

**unfit**
44:11,13,17,
21 46:7,8
48:13,14,18
57:8 66:23
70:13 102:6

**unfounded**
96:10,17

**uniformed**
53:15

**union** 54:9,10
55:16 99:5

**unit** 8:1,3
9:13
10:9,10,11
13:18 23:17
28:19 40:3
108:13

**UNITED** 1:1

**units** 9:21
10:5 34:23

**University**
6:6,7

**unjustified**
51:9

**Unlike** 46:10
47:17

**unprofessional**
58:16,20

**unsubstantiate
d** 96:12,22

**unusual** 75:17

**update** 23:7

**upon** 107:7

———————
V
———————
**vacation** 72:1
73:12,19,23

**validity** 92:19

**version** 63:24

**via** 80:17
113:23

**Vice** 10:10,11

**victim** 76:13

**video** 76:25
77:4,7,20

**Vielma**
22:21,25
25:3

**violated** 53:9

**violation**
17:19,20,25
18:11,12,16,
20 19:9,17
38:14

**violations**
16:10,17
17:1,13 19:1
26:25

**violent**
94:14,15

**visit** 65:4

**vs** 1:7 113:6
114:4

———————
W
———————
**wait** 6:11 42:1
70:2 83:11
91:16

**waiting** 51:23
52:7

**waive** 113:18

**walked** 90:24

**warrant** 4:14
11:5,7,10,23
,25 12:15
14:1 15:7
18:7,25
19:21
20:1,5,14,17
,19,23,24

21:6,9,12,15
22:2 23:8,10
24:1,4,9,11,
20,21 25:17
27:1,3,6,9
28:24 29:16
35:5,12,15,1
7,21,25 36:1
40:15 41:24
104:12

**warrants**
10:16,18
13:1 19:22
28:11

**wasn't** 28:2
41:16 45:25
50:7 53:16
90:11 100:21
106:9

**ways** 33:24
57:18

**We'd** 14:12

**weight** 28:20
100:12
105:14,22

**we'll** 20:25
42:21
110:6,9

**we're** 19:16
41:7 48:6
51:23 78:12
91:4 97:16

**West** 1:8
2:20,22
5:14,17 7:7
13:20,22
17:9,10
22:23 43:16
44:7,8,21,23
46:23 50:11
60:15,17
68:3,4,13,17
,22 69:4,6,7
72:25
74:3,14,19

81:12 82:7
83:8,16
84:10
88:13,14,20
92:9,23
93:13 97:19
100:7 113:6
114:4

**we've** 19:19
34:10 42:12
59:16,18

**whatever** 28:21
29:21,25

**whether** 35:24
36:24 55:20
58:18 73:18
77:3
79:16,18
81:13 88:15
90:18
94:19,23
95:4 100:2
101:11,17
103:24

**white** 65:19

**whom** 21:21
39:2 55:10

**Whose** 78:22
105:15

**WILLIAM** 2:8

**wish** 12:1

**wishes** 34:8,20

**witness** 5:21
10:23 11:12
12:4,9 13:5
14:3,16
15:11,20,25
16:6,19
17:16 18:9
19:3 20:4,7
23:3,13
25:19
26:4,13 28:2
29:1,6,19
30:8,17

31:2,8,14
32:19
33:10,22
35:14,20
36:4,12
37:22 38:11
39:4
40:11,18
42:9 46:22
49:24 50:7
51:17
52:3,23
56:23 57:24
60:5 61:25
63:14,19
65:16,18
66:6,12,15,2
5 67:6,21
69:17,24
71:1,3,18,20
72:17,20,24
73:10,25
74:7 75:23
76:6,15
77:11
78:2,17
79:14,21
81:5,16 83:1
86:9,25
88:18,19
91:16
92:8,11,18
93:17,19
96:6,16,25
97:10 99:2
100:5 101:14
102:5
104:15,21
105:8,25
106:18
107:10,17
108:17,23
113:1

**witnesses** 52:8

**work** 43:23
59:15,17
60:24 61:6
65:12 67:1

69:9 87:6
95:18

**worked** 7:25
10:9,11
43:8,12 87:7
89:12 95:13

**working** 17:24
57:17 98:21
99:13 100:22

**works** 34:1
95:15

**worse** 57:24
58:1

**Wow** 57:24

**wramlong@theam
longfirm.com**
2:7 113:23

**WRITE** 114:2

**writing** 108:15

**written** 69:19
71:3,4,14

**wrong** 26:21

**wrote** 60:9

———————
Y
———————

**YEARGIN** 2:25

**Yep** 72:7
110:13

**yet** 50:7 75:3
86:3

**you've** 10:15
12:20 14:19
16:23 19:20
23:16,21
24:13 28:17
34:4,21
42:10 58:14
59:13,14,17
70:8,9 71:4
74:25 95:23

———————
Z
———————

**ZOLTY** 2:17

**zone** 24:2

**Zoom** 1:13